# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #112</u>

## BSC00042-43, 60-64

# BRILLIANT SKY COUNSELING, PLLC

## PROGRESS NOTES

CLIENT:   Matthew Parker

DATE:   10/28/2014 11:00 AM                              Duration:   60 minutes

STAFF MEMBER(S):   Loraine Kern, Licensed Professional Counselor

| | | | |
|---|---|---|---|
| Appearance: | WNL | Orientation: | WNL, x4: time, place, person, situation |
| Behavior: | WNL | Speech: | WNL |
| Affect: | WNL | Mood: | WNL, anxious: severe |
| Thought Process: | WNL | Thought Content: | WNL |
| Perception: | WNL | Judgement: | WNL |
| Insight: | WNL, emotional | Appetite: | WNL |
| Sleep: | WNL, impaired | Suicidality: | Not Present |
| Homicidality: | Not Present | | |

## Treatment Goals

| Goal | Date | Objectives | |
|---|---|---|---|
| Increase sense of confidence and competence in dealing with work responsibilities | 01/03/2015 | Explore the effect of the client's vocational stress on his intra and/or interpersonal dynamics with friends and family. | In Progress |
| | | Assist client in developing a plan to react positively to his vocational situation, process the proactive plan and assist in its implementation. | In Progress |

## Diagnostic Impressions:

Vocational Stress

## Focus of Session:

Client in for individual appointment. Client reported increased intensive emotional responses of fear helplessness and horror. Client reported intrusive thoughts images that recall the event. client reported disturbing dreams associated with traumatic event. Client reported physiological reactivity when exposed to internal or external cues that symbolize the event. Client reported avoidance of thoughts, feelings and conversations about the traumatic event. Client reported avoidance of activity, places and people associated with the traumatic event. Client reported a lack of interest and participation in significant activities. Client reported a sense of detachment from others. Client reported the inability to experience a full range of emotions including love. Client described a pessimistic, fatalistic attitude regarding the future. Client reported sleep disturbance. Client reported irritability, lack of concentration, hypervigilance, sad affect. Client reported a pattern of interpersonal conflict especially in intimate relationships.

## Therapeutic Intervention:

Utilized somatic experiencing to assist client in grounding self as he described traumatic events. Focused on building trust with client through consistent eye contact, active listening, unconditional positive regard and warm acceptance. Empathy and support were provided for client's expression of thoughts and feelings. Client was provided with support and feedback as he described his maladaptive pattern of anxiety. Client

was given referral to psychiatrist for ptsd evaluation.

**Planned Intervention:**

Will adjust treatment plan to ptsd diagnosis. Will utilize somatic experiencing to assist client in supporting initial exploration and acceptance of trauma.

Return Appointment:        10/29/2014 09:00 PM

Staff Signature: *Loraine Kern, LPC* Loraine  Kern, Licensed Professional Counselor Therapist
I approve this document
Signed: 10/30/2014 11:51 AM

Brilliant Sky Counseling, PLLC
Loraine Kern, MA, LPC
2929 North Power Road, Suite 101
Mesa Arizona 85215
602-753-6841

November 22, 2014

Matthew Parker
6457 East Snowden Street
Mesa Arizona 85215

Dear Mr. Parker,

This summary is addressed to you, therefore no release of information is
needed. It is then your prerogative to pass this letter along to whomever you
deem appropriate.

This letter is to confirm that I have been seeing you since August 5, 2014. At
the beginning of our sessions we focused on problems related to intimate
relationships and Occupational Stress (V62.2) related to your career as a law
enforcement agent for the Arizona Attorney General's Office. However, after a
more thorough assessment, it is my personal opinion that your diagnosis
currently meets criteria for Posttraumatic Stress Disorder (309.81) according to
the Diagnostic and Statistical Manual of Mental Disorders V.

You reported beginning your career at the Arizona Attorney General's on
January 21, 2014. The first day on the job, you described being assigned to an
investigation related to a human body parts donation company. You described
your first task was to assist in the search for criminal evidence at the
company's office.  Additionally, you stated you were assigned to provide
overnight security of the facility as the search warrant lasted around one week.

You described that frozen human remains were removed and sent to several
mortuaries around the valley. You later described that a decision was made at
the Arizona Attorney General's Office to re-take possession of the human
remains and they were to be stored at a secure facility in commercial freezers.
You stated you were assigned to transfer the human remains being delivered
by the mortuaries into three commercial freezers on the following dates:
2/13/2014; 2/15/2014; 2/18/2014; 2/19/2014; 2/20/2014; and 2/25/2014.

You described that the human remains were placed in body bags that were
leaking bodily fluids.  You described that there were approximately 140 body
bags containing over 2,200 human remains that were dissected in various

BSC000060

ways including partial limbs, heads, torsos, and full bodies missing various parts.

You stated that you had to move these body parts and stack them into the freezers while verifying the contents of each bag to maintain the chain of evidence. You mentioned that because the freezers were at a secure facility and due to scheduling of the mortuaries you were required to be at the facility for several hours at a time. You described having to be inside of the freezers and push the human remains on top of one another because the parts were very heavy. You mentioned that while moving these parts you could clearly make out human body parts, in particular a cut off female head that you could view through a see-through bag.

You described that you were required to do this after normal working hours or on weekends when the majority of the facilities personnel were not present. You described that prior to having to move the human remains, during your normal work hours you were required to call the families of the deceased and interview them. You stated you were required to make over fifty phone calls to family members and inform them of the investigation into the possible misconduct related to the body donation of their family member. You reported these phone calls were emotionally difficult, as many family members began telling the stories about the decedent.

You stated you were later notified that some of the body parts contained infectious diseases by the other investigator on the case and notified your immediate supervisor on 3/7/2014. You stated you were later required to submit a memo on 3/11/2014 detailing the exposure risk at the direction of your Chief of Police. You described being ordered to go for infectious disease testing and described feeling anxious during the testing period and while waiting for the results of the disease testing.

You said that you were assigned as the co-case agent on the case and have been working on the case since you started your employment with the Arizona Attorney General's Office. You stated that you have bi-weekly case status meetings where you must discuss the case. You described having to put together charts that contain victim information, videos of body part dissection, and, as well as conduct interviews with suspected perpetrators. You stated that the case is ongoing and are not sure when it will be completed.

BSC000061

In accordance with the DSM-5, you have met:

**Criterion A**: Experiencing repeated or extreme exposure to aversive details of traumatic events. (E.g. first responders collecting human remains)

**Criterion B:** Presence of one (or more) of the following intrusion symptoms associated with the aforementioned event(s), beginning after the event occurred:
1. Recurrent, involuntary and intrusive distressing memories of the traumatic event(s)
    a. Overall, you descried experiencing intrusive, distressing thoughts and images that recall the traumatic event and its associated intense emotional response.
    b. You reported being in the freezer is a constant factor
    c. You reported seeing commercials, movies or song about people getting older and families as causing emotional reactions.
2. Recurrent distressing dreams in which the content and affect of the dream are related to the traumatic events
    a. You described disturbing dreams experiences and they are associated with the traumatic events.
    b. Recurring dream of hanging out in freezer with boss, talking, as if everything is normal while you are surrounded by body parts.
    c. You describe increase in violent and disturbing dreams
    d. You reported you have discontinued watching regular television for fear that you may be exposed traumatic events similar to the case.
3. No flashbacks
4. Intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic events.
    a. You described experiencing intense distress when exposed to reminder of the traumatic events.
    b. You described the moral injuries you are facing with regards to this event.
    c. You reported feeling as if you were working with human beings and felt as if you were discarding them as "waste" and dehumanizing these people.
5. Intense and prolong physiological distress at exposure to internal and external cues that symbolize or resemble an aspect of the traumatic events
    a. You described experiences of physiological reactivity associated with fear and anger when you are exposed to the internal or external cues that symbolize the traumatic events.
    b. You reported that you have discontinued watching regular television for fear that you will be exposed to traumatic content.

Parker, Matthew pg. 3

BSC000062

    c. You described being behind a mortuary van and felt feelings of anxiety and being trapped because you could not get around vehicle.

**Criterion C**: Persistent avoidance of stimuli associated with the traumatic event(s) beginning after the traumatic events occurred as evidenced by one or both of the following:

1. You described trying to avoid thinking, feeling or talking about the traumatic events because of the associated negative emotional response.
2. You reported a pattern of avoidance of activity, places, or activities associated with the traumatic event because you are fearful of the negative emotions that may be triggered.
   a. You reported "creating scheduling conflicts" to avoid going to the meetings about this aforementioned case.
   b. You reported avoiding the other case agent who is assigned to the case. You stated you will return his calls only after he has left approximately multiple messages.
   c. You reported avoiding talking to "old people" due to reminders of the traumatic event

**Criterial D**: Negative alteration in cognitions and mood associated with the traumatic events. Beginning or worsening after the traumatic events occurred as evidenced by two or more of the following

1. You described persistent distorted cognitions about the cause or consequences of the traumatic events that lead the individual to blame himself and others.
   a. "I should have known better"
   b. "How could someone treat human beings like this"
   c. When calling family members, "I cannot show my emotions"
2. Persistent negative emotional state of anger, shame and guilt
   a. You reported feeling as if others "can do this" and are not affected by this case.
   b. You described being angry "at the job for exposing me" and anger directed inward "I should not have been exposed to this case" and anger at the "company who disrespected these human beings."
3. You described a lack of interest and a pattern of lack of participation in activities that had previously been enjoyable.
   a. You reported avoiding activities with friends because "I do not want to lie and say everything is OK."
4. You reported a sense of detachment from others.
5. You reported an inability to experience the full range of emotions, including love.

Parker, Matthew pg. 4

BSC000063

**Criterion E**: Marked alteration in arousal and reactivity associated with traumatic events beginning or worsening after the traumatic events occurred:

1. Irritable behavior and angry a outbursts with little or no provocation typically expressed as verbal aggression toward people and/or objects
   a. You reported having to do mundane "secretarial orientated tasks" and became extremely "irate, angry and explosively angry"
   b. You reported being more "confrontational" at work and will often "welcome it" to provide an opportunity to "blow up."
2. You reported after this event you have discontinued wearing your helmet while riding your motorcycle.
3. You described increase in hypervigilance and feeling as if you are on constant alert.
   a. You reported while in church, you are constantly scanning the environment looking for threats.
4. You described difficulty concentrating
   a. You describe difficulty paying attention in class and staying on task at work
5. You described sleep disturbance of waking up approximately 10 times a night. You reported difficulty falling asleep 3 out of 7 days a week, and early morning waking.

**Criterion F**: These symptoms have been going on for over one month.

**Criterion G**: These symptoms have created clinically significant distress and impairment in social, occupational and other important areas of functioning.

**Criterion H**: The disturbance is not attributable to the physiological effects of a substance or another medical contrition.

Since the event occurred, you describe the following symptoms: depressed mood, anxiety, suspiciousness, chronic sleep impairment, disturbances in motivation and mood, difficulty establishing and maintaining effective social and intimate relationships.

It is my professional opinion that you meet the criteria for Posttraumatic Stress Disorder, Chronic Type. If you have further questions, please feel free to contact me from the information above.

Respectfully,

*Loraine Kern, MA, LPC*

Loraine Kern, MA, LPC

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #113</u>

**Deposition of Tammie Jo Hatcher 5/16/2018**

# In The Matter Of:

*Parker vs.*
*State of Arizona*

---

*Tammie Jo Hatcher*
*May 16, 2018*

---

*Griffin & Associates Court Reporters, LLC*

*2398 E. Camelback Road*

*Suite 260*

*Phoenix, AZ 85016*

Original File TH051618NONCONF.TXT
Min-U-Script® with Word Index

1

1          UNITED STATES DISTRICT COURT

2              DISTRICT OF ARIZONA

3

4  Matthew V. Parker,          )Case # 2:17 CV-887-PHX-DLR
                                )
5           Plaintiff,          )
                                )
6              vs.              )
                                )
7  State of Arizona, and Mark   )
   Brnovich, Arizona Attorney   )
8  General, in his official     )
   capacity,                    )
                                )
9                               )
           Defendants.          )
10 _____)

11

12          DEPOSITION OF TAMMIE JO HATCHER

13

14                  Phoenix, Arizona
                     May 16, 2018
15                   12:00 p.m.

16

17

18

19

20  Reported by:
    JENNIFER HANSSEN, RPR
21  Certified Reporter No. 50165

22  PREPARED FOR:
    ASCII/CONDENSED
23

24  (Certified Copy)

25

2

1                         I N D E X

2    WITNESS                                    Page

3    TAMMIE JO HATCHER

4            Examination by Mr. Ludwig              4

5

6                   E X H I B I T S

7    Deposition
     Exhibits:         Description              Page

8

9                    (None marked.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          DEPOSITION OF TAMMIE JO HATCHER was taken

2    on May 16, 2018, commencing at 12:19 p.m., at Griffin &

3    Associates, 2398 East Camelback Road, Suite 260,

4    Phoenix, Arizona, before JENNIFER HANSSEN, RPR, a

5    Certified Reporter in the State of Arizona.

6

7    COUNSEL APPEARING:

8                    For the Plaintiff:
                     Ludwig Law Offices, Ltd.
9                    By:  AARON S. LUDWIG
                     4242 North 19th Avenue, Suite 150
10                   Phoenix, Arizona  85015

11                   For the Defendants:
                     Littler Mendelson, P.C.
12                   By:  LINDSAY MICHELLE SCHAFER
                     Camelback Esplanade
13                   2425 East Camelback Road, Suite 900
                     Phoenix, Arizona  85016

14

15   ALSO PRESENT:

16                   Roger McKee
                     Matthew Parker
17                   John Fry

18

19

20

21

22

23

24

25

77

1     A.     Correct.

2     Q.     So who does decide what the accommodation will

3   be?

4               MS. SCHAFER:   Form, foundation.

5     A.     A combination of the Human Resources

6   representative, the director of Operations, our legal

7   counsel and input from the supervisor section.

8     Q.     BY MR. LUDWIG:   Are there any guiding

9   documents used by those parties to determine what

10  accommodation will be given?

11    A.     Every situation is different.

12    Q.     So some situations require consulting some

13  documents and other situations consulting other

14  documents?

15    A.     No, the consideration is based upon what the

16  doctor is recommending and what is reasonable and

17  effective for the position.

18    Q.     Are you aware of how long Mr. Parker had to

19  continue working after he reported his injury on

20  October 27th, 28th, 2014?

21               MS. SCHAFER:   Form, foundation.

22    A.     No.

23    Q.     BY MR. LUDWIG:   Let's go to Exhibit 4.   This

24  is Bates stamped SOA 8 73 through SOA 882.   If you

25  could just peruse this document and tell me if you're

1  familiar with it?

2      A.    In general, I'm familiar with it.

3      Q.    What is it?

4      A.    It's the Department of Administration's policy

5  and procedure for leave under the Family Medical Leave

6  Act.

7      Q.    Is this the document that the AG's Office uses

8  to determine when an employee is eligible for FMLA?

9      A.    We use the federal guidelines to determine

10  when an employee is eligible for FMLA.

11      Q.    What is this document used for?

12      A.    This document, as noted, is derived from the

13  regulations as well as the personnel rules defining

14  FMLA at the State.

15      Q.    Does this document guide what you can and

16  cannot do when an employee is on FMLA?

17              MS. SCHAFER:  Form, foundation.

18      A.    The doctor certification guides when an

19  employee is on FMLA.

20      Q.    BY MR. LUDWIG:  What about what an employer

21  can and cannot do when an employee is on FMLA, what

22  guides that?  What gives the employer guidance of what

23  the employer can and cannot do when an employee is on

24  FMLA?

25              MS. SCHAFER:  Form, foundation.

79

1       A.    I think you'd need to be more specific in what

2   you're asking me in terms of can and cannot do.

3       Q.    BY MR. LUDWIG:  Does this policy or the FMLA

4   law which you said governs the AGO's policies about

5   FMLA, do those state anywhere that employees on FMLA

6   shall have their building and email access suspended?

7               MS. SCHAFER:  Form, foundation.

8       A.    In this document?

9       Q.    BY MR. LUDWIG:  Let's start with this

10  document, yes.  Does this document contain that policy?

11      A.    I'm not aware of it.

12      Q.    And you said this document is not the only

13  document that guides the AGO in determining FMLA

14  eligibility, the federal law governs that as well.

15  Does the federal law State that employees on FMLA

16  shall have their building and email access suspended?

17              MS. SCHAFER:  Form, foundation.

18      A.    Not that I'm aware of.

19      Q.    BY MR. LUDWIG:  Do you know if that policy of

20  suspending building and email access is written

21  anywhere in any document of the AGO?

22              MS. SCHAFER:  Form, foundation.

23      A.    Not that I'm aware of.

24              MS. SCHAFER:  Let's take a break.

25              (Recessed from 3:11 p.m. until 3:16 p.m.)

Tammie Jo Hatcher - May 16, 2018

80

1    Q.    BY MR. LUDWIG:  Is it the policy of the AGO to

2   suspend an employee's building access when he's on

3   medical leave?

4              MS. SCHAFER:  Form, foundation.

5    A.    When an employee is on medical leave, the

6   doctor is indicating they need to be on leave, not

7   working.

8    Q.    BY MR. LUDWIG:  So is it the policy of the AGO

9   to suspend an employee's building access when he's on

10  medical leave?

11   A.    That would be on a case-by-case basis.

12   Q.    So yes or no?

13              MS. SCHAFER:  Form, foundation.  She just

14  said it's not a yes or no answer.

15   Q.    BY MR. LUDWIG:  Is it the policy of the AGO to

16  suspend an employee's building access when he's on

17  medical leave?

18              MS. SCHAFER:  Form, foundation.

19   A.    It would be a case-by-case basis.

20   Q.    BY MR. LUDWIG:  Is it the policy of the AGO to

21  suspend an employee's email access while he's on

22  medical leave?

23   A.    Again, on a case-by-case basis.

24   Q.    Is it the official policy of the AGO to, on a

25  case-by-case basis, suspend an employee's building

81

1    access when he's on medical leave?

2                  MS. SCHAFER:  Form, foundation.

3        A.    Can you repeat that?

4        Q.    BY MR. LUDWIG:  Is it the official policy of

5    the AGO, on a case-by-case basis, to suspend an

6    employee's building access while he's on medical leave?

7                  MS. SCHAFER:  Form.

8        A.    I'm not sure I followed that question.

9        Q.    BY MR. LUDWIG:  Is it the official policy of

10   the AGO to suspend an employee's building access while

11   he's on medical leave?

12                 MS. SCHAFER:  Form, foundation.

13       A.    An employee's placed on medical leave based on

14   the doctor certification.  Any suspension of what

15   you're referring to would be considered on a

16   case-by-case basis.

17       Q.    BY MR. LUDWIG:  So that's why I followed up

18   and I said is it the official policy of the AGO to

19   determine on a case-by-case basis whether to suspend an

20   employee's building access when he's on medical leave.

21                 MS. SCHAFER:  Form, foundation.

22       A.    I don't know.

23       Q.    BY MR. LUDWIG:  Is there a policy written

24   anywhere within AGO's policies and procedures directing

25   someone, HR, management, someone, directing anyone to

82

1    determine on a case-by-case basis whether to suspend an

2    employee's building access when he's on medical leave?

3              MS. SCHAFER:   Form, foundation.

4        A.    I don't know.

5        Q.    BY MR. LUDWIG:   Are you aware of the AGO's

6    policies and procedures regarding building access?

7              MS. SCHAFER:   Form, foundation.

8        A.    No.

9        Q.    BY MR. LUDWIG:   Are you aware of the AGO's

10   policies and procedures regarding medical leave?

11       A.    Yes.

12       Q.    Within those policies and procedures that

13   you're aware of, is it written anywhere that a person

14   on medical leave, an employee on medical leave, shall

15   have his building access removed or suspended?

16             MS. SCHAFER:   Form, foundation.

17       A.    An employee on medical leave is not working so

18   there's not a business need.

19       Q.    BY MR. LUDWIG:   Is it written somewhere within

20   those policies that because there's no business need, a

21   person who's on medical leave shall have his building

22   access suspended?

23             MS. SCHAFER:   Form, foundation.

24       A.    Again, when an employee's on medical leave,

25   they've been deemed not able to work by their doctor.

83

```
 1      Q.    BY MR. LUDWIG:  Does the written policy of the
 2   AGO state that because a person who's on medical leave
 3   is not supposed to be at work, his building access
 4   shall be suspended while he's on medical leave?
 5      A.    Not that I'm aware of.
 6      Q.    Is it written somewhere in the AGO's policies
 7   regarding medical leave that when an employee is on
 8   medical leave, his email access shall be suspended?
 9            MS. SCHAFER:  Form, foundation.
10      A.    Again, the employee has been deemed unable to
11   work so there's not a business need for that employee.
12      Q.    BY MR. LUDWIG:  For that employee to?
13      A.    To have access.
14      Q.    To his email?
15      A.    Correct.
16      Q.    And, again, is that written in the medical
17   leave policies of the AGO that because there's no
18   business need, employees on medical leave shall have
19   his access to email suspended?
20            MS. SCHAFER:  Form, foundation.
21      A.    Not that I'm aware of.
22      Q.    BY MR. LUDWIG:  What are the criteria used on
23   the case-by-case basis that you talked about?
24            MS. SCHAFER:  Foundation.
25      A.    I don't know.
```

Tammie Jo Hatcher - May 16, 2018

84

1   Q.   BY MR. LUDWIG:  Who would know?

2   A.   The director of Human Resources.

3   Q.   What makes you say that the policy or that

4   it's addressed on a case-by-case basis, what makes you

5   say that?

6   A.   I believe it would be based upon the

7   situation, which I wouldn't know the details to.

8   Q.   Why wouldn't you know the details?  We're

9   talking about medical leave, right, and that's

10  something that's within your area of responsibility;

11  correct?

12  A.   Yes.

13  Q.   Okay.  So tell me why you wouldn't know the

14  details of the case-by-case basis criteria.

15  A.   Because it's not a decision that I make.

16  Q.   Again, that would be the director of

17  Operations who makes that decision?

18       MS. SCHAFER:  Form.

19  A.   Along with our legal counsel.

20  Q.   BY MR. LUDWIG:  Have you ever been out on FMLA

21  or medical leave?

22  A.   Yes.

23  Q.   Was your building access suspended?

24       MS. SCHAFER:  Form, foundation.

25  A.   I don't know.

85

1    Q.    BY MR. LUDWIG:  Did you try to access the

2  building while you were on leave?

3    A.    No.

4    Q.    Was your email access suspended?

5    A.    I don't know.

6    Q.    Did you ever try to access your email while

7  you were on leave?

8    A.    I don't recall.

9    Q.    How long were you on medical leave?

10   A.    Approximately two weeks.

11   Q.    Are you aware of any instance of an injured

12 employee going out on medical leave having his building

13 and email access immediately suspended?

14           MS. SCHAFER:  Form, foundation.

15   A.    I'm not aware.

16   Q.    BY MR. LUDWIG:  Are you aware of any instance

17 of an injured employee going out on medical leave and

18 having his building and email access later suspended?

19           MS. SCHAFER:  Form, foundation.

20   A.    I'm not aware.

21   Q.    BY MR. LUDWIG:  Are you familiar with the

22 issue of Mr. Parker's building access being suspended?

23   A.    Yes.

24   Q.    How are you aware of that?

25   A.    Mr. Parker contacted me.

Tammie Jo Hatcher - May 16, 2018

88

1    Q.    BY MR. LUDWIG:  Did you ever become aware of

2    that?

3              MS. SCHAFER:  Form, foundation.

4    A.    When Mr. Parker contacted me.

5    Q.    BY MR. LUDWIG:  Did you or anyone else at the

6    AG's Office, but more specifically within HR, ever

7    inform Mr. Parker that his building access and email

8    access had been suspended?

9    A.    I'm not aware.

10   Q.    Have you ever had a situation where an AGO

11   employee such as a special agent or a supervisor

12   instructed you to do something contrary to your human

13   resources training?

14             MS. SCHAFER:  Form.

15   A.    No.

16   Q.    BY MR. LUDWIG:  Have you ever been instructed

17   by a supervisor to do something contrary or

18   questionable with respect to your HR training?

19             MS. SCHAFER:  Form.

20   A.    No.

21   Q.    BY MR. LUDWIG:  Let's take a look at

22   Exhibit 5, Bates SOA 884.  Are you familiar with this

23   document?

24   A.    Appears to be my handwriting.

25   Q.    What is it?

89

1     A.     It looks like chronological listing of things

2   that occurred for the particular file.

3     Q.     Is it regarding Mr. Parker's file?

4     A.     Appears to be.

5     Q.     Could you read the third line down beginning

6   with it looks like the word "firearm"?

7     A.     Yes.

8     Q.     Could you read those three lines, please?

9     A.     "Firearm turned in to supervisor Charles

10  Loftus.  Badge access turned off at 5:00 p.m. 12-12-14

11  per D. Jackson on recommendation of SIS management."

12    Q.     Did SIS management direct Debbie Jackson, and

13  you said she was the director of HR, to suspend

14  Mr. Parker's badge access?

15              MS. SCHAFER:  Foundation.

16    Q.     BY MR. LUDWIG:  Access to the building?

17    A.     I don't know.

18    Q.     What did that mean what you wrote there, what

19  does that mean?

20    A.     That the badge access was turned off.

21    Q.     How do you know it was turned off?

22    A.     That's what I was informed.

23    Q.     And what is the part where it says "on

24  recommendation of SIS management," what does that mean?

25    A.     That means that's what I was informed.

91

1    A.    I try to.

2    Q.    What kinds of things do you note?  What kinds

3  of tasks do you note and what kinds do you not bother

4  to note?

5    A.    The tasks are similar to what's indicated here

6  when I'm communicating with the employee or sending

7  emails.

8    Q.    Have you made a document, a notation of tasks

9  like this, with other special agents who have gone on

10  medical leave?

11    A.    Possibly.

12    Q.    Do you recall as we sit here now whether in

13  any of those other special agent files you've noted

14  firearms being turned in, badge access being turned

15  off?

16    A.    Not that I can recall.

17    Q.    Do you know who the SIS managers were during

18  December of 2014?

19    A.    I know who the section chief was and who

20  Mr. Parker's supervisor was.

21    Q.    Who were they?

22    A.    The section chief was Andy Rubalcava and

23  Mr. Parker's supervisor was Charles Loftus.

24    Q.    Do you know why SIS management directed HR to

25  suspend Mr. Parker's badge access?

122

1    Q.    BY MR. LUDWIG:  Did anyone in HR talk about

2   the BRC case?

3              MS. SCHAFER:  Foundation.

4    A.    No.

5    Q.    BY MR. LUDWIG:  What about mental health

6   claims in general, do you have any training about that?

7    A.    I have attended a training on crisis.

8    Q.    Tell me about that.

9    A.    Just a crisis training when somebody is in

10   need.

11   Q.    What did you get trained on, what was the

12   training?

13   A.    How to help somebody who's in a crisis.

14   Q.    How do you help somebody in a crisis?

15   A.    It depends on what's going on.

16   Q.    Tell me about certain circumstances of people

17   in crisis and how you deal with it.

18              MS. SCHAFER:  Form.

19   A.    If they're asking me for assistance, I help

20   them based on the resources that I have.

21   Q.    BY MR. LUDWIG:  Tell me more.

22              MS. SCHAFER:  Form.

23   A.    I'm not sure what you're trying to get at.

24   Q.    BY MR. LUDWIG:  The people that are -- the AGO

25   employees that are making claims like Mr. Parker made a

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #114</u>

**Deposition of Leslie Welch 5/14/2018**

# In The Matter Of:

*Parker vs.*
*State of Arizona*

---

*Leslie Welch*
*May 14, 2018*

---

*Griffin & Associates Court Reporters, LLC*

*2398 E. Camelback Road*

*Suite 260*

*Phoenix, AZ 85016*

Original File LW051418NONCONF.TXT

**Min-U-Script® with Word Index**

1

1                UNITED STATES DISTRICT COURT

2                   DISTRICT OF ARIZONA

3

4   Matthew V. Parker,          )Case # 2:17 CV-887-PHX-DLR
                                 )
5            Plaintiff,          )
                                 )
6                vs.             )
                                 )
7   State of Arizona, and Mark   )
    Brnovich, Arizona Attorney   )
8   General, in his official     )
    capacity,                    )
9                                )
             Defendants.         )
10  _____)

11

12              DEPOSITION OF LESLIE WELCH

13

14                   Phoenix, Arizona
                      May 14, 2018
15                    12:00 p.m.

16

17

18

19

20   Reported by:
     JENNIFER HANSSEN, RPR
21   Certified Reporter No. 50165

22   PREPARED FOR:
     ASCII/CONDENSED
23

24   (Certified Copy)

25

2

1                          I N D E X

2   WITNESS                                        Page

3   LESLIE WELCH

4           Examination by Mr. Ludwig                4

5

6                      E X H I B I T S

7   Deposition
    Exhibits:          Description               Page

8                      (None marked.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1               DEPOSITION OF LESLIE WELCH was taken on

2     May 14, 2018, commencing at 12:19 p.m., at Griffin &

3     Associates, 2398 East Camelback Road, Suite 260,

4     Phoenix, Arizona, before JENNIFER HANSSEN, RPR, a

5     Certified Reporter in the State of Arizona.

6

7     COUNSEL APPEARING:

8                   For the Plaintiff:
                    Ludwig Law Offices, Ltd.
9                   By:  AARON S. LUDWIG
                    4242 North 19th Avenue, Suite 150
10                  Phoenix, Arizona  85015

11                  For the Defendants:
                    Littler Mendelson, P.C.
12                  By:  LINDSAY MICHELLE SCHAFER
                    Camelback Esplanade
13                  2425 East Camelback Road, Suite 900
                    Phoenix, Arizona  85016

14    ALSO PRESENT:

15
                    Roger McKee
16                  Matthew Parker
                    John Fry
17

18

19

20

21

22

23

24

25

67

1    you familiar with this document?

2        A.    I've not -- I don't believe I've seen this

3    document.

4        Q.    Are you familiar with workers' compensation

5    injury report forms?  Is that what this is?

6        A.    That's what it says it is.  I'm not familiar

7    with the form, I've never completed one.

8        Q.    Are you familiar with disability

9    accommodations?

10       A.    I'm familiar.

11       Q.    How are you familiar with that?

12       A.    I am the AGO's ADA coordinator.

13       Q.    And what is that?

14       A.    That's the main point of contact for employees

15   or members of the public to contact for accommodation

16   requests.

17       Q.    Do you know of any examples of AGO employees

18   requesting accommodations for their disabilities?

19       A.    Can you repeat the question?

20       Q.    Are you aware of any instances of AGO

21   employees requesting accommodations for their

22   disabilities?

23       A.    Yes.

24              MR. LUDWIG:  I'm going to ask for the

25   names and circumstances.

74

```
 1    not to answer, but you can ask any other questions
 2    about that accommodation.
 3        Q.   BY MR. LUDWIG:  What -- tell me more about the
 4    details of that.  What was the reason for the request
 5    for the change?
 6              MS. SCHAFER:  Foundation.
 7        A.   I don't remember what -- I don't remember what
 8    that particular office change was related to.  I don't
 9    remember -- I don't remember that one.
10        Q.   BY MR. LUDWIG:  Who determines what a
11    reasonable accommodation is?
12              MS. SCHAFER:  Form, foundation.
13        A.   We work with our Employment Law section
14    attorney to review an accommodation request.  And every
15    accommodation request is unique and it's something that
16    we work through, like I said, through with our legal
17    counsel.
18        Q.   BY MR. LUDWIG:  Are there any documents that
19    the AG's Office uses to determine what is reasonable
20    with respect to reasonable accommodation?
21        A.   A document that we use to determine whether
22    it's reasonable?
23        Q.   Anything that gives you any guidance, any
24    document that gives you any guidance as to what is
25    reasonable.
```

Leslie Welch - May 14, 2018

75

1      A.     We have no document at the AG's Office.  We

2   have resources.

3      Q.     What are those resources?

4      A.     We refer to I believe it's -- I believe it's

5   related to -- it's the job accommodations network.  I

6   believe it's related to a federal agency, I believe

7   it's the -- it may be -- Department of Labor I believe

8   actually.

9      Q.     So you've consulted this guide, these

10   resources?

11      A.     It's a resource.

12      Q.     You've consulted it?

13      A.     We have in specific circumstances where, you

14   know, we needed to, yes.

15      Q.     Are you aware of how long the plaintiff had to

16   continue to work after reporting his injury on

17   October 27th, 2014?

18              MS. SCHAFER:  Form, foundation.

19      A.     No.

20      Q.    BY MR. LUDWIG:  In your professional

21   experience working in Human Resources and knowing that

22   all special agents have a minimum competency to even be

23   hired, is transferring a special agent from one case to

24   another reasonable?

25              MS. SCHAFER:  Form, foundation.

84

1            MS. SCHAFER:  Form, foundation.

2      A.    I'm sorry, can you help me understand the

3  question?

4      Q.    BY MR. LUDWIG:  This document having been

5  provided by the defendants as the policy and procedure

6  that is applicable to the time period that Mr. Parker

7  was employed at the AG's Office, is this document used

8  by the AGO to determine when an employee is eligible

9  for FMLA?

10            MS. SCHAFER:  Form, foundation.  You

11  don't have to assume what he's saying about why we

12  produced it, all you need to know is that we produced

13  it to them.

14      A.    When you say document, are we talking about --

15            MR. LUDWIG:  This document.

16      A.    -- this version of the document?

17            MR. LUDWIG:  Yes.

18      A.    Without knowing what is in this document,

19  based on the dates, I can't say whether or not this is

20  the document I've referred to.  I can't speak to what

21  was the active policy.

22      Q.    BY MR. LUDWIG:  Do you know if there's a newer

23  version of this policy?

24      A.    I don't know.

25      Q.    Do you have any reason to believe that this

85

1  policy has been superseded?

2      A.    It's entirely possible.  I don't own the

3  document so I don't know, but it's entirely possible.

4      Q.    Whether this version or a superseding version,

5  is this a document that the AG's Office uses to

6  determine when an employee is eligible for FMLA?

7      A.    When you say document, do you mean

8  specifically this version?

9      Q.    This version or a superseding version, is this

10 policy a policy that the AG's Office uses to determine

11 when an employee is eligible for FMLA?

12     A.    I can say that we do refer to ADOA's FMLA

13 policy.

14     Q.    Is this an ADOA FMLA policy?

15     A.    It is ADOA's FMLA policy, it appears by title.

16     Q.    Does this policy state that an employee on

17 FMLA leave shall have his building and email access

18 suspended?

19             MS. SCHAFER:  Form, foundation.

20     A.    Do you want me to read this policy to see if

21 that's covered?

22     Q.    BY MR. LUDWIG:  No.  Do you know if this

23 policy states that?

24     A.    If you're asking me if I know something, I

25 can't answer that, I don't -- I don't know if that's

86

1  covered.

2       Q.    Do you know the AGO's FMLA policy?

3       A.    I know that we refer to ADOA's FMLA policy as

4  well as the federal guidelines regarding FMLA.

5       Q.    So do I understand that you're saying that the

6  AG's policy is made up of the ADOA policy and the

7  federal guidelines?

8       A.    I would say we make reference to both.

9       Q.    Are you familiar with both?

10      A.    What do you mean by "familiar"?

11      Q.    Let me ask it again.  Do you know the AG's

12  FMLA policy?

13      A.    Our policy would be to follow ADOA's FMLA

14  policy along with the federal guidelines and

15  regulations regarding FMLA.

16      Q.    Is it the official policy of the AGO to

17  suspend an employee's building access and/or his email

18  access when he's on medical leave?

19               MS. SCHAFER:  Form, foundation.  Are you

20  asking about present day?

21               MR. LUDWIG:  Let's start with just do you

22  know if it's the policy and I'll ask if it was the

23  policy in 2015.

24               MS. SCHAFER:  So you're asking about

25  present day?

**87**

```
 1                MR. LUDWIG:  Yes, present day for now.

 2      Q.    BY MR. LUDWIG:  Is it the policy of the AG's

 3  Office to suspend an employee's building and email

 4  access while he's on medical leave?

 5                MS. SCHAFER:  Form, foundation.

 6      A.    It is permissible to do those things.  It is

 7  something that we provide in an AGO guideline regarding

 8  FMLA.

 9      Q.    BY MR. LUDWIG:  What is a guideline?  I don't

10  know what that means.

11      A.    It is a written document that we provide to

12  all employees on our SharePoint system.

13      Q.    How about in 2015?

14                MS. SCHAFER:  Form, foundation.

15      A.    I don't recall if the document was available.

16  I assume that it was, but I don't know.

17      Q.    BY MR. LUDWIG:  So this guideline resides on a

18  SharePoint you said; correct?

19      A.    Uh-huh.

20      Q.    SharePoint is an intranet; is that correct?

21      A.    Yes.

22      Q.    So it's an in-house database of documents; is

23  that correct?

24      A.    Yes.

25      Q.    Is it pushed to all employees or is it just
```

88

```
 1    available for employees to go get it if they pull it
 2    and when they need it if they want it?
 3                    MS. SCHAFER:  Form.
 4        A.    I don't know what you mean by that.
 5        Q.    BY MR. LUDWIG:  Is this document distributed
 6    and handed to each employee, this guideline?
 7        A.    I don't know if it's handed.  I know that it's
 8    available on our internet -- or intranet.
 9        Q.    Do you know the date of the guideline?
10        A.    No.
11        Q.    What is the guideline called?
12        A.    I believe it's called Employee's -- it's
13    something regarding an employee's guidelines to FMLA.
14        Q.    Who drafted it?
15                    MS. SCHAFER:  Foundation.
16        A.    I don't -- I don't know.
17        Q.    BY MR. LUDWIG:  Did you draft it?
18        A.    No.
19        Q.    Did it exist before you took office, before
20    you worked at the AG's Office?
21        A.    I assume that it did.
22        Q.    But you don't know?
23        A.    I don't know, I assume.
24        Q.    And what does it say specifically about
25    building access and email access?
```

89

1    A.    I don't know the words verbatim, but it

2    addresses not working and not attending meetings at the

3    office.   I'd have to read the document.

4    Q.    Are you aware of any instances when an injured

5    employee going on leave has had their building and/or

6    email access suspended?

7    A.    What do you mean by "injured"?

8    Q.    Medical leave, somebody who's going on medical

9    leave.

10    A.    So the question is if somebody is going on

11    medical leave, has a supervisor requested that access

12    of any kind is turned off?

13    Q.    Yes.   Yes.   Are you aware of any of those

14    instances?

15    A.    Yes.

16    Q.    Are you aware of instances where the

17    supervisor hasn't requested it to be turned off but you

18    know they're on medical leave?

19    A.    I'm not sure I follow the question.

20    Q.    So you rephrased my question and you said "do

21    I know of any instance where an employee went on

22    medical leave and his supervisor requested that his

23    access be turned off."

24    A.    Uh-huh.

25    Q.    And I said, yeah, that's a good question, and

Leslie Welch - May 14, 2018

90

1    you said, "yes, I know of instances like that."  So I'm

2    wondering is there an instance where an employee is

3    going on medical leave but you do not receive a request

4    from a supervisor shutting off access?

5        A.    Yes.

6        Q.    Do you know any names of those people?

7             MS. SCHAFER:  So are you asking about

8    people on medical leave, are you asking about the

9    supervisor's names or --

10             MR. LUDWIG:  No, the people going on

11    medical leave.

12             MS. SCHAFER:  So you want to know if she

13    knows the names of people on medical leave for whom the

14    supervisor did not request to turn off building or

15    computer access?

16             MR. LUDWIG:  Yes.

17             Do you understand the question.

18        A.    No, I'm sorry.

19        Q.    BY MR. LUDWIG:  I would like to know the names

20    of AGO employees who went on medical leave but whose

21    supervisors did not request their access be turned off.

22             MS. SCHAFER:  Let's just ask you, do you

23    know, yes or no, any names?  Because I don't want to

24    fight over it if she doesn't know the names.

25        A.    Yes.

91

1              MS. SCHAFER:  Okay.  So we'll let her

2    answer as to names that she remembers with the

3    provision that this is designated as confidential.

4              MR. LUDWIG:  Understood.

5              (Confidential testimony begins.)

6

7

8

9

10

11

12

13

14

15

16

17

18    Q.    BY MR. LUDWIG:  Does anyone else know -- could

19    answer this question who'd have a list of people on

20    leave and whose supervisors have not requested access

21    be shut off?

22              MS. SCHAFER:  Foundation.

23    A.    I cannot say with certainty that someone would

24    know that a person's on medical leave and has had their

25    access turned off.  There could be cases I don't know

91

```
 1
 2
 3
 4
 5
 6    A.      M REDACTED ,  REDACTED  leave.
 7              MR. FRY:  She doesn't need to say the
 8  reason.
 9              MS. SCHAFER:  Don't give the reason.
10    A.    I'm sorry.
11              MS. SCHAFER:  It's okay.
12    A.    Don't give the name?
13              MS. SCHAFER:  Give the name, but not the
14  reason for the leave.
15    A.    R  REDACTED  P  REDACTED   Suddenly I can't
16  think of anybody going on leave.  I can't think of
17  people on leave.
18
19
20
21
22
23
24
25
```

1  about or situations I don't know about where a

2  supervisor has made the request with the ISS group and

3  for whatever reason I'm unaware, they may not be aware

4  of medical leave.  I can't say with certainty that

5  there's one place to validate both medical leave and

6  access.

7     Q.   BY MR. LUDWIG:  Do you maintain a list or a

8  database of badge access, meaning physical access to

9  the building?  That's what I mean by badge access, to

10 gain access to the building.

11              MS. SCHAFER:  Form.

12    A.   Do we at the AG's Office maintain that or

13 manage that?

14              MR. LUDWIG:  Yes.

15    A.   We do now at the new building.  We're

16 independent from the ADOA building system.  Our

17 building that's currently at -- is the Cap Center

18 currently at the capitol mall area, that system is an

19 ADOA system that's managed by them.

20    Q.   BY MR. LUDWIG:  Is it the official policy of

21 the AG's Office to suspend an employee's building

22 access or his work email access while on leave?

23              MS. SCHAFER:  Form.

24    A.   I'm not sure I understand what you mean by

25 "official policy."

93

```
 1      Q.    BY MR. LUDWIG:  Well, what is the policy

 2   regarding shutting off access?

 3      A.    Supervisor can make that request.

 4      Q.    So is it the official policy -- is it written

 5   somewhere in a policy that supervisors may or -- how do

 6   I phrase this question.

 7            You said it's essentially up to the

 8   supervisor to decide whether to cut off access;

 9   correct?

10            MS. SCHAFER:  Form, foundation.

11      A.    Can you repeat the question?

12      Q.    BY MR. LUDWIG:  I said -- you testified that

13   it's essentially up to the supervisor whether to

14   request -- to cut off access; correct?

15            MS. SCHAFER:  Form, foundation.

16      A.    It's within a supervisor's authority to

17   request access.

18      Q.    BY MR. LUDWIG:  So is it the official policy

19   of the AG's Office that a supervisor shall say whether

20   or not an employee going on medical leave shall have

21   his or her access turned off or kept on?

22            MS. SCHAFER:  Form.

23      A.    I didn't follow the way you asked that.

24      Q.    BY MR. LUDWIG:  Let me just say it one more

25   time.
```

 1      A.     I'm sorry.

 2      Q.     What is the official policy of the AG's Office

 3   regarding access to building and email when people go

 4   on medical leave?

 5      A.     Official policy I can't speak to.  If you're

 6   asking if a supervisor has the authority to both give

 7   and take away access, that exists whether there's

 8   medical leave or no medical leave.

 9      Q.     Where does it say that the supervisor has that

10   authority?

11              MS. SCHAFER:  Foundation.

12      A.     I think it's defined in personnel rules that a

13   supervisor delegates the work of an employee.  In our

14   agency situation we have a network access form, for

15   example, that could be used.  By way of supervising an

16   employee, you can delegate what agency information is

17   accessed and what information is not accessed.  That's

18   very simply the relationship of supervisor to employee.

19      Q.     BY MR. LUDWIG:  Is there a policy that states

20   specifically that a supervisor shall decide when an

21   employee goes on medical leave?  You talked about

22   supervisors having authority and that it's written in

23   personnel rules.  What about supervisors shall decide

24   one way or the other when an employee goes on medical

25   leave?

Leslie Welch - May 14, 2018

95

1          MS. SCHAFER:  Form and foundation.

2     A.    I don't understand the difference.

3     Q.    BY MR. LUDWIG:  Well, I'm trying to

4  differentiate between just the supervisors having

5  authority and the AG's policy when employees go on

6  medical leave, if there's -- is there a policy about

7  access when employees go on medical leave, building

8  access and email access when employees go on medical

9  leave?

10     A.    Repeat the question.

11     Q.    Is there a policy about email and building

12  access for employees who go on medical leave?

13     A.    If you're talking about the AG's policy or

14  guideline that discusses that employees shall not

15  access work or attend meetings at the office, that I

16  believe is covered in the guidelines document I

17  mentioned earlier.

18     Q.    You used the term "guideline."  Is guideline

19  different than policy?

20     A.    I guess it depends.

21     Q.    What does it depend on?

22     A.    I don't know, I hadn't thought about it.

23     Q.    Does every employee have to acknowledge

24  receipt of the guideline?

25     A.    No, I don't think so.

96

1          MS. SCHAFER:  Can we take a break real

2    quick?

3          MR. LUDWIG:  Oh, sure.

4          (Recessed from 4:20 p.m. until 4:30 p.m.)

5    Q.    BY MR. LUDWIG:  Were you or anyone in your

6    department involved in suspending Agent Parker's access

7    to the building?

8          MS. SCHAFER:  Form, foundation.

9    A.    Can you please repeat the question?

10   Q.    BY MR. LUDWIG:  Were you or anyone in your

11   department involved in suspending Agent Parker's, the

12   plaintiff's, access to the building?

13          MS. SCHAFER:  Form, foundation.

14   A.    I don't recall.

15   Q.    BY MR. LUDWIG:  Were you or anyone in your

16   department aware that he had personal nonemployer owned

17   property in his office when he was -- when his access

18   to the building was cut off?

19   A.    I -- I -- what was the question?

20   Q.    Were you or anyone in your department aware

21   that he had personal nonAGO belongings in his office

22   when his access to the building was cut off?

23          MS. SCHAFER:  Foundation.

24   A.    I don't know -- I don't know if I can answer

25   that literally.  I don't know when the access was cut

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #115</u>

**Loraine Kern, M.A., LPC Letter dated
11/22/2015**

**BSC000060-64**

Brilliant Sky Counseling, PLLC
Loraine Kern, MA, LPC
2929 North Power Road, Suite 101
Mesa Arizona 85215
602-753-6841

November 22, 2014

Matthew Parker
6457 East Snowden Street
Mesa Arizona 85215

Dear Mr. Parker,

This summary is addressed to you, therefore no release of information is
needed. It is then your prerogative to pass this letter along to whomever you
deem appropriate.

This letter is to confirm that I have been seeing you since August 5, 2014. At
the beginning of our sessions we focused on problems related to intimate
relationships and Occupational Stress (V62.2) related to your career as a law
enforcement agent for the Arizona Attorney General's Office. However, after a
more thorough assessment, it is my personal opinion that your diagnosis
currently meets criteria for Posttraumatic Stress Disorder (309.81) according to
the Diagnostic and Statistical Manual of Mental Disorders V.

You reported beginning your career at the Arizona Attorney General's on
January 21, 2014. The first day on the job, you described being assigned to an
investigation related to a human body parts donation company. You described
your first task was to assist in the search for criminal evidence at the
company's office.  Additionally, you stated you were assigned to provide
overnight security of the facility as the search warrant lasted around one week.

You described that frozen human remains were removed and sent to several
mortuaries around the valley. You later described that a decision was made at
the Arizona Attorney General's Office to re-take possession of the human
remains and they were to be stored at a secure facility in commercial freezers.
You stated you were assigned to transfer the human remains being delivered
by the mortuaries into three commercial freezers on the following dates:
2/13/2014; 2/15/2014; 2/18/2014; 2/19/2014; 2/20/2014; and 2/25/2014.

You described that the human remains were placed in body bags that were
leaking bodily fluids.  You described that there were approximately 140 body
bags containing over 2,200 human remains that were dissected in various

Parker, Matthew pg. 1

BSC000060

ways including partial limbs, heads, torsos, and full bodies missing various parts.

You stated that you had to move these body parts and stack them into the freezers while verifying the contents of each bag to maintain the chain of evidence. You mentioned that because the freezers were at a secure facility and due to scheduling of the mortuaries you were required to be at the facility for several hours at a time. You described having to be inside of the freezers and push the human remains on top of one another because the parts were very heavy. You mentioned that while moving these parts you could clearly make out human body parts, in particular a cut off female head that you could view through a see-through bag.

You described that you were required to do this after normal working hours or on weekends when the majority of the facilities personnel were not present. You described that prior to having to move the human remains, during your normal work hours you were required to call the families of the deceased and interview them. You stated you were required to make over fifty phone calls to family members and inform them of the investigation into the possible misconduct related to the body donation of their family member. You reported these phone calls were emotionally difficult, as many family members began telling the stories about the decedent.

You stated you were later notified that some of the body parts contained infectious diseases by the other investigator on the case and notified your immediate supervisor on 3/7/2014. You stated you were later required to submit a memo on 3/11/2014 detailing the exposure risk at the direction of your Chief of Police. You described being ordered to go for infectious disease testing and described feeling anxious during the testing period and while waiting for the results of the disease testing.

You said that you were assigned as the co-case agent on the case and have been working on the case since you started your employment with the Arizona Attorney General's Office. You stated that you have bi-weekly case status meetings where you must discuss the case. You described having to put together charts that contain victim information, videos of body part dissection, and, as well as conduct interviews with suspected perpetrators. You stated that the case is ongoing and are not sure when it will be completed.

Parker, Matthew pg. 2

In accordance with the DSM-5, you have met:

**Criterion A**: Experiencing repeated or extreme exposure to aversive details of traumatic events. (E.g. first responders collecting human remains)

**Criterion B:** Presence of one (or more) of the following intrusion symptoms associated with the aforementioned event(s), beginning after the event occurred:
1. Recurrent, involuntary and intrusive distressing memories of the traumatic event(s)
   a. Overall, you descried experiencing intrusive, distressing thoughts and images that recall the traumatic event and its associated intense emotional response.
   b. You reported being in the freezer is a constant factor
   c. You reported seeing commercials, movies or song about people getting older and families as causing emotional reactions.
2. Recurrent distressing dreams in which the content and affect of the dream are related to the traumatic events
   a. You described disturbing dreams experiences and they are associated with the traumatic events.
   b. Recurring dream of hanging out in freezer with boss, talking, as if everything is normal while you are surrounded by body parts.
   c. You describe increase in violent and disturbing dreams
   d. You reported you have discontinued watching regular television for fear that you may be exposed traumatic events similar to the case.
3. No flashbacks
4. Intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic events.
   a. You described experiencing intense distress when exposed to reminder of the traumatic events.
   b. You described the moral injuries you are facing with regards to this event.
   c. You reported feeling as if you were working with human beings and felt as if you were discarding them as "waste" and dehumanizing these people.
5. Intense and prolong physiological distress at exposure to internal and external cues that symbolize or resemble an aspect of the traumatic events
   a. You described experiences of physiological reactivity associated with fear and anger when you are exposed to the internal or external cues that symbolize the traumatic events.
   b. You reported that you have discontinued watching regular television for fear that you will be exposed to traumatic content.

Parker, Matthew pg. 3

BSC000062

    c. You described being behind a mortuary van and felt feelings of anxiety and being trapped because you could not get around vehicle.

**Criterion C**: Persistent avoidance of stimuli associated with the traumatic event(s) beginning after the traumatic events occurred as evidenced by one or both of the following:
1. You described trying to avoid thinking, feeling or talking about the traumatic events because of the associated negative emotional response.
2. You reported a pattern of avoidance of activity, places, or activities associated with the traumatic event because you are fearful of the negative emotions that may be triggered.
   a. You reported "creating scheduling conflicts" to avoid going to the meetings about this aforementioned case.
   b. You reported avoiding the other case agent who is assigned to the case. You stated you will return his calls only after he has left approximately multiple messages.
   c. You reported avoiding talking to "old people" due to reminders of the traumatic event

**Criterial D**: Negative alteration in cognitions and mood associated with the traumatic events. Beginning or worsening after the traumatic events occurred as evidenced by two or more of the following
1. You described persistent distorted cognitions about the cause or consequences of the traumatic events that lead the individual to blame himself and others.
   a. "I should have known better"
   b. "How could someone treat human beings like this"
   c. When calling family members, "I cannot show my emotions"
2. Persistent negative emotional state of anger, shame and guilt
   a. You reported feeling as if others "can do this" and are not affected by this case.
   b. You described being angry "at the job for exposing me" and anger directed inward "I should not have been exposed to this case" and anger at the "company who disrespected these human beings."
3. You described a lack of interest and a pattern of lack of participation in activities that had previously been enjoyable.
   a. You reported avoiding activities with friends because "I do not want to lie and say everything is OK."
4. You reported a sense of detachment from others.
5. You reported an inability to experience the full range of emotions, including love.

Parker, Matthew pg. 4

BSC000063

**Criterion E**: Marked alteration in arousal and reactivity associated with traumatic events beginning or worsening after the traumatic events occurred:
1. Irritable behavior and angry a outbursts with little or no provocation typically expressed as verbal aggression toward people and/or objects
   a. You reported having to do mundane "secretarial orientated tasks" and became extremely "irate, angry and explosively angry"
   b. You reported being more "confrontational" at work and will often "welcome it" to provide an opportunity to "blow up."
2. You reported after this event you have discontinued wearing your helmet while riding your motorcycle.
3. You described increase in hypervigilance and feeling as if you are on constant alert.
   a. You reported while in church, you are constantly scanning the environment looking for threats.
4. You described difficulty concentrating
   a. You describe difficulty paying attention in class and staying on task at work
5. You described sleep disturbance of waking up approximately 10 times a night. You reported difficulty falling asleep 3 out of 7 days a week, and early morning waking.

**Criterion F**: These symptoms have been going on for over one month.

**Criterion G**: These symptoms have created clinically significant distress and impairment in social, occupational and other important areas of functioning.

**Criterion H**: The disturbance is not attributable to the physiological effects of a substance or another medical contrition.

Since the event occurred, you describe the following symptoms: depressed mood, anxiety, suspiciousness, chronic sleep impairment, disturbances in motivation and mood, difficulty establishing and maintaining effective social and intimate relationships.

It is my professional opinion that you meet the criteria for Posttraumatic Stress Disorder, Chronic Type. If you have further questions, please feel free to contact me from the information above.

Respectfully,

*Loraine Kern, MA, LPC*

Loraine Kern, MA, LPC

Parker, Matthew pg. 5

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #116</u>

## Deposition of Andrew Rubalcava

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Matthew V. Parker,                  )
                                    )
                Plaintiff,          )
                                    )
        vs.                         )   No. 2:17 CV-887-PHX-DLR
                                    )
State of Arizona, and Mark          )
Brnovich,                           )
                                    )
                Defendants.         )
_____)




DEPOSITION OF ANDREW RUBALCAVA - VOLUME I



Phoenix, Arizona
March 28, 2018
1:09 p.m.




REPORTED BY:
CHRISTINE A. LANDERS, RPR
Certified Reporter
Certificate No. 50924

PREPARED FOR:
THE COURT
(Original)

2

1         THE DEPOSITION OF ANDREW RUBALCAVA, VOLUME I, was

2    taken on March 28, 2018, commencing at 1:09 p.m., at the

3    offices of GRIFFIN & ASSOCIATES, 2398 East Camelback Road,

4    Suite 260, Phoenix, Arizona 85016, before CHRISTINE A.

5    LANDERS, a Certified Reporter in and for the State of

6    Arizona, County of Maricopa, pursuant to the Rules of Civil

7    Procedure.

8

9    COUNSEL APPEARING:

10   For the Plaintiff:

11            LUDWIG LAW OFFICES, LTD.
             By:  Mr. Aaron S. Ludwig
12            4242 North 19th Avenue
             Suite 150
13            Phoenix, Arizona 85015-5108

14   For the Defendants:

15            LITTLER MENDELSON, PC
             By:  Ms. Lindsay Michelle Schafer
16            2425 East Camelback Road
             Suite 900
17            Phoenix, Arizona 85016-2907

18

19

20

21

22

23

24

25

125

1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF ARIZONA

3

4   Matthew V. Parker,          )Case # 2:17 CV-887-PHX-DLR
                                )
5           Plaintiff,          )
                                )
6              vs.              )
                                )
7   State of Arizona, and Mark  )
    Brnovich, Arizona Attorney  )
8   General, in his official    )
    capacity,                   )
9                               )
            Defendants.         )
10  _____)

11

12          DEPOSITION OF ANDY RUBALCAVA
                    VOLUME II
13            (pages 125 through 244)

14

15              Phoenix, Arizona
                 May 15, 2018
16                5:30 p.m.

17

18

19

20  Reported by:
    JENNIFER HANSSEN, RPR
21  Certified Reporter No. 50165

22  PREPARED FOR:
    ASCII/CONDENSED
23

24  (Certified Copy)

25

126

1                          I N D E X

2    WITNESS                                      Page

3    ANDY RUBALCAVA

4              Examination by Mr. Ludwig          128

5

6                        E X H I B I T S

7    Deposition
     Exhibits:         Description               Page
8                      (None marked.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**127**

1          DEPOSITION OF ANDY RUBALCAVA was taken on

2    May 15, 2018, commencing at 6:06 p.m., at Littler

3    Mendelson, P.C., 2425 East Camelback Road, Suite 900,

4    Phoenix, Arizona, before JENNIFER HANSSEN, RPR, a

5    Certified Reporter in the State of Arizona.

6

7    COUNSEL APPEARING:

8                    For the Plaintiff:
                     Ludwig Law Offices, Ltd.
9                    By:  AARON S. LUDWIG
                     4242 North 19th Avenue, Suite 150
10                   Phoenix, Arizona  85015

11                   For the Defendants:
                     Littler Mendelson, P.C.
12                   By:  GREG COULTER
                     Camelback Esplanade
13                   2425 East Camelback Road, Suite 900
                     Phoenix, Arizona  85016

14    ALSO PRESENT:

15
                     Roger McKee
16                   Matthew Parker

17

18

19

20

21

22

23

24

25

1    through my supervisor"?

2                    THE WITNESS:  Yes.

3                    THE REPORTER:  Okay.

4                    THE WITNESS:  Sending it to my supervisor.

5    And same reference to the supervisors that worked under me,

6    document it, and submit it to -- to myself or to their direct

7    supervisor.

8    BY MR. LUDWIG:

9        Q.    Does that process differ for AZ POST certified

10   police officers?

11       A.    Not a lot that I can recall.  There's an additional

12   component that there has to be some determination of fitness

13   for duty; it's also impacted.  And that aspect relates to

14   police officers versus civilian staff.

15       Q.    Are you familiar with the disciplinary requirements

16   of Arizona Revised Statutes Section 38-1101 through 38-1116,

17   more commonly referred to as the "Police Officers Bill of

18   Rights"?

19                    MS. SCHAFER:  Form, foundation.

20                    THE WITNESS:  I am familiar with that.  Yes, I

21   am.

22   BY MR. LUDWIG:

23       Q.    Could you describe it?

24                    MS. SCHAFER:  Form, foundation.  Are you just

25   asking for what he remembers of it?  Or can you maybe put it

27

1   in front of him?  Or is this like --

2                  MR. LUDWIG:  Let me clarify the question.

3                  MS. SCHAFER:  Yeah.

4   BY MR. LUDWIG:

5       Q.    Are you familiar with the POBOR requirements for

6   disciplining officers?

7       A.    I am familiar.

8                  MS. SCHAFER:  Form, foundation.

9                  THE WITNESS:  Familiar.  And there were

10  aspects of my job that related to how that needed to be done

11  within SIS, yes.

12  BY MR. LUDWIG:

13      Q.    And are you familiar with the requirements that

14  it -- that discipline be only for just cause?

15                 MS. SCHAFER:  Form, foundation.

16                 THE WITNESS:  I'm familiar with that, yes.

17  BY MR. LUDWIG:

18      Q.    Can you explain to me what that means to you, in

19  your own words?

20      A.    It can't be for a -- it has to be a real reason why

21  someone is receiving discipline.

22      Q.    Are you familiar with the POBOR requirements for

23  conducting Internal Affairs investigations and interviewing

24  officers?

25      A.    Yes.

Andrew Rubalcava - Vol. I - March 28, 2018

28

1    Q.    Could you please describe that in your own words?

2    A.    It puts a burden on the supervisor to put the

3 employee on notice, especially if it relates to an infraction

4 or a violation that could potentially lead to discipline for

5 a criminal investigation.

6    Q.    When Agent Parker was terminated from the Attorney

7 General's Office, what was the reason?

8              MS. SCHAFER:  Form, foundation.

9              THE WITNESS:  To be honest, I'm unsure.  This

10 is only through third-hand information that I believe

11 administration, HR, provided, that he had abandoned his

12 position.

13 BY MR. LUDWIG:

14    Q.    When did he allegedly abandon his position?

15              MS. SCHAFER:  Form, foundation.

16              THE WITNESS:  This would have been late --

17 within a month or two -- at the end of 2014, receiving notice

18 from HR.

19 BY MR. LUDWIG:

20    Q.    So that was -- was that the official reason for his

21 termination?

22              MS. SCHAFER:  Form, foundation.

23              THE WITNESS:  That was my understanding, yes.

24 BY MR. LUDWIG:

25    Q.    When Mr. Parker was fired from the Attorney

30

1              THE WITNESS:  Yes.

2    BY MR. LUDWIG:

3        Q.    Do you know Mr. Parker, the plaintiff in this case?

4        A.    Yes.

5        Q.    How did you meet him?

6        A.    My first -- the first time I met him was during an

7    interview.  He was an unsuccessful candidate.  I believe the

8    second time was at a other interview for a position in which

9    he was a successful candidate.

10              He became hired, assigned to the asset

11   forfeiture unit that our office -- our police officers were

12   assigned to and for approximately a year.

13       Q.    So how long have you known him?

14       A.    About a year.  This period of time.

15       Q.    Have you ever directly supervised him?

16              MS. SCHAFER:  Form.

17              THE WITNESS:  No.

18   BY MR. LUDWIG:

19       Q.    Do you know how long Mr. Parker worked for the

20   Attorney General's Office?

21       A.    I believe it was a year.

22       Q.    Do you know that he was hired in 2014?

23       A.    Yes.  It's right in front of me.

24       Q.    At the time Mr. Parker was hired, do you believe

25   that he was a trustworthy individual?

1              MS. SCHAFER:  Form, foundation.

2              THE WITNESS:  Yes.

3   BY MR. LUDWIG:

4       Q.    What led you to believe that?

5              MS. SCHAFER:  Form, foundation.

6              THE WITNESS:  You said, "at the time that he

7   was hired"?

8   BY MR. LUDWIG:

9       Q.    Correct.

10      A.    At the time he was hired, he had already been

11  interviewed on one previous occasion, made an impression upon

12  me, and appeared sincere and qualified for the position.

13      Q.    Anything else regarding his trustworthiness at the

14  time that he was hired?

15             MS. SCHAFER:  Form.

16             THE WITNESS:  At the time that he was hired,

17  we rely on a polygraph examination to clear up any issues

18  relating to his fitness for duty as it relates to the

19  position, and he had passed that.

20  BY MR. LUDWIG:

21      Q.    What were Mr. Parker's responsibilities at the

22  Attorney General's Office?

23      A.    He handled the caseload, conducted investigations

24  for his being supervised by a senior special agent or

25  supervisor.  I believe he had asset forfeiture cases, which

Andrew Rubalcava - Vol. I - March 28, 2018

40

1    enough to be placed in charge of monitoring the AGO's ACJIS

2    access as the SSO?

3                    MS. SCHAFER:  Form.

4                    THE WITNESS:  Yes, as part of his SSO duties.

5    BY MR. LUDWIG:

6        Q.    Is it accurate to say that Agent Parker was trusted

7    enough to speak as a representative of SIS on matters related

8    to interagency agreements with DPS --

9                    THE REPORTER:  I'm sorry, Counsel.  I lost

10   you.  I'm so sorry.  "Is it accurate to say"?  Go ahead.

11   BY MR. LUDWIG:

12       Q.    That Agent Parker was trusted enough to speak as a

13   representative of SIS on matters related to interagency

14   agreements with DPS and Maricopa County?

15       A.    Yes.

16       Q.    Is it accurate to say that Agent Parker was trusted

17   enough to be deputized by the U.S. Marshal for the State of

18   Arizona --

19                   MS. SCHAFER:  Form.

20   BY MR. LUDWIG:

21       Q.    -- to represent the AGO on a federal task force?

22                   MS. SCHAFER:  Form.

23                   THE WITNESS:  Yes.

24   BY MR. LUDWIG:

25       Q.    Are you aware of the AZ POST complaint filed

```
1   BY MR. LUDWIG:

2       Q.    What other AGO employees said to you that Agent

3   Parker was untrustworthy or deceitful or a liar?

4                 MS. SCHAFER:  Form, foundation.

5                 THE WITNESS:  In that context, no, no one

6   else.  No one else.

7   BY MR. LUDWIG:

8       Q.    Not Assistant Special Agent Woods?

9       A.    (No audible response.)

10      Q.    Did Woods say it to you?

11      A.    Mr. Woods --

12                MS. SCHAFER:  Form.

13                THE WITNESS:  -- reported his findings.

14  BY MR. LUDWIG:

15      Q.    I could have your answer read back, but I think you

16  qualified that, in your capacity as the chief, you heard from

17  Charlie Loftus.  How about in any capacity, have you heard

18  that Agent Parker is a liar or deceptive or untrustworthy?

19                MS. SCHAFER:  Form.

20                THE WITNESS:  I have heard, as a result, time

21  frame, that Mr. Parker was filing a workers' comp claim.  And

22  in support of his workers' comp claim, that he had photos of

23  subjects or human tissue that he could use to support his

24  claim of stress or PTSD.

25                And at that time that that was relayed to me,
```

1    I checked with just -- I don't know who was in the room and

2    wanted to know who else may have known of this.  And everyone

3    was surprised.

4    BY MR. LUDWIG:

5        Q.    So --

6        A.    So -- excuse me.

7        Q.    Yes.

8        A.    So as it relates to his trustworthiness or his

9    telling the truth, I was extremely upset that this was --

10   potentially could be attributable to him, the misuse of

11   evidence in this way.

12              So at that time, would it be fair to say that

13   I -- you know, everyone was calling him, potentially,

14   untruthful or dishonest?  That collectively, when that

15   occurred and everyone else did not know about it, that led me

16   to believe that how in the world can somebody make this --

17   can actually do this with these photos.

18       Q.    Okay.  So tell me about that meeting.  Who was at

19   that meeting?  Who was in this room?  And what room was it?

20       A.    It was my office.  And it was right after receiving

21   a notification from our HR that this is what is being filed.

22   This is his current status is that he has filed this claim,

23   and that it's no longer a -- on medical leave.  It's this.

24              And it was instructive of me to, from that --

25   from this point on, this is how we're going to handle the

1    to -- and the question at hand is:  What rises to the

2    level -- agent versus agent complaint of misconduct rises to

3    the level of AZ POST reporting?  And you gave me examples of

4    misconduct, alleged misconduct that would result in AZ POST

5    reporting.

6              I'm asking you for examples of agent versus

7    agent misconduct that doesn't result in AZ POST reporting.

8              MS. SCHAFER:  Form, foundation.

9              THE WITNESS:  I'll give you an example.  If

10   there's a -- is misrepresenting -- misrepresenting leave time

11   or sick, calling in sick when you're not, that might be

12   something that may result in a, "Don't do it again."  A

13   verbal warning, a written warning, memorandum in the file;

14   but certainly, it doesn't rise to something that's going to

15   be reported to AZ POST.

16   BY MR. LUDWIG:

17        Q.    If an agent complains about misconduct by another

18   agent and an investigation is conducted and it is found to be

19   unsubstantiated, is there any reporting to AZ POST, even if

20   it was the kind of allegation that would rise to the level of

21   reporting, but your internal investigation finds it to be

22   unfounded?

23        A.    You're correct.  It would not need to be reported

24   to AZ POST.  AZ POST does do routine inspection of personnel

25   files, personnel files relating to discipline and actions

1    about the possibility that Mr. Parker had misrepresented his

2    application for employment?

3        A.    It would have been close to about that time.  And

4    there's the -- the date of the report by Mr. Woods would give

5    you an indication as to when -- if he documented when he made

6    the request or the public records request or made the request

7    of ASU DPS HR, that would give you the time frame as to when.

8    Roughly, about that time.

9        Q.    Did Charlie say who he heard this from?

10       A.    If he did, I don't remember.

11       Q.    Oh.  Do you recall anything about the person who

12   told Charlie about it?  Like, his position at ASU?  His rank

13   or his position at ASU?

14               MS. SCHAFER:  Form, foundation.

15               THE WITNESS:  No.

16   BY MR. LUDWIG:

17       Q.    Did Charlie hear about it from someone at the

18   Attorney General's Office?

19               MS. SCHAFER:  Form, foundation.

20               THE WITNESS:  Again, I don't know.

21   BY MR. LUDWIG:

22       Q.    Did you believe it when he said it?

23       A.    Don't know.  I needed to run it down.

24       Q.    Okay.  Let's talk a little bit about the BRC

25   investigation, Biological Research Center.

81

1      A.      Resource Center.

2      Q.      Resource Center.  Thank you.

3              You're familiar with the case; correct?

4      A.      No, not really.

5      Q.      Oh.  Did you have any -- do you know what it is?

6      A.      The 30,000 view, a fraud perpetuated by a company

7   claiming to have a -- claiming to have a legitimate need for

8   cadavers.  And not for transplantation purposes, but for

9   science purposes.  And in exchange, would provide cremation

10   services for family members.

11              In essence, they obtained body parts to meet

12   the needs of, in part, defense contractors who were

13   conducting tests on human tissue all across the country and

14   overseas.

15      Q.      What was your involvement in the investigation?

16      A.      Really to oversee, as a manager, some of the

17   resources initially involved with the search warrant and as

18   an investigative assist to the FBI.  It became 180 degrees

19   different post search warrant, when the seizure of tons of

20   this tissue was recovered and inventoried by the FBI, and it

21   was no longer going to be disposed of as originally planned,

22   as medical waste.

23              And I remember this succinctly because there

24   was letters that I had to draft signed by me, countersigned

25   by the Attorney General, requesting the Reserve Center, the

```
 1   National Guard --
 2                 THE REPORTER:  "Reserve Center"?
 3                 THE WITNESS:  The National Guard for space on
 4   the military reservation to store this tons -- three trailers
 5   worth of tissue.  And it remained -- I think we initially
 6   loaded the trailers within a month or so of the search
 7   warrant.  And when I left, they were still refrigerated
 8   because the case was still in process.
 9   BY MR. LUDWIG:
10       Q.    What other AGO employees were involved in the BRC
11   investigation?
12                 MS. SCHAFER:  Foundation.
13                 THE WITNESS:  There's many.  There's many
14   special agents that were tasked with the original search
15   warrant assist, both as searchers and interviewers and
16   security.  Both Attorney General investigators as well as FBI
17   agents.
18                 The lead agent from our office, who became the
19   case agent, was Ronnie Jackson.  He remained the case agent
20   until I left in June of 2015.  But there are -- as far as
21   exposure to the case, there are probably double digits in
22   number of people that participated in it.
23   BY MR. LUDWIG:
24       Q.    How about just much more involvement than exposure
25   to the case?  How about investigative follow-up after the
```

1    warrant?  Who -- what AG employees were involved?

2                    MS. SCHAFER:  Form, foundation.

3                    THE WITNESS:  The prosecutors, Agents Jackson,

4    Parker, an agent named Paul, Dan Woods.  Several other agents

5    that spoke to victims because there was a -- when it became

6    public, there was a public outcry, and we had to handle a lot

7    of phone calls.  Elizabeth -- I'm sorry with the names

8    because I just have forgotten so many other people that

9    were -- that were there.

10                   But day-to-day casework related, it would have

11   been Mr. Parker, Mr. Jackson, Joe Waters as the prosecutor.

12   BY MR. LUDWIG:

13       Q.    Would it surprise you to know that both Charlie

14   Loftus and Ronnie Jackson advised in the workers' comp case,

15   Mr. Parker's workers' comp case, that Mr. Parker had little

16   to no involvement in BRC?

17                   MS. SCHAFER:  Form.

18                   THE WITNESS:  It would not surprise me.

19   BY MR. LUDWIG:

20       Q.    Why wouldn't it surprise you?

21       A.    It would not surprise me because it was -- aside

22   from the initial search warrant where you had to have -- you

23   were actually present at the site, or if you were involved in

24   the transportation of the tissue from point A to point B,

25   there was very little to do with -- as it related to the

1    version of this that's more easy to read, but can't be found

2    electronically at this point, I'm just wondering if you know

3    that the BRC investigation had a spreadsheet of tasks?

4         A.    Would not surprise me.

5         Q.    Also, would you -- you know that a bunch of the

6    tasks -- many of the tasks regarding BRC had to do with body

7    parts; right?  You just described that; correct?

8         A.    Tasks relating to body parts?

9         Q.    Yes.

10        A.    I don't understand that.

11        Q.    Did the BRC investigation have any tasks regarding

12   body parts?

13             MS. SCHAFER:  Form.

14             THE WITNESS:  No.

15   BY MR. LUDWIG:

16        Q.    Did the agents of the AG's Office have to deal with

17   the body parts that are in the investigation?

18        A.    They had to move them from funeral -- funeral shops

19   over to the final destination, the storage.  That's what I'm

20   aware of.

21             MR. LUDWIG:  Okay.  And let's -- if we could

22   get the next exhibit marked.  That would be Exhibit 13.

23             (Deposition Exhibit No. 13 was marked for

24        identification.)

25             MS. SCHAFER:  I forgot to mention when we went

1   meaning do you know that Agent Parker was told that he
2   needed to work on his image?
3             MR. COULTER:  Form, foundation.
4      A.    I do not know of that.
5      Q.    BY MR. LUDWIG:  The next highlighted section
6   reads, "Assistant Chief Loftus stated that he
7   personally does not see the trauma Agent Parker is
8   relating as having caused his PTSD."
9             Did Charles Loftus ever make this or a
10  similar statement to you?
11            MR. COULTER:  Form.
12     A.    He may have said words to that effect, yes.
13     Q.    BY MR. LUDWIG:  Is the statement accurate, did
14  you see any of the trauma that Agent Parker --
15     A.    That's two separate questions.  He never
16  discussed this with me in detail so that I could form
17  my own opinion, and did I ever hear him say that, words
18  to that effect, yes.
19            MR. COULTER:  Form.
20     Q.    BY MR. LUDWIG:  Okay.  And the next
21  highlighted section reads, "Assistant Chief Loftus
22  stated that Agent Parker is a very good writer and
23  swift with the words."
24            Did Charles Loftus ever make this or a
25  similar statement to you?

1    Q.   BY MR. LUDWIG:  Is it accurate, do you know if

2   that was Agent Parker's co-workers' belief of his

3   intentions?

4               MR. COULTER:  Form, foundation.

5    A.   I have no reason to believe that there would

6   be a consensus.

7    Q.   BY MR. LUDWIG:  Finally, "Assistant Chief

8   Loftus was concerned some of Agent Parker's comments

9   could rise to the level of placing him on the Brady

10   list."

11               Did Charles Loftus ever make this or a

12   similar statement to you?

13               MR. COULTER:  Form.

14    A.   That's always a concern.  There was discussion

15   about that when -- at some point after he had already

16   left.

17    Q.   BY MR. LUDWIG:  Is this statement accurate,

18   that Charles Loftus was concerned that Agent Parker

19   should be on the Brady list?

20               MR. COULTER:  Form, foundation.

21    A.   I don't know if it was his concern or

22   Chief Woods's.

23    Q.   BY MR. LUDWIG:  How would reporting a

24   workplace injury be a Brady reportable issue?

25               MR. COULTER:  Form.

1    supervisor's call.

2        Q.    BY MR. LUDWIG:   If he wanted to be taken off

3    of it, did you ever say, "You're too involved to be

4    taken off of it"?

5                MR. COULTER:   Form, foundation.

6        A.    No.

7        Q.    BY MR. LUDWIG:   Did you talk with him about

8    being taken off of it?

9        A.    No.

10       Q.    What does "a personal/work-related issue

11   regarding BRC" mean to you?

12                MR. COULTER:   Form, foundation.

13       A.    Amongst the 40, 50 other emails I probably

14   received that day, he wants to talk about something,

15   and I don't know if we actually had this conversation

16   or not.   I'm not saying that he didn't try.   It's just

17   sometimes the line out my door is so big, it may have

18   been a week later.   I don't know, I have no

19   recollection of that.

20       Q.    BY MR. LUDWIG:   Did you ever tell Mr. Parker

21   that you would take him off the BRC case?

22                MR. COULTER:   Form.

23       A.    No.

24       Q.    BY MR. LUDWIG:   Did you ever tell Mr. Parker

25   to take some time off?

1      A.     I may have said, just like anybody else, if

2    they have issues at home or stress or what have you,

3    "Take the time you need."  I said that so many times to

4    so many people, I honestly cannot tell if it was

5    Mr. Parker or 10 others inside of the same year.

6      Q.     Okay.  What are the penalties through AZPOST

7    if a police officer lies on a background investigation?

8                 MR. COULTER:  Form, foundation.

9      A.     I don't know if there's stated penalties, but

10   a fraudulent application with the State of Arizona is

11   you don't get the job and you might get investigated,

12   looked into it further.

13     Q.     BY MR. LUDWIG:  I think we previously

14   discussed that after Dan Woods had been assigned by you

15   or to run down the IA issue about Mr. Parker, the

16   possibility existed that Mr. Parker's certification as

17   a peace officer could be revoked; right?

18                 MR. COULTER:  Form.

19     A.     To get to the bottom of it is what I think I

20   remember telling him.  He found the information out,

21   gave it to us, and we informed AZPOST of the finding.

22     Q.     BY MR. LUDWIG:  And a possible outcome could

23   be revocation of his peace officer certification;

24   right?

25                 MR. COULTER:  Form, foundation.

232

1

2

3

4

5      Q.    BY MR. LUDWIG:  Do you know if employees who

6   transfer State service, do they maintain their covered

7   status?

8                 MR. COULTER:  Form.

9      A.    That, I don't know.  At one time, I may have

10   known it, but I don't know now.

11      Q.    BY MR. LUDWIG:  Do you think that peace

12   officers and the Police Officers Bill of Rights is

13   important?

14                 MR. COULTER:  Form, foundation.

15      A.    Absolutely.

16      Q.    BY MR. LUDWIG:  Do you think that Mr. Parker

17   was entitled to any rights under the POBOR?

18                 MR. COULTER:  Form, foundation.

19      A.    At the time that this was occurring, and I'd

20   have to know what the information was and what date

21   that this had occurred because I believe that he had

22   already separated from service, but I don't recall what

23   the status was.

24      Q.    BY MR. LUDWIG:  Was Mr. Parker ever

25   interviewed regarding any of the items that the AG's

1    Office was concerned about?

2                   MR. COULTER:  Form, foundation.

3        A.    I don't believe so, no, not by SIS.  There may

4    have been other interviews that I'm unaware of that

5    dealt with concerns of the office, workplace injury and

6    what have you, but as it related to SIS, I don't

7    believe so, no.

8        Q.    BY MR. LUDWIG:  Did Charles Loftus ever speak

9    with Mr. Parker, that you know of, regarding Loftus's

10   concerns about Mr. Parker?

11                  MR. COULTER:  Form.

12       A.    Again, I don't know if he had.  That's pretty

13   broad.  What's the time period?

14       Q.    BY MR. LUDWIG:  Performance issues, Mr. Loftus

15   was Mr. Parker's supervisor; correct?

16       A.    Yes.

17       Q.    Do you know if Mr. Loftus spoke with

18   Mr. Parker about Loftus's concerns about Mr. Parker's

19   performance?

20                  MR. COULTER:  Form, foundation.

21       A.    Yes.

22       Q.    BY MR. LUDWIG:  Do you know whether Mr. Loftus

23   spoke to Mr. Parker about other concerns about

24   Mr. Parker, for instance, the photos or any other

25   issues?

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #117</u>

**EEOC000026-28**

## ADA QUESTIONNAIRE

Name: Matthew V. Parker          Date: 6/25/2015

1. Name and describe your physical or mental condition(s).

   Post Traumatic Stress Disorder

2. How does this medical condition affect you?

   Anxiety, Depression, Nightmares, paranoia(mild), over-response to stimuli, inability to maintain focus

3. How long have you had your condition? October 2014 (Diagnosed) Exposed in January 2014

4. Has your condition been diagnosed? Medical Doctor

5. If so, when was your condition first diagnosed? October 2014

6. Do you know how long this condition is expected to last? Yes _____ No ✓

   If yes, how long? N/A

7. Please describe any limitations or impact that your mental or physical condition has on your ordinary daily activities.

   These can include walking, standing, sitting, eating, lifting, reaching, sleeping, speaking, breathing, seeing, learning, caring for oneself, hearing, thinking, concentrating, controlling bodily waste, relating and getting along with others, reproduction or sexual relations, performing manual tasks, etc.

   Unable to work, in particular as a police officer. Limited interaction w/ family & friends, difficulty concentrating

EEOC000026

8. Identify any limitations or restrictions which have been placed on you by a physician for reasons related to your condition(s).

Put on FMLA. Recommended medical retirement.

9. Have you used any medications or assistive devices (hearing aids, canes, prosthesis) to help control or eliminate symptoms or limitations of your condition?

If so,

(a) name and describe the assistive devices used.

(b) list all medications taken to control or eliminate symptoms or limitations of your condition(s).

(c) describe how well the medication and/or assistive devices controls your symptoms (at the time of the alleged discrimination).

(d) Describe any side effects to the medications and/or assistive devices.

Medication: setraline (generic zoloft) & lexapro. Was not talking when first diagnosed.

10. Did you notify your employer of your mental or physical condition(s)? _yes._

11. Indicate who was made aware of your condition(s) and when they were made aware.

| Name | Position | Approximate Date Notified |
|---|---|---|
| Andy Rublcava | Chief of Police | 10/28/8014 |
| Charles Loftus | Ast. Chief | 10/30/2014 |
| Human Resources | | 10/28/2014 |

12. Have you asked for a reasonable accommodation from your employer (anything to help you perform your job, e.g. modification of equipment, change in job duties, schedule change, etc.)?   Yes  X   No _____

If yes, describe the circumstances, including the following:

a. Approximate date of request(s): 10/28/2014

b. Who did you ask for an accommodation? Removal from Investigation
Andy Rublcava + Charles Loftus
10/28/14     10/30/14

c. What accommodation did you ask for?
Removal from Investigation

d. Why did you need a reasonable accommodation? Triggering PTSD.

e. What was the employer's response?
Too involved in case to be removed, but
would look into it in the future.

EEOC000028

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #118</u>

**MVP00018314-MVP00018317**



**Matt Parker <matthew.v.parker@gmail.com>**

## EEOC Charge
1 message

**NICHOLAS MCLAIN** <NICHOLAS.MCLAIN@eeoc.gov>                  Fri, Jul 10, 2015 at 10:09 AM
To: matthew.v.parker@gmail.com

Sir,

Please sign and return the attached form to preserve your rights. Sign on the bottom left of the page where it says "charging party" please. You can mail or email the form back. If you have any questions please let me know. thank you.

Nicholas L McLain
Federal Investigator
U.S. Equal Employment Opportunity Commission
Phoenix District Office
3300 North Central Suite 690
Phoenix, Arizona 85012
(602) 640-4664

---

**2 attachments**

 **Parker Form 5**.doc
72K

📄 **MCLAIN, NICHOLAS.vcf**
1K



**Matt Parker <matthew.v.parker@gmail.com>**

---

## Re: EEOC Charge
1 message

---

**NICHOLAS MCLAIN** <NICHOLAS.MCLAIN@eeoc.gov>          Tue, Jul 14, 2015 at 8:17 AM
To: Matt Parker <matthew.v.parker@gmail.com>

<mark>Sooner would be appreciated as I need to turn it in Thursday.</mark>


Nicholas L McLain
Federal Investigator
U.S. Equal Employment Opportunity Commission
Phoenix District Office
3300 North Central Suite 690
Phoenix, Arizona 85012
(602) 640-4664
>>> Matt Parker <matthew.v.parker@gmail.com> 7/14/2015 8:14 AM >>>
<mark>I will be submitting it via email. I will probably not be able to return it until Friday (hopefully sooner) due to appointments and some other commitments. I appreciate your help with everything.</mark>


On Tue, Jul 14, 2015 at 7:16 AM, NICHOLAS MCLAIN <NICHOLAS.MCLAIN@eeoc.gov> wrote:

> Were you going to be mailing the form back or sending it through email?
>
> Nicholas L McLain
> Federal Investigator
> U.S. Equal Employment Opportunity Commission
> Phoenix District Office
> 3300 North Central Suite 690
> Phoenix, Arizona 85012
> (602) 640-4664
> >>> Matt Parker <matthew.v.parker@gmail.com> 7/13/2015 10:11 AM >>>
> <mark>I understand. I apologize because there are some complex nuisance here which I am not 100% sure on.</mark>
>
> In my case, I spoke to my HR department in late January / February 2015 about having my building access and email access suspended and subsequently having my office packed up while I was out on FMLA. The only reason I was on FMLA was related to my disability through a worker's comp. claim. I told HR I believed I was being prevented access because I had filed a claim for worker's compensation (which was the cause of my disability). The adverse result was I was unable to submit information related to my injury (which was evidenced in my work email) to the Industrial Commission for almost 2 months, which allowed the AGO to submit information uncontested for that period of time. I told HR I believed the only reason I was being prevented access was due to my filing a claim and that I was being targeted by a policy that did not exist. There were then other negative actions that were taken against me at that point, i.e. the filing a complaint against my certification.
>
> So, would notifying my HR that I believed I was being unfairly targeted due to my filing a worker's comp. claim, even though I was only on worker's comp. due to my disability, count under the EEOC laws? In my opinion, the worker's comp. discrimination is the same as the EEOC discrimination because I was only on worker's compensation due to a work induced disability. <mark>However, I understand you are much more versed in these matters so I will yield to whatever you think is the most appropriate.</mark>

MVP00018315

Matt Parker

On Fri, Jul 10, 2015 at 10:09 AM, NICHOLAS MCLAIN <NICHOLAS.MCLAIN@eeoc.gov>
wrote:

> Sir,
>
> Please sign and return the attached form to preserve your rights. Sign on
> the bottom left of the page where it says "charging party" please. You can
> mail or email the form back. If you have any questions please let me know.
> thank you.
>
>
> Nicholas L McLain
> Federal Investigator
> U.S. Equal Employment Opportunity Commission
> Phoenix District Office
> 3300 North Central Suite 690
> Phoenix, Arizona 85012
> (602) 640-4664
>

---

📄 **MCLAIN, NICHOLAS.vcf**
   1K

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|

This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To:
- [ ] FEPA
- [X] EEOC

Agency(ies) Charge No(s): **540-2015-02547**

**Arizona Attorney General's Office, Civil Rights Division**                and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs )* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Matthew Parker** | **(570) 604-5686** | **12-09-1984** |

Street Address                                                City, State and ZIP Code
**530 E. Mcdowell Rd., Apt 107-217, Phoenix, AZ 85004**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others.  *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **ARIZONA ATTORNEY GENERAL'S OFFICE** | **500 or More** | **(602) 542-0006** |

Street Address                                                City, State and ZIP Code
**1275 W. Washington St.,  Phoenix, AZ 85007**

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|

Street Address                                                City, State and ZIP Code

DISCRIMINATION BASED ON *(Check appropriate box(es) )*

- [X] RACE
- [ ] COLOR
- [ ] SEX
- [ ] RELIGION
- [ ] NATIONAL ORIGIN
- [ ] RETALIATION
- [ ] AGE
- [X] DISABILITY
- [ ] GENETIC INFORMATION
- [ ] OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest                    Latest
**04-08-2015**

- [ ] CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

**I began employment with the above employer in or around January 2014 and was terminated April 8, 2015. I was exposed to a severe mental trauma on the job which resulted in a diagnosis of Post Traumatic Stress Disorder. I discussed the diagnosis with my employer and no reasonable accommodation was offered. Subsequently I was placed on FMLA and then LWOP when FMLA expired. I was still pending administrative actions with the employer when terminated and I believe I was terminated due to discrimination of my race and the fact that I needed a reasonable accommodation.**

**I believe I was discriminated against, in violation of the Americans with Disabilities Act of 1990, as amended. Furthermore, I believe I have been discriminated against because of my race (African American) in violation of Title VII of the Civil Rights Act of 1964, as amended.**

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Jul 10, 2015** _____ <br> Date                    *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

MVP00018317

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:**  Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.**  EEOC Form 5, Charge of Discrimination (11/09).

2. **AUTHORITY.**  42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.**  The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.**  This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions.  A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.**  Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

MVP00018317

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #119</u>

## Declaration of Agent Paul Cuellar

## Declaration of Paul Cuellar

1.  My name is Paul Cuellar.  I am an adult resident of Pinal County, Arizona and was employed at the Arizona Attorney General's Office (AGO) between March 2014 and September 2016.

2.  I was assigned to the same unit as Special Agent (SA) Matthew Parker while employed at the AGO, which was the Financial Remedies Section (FRS).

3.  SA Parker and I were the only two members of that unit in the Phoenix office, our offices were across the hall from each other, and we had frequent contact at work due to our unit responsibilities.

4.  I was hired to replace SA Ronald Jackson who was re-assigned to a task force assignment at the FBI Phoenix Field Office.  This assignment removed SA Jackson from the AGO located in downtown Phoenix and placed him in North Phoenix.

5.  From my date of hiring, I learned of an active investigation into the Biological Resource Center (BRC).  I am aware that the BRC investigation is now since closed and there are no outstanding investigations involving that organization.

6.  SA Parker and SA Jackson were both assigned as the case agents at the time.

7.  As SA Jackson had been reassigned, many of the investigative responsibilities of the case fell onto SA Parker.

8.  Throughout, SA Parker's employment I assisted him on a number of matters involving the BRC case.  For example:

9.  SA Parker was required to locate individuals to conduct interviews.  In particular, I participated in an interview of a former BRC employee named Sam Kazemi.  SA Parker and I interviewed Kazemi at the Arizona State University Police Department (ASU PD) in Tempe, AZ as Kazemi was an ASU student.

10. During this interview, which lasted several hours, SA Parker displayed a video to Kazemi where Kazemi was cutting up a deceased human body with a Sawz-all reciprocating saw at the BRC facility in Phoenix, AZ.

11. The video was extremely graphic and showed Kazemi performing a C-spine removal.

12.     The video showed Kazemi cut the face around the skin of the deceased, peeled his facial skin down from the forehead to chin, grabbed the deceased's hair, and proceeded to cut into his scalp.

13.     The video then showed Kazemi cutting the back of the deceased with the saw and pulling the deceased spine out of his body.

14.     These images were extremely disturbing, even for me, who served as a Captain in the U.S. Army Reserve, and completed a tour of duty in Afghanistan where I witnessed war casualties.

15.     I was in a support role during this interview and SA Parker had watched this video multiple times in its entirety in order to identify evidence related to the case in which Kazemi was being interviewed.

16.     SA Parker discussed with Kazemi if the Saw was a medically approved device and how human tissue was stuck in the locking mechanism.

17.     This is only one of many examples of the type of images SA Parker was exposed to during the BRC case.

18.     SA Parker spent numerous hours on the BRC case, had boxes of investigative files in his office, and was responsible for coordinating investigative tasks with several interns.  I would describe SA Parker's involvement in the BRC case as very heavily involved from my time of hiring until his going on leave in December 2014.

19.     I routinely would travel with SA Parker, typically during the lunch hour, to the BRC storage site located at the Arizona Department of Military Affairs (DEMA) in Phoenix.

20.     We would routinely be flagged onto the base without having to sign into the log because the gates to where the freezers were stored were open.

21.     On occasion SA Parker would need to sign out a key if the gate was locked for whatever reason.

22.     SA Parker would exit the vehicle, walk up to each unit, check the temperature gauge, and inspect the outside of the units to ensure the evidence had not been tampered with.

23.     I would estimate that I traveled to DEMA with SA Parker at least 30 times between April and December 2014.

24.     The BRC investigation was one of the most unique case in my over 25 year law enforcement career that I have ever experienced or even heard of.  I know of no other cases involving cut up and dismembered remains on this scale during my tenure in law enforcement.

25.     SA Parker described to me on numerous occasions in 2014 and 2015 that he was having difficulty sleeping, having nightmare, and began having marital problem.

26.     SA Parker appeared to become increasingly emotional as 2014 went on.

27.     SA Parker confided in me that he was going to see a therapist in the late Summer 2014 and asked me to keep it confidential because he was afraid of being declared unfit for duty, to which I agreed.

28.     In approximately October 2014, SA Parker informed that he had been diagnosed with Post Traumatic Stress Disorder (PTSD) by his therapist.

29.     SA Parker told me he needed to get away from the BRC investigation because it was too emotionally distressing.

30.     SA Parker informed me that he had requested to be removed from the case after meeting with Chief Special Agent Andy Rubalcava and Assistant Chief Special Agent Charles Loftus.

31.     SA Parker told me that he had told both Rubalcava and Loftus that he had been diagnosed with PTSD.

32.     SA Parker told me that both Rubalcava and Loftus were dismissive of his reporting of the diagnosis and appeared more concerned with the investigation than his well-being.

33.     SA Parker told me Rubalcava stated that Parker was "too involved" in the BRC case to be taken off of it.

34.     Several weeks later, in December 2014 I recall SA Parker working all day on reports for BRC.  I remember that was the last day that I worked with SA Parker.

35.     SA Parker told me that he was taking FMLA leave because the agency refused to take him of the BRC case and his doctor recommended it.

36.     While on FMLA, I heard multiple negative statements made by special agents about SA Parker, namely that SA Parker was faking a disability to take an early medical retirement.

37.   Based on my knowledge of SA Parker I did not believe these statements to be true, but as SA Parker requested that I not disclose to others what he told me about being in therapy in confidence, I did not correct these statements even though I knew them to be untrue.

38.   While SA Parker was on FMLA his office was packed up and his belongings placed into several storage boxes and stacked in a storage room.

39.   As I knew SA Parker was on leave, I called him to alert him that his personal belongings had been boxed up, around mid-February 2015.  SA Parker told me he would contact Charles Loftus and come pickup his personal stuff because he did not want it to go missing or get lost.  I requested SA Parker not inform anyone that I provided him this information because I did not want to have any negative repercussions for associating with him.

40.   While I was working SA Parker came to the AGO to pick up his personal items.  He was required to be escorted thought out the building by Charles Loftus even though he was still an employee.

41.   I found this odd, as I had never seen any other AGO employee before or after SA Parker's employment be required to be escorted while in the building, especially while on medical leave.

42.   Since, SA Parker's termination from the AGO in 2015, we have only communicated with each other periodically.  I would estimate we have communicated between 5-10 times.

43.   I enjoyed working with SA Parker.  I found him to be honest, trustworthy, dependable, and very competent.  SA Parker was knowledgeable and had discussed his intentions of remaining in law enforcement until at least his retirement age.

44.   I believe that SA Parker was singled out because he reported having PTSD.  I base this statement that SA Parker was a competent and well liked employee, especially by his supervision.

45.   Since Parker left the AGO I have only communicated with SA Parker sporadically, estimated less than ten times.

Pursuant to 28 U.S.C. 1746, I declare and verify under penalty of perjury that the foregoing statements are true and correct based upon my own personal knowledge, experience and observations.

Executed this 20th day of December, 2018.

*Paul Cuellar*

Paul Cuellar

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #120</u>

**MVP00016838-16839**

**PUBLIC SAFETY PERSONNEL RETIREMENT SYSTEM**
3010 E. Camelback Rd., Suite 200, Phoenix, AZ 85016
(602) 255-5575 FAX (602) 296-2369 ww.psprs.com

**FORM P5-EE**
**Page 1 of 2**
**08/14**

**APPLICATION FOR DISABILITY RETIREMENT**
**Completed by Employee**

| PRINT Full Name of Employee Matthew Vernon Parker | | SSN REDACTED |
|---|---|---|
| Address REDACTED | | Date of Birth REDACTED |
| City, State and Zip Code REDACTED | | Email Matthew.V.Parker@gmail.com |
| Home # N/A | Cell # (570) 604-5686 | Work # |

Employer Arizona Attorney General's Office    Service Date from 1/21/2014  to 3/9/2015

Leaves(s) Without Pay - 2/5/15 partial paycheck
Missed Pay Periods: No remaining leave     Industrial Leave: from 12/15/2014  to Present

Type of Disability (check ONE):     ☒ Accidental    ☐ Ordinary    ☐ Temporary    ☐ Catastrophic

Date of Disabling Event or Condition Diagnosis   February 2014

Nature and Cause of Disability   Post Traumatic Stress Disorder (PTSD) / Exposure to large quantities of human remains + personal interviews with families. (2000+)

List the physicians, hospitals and clinics who attended or examined your disability and three years prior
For additional physicians, attach a supplemental page

| Company Name Brilliant Sky Counselling Loraine Kern | Company Name Ironwood Behavioral Health | Company Name Biltmore Psychology Services |
|---|---|---|
| Physician Loraine Kern, MA, LPC. | Physician Dr. David Leicken, MD | Physician Dr. Robin Potter (PsyD) |
| Address 2929 N. Power Rd., Ste. 101 | Address 15849 N. 71st. St., Ste.160 | Address 3747 N. 24th St. |
| City, State, Zip+4 Mesa, Arizona 85215 | City, State, Zip+4 Scottsdale, AZ 85254 | City, State, Zip+4 Phoenix, AZ 85016 |
| Phone (602) 753-6841 | Phone (602) 910-4050 | Phone (602) 430-2337 |
| Illness PTSD | Address Illness PTSD | Illness PTSD |

(For additional children, attach a supplemental page)

| SPOUSE/CHILDREN: (Check box) | Print Name: (Last, First, Middle) | Date of Birth | Social Security Number | Disabled Child(ren)? Yes or No | Child(ren) 18-22 yrs in school fulltime? Yes or No |
|---|---|---|---|---|---|
| ☒ Spouse ☐ Not applicable | REDACTED | REDACTED | | | |
| ☐ Child ☒ Not applicable | | | 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 | | yes |
| ☐ Child | | | | | |
| ☐ Child | | | | | |

Rev. 08/2014     **EMPLOYEE:** Copy for your records and send **ORIGINAL** to your <u>Local Board</u>.

**PUBLIC SAFETY PERSONNEL RETIREMENT SYSTEM**
3010 E. Camelback Rd. Suite 200, Phoenix, Arizona 85016
PHONE: (602)255-5575     FAX: (602)296-2369     www.psprs.com

FORM P5-EE
Page 2 of 2
08/14

## APPLICATION FOR DISABILITY RETIREMENT
**Completed by Employee**

**EMPLOYEE AUTHORIZATIONS:**

INITIAL THE FOLLOWING - Authorizations are in effect from the date of this application to 120 days after first receipt of retirement benefits

1) *(MR)* I authorize and request each physician and person in the medical or related fields, and each hospital, clinic, establishment and place rendering or having in the past rendered to me any medical or related service to allow the Local Board, the office of the Board of Trustees of the Public Safety Personnel Retirement System (PSPRS), their authorized designee, and/or each physician appointed by them to have, examine and/or copy, any and all information, records, reports and x-rays, regarding my physical and/or mental condition and treatment therefore.

2) *(MR)* I authorize the Local Board, the office of the Board of Trustees and/or their authorized designee to procure from my employer(s) or from any other person, firm or corporation (including any governmental agency or department thereof) any and all information as directly related to leave(s) of absence without pay and/or application(s) for and/or receipt of Worker's Compensation Benefits. I expressly waive all provision of law forbidding any physician, person, firm or corporation (including any governmental agency or department thereof) from disclosing any knowledge or information which they have in their possession concerning leave(s) of absence without pay and/or Worker's Compensation.

3) *(MR)* I understand that pursuant to A.R.S. § 38-847(H), the Board of Trustees may perform a review of the disability retirements to ensure that the employee and Local Board are in compliance with statutory requirements.

4) *N/A* WAIVER OF CONFIDENTIALITY. I hereby consent, upon the advice of counsel, that all matters and issues relating to my physical or mental condition or medical history, including, without limitation, whether my physical or mental condition arises from any preexisting disability, may be discussed and considered by the Board of Trustees and/or Local Board in open public meeting, and I hereby waive any right to have my physical or mental condition or medical history discussed and evaluated by the Board of Trustees and/or Local Board in executive session only. As part of the aforesaid waiver, I further consent that the Board of Trustees and/or Local Board may discuss and consider all evidence touching upon my physical or mental condition or medical history in open public session, including without limitation, testimony or records concerning my physical or mental condition or medical history from physicians or other expert witnesses, the social security administration, the state industrial commission, or other sources or persons of any kind or description. I understand that neither the Board of Trustees nor the Local Board has any obligation to keep confidential any information about my physical or mental condition or medical history that is discussed, presented or considered during any public session of the Board of Trustees or Local Board, and I absolve the Board of Trustees and Local Board from any liability arising from disclosure of such information during public session. I DO NOT CONSENT TO A WAIVER OF CONFIDENTIALITY AT THIS TIME. *Matter v. Nea*

I hereby submit my application for a disability pension subject to all of the terms and conditions of the PSPRS. I attest that all information submitted is true, complete and correct to the best of my knowledge and belief. I understand that A.R.S. § 38-849(B) states: "A person who knowingly makes any false statement or who falsifies or permits to be falsified any record of the system with an intent to defraud the system is guilty of a class 5 felony."

EMPLOYEE SIGNATURE *Matter V. Roll*          DATE *2/20/2015*

**Provide a copy of the applicable documents to your Local Board**

1. Birth certificate for member
2. <u>Recorded</u> Marriage and birth certificate for spouse
3. Dependent child(ren) birth certificates

4. Medical documentation for disabled children
5. If divorced during period of employment:  Divorce Decree, or Certified

Retirees are eligible for health insurance benefits.  Contact your employer and/or PSPRS for information.

**LOCAL BOARD RECEIPT ACKNOWLEDGMENT –See A.R.S. § 38-847(D)(3):**

*Lauren V. Roll*     Chair, Local Board          *3-2-15*
RECEIVED STAMP, or Local Board Representative Signature          DATE

Rev. 08/2014

**EMPLOYEE:** Copy for your records and send**ORIGINAL** to your <u>Local Board</u>.

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #121</u>

## MVP00011556-11565



Mark Brnovich
Attorney General

Office of the Attorney General
State of Arizona
EMPLOYMENT LAW SECTION

Dennis D. Carpenter, Jr.
(602) 542-7677
Dennis.Carpenter@azag.gov

April 21, 2015

Matthew Parker
6457 E. Snowdon St.
Mesa, AZ 85215

Dear Mr. Parker:

The Attorney General's Office is in receipt of your letter dated April 17, 2015 in which you indicate that you do not believe that you were an at-will employee in uncovered service and that you wish to appeal your separation from the Attorney General's Office. While we disagree with your interpretation of A.R.S. § 41-742 with regards to full-authority peace officers in at-will status with the State of Arizona, nothing changes the fact that you were not terminated for cause, but instead were considered to have resigned after abandoning your job. As we indicated in the April 8, 2015 separation letter, over a period of four weeks following the end of your approved FMLA leave we attempted to solicit from you a request for leave without pay.  We received nothing back from you. The State Personnel Rules, A.A.C. R2-5A-1001(B) states that "an agency head may consider an employee to have voluntarily resigned from employment with the agency when the employee is absent from duty for three consecutive workdays or equivalent without proper authorization." This rule applies to covered and uncovered employees alike. You were absent from duty for 27 consecutive workdays without authorization, and pursuant to the rule, you were deemed to have resigned from your position. This would not be appealable for any employee.

Sincerely,

Dennis D. Carpenter, Jr.
Chief Counsel
Employment Law Section

DC:ca

4424367

| From: | Hatcher, TammieJo |
|---|---|
| To: | Knebel, April |
| Cc: | Human Resources |
| Subject: | FW: Emailing: Letter_PARKER; Memo_Parker |
| Date: | Wednesday, April 22, 2015 11:34:44 AM |
| Attachments: | Letter to AGO Regarding covered status 4-17-2015.docx |
| | RE   Uncovered Vs Covered Status.pdf |

Please include these letters in his term folder.

Thanks,

TJ

**From:** Human Resources
**Sent:** Friday, April 17, 2015 2:18 PM
**To:** Hatcher, TammieJo; Welch, Leslie; Daniels, Paula
**Cc:** Human Resources
**Subject:** FW: Emailing: Letter_PARKER; Memo_Parker

**From:** Matt Parker [mailto:matthew.v.parker@gmail.com]
**Sent:** Friday, April 17, 2015 10:43 AM
**To:** Human Resources
**Subject:** Re: Emailing: Letter_PARKER; Memo_Parker

Hello,

Please see an attached response to the correspondence I received dated April 8th, 2015.

Also, I would like to request a copy of all of my time sheets records as I do not have access to HRIS/Yes to download them myself.

Respectfully,

Matt Parker

On Wed, Apr 8, 2015 at 4:51 PM, Human Resources <HumanResources@azag.gov> wrote:
Matthew,
Attached please find two important documents from Human Resources relating to your employment at the Attorney General's Office.

Thank you,

Human Resources/tjh
Office of the Arizona Attorney General Mark Brnovich Main Office - 1275 West Washington, Phoenix, AZ  85007
Phone: (602) 542-8056
Fax: (602) 542-8000
Email: HumanResources@azag.gov
Employment Opportunities:  http://www.azag.gov/employment/
Website: www.azag.gov

NOTICE: This email (and any attachments) may contain PRIVILEGED OR
CONFIDENTIAL information and is intended only for the use of the specific individual(s) to
whom it is addressed.  It may contain information that is privileged and confidential under
state and federal law.  This information may be used or disclosed only in accordance with
law, and you may be subject to penalties under law for improper use or further disclosure of
the information in this email and its attachments.  If you have received this email in error,
please immediately notify the person named above by reply email, and then delete the
original email.  Thank you.

| | |
|---|---|
| **From:** | Loftus, Charles |
| **To:** | Parker, Matthew |
| **Subject:** | RE: Uncovered Vs Covered Status |
| **Date:** | Monday, February 17, 2014 8:02:35 PM |
| **Attachments:** | image001.png |

Look at your YES profile, uncovered full authority peace officer.  You Are Covered By The Statute.   I pointed this out last year and they changed all of the uncovered agents.


Sent from my Droid


-------- Original message --------
From: "Parker, Matthew"
Date:02/17/2014 19:57 (GMT-07:00)
To: "Loftus, Charles"
Subject: Uncovered Vs Covered Status


AC Loftus,


I am going to apologize in advance for bringing up this issue, as I know how busy you are.  However, I believe that I (and possibly some of the other agents hired after 9/29/2012) are incorrectly classified as "uncovered" employees.


I understand this could have broad consequences for the agents in our office, so I have not discussed this with any other employees.  First and foremost, I am not trying to create waves with issue however being covered versus uncovered is an important distinction for LEO's as it takes quite some time to get hired with an agency, not that I am anticipating any type of issues, but one thing being in law enforcement has taught me is be prepared.


The other issue this effects leave accrual as covered employees and uncovered employees accrue leave at different rates.


Per ARS 41-742.E.1., all AZPOST certified officers are automatically "covered employees" if they work for State Agencies unless they voluntarily waive that right under the conditions set forth in A3 of the statue.


As a condition of employment an agency cannot require you to waive this right.  The only time a change of covered and uncovered status can take effect is if a covered employee **voluntarily** accepts a change in "assignment", "promotion, demotion, or lateral transfer".

The waiver of uncovered status isn't voluntarily if it is a requirement for employment. In my particular case, since I did not laterally transfer within the same agency (or even from another State Personnel rule agency) the waiver doesn't apply. The statue states that any "communications" or "job offers", "either written or oral", that contradict this statue are "void". So, the documents I signed accepting uncovered status are invalidated by the provisions of this statue. Hence, I believe that I (and every other agent) are technically covered employees regardless of date of hire.

The reason I even know about this statue is I remember DPS specifically fighting this statue when it was passed to exempt AZPOST certified officers at all state agencies. Since, I was heading up the police association at ASU PD I was concerned that our officers there would become uncovered as well, which they are not.

I requested my attorney look at the statue as well as Dr. Levi Bolton (head of the APA) and both agree with my interpretation of the statue. All AZPOST certified officers at state agencies are covered employees.

Perhaps this was merely an oversight by the AGO since we are primarily a non-law enforcement agency? I included the statue and highlighted the relevant portions.

41-742. State personnel system; covered and uncovered employees; application; exemptions
A. Beginning September 29, 2012, unless otherwise prescribed in this article:
1. All new hires are at will uncovered employees.
2. Any employee who meets any of the following criteria is an at will uncovered employee:
(a) Is employed as an attorney in a position assigned to the attorney salary schedule.
(b) A supervisor.
(c) Is at a pay grade of nineteen or above or, if a successor compensation system is established, in an equivalent pay range as determined by the director.
(d) Is in a position assigned to the information technology salary schedule, in a position assigned to an information technology classification or, if a successor compensation system is established, in an equivalent pay range as determined by the director.
3. Any covered employee who voluntarily accepts a change in assignment to a position in the uncovered service, regardless of whether the voluntary change in assignment is a promotion, demotion or lateral transfer, is an at will uncovered employee on the start date of the voluntary change in assignment.
4. A covered employee may voluntarily elect to become an at will uncovered employee without a change in assignment on approval by the state agency head and the director. If approved, the change from covered to uncovered status is immediate.
5. Once a covered employee becomes an at will uncovered employee, the change is irrevocable.
B. Except as provided in subsection F of this section, the purpose of this article is for all state agencies in the state personnel system to treat employees pursuant to the following principles:
1. Recruiting, selecting and advancing employees on the basis of the employee's relative

ability, knowledge and skills after open competition.

2. Providing compensation based on merit, performance, job value and competitiveness within applicable labor markets.

3. Training employees if the training will result in better organizational and individual performance.

4. Retaining employees on the basis of the adequacy of their performance, correct inadequate performance where possible and appropriate and separate employees whose performance is inadequate.

5. Managing applicants and employees in all aspects of personnel administration without regard to political affiliation, race, color, national origin, sex, age, disability or religious creed and with proper regard for their privacy and constitutional rights as citizens.

6. Ensuring that employees are protected against coercion for partisan political purposes and are prohibited from using their official authority for the purpose of interfering with or affecting the result of an election or nomination for office.

C. The director shall establish and administer the state personnel system, including:

1. A classification system and job classes and associated knowledge, skills and abilities for those classes.

2. A centralized job announcement system to streamline statewide recruiting for applicants.

3. A centralized employment system to be used by all successful applicants, including a common application form to be used by all state agencies.

4. A compensation system, including assigning pay ranges for all job classes and special pay plans for certain classes or groups of employees considering such factors as occupational patterns, economic conditions and pay plans common to government, business and industry.

5. A statewide training program.

6. A statewide performance management system.

7. An audit function to review state agencies' processes and compliance with applicable statutes, personnel rules and policies.

8. An integrated system to process personnel, payroll and benefits transactions and serve as the system of record for state employees.

D. This article and articles 5 and 6 do not apply to:

1. An elected state officer. An elected state officer means only elected officials and does not include the employees of elected state officers unless expressly provided.

2. Members of boards and commissions who are appointed by the legislature or the governor, board members appointed pursuant to section 41-619.52 unless otherwise prescribed by law, employees of the Arizona legislative council, employees appointed or employed by the legislature, any legislative agency or either house of the legislature and employees of the supreme court and the court of appeals.

3. The Arizona board of regents, officers or employees of state universities and personnel of the Arizona state schools for the deaf and the blind.

4. Patients or inmates employed in state institutions.

5. Officers and enlisted personnel of the national guard of Arizona and employees of the department of emergency and military affairs who occupy Arizona national guard positions identified as mobilization assets.

6. The cotton research and protection council.

7. The department of public safety.

8. The Arizona peace officer standards and training board.

E. Unless otherwise prescribed in this article, subsection A, paragraphs 1, 2 and 3 of this section **do not apply to** either an **initial appointment to or changes in assignment to:**

1. An employee of **any state agency who is a full authority peace officer** as certified by the Arizona peace officer standards and training board.

2. An employee of the state department of corrections who is employed as a correctional officer I, correctional officer II, correctional officer III, community corrections officer or, if a successor classification system is established, in an equivalent job class as determined by the director.

F. Subsection B, paragraph 1 of this section, relating to open competition and subsection B, paragraph 4 of this section and subsection B, paragraph 5 of this section, relating to political affiliation, do not apply to:

1. Employees of the governor's office.
2. Employees of offices of elected officials who either:
(a) Report directly to the elected official.
(b) Head a primary component or report directly to the head of a primary component of the office of the elected official.
(c) As a primary duty, determine or publicly advocate substantive program policy for the office of the elected official.
3. The state agency head and each deputy director, or equivalent, of each state agency and employees of the state agency who report directly to either the state agency head or deputy director.
4. Each assistant director, or equivalent, of each state agency and employees in the state agency who report directly to an assistant director.
5. Attorneys in the office of the attorney general.
6. Employees in investment related positions in the state retirement system or plans established by title 38, chapter 5, article 2, 3, 4 or 6.
G. This article and articles 5 and 6 of this chapter do not confer any rights in excess of, or in addition to, those previously authorized to any state employee.
H. This article does not create or confer any contractual employment right for any employee and, unless otherwise provided by law, state agencies are prohibited from executing employment contracts with any state employee.
I. **Any communications**, including policy manuals, employee handbooks, **job offers** and performance appraisals and other communications as determined by the director, **whether in writing or oral, that conflict with** article 1, 5 or 6 of this chapter or **this article are void** and do not alter or supersede article 1, 5 or 6 of this chapter or this article.

Respectfully,

Matt



Special Agent Matt Parker

Criminal Division

Financial Remedies Section

1275 W. Washington Str.

Phoenix, AZ  85007

Desk:  602-542-7929

Matthew.V.Parker@azag.gov

**LAW ENFORCEMENT SENSITIVE**

**NOTICE:**  This message is intended exclusively for the individual or entity to which it is addressed. This communication contains information that is law enforcement sensitive, for official use only, sensitive but unclassified, proprietary, privileged, and may be legally protected or otherwise exempt from disclosure.  If you are not the intended recipient, you are hereby notified that any disclosure, dissemination, copying or distribution of this transmission is strictly prohibited.  If you have received this message in error, please notify the sender immediately by email and immediately delete this message and all of its attachments.

6457 E. Snowdon St., Mesa, AZ 85215
Phone: (570) 604-5686 * Email: Matthew.V.Parker@gmail.com

# MATTHEW V. PARKER

April 17th, 2015

Human Resources
Arizona Office of the Attorney General
1275 West Washington Street
Phoenix, AZ 85007-2926
(602) 542-5025

To whom it may concern:

This letter is in response to a letter forwarded to me, Matthew Parker, dated April 8th, 2015 regarding my employment status with the Arizona Attorney General's Office as a Special Agent.  In the correspondence it states that my job was abandoned and "[a]s an uncovered employee, you do not have the right to grieve this action or the right to appeal this action to either the Law Enforcement Merit System Council or the State Personnel Board."

However, I am formally requesting an appeal regarding this matter under the provisions set forth in the Law Enforcement Merit Council Guidelines set forth in A.R.S. 41-1830.06 as there was a material error in the designation of my employment classification as an uncovered versus covered employee status and thus my statutorily right to appeal and my right to due process.

My being classified as an uncovered employee is contrary to Arizona law and as such I was and am now improperly misclassified as an uncovered employee when I clearly meet the definition of a "covered" employee.   Arizona Revised Statutes 41-742; State personnel system; covered and uncovered employees; application; exceptions, is the statue that discusses the parameters for state employees being either covered or uncovered, which went into effect on September 29th, 2012.

Under Arizona Revised Statutes 41-742E.1 it states:

*"Unless otherwise prescribe in this article, subsection A, paragraphs 1, 2 and 3 of this section **do not apply to either an initial appointment to or changes in assignment to: 1. An employee of any state agency who is a full authority peace officer** as certified by the Arizona peace officers standards and training board."*

Further citing 41-742I:

*"**Any communications, including policy manuals, employee handbooks, job offers and** performance appraisals and other communications as determined by the director, **whether in writing or oral that conflict with article 1, 5 or 6 of this chapter or this article are void** and do not alter or supersede article 1, 5, or 6 of this chapter or this article."*

Therefore, under ARS 41-742E1 and ARS 41-742I I am exempted from the purview of the uncovered employee statue so I am entitled to an appeal in accordance with rules provided under the Law Enforcement merit system council as prescribed in ARS 41-1830.16.

Additionally, I am in receipt of an email between myself and Assistant Chief (AC) Charles Loftus dated Monday February 17th, 2014.  In this email, I addressed the issue with AC Loftus.  AC Loftus' response states that he contacted AGO HR to have the Special Agents who were designated as uncovered employees corrected.  When I had a follow up conversation with AC Loftus he assured me that I was covered by the statute (as does his email) and dissuaded me to address the issue directly with AGO HR as I was a new employee.  Please see the attached email.

As such, I am requesting an appeal within the prescribed time of 10 days listed in the statue.  Upon acceptance that I do have a right to appeal, in accordance with Arizona law, from your agency, I will, within 10 days forward a list of all allegation and information regarding why the appeal should be granted to the Law Enforcement Merit Council through the appropriate channels.

I plan to pursue this matter to the full extent possible under the law up to and including litigation.   I look forward to you reply.

Respectfully,

*Matthew V. Parker*

Matthew V. Parker

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #122</u>

**AZ Attorney General Agency Handbook 2014**

**MVP00013654-57, 13695, 13711, 13721-22**



## Arizona Attorney General
# Mark Brnovich

| Search |

OFFICE    COMPLAINTS    OUTREACH    SENIORS    CONSUMER    CRIMINAL    CIVIL RIGHTS

MEDIA

*Home* » *Agency Handbook*

## Agency Handbook

**Arizona Revised Statute §41-192(A)(8)** requires the Attorney General to "compile, publish and distribute to . . . persons and government entities on request, at least every ten years, the Arizona agency handbook." Due to the high cost of publishing, the current version of the Handbook is posted on the Attorney General's Web site to satisfy this statutory requirement. (Revised 2013)



**The Attorney General's Office is in the process of updating the Agency Handbook to reflect some policy and procedure changes currently in effect. We anticipate that the updated version will be released in 2017. In the meantime, please note that the policy has changed with respect to the AGO's representation as advocate and advisor to agencies. Should you have any**

### PRESS RELEASE ARCHIVE

03/2018 (11)
02/2018 (16)
01/2018 (18)
12/2017 (8)
11/2017 (11)
10/2017 (11)

| 1 | 2 | 3 | 4 | 5 | next › | last » |
| 9 | … | | | | | |

questions as to that change, please contact the AGO directly (**LicensingEnforcement@azag.gov**).  These changes will be reflected in  Chapter 1 at 1.9.4 et seq.  and Chapter 10 at 10.17.

---

## PREFACE

I proudly present the 2014 edition of the Arizona Agency Handbook. This publication is intended to provide guidance to State officers and employees and to the lawyers who represent the State or appear before its boards and agencies. The Handbook does not itself create legal rights or obligations; instead it is a reference source that discusses laws otherwise created by statutes, regulations, and the state or federal constitutions.

This edition of the Handbook supersedes the 2011 edition and reflects the changes that have occurred in the laws governing state agencies since 2011. Among other things, the 2014 edition addresses the significant new or amended laws on such topics as personnel, procurement, public records, discrimination law, administrative adjudications, and rulemaking.

The 2014 edition of the Handbook is available on the website of the Attorney General's Office at **www.azag.gov**. Individual chapters will be updated periodically to reflect significant legal developments, and such revisions will be posted on the website as they become available. Comments and suggestions concerning the Handbook are welcome and should be sent to the Solicitor General's Office at the Office of the Attorney General, 2005 N Central Ave., Phoenix, Arizona, 85004.

Updating the Handbook required many hours of work by lawyers, legal assistants, and other staff throughout the Attorney General's Office, and I sincerely thank all of those who did the research, writing, editing, proof reading, and cite checking necessary to complete this massive project.

Very truly yours,


Attorney General Mark Brnovich

---

## ARIZONA AGENCY HANDBOOK

### HANDBOOK COORDINATORS

JOHN LOPEZ, Solicitor General
MARY JO FOSTER, Special Counsel, Ethics & Training

### CONTRIBUTORS

MVP00013655

TODD ALLISON

PAULA S. BICKETT

DENNIS CARPENTER

KRISTINA FREDERICKSON

JEANNE GALVIN

BETSY GORDON

SETH HARGREAVES

MARC HARRIS

JOY HERNBRODE

ANN HOBART

LESLIE KEILP

MICHELLE KUNZMAN

CHRIS MUNNS

REX NOWLAN

NORMA QUIROZ

DAN SCHAACK

GINA SCOTT

ROBERT SOKOL

MARLENA SOTO

KIRSTIN STORY

KATHLEEN P. SWEENEY

MARY D. WILLIAMS

---

## TABLE OF CONTENTS

**CHAPTER**

01. **THE ATTORNEY GENERAL AND THE DEPARTMENT OF LAW**

02. **PUBLIC OFFICERS AND EMPLOYEES**

03. **PERSONNEL**

04. **PUBLIC MONIES**

05. **PROCUREMENT**

06. **PUBLIC RECORDS**

07. **OPEN MEETINGS**

08. **CONFLICT OF INTEREST**

09. **LICENSING**

10. **ADMINISTRATIVE ADJUDICATIONS**

11. **RULEMAKING**

12. **ENFORCEMENT**

13. **LITIGATION AGAINST STATE ENTITIES**

14. **DETECTION OF CRIMINAL VIOLATIONS**

15. **DISCRIMINATION LAW**

16. **LOBBYING**



Arizona Attorney

OFFICE   COMPLAINTS   OUTREACH   SENIORS   CONSUMER   CRIMINAL   CIVIL RIGHTS   MEDIA

2005 N CENTRAL AVENUE, PHOENIX, AZ 85004 | EMAIL: **CONTACT US** | PHONE: (602) 542-5025

PRIVACY STATEMENT

# CHAPTER 2

# PUBLIC OFFICERS AND EMPLOYEES

**2.1    Scope of this Chapter.**  This Chapter discusses the qualifications, duties, and responsibilities of public officers.  It also discusses selected constitutional and statutory provisions concerning public officers' appointment and tenure in office, as well as the civil or criminal liability of public officers and employees.  *See also* Agency Handbook Chapter 3 (Personnel).

**2.2    Definition of "Public Officer."**  A "public officer" is "the incumbent of any office, member of any board or commission, or his deputy or assistant exercising the powers and duties of the officer, other than clerks or mere employees of the officer." A.R.S. § 38-101(3).  The executive heads of all state agencies and the members of all state boards and commissions are considered "public officers."  Generally, all others working for the state are "employees."

**2.3    Qualifications for Public Office.**  Persons seeking election to public office must meet Arizona constitutional and statutory requirements.  To be eligible for elective state office, a person must be a qualified elector of the political division or municipality in which he or she is seeking to be elected.  Ariz. Const. art. VII, § 15.  A person who is adjudicated an incapacitated person is not a qualified elector, nor is any person convicted of treason or of a felony, unless restored to civil rights.  Ariz. Const. art. VII, § 2(C).

Public officers, whether elected or appointed, must be at least eighteen years old, must be United States citizens and Arizona residents, must be able to speak, write, and read the English language, and must have registered with the selective service system if required by law to do so.  A.R.S. § 38-201(A)-(E); *see also Escamilla v. Cuello*, 230 Ariz. 202, 205-06, 282 P.3d 403, 406-07 (2012) (holding that A.R.S. § 38-201(C) requires that a candidate for public office "possess sufficient proficiency in the English language to conduct the duties of the office" and that this requirement does not unconstitutionally violate a non-English-speaking candidate's right to participate government).  Constitutional and statutory provisions establish additional qualifications for certain public officers.  *See, e.g.*, Ariz. Const. art. V, §§ 1, 2 (age and residency requirements for the Governor, Secretary of State, State Treasurer, Attorney General, and Superintendent of Public Instruction); Ariz. Const. art. XV, § 1 (qualifications for Corporation Commissioner); Ariz. Const. art. IV, Pt. 2, § 2 (qualifications to be a member of the Arizona legislature); A.R.S. § 27-121 (qualifications for the State Mine Inspector); A.R.S. § 41-191 (the Attorney General must have been a practicing attorney for at least five years before taking office); A.R.S. § 11-402 (qualifications for county offices).

**CHAPTER 3**

**PERSONNEL**

Table of Contents

Section 3.1          Scope of This Chapter

Section 3.2          State Personnel System

     3.2.1          Uncovered Employees

     3.2.2          Covered Employees

     3.2.3          Original Probationary Employees

     3.2.4          Types of Appointment

Section 3.3          Discipline of Covered Employees

     3.3.1          Reprimand and Counseling

     3.3.2          Suspension

     3.3.3.          Demotion

     3.3.4.          Dismissal

     3.3.5.          Rules for Law Enforcement Officers

Section 3.4          Appeal from Disciplinary Action

     3.4.1          Appeals Involving Law Enforcement Officers

     3.4.2          Employee's Disclosure of Information ("Whistleblowing")

Section 3.5          Employee Grievances

Section 3.6          Agency Actions Affecting Employees

     3.6.1          Promotional Probation

     3.6.2          Reorganization and Reduction in Force

Section 3.7          Employee Options

Revised 2013

1.   A statement describing the corrective action that the employee must take to remedy the misconduct or deficient performance to avoid further discipline;

2.   A statement of the consequences of failing to remedy the misconduct or deficient performance; and

3.   A warning that any further misconduct or deficient performance may or will lead to additional discipline up to and including dismissal.

If the agency head decides that dismissal is appropriate, the agency must provide the employee with written notice of the decision.  The letter should include the information in the notice of charges (items 1 through 6 above).   See Form 3.7(b). Dismissal is effective only after the dismissal letter has been served on the employee in accordance with A.A.C. R2-5B-305(E).

### 3.3.5  Rules for Law Enforcement Officers.

Arizona Revised Statutes Section 38-1101 imposes certain requirements on state agencies that are investigating misconduct by nonprobationary employees who are statutorily defined as "law enforcement officers."   These requirements apply regardless of whether the nonprobationary employee is a covered or an uncovered employee.  The statute defines a law enforcement officer as an individual who is either (1) certified by the Arizona Peace Officer Standards and Training Board or (2) a detention or a correction officer.  A.R.S. § 38-1101(P)(4).

If an employee meets the statutory definition of law enforcement officer, the agency must provide the employee with written notice before interviewing the employee on a matter that the agency reasonably believes could lead to dismissal, demotion, or suspension.  A.R.S. § 38-1101(A)(2).  The notice must inform the employee of (1) any known allegations of misconduct, (2) the alleged facts on which the agency is basing the investigation, (3) the nature of the investigation, (4) whether the employee is the subject of the investigation, and (5) the employee's right to have a representative present at the interview.  *Id.*

The employee then has the right to request that a representative be present at the interview to act as an observer.  A.R.S. § 38-1101(A)(1).  The representative must be an employee of the same agency, or, if one is not reasonably available, a representative from the employee's professional membership organization.  *Id.*  The agency should give the employee reasonable notice prior to the interview to ensure that the employee's representative is available.  *Id.*  The representative cannot be an attorney unless the agency agrees that he or she can be and cannot verbally participate in the interview, but can be present only as an observer.  *Id.*  During the interview, the employee has the right to take short, reasonable breaks to consult in person or telephonically with an attorney or other representative.  *Id.*

The Legislature has also enacted A.R.S. § 38-1104, which states that law enforcement officers "shall not be subject to disciplinary action except for just cause." A.R.S. § 38-1104(A).  It requires an agency to establish that the law enforcement officer had reasonable knowledge that the actions at issue constituted misconduct for which discipline could be imposed, A.R.S. § 38-1104(I)(3)(a), and that a preponderance of evidence supports the discipline, A.R.S. § 38-1104(I)(3)(c).  Furthermore, the discipline must not be excessive and must be reasonably related to the seriousness of the offense and the officer's service record.  A.R.S. § 38-1104(I)(3)(d).  However, an agency does not have to establish just cause to discipline law enforcement officers who are probationary employees, A.R.S. § 38-1104(B), or who are uncovered employees, A.A.C. R2-5A-801(A).

See Forms 3.3(a), 3.7(a), 3.22, 3.29, and 3.30 for examples of letters that can be used when disciplining full authority peace officers.

**3.4    Appeal from Disciplinary Action.**   Permanent status covered employees, who are not full authority peace officers, may appeal a suspension without pay for more than 80 working hours, a demotion, or a dismissal.  A.R.S. § 41-783(A).  The appeal must be filed with the Personnel Board no later than ten working days after the action's effective date.  *Id.*  An agency should be prepared to obtain the information and witnesses necessary to establish the basis for the disciplinary action.  If an appeal is filed, the agency should immediately notify its employment counsel.

**3.4.1  Appeals Involving Law Enforcement Officers.**   Covered employees who are permanent status full authority peace officers may appeal a suspension without pay for more than 40 working hours, a demotion, or a dismissal.  A.R.S. § 41-1830.16(B).  These appeals are made to the Law Enforcement System Council, not the Personnel Board.

Arizona Revised Statutes Section 38-1101 imposes additional requirements in disciplinary appeals involving state employees who qualify as law enforcement officers.  At any time after these employees file an appeal, they are entitled to request in writing a copy of the complete investigative file related to their discipline.  The agency must provide the investigative file and the names and home or work mailing addresses of all persons interviewed during the course of the investigation to the employee within three business days of receiving the written request.  A.R.S. § 38-1101(E)(1).  These employees are also entitled, no later than ten days prior to their appeal hearings, to an exchange of copies of the documents that will be used at the hearing and that have not already been exchanged, the names and contact information of persons who have given statements, and the names of the witnesses who will appear at the appeal hearing and the subject matter of their testimony.  A.R.S. § 38-1101(E)(2).  The statute also imposes additional requirements in the appeal process that are not required for state employees who are not law enforcement officers.

**3.4.2  Employee's   Disclosure   of   Information   ("Whistleblowing").** Whistleblower law constantly changes due to legislative rewriting and judicial

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #123</u>

**Deposition of Lauren Buhrow (Volume II) on 5/15/2018**

134

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF ARIZONA

3

4    Matthew V. Parker,            )Case # 2:17 CV-887-PHX-DLR
                                   )
5              Plaintiff,          )
                                   )
6                   vs.            )
                                   )
7    State of Arizona, and Mark    )
     Brnovich, Arizona Attorney    )
8    General, in his official      )
     capacity,                     )
9                                  )
               Defendants.         )
10   _____)

11

12             DEPOSITION OF LAUREN BUHROW
                         VOLUME II
13              (pages 134 through 265)

14

15                   Phoenix, Arizona
                      May 15, 2018
16                    12:00 p.m.

17

18

19

20   Reported by:
     JENNIFER HANSSEN, RPR
21   Certified Reporter No. 50165

22   PREPARED FOR:
     ASCII/CONDENSED
23

24   (Certified Copy)

25

1    Jackson about Mr. Parker?

2        A.    No.

3        Q.    Did you speak to Leslie Welch about

4    Mr. Parker?

5        A.    Yes.

6        Q.    What about?

7        A.    That there were records that I needed that she

8    had, that her staff member -- she was giving us a staff

9    member to sit on the board and help, because it was

10   starting to take more time, to develop a better working

11   relationship between HR and PSPRS for their desire to

12   take over the record holding which has been an issue of

13   contention with the personnel, and the reason for

14   keeping it separate.  But, again, about Parker, he

15   would have been a part of all of that.

16              Also about him being a pain in the ass.

17   Maybe that's my words.  Being a pain in the butt.

18       Q.    Who characterized Parker as a pain in the

19   butt?

20       A.    I believe Leslie Welch.

21       Q.    Did she expound on that?  Or why did she feel

22   that way?

23              MS. SCHAFER:  Foundation.

24       A.    Just ongoing processes and the amount of time

25   it was taking.

1    Q.    And did you talk to her more than once, Welch?

2    A.    Yes.

3    Q.    Did she call Mr. Parker a pain in the ass

4    every time?

5              MS. SCHAFER:   Form.

6    A.    I don't think so.

7    Q.    BY MR. LUDWIG:   Just one time?

8              MS. SCHAFER:   Form.

9    A.    Probably.

10   Q.    BY MR. LUDWIG:  Did you ask her why did you

11   think he was a pain in the ass?

12   A.    I didn't care.  I didn't usually get involved

13   in that.

14   Q.    At that time did you think that Mr. Parker was

15   a pain in the ass?

16   A.    No, except when he would drone on and on like

17   the first time, last meeting, I told you that he came

18   into my office and was talking extensively about his

19   knowledge of the PSPRS system and how out of compliance

20   we were and the fact that he thought we needed to be

21   having four meetings a year, and that wasn't the case

22   and he didn't know that I was the chair.  I told you

23   about that.

24             He had a habit of being an expert on

25   everything or proposing or pretending to be and that

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# Exhibit #124

**MVP00014998-15002**



MVP00014998



**DEVELOPING STORY**

**FBI AGENTS INVESTIGATE VALLEY TISSUE BANK**

COMPANY DEALS WITH PEOPLE WHO DONATE BODIES TO SCIENCE

#ab

abc

6:00

MVP00014999



MVP00015000



ONLY ON ABC15

INVESTIGATION CONTINUES INTO BRC
FAMILIES OF DONORS SAY THEY AREN'T GETTING UPDATES

ABC15 ARIZONA



MVP00015002

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #125</u>

**MVP0002276-2278**

| | |
|---|---|
| **From:** | Human Resources |
| **To:** | Hatcher, TammieJo |
| **Cc:** | Human Resources |
| **Subject:** | FW: Employee ID Card |
| **Date:** | Tuesday, January 20, 2015 3:35:22 PM |

*4m 1/26/15
re: building access.
Please call*

**From:** Parker, Matthew
**Sent:** Tuesday, January 20, 2015 3:05 PM
**To:** Human Resources
**Cc:** Loftus, Charles
**Subject:** Employee ID Card

HR,

I stopped by the office to retrieve a piece of personal property last week from my office but my employee badge did not work.  Is there a way to reactivate it?  I am not sure if since I am out on FMLA it was deactivated, the card automatically deactivated after not being used for weeks, or it was just during maintenance period.   In any event is there a way to re-authorize my card since I am still employed there or at least provide me some information as to why it was deactivated?

Respectfully,

Matt


Special Agent Matt Parker
Criminal Division
Financial Remedies Section
Arizona Attorney General's Office
1275 W. Washington St.
Phoenix, AZ  85007
Desk:  602-542-7929
Cell: 602-920-9149
Matthew.V.Parker@azag.gov

**LAW ENFORCEMENT SENSITIVE**
**NOTICE:**  This message is intended exclusively for the individual or entity to which it is addressed.  This communication contains information that is law enforcement sensitive, for official use only, sensitive but unclassified, proprietary, privileged, and may be legally protected or otherwise exempt from disclosure.  If you are not the intended recipient, you are hereby notified that any disclosure, dissemination, copying or distribution of this transmission is strictly prohibited.  If you have received this message in error, please notify the sender immediately by email and immediately delete this message and all of its attachments.



| From: | Human Resources |
|---|---|
| To: | Hatcher, TammieJo |
| Cc: | Human Resources |
| Subject: | FW: FMLA Continuation - UPDATE 1/7/2015 |
| Date: | Wednesday, January 07, 2015 1:42:03 PM |

**From:** Parker, Matthew
**Sent:** Wednesday, January 07, 2015 1:24 PM
**To:** Loftus, Charles; Human Resources
**Subject:** RE: FMLA Continuation - UPDATE 1/7/2015

AC Loftus and AGO HR,

I have not been cleared to return to work yet by my doctor. I will continue to be out on FMLA for at least the next two work weeks (Monday 1/11/2015 - Friday 1/23/2015). I will continue to provide periodic updates of my expected return to work date as I receive more information from my doctor.

Special Agent Matt Parker
Criminal Division
Financial Remedies Section
Arizona Attorney General's Office
1275 W. Washington St.
Phoenix, AZ  85007
Desk:  602-542-7929
Cell: 602-920-9149
Matthew.V.Parker@azag.gov

**LAW ENFORCEMENT SENSITIVE**
**NOTICE:**  This message is intended exclusively for the individual or entity to which it is addressed.  This communication contains information that is law enforcement sensitive, for official use only, sensitive but unclassified, proprietary, privileged, and may be legally protected or otherwise exempt from disclosure.  If you are not the intended recipient, you are hereby notified that any disclosure, dissemination, copying or distribution of this transmission is strictly prohibited.  If you have received this message in error, please notify the sender immediately by email and immediately delete this message and all of its attachments.

**From:** Parker, Matthew
**Sent:** Sunday, December 28, 2014 6:29 PM
**To:** Loftus, Charles; Human Resources
**Subject:** FMLA Continuation

AC Loftus and AGO HR,

I have not been cleared to return to work yet by my doctor. I will continue to be out on FMLA for at least the next two work weeks (Monday 12/29/2014 - Friday 1/9/2015). I will continue to provide periodic updates of my expected return to work date as I receive more information from my doctor.

Respectfully,

MVP0002278

Matt


Special Agent Matt Parker
Criminal Division
Financial Remedies Section
Arizona Attorney General's Office
1275 W. Washington St.
Phoenix, AZ  85007
Desk:  602-542-7929
Cell: 602-920-9149
Matthew.V.Parker@azag.gov

**LAW ENFORCEMENT SENSITIVE**
**NOTICE:**  This message is intended exclusively for the individual or entity to which it is addressed.  This communication contains information that is law enforcement sensitive, for official use only, sensitive but unclassified, proprietary, privileged, and may be legally protected or otherwise exempt from disclosure.  If you are not the intended recipient, you are hereby notified that any disclosure, dissemination, copying or distribution of this transmission is strictly prohibited.  If you have received this message in error, please notify the sender immediately by email and immediately delete this message and all of its attachments.

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #126</u>

### SOA000763-882

**FINAL RULES (EXEMPT RULEMAKING)**

**Effective:  April 13, 2013**

**TITLE 2. ADMINISTRATION**

**CHAPTER 5. DEPARTMENT OF ADMINISTRATION**

**STATE PERSONNEL SYSTEM**

**SUBCHAPTER A. COVERED AND UNCOVERED EMPLOYEES**

**ARTICLE 1. GENERAL**

Section

R2-5A-101.    Definitions

R2-5A-102.    General Provisions

R2-5A-103.    Applicability

R2-5A-104.    Prohibition Against Discrimination, Harassment and Retaliation

R2-5A-105.    Records

**ARTICLE 2. CLASSIFICATION SYSTEM**

Section

R2-5A-201.    Classification Plan

R2-5A-202.    Change in Classification

R2-5A-203.    Second Level Review

**ARTICLE 3. RECRUITMENT, SELECTION AND APPOINTMENT**

Section

R2-5A-301.    General

R2-5A-302.    Recruitment

R2-5A-303.    Reference and Background Checks

R2-5A-304.    Qualifications of Selected Candidate

R2-5A-305.    Employment of Relatives

R2-5A-306.    Hiring Requirements

R2-5A-307.    Appointment

R2-5A-308.    Applicant Complaint

SOA000763

## ARTICLE 4. COMPENSATION SYSTEM

Section

R2-5A-401.    Salary Plans

R2-5A-402.    Salary Administration

R2-5A-403.    Supplemental Pay

R2-5A-404.    Overtime

R2-5A-405.    Tuition Reimbursement for Education

R2-5A-406.    Reimbursement for Relocation

## ARTICLE 5. CONDITIONS OF EMPLOYMENT

Section

R2-5A-501.    Standards of Conduct

R2-5A-502.    Hours of Work

R2-5A-503.    Outside Employment

R2-5A-504.    Alcohol and Drug-free Workplace

## ARTICLE 6. LEAVE

### PART A. GENERAL

Section

R2-5A-A601.    Leave Administration

### PART B. PAID LEAVE

Section

R2-5A-B601.    Holidays

R2-5A-B602.    Annual Leave

R2-5A-B603.    Sick Leave

R2-5A-B604.    Administrative Leave

R2-5A-B605.    Bereavement Leave

R2-5A-B606.    Civic Duty Leave

R2-5A-B607.    Compensatory Leave

R2-5A-B608.    Educational Leave

R2-5A-B609.    Living Donor Leave

R2-5A-B610.    Leave for National Disaster Medical System (NDMS) Training

SOA000764

R2-5A-B611.    Meritorious Service Leave

## PART C. UNPAID LEAVE

Section

R2-5A-C601.    Furlough

R2-5A-C602.    Leave Without Pay

## PART D. LEAVE THAT COULD BE EITHER PAID OR UNPAID

Section

R2-5A-D601.    Family and Medical Leave Act (FMLA) Leave

R2-5A-D602.    Industrial Leave

R2-5A-D603.    Military Leave

R2-5A-D604.    Victim Leave

## ARTICLE 7. PERFORMANCE MANAGEMENT

Section

R2-5A-701.    General

R2-5A-702.    Performance Management Process

## ARTICLE 8. DISCIPLINARY ACTIONS

Section

R2-5A-801.    General

R2-5A-802.    Procedures for Review by the Director

R2-5A-803.    Employee Request for Review of Disciplinary Action

## ARTICLE 9. COMPLAINTS

Section

R2-5A-901.    Complaint System

R2-5A-902.    Complaint Procedures

## ARTICLE 10. SEPARATIONS

Section

R2-5A-1001.    Voluntary Separation

R2-5A-1002.    Involuntary Separation

**SOA000765**

## SUBCHAPTER B. COVERED EMPLOYEES

### ARTICLE 1. GENERAL

Section
R2-5B-101.    Definitions
R2-5B-102.    Applicability

### ARTICLE 2. EMPLOYMENT STATUS

Section
R2-5B-201.    Applicability
R2-5B-202.    Original Probation
R2-5B-203.    Promotional Probation
R2-5B-204.    Permanent Status
R2-5B-205.    Change from Covered to Uncovered Service

### ARTICLE 3. DISCIPLINARY ACTIONS

Section
R2-5B-301.    General
R2-5B-302.    Reprimand
R2-5B-303.    Suspension
R2-5B-304.    Involuntary Demotion
R2-5B-305.    Dismissal

### ARTICLE 4. GRIEVANCES

Section
R2-5B-401.    Applicability
R2-5B-402.    Grievance System
R2-5B-403.    Grievance Procedures

### ARTICLE 5. APPEALS

Section
R2-5B-501.    Applicability
R2-5B-502.    General
R2-5B-503.    Full Authority Peace Officers

SOA000766

## ARTICLE 6. REDUCTION IN FORCE

Section

R2-5B-601.    Applicability

R2-5B-602.    Reduction in Force Procedures

R2-5B-603.    Employee Request for Review

**SOA000767**

## SUBCHAPTER A. COVERED AND UNCOVERED EMPLOYEES

### ARTICLE 1. GENERAL

**R2-5A-101.     Definitions**

In this subchapter, the following words and phrases have the defined meanings unless otherwise clearly indicated by the context:

"Agency head" means the chief executive officer of a state agency, or designee.

"Appeal" means a covered employee's request for a review of a disciplinary action by the State Personnel Board under A.R.S. § 41-782 or the Law Enforcement Merit System Council under A.R.S. § 41-1830.16, as applicable.

"Applicant" means a person who seeks appointment to a position in state employment.

*"Appointing authority" means the person or group of persons authorized by law or delegated authority to make appointments to fill positions. A.R.S. § 41-741(1)*

"Appointment" means the offer to and the acceptance by a candidate of a position in a state agency.

*"At will" means an employment relationship where either party to the relationship may sever the relationship at any time for any reason other than an unlawful reason. A.R.S. § 41-741(2)*

"Base salary" means an employee's salary excluding supplemental pay provided by R2-5A-403, overtime pay or other pay allowance provided by law.

*"Break in service" means a separation from state employment, regardless of the reason for separation. A.R.S. § 41-741(3)*

"Business day" means the hours between 8:00 a.m. and 5:00 p.m. Monday through Friday, excluding observed state holidays.

"Candidate" means a person whose education, experience, competencies and other qualifications meet the requirements of a position and who may be considered for employment.

"Cause" means any of the reasons for disciplinary action provided by A.R.S. § 41-773 or these rules.

*"Change in assignment" means movement of an employee to a different position in the same state agency or another state agency. A.R.S. § 41-741(4)*

"Child" means, for purposes of R2-5A-B603, pertaining to sick leave, and R2-5A-B605 pertaining to bereavement leave, a natural child, adopted child, foster child, or stepchild.

"Class" means a group of positions with the same title and grade because each position in the group has similar duties, scope of discretion and responsibility, required qualifications, or other job-related characteristics.

**SOA000768**

"Class series" means a group of related classes as listed by the Arizona Department of Administration, Human Resources Division.

"Class specification" means a description of the type and level of duties and responsibilities of the positions assigned to a class.

"Competencies" means knowledge, skills, abilities, behaviors and other characteristics that contribute to successful job performance and the achievement of organizational results.

*"Covered employee" means an employee who:*

(a) *Before September 29, 2012, is in the state service, is not uncovered pursuant to section 41-742, subsection A, and has remained in covered status without a break in service since that date.*

(b) *Before September 29, 2012, is in the state service, is employed as a Correctional Officer I, Correctional Officer II, Correctional Officer III or Community Corrections Officer and has remained in covered status without a break in service since that date.*

(c) *Before September 29, 2012, is in the state service, is a full authority peace officer as certified by the Arizona Peace Officer Standards and Training Board and has remained in that status without a break in service since that date.*

(d) *On or after September 29, 2012, is a Correctional Officer I, Correctional Officer II, Correctional Officer III or Community Corrections Officer and is appointed to a position in the covered service, but does not include a position in any other class in the correctional officer class series or the community correctional officer class series or in any other correctional class series.*

(e) *On or after September 29, 2012, is a full authority peace officer as certified by the Arizona Peace Officer Standards and Training Board and is appointed to a position that requires such a certification in the covered service.* A.R.S. § 41-741(5)

"Covered position" means a position in the covered service.

"Covered service" is defined in A.R.S. § 41-741 and means that employment status conferring rights of appeal as prescribed in A.R.S. §§ 41-782 and 41-783 or A.R.S. § 41-1830.16, as applicable.

"Days" means calendar days, unless otherwise stated.

"Demotion" means a change in the assignment of an employee from a position in one class to a position in another class that has a lower grade.

"Department" means the Arizona Department of Administration.

*"Director" means the Director of the Arizona Department of Administration, or the Director's designee, who is responsible for administering the state personnel system pursuant to applicable state and federal laws.* A.R.S. § 41-741(7)

SOA000769

*"Employee" means all officers and employees of this state, whether in covered service or uncovered service, unless otherwise prescribed.* A.R.S § 41-741(8)

"Employing agency" means the agency where the employee is employed or, if an applicant, the agency to which the person has applied.

"Essential job function" means a fundamental job duty of a position that an applicant or employee must be able to perform, with or without a reasonable accommodation.

"FLSA" means the federal Fair Labor Standards Act.

"FLSA exempt" means a position that is not entitled to overtime compensation under the FLSA.

"FLSA non-exempt" means a position that is entitled to overtime compensation under the FLSA.

"FMLA" means the federal Family and Medical Leave Act.

*"Full authority peace officer" means a peace officer whose authority to enforce the laws of this state is not limited by the rules adopted by the Arizona Peace Officer Standards and Training Board.* A.R.S. § 41-741(9)

"Grade" means the numeric identifier associated with one or more pay ranges, used to determine the internal worth of a class relative to other classes.

"Manifest error" means an act or failure to act that is, or clearly has caused, a mistake.

"Parent" means, for purposes of R2-5A-B602, pertaining to annual leave, R2-5A-B603, pertaining to sick leave, and R2-5A-B605, pertaining to bereavement leave, a birth parent, adoptive parent, stepparent, foster parent, grandparent, parent-in-law, or anyone who can be considered "in loco parentis."

"Part-time" means employment scheduled for less than 40 hours per week.

> "3/4 time" means employment regularly scheduled for at least 30 hours but fewer than 40 hours per week.

> "1/2 time" means employment regularly scheduled for at least 20 hours but fewer than 30 hours per week.

> "1/4 time" means employment regularly scheduled for at least 10 hours but fewer than 20 hours per week.

"Pay status" means an employee is receiving pay for work or for a compensated absence.

"Premium/contribution" means the amount paid in exchange for insurance coverage. Depending on the type of coverage, the premium/contribution is paid by the employee, the state, or a combination of both.

"Promotion" means a change in assignment of an employee from a position in one class to a position in another class that has a higher grade.

**SOA000770**

"Reallocation" means changing the allocation of a position to a different class if a material and permanent change in duties or responsibilities occurs.

"Reversion" means the return of a covered employee on promotional probation to a position in the class in which the employee held permanent status immediately before the promotion or to a similar position in another class at the same grade as the class the employee held permanent status if the employee possesses the qualifications for that position.

*"Rules" means the rules adopted by the Department of Administration, Human Resources Division.* A.R.S. § 41-741(13)

"Special assignment" means the temporary assignment, for up to six months, of the duties and responsibilities of another position to an employee in the same agency.

*"State agency" means a department, board, office, authority, commission or other governmental budget unit of this state and includes an agency assigned to a department for administrative purposes. State agency does not include the legislative and judicial branches, the Arizona Board of Regents, state universities, the Arizona State Schools for the Deaf and the Blind, the Department of Public Safety, the Arizona Peace Officer Standards and Training Board, the Cotton Research and Protection Council or public corporations.* A.R.S. § 41-741(14)

"State Personnel Board" is defined in A.R.S. § 41-741 and means the board established by A.R.S. Title 41, Chapter 4, Article 6.

"State Personnel System" is defined in A.R.S. § 41-741 and means all state agencies and employees of those agencies that are not exempted by the provisions of A.R.S. Title 41, Chapter 4, Article 4.

"State service" is defined in A.R.S. § 41-741 and means all offices and positions of employment in state government that, before September 29, 2012, were subject to the provisions of A.R.S. Title 41, Chapter 4, Articles 5 and 6 that were in effect before September 29, 2012.

*"Supervisor" means a state employee who has one or more other state employees reporting directly to the person and, for those state employees, typically has the authority to:*

  *(a) Approve sick or annual leave.*

  *(b) Recommend hiring, discipline or dismissal.*

  *(c) Assign or schedule daily work.*

  *(d) Complete a performance evaluation.* A.R.S. § 41-741(18)

"Temporary appointment" means an appointment made for a maximum of 1,500 hours worked in any agency in each calendar year.

"Transfer" means the movement of an employee from one position to another position in the same or an equivalent grade.

*"Uncovered employee" means an employee in uncovered service.* A.R.S. § 41-741(19)

SOA000771

*"Uncovered service" means employment at will and includes all state employees except those in covered service.* A.R.S. § 41-741(20)

"Working day" or "working hours" means a day or the hours an employee is regularly scheduled to work.

### R2-5A-102.    General Provisions

**A.**  Authority of Director.

  1.  The Director may approve, modify or deny a request, plan or proposal submitted by a state agency for review or when the Director's approval is required by rule.

  2.  The Director may audit an agency's personnel policies and procedures at any time. If the Director determines that the agency's policies or procedures are inconsistent with these rules or are inconsistent with the procedures or guidelines issued by the Director, the Director may direct the agency head to modify them to achieve consistency or to discontinue them.

**B.**  Delegation of authority.

  1.  The Director may, in writing, delegate authority to an agency head as consistent with legal requirements.

  2.  The Director may review or audit delegated authority to determine compliance with laws, rules, and policies.

  3.  Unless otherwise stated by law, or in these rules, an agency head may delegate authority granted to the agency head in these rules.

**C.**  Availability of funds. The granting of any compensation under these rules is contingent upon the availability of funds, as determined by an agency head and the Director.

**D.**  Service of notice. If a notice or document is to be given to a person or agency, the notice or document may be served personally or mailed to the last known residence or current business address of the person or agency. Unless otherwise provided by law or these rules, service is complete upon personal delivery or mailing.

**E.**  Employee handbook. The Director may publish an employee handbook outlining pertinent rules and regulations and make the handbook available to all employees.  If published, the employee handbook shall serve as the official handbook for all employees in the State Personnel System. An agency head may supplement the employee handbook with agency specific policies and directives.

**F.**  Employment contracts.  Unless otherwise provided by law, an appointing authority shall not execute an employment contract with any state employee.

**G.**  Correction of errors. Only the Director, or designee, has authority to determine whether a manifest error exists and to correct the manifest error.

**SOA000772**

**R2-5A-103.    Applicability**

**A.** General. Except as provided in A.R.S., Title 41, Chapter 4, Article 4 and Article 5, or otherwise stated in rule, the rules in this subchapter are applicable to covered and uncovered positions, applicants for covered and uncovered positions and covered and uncovered employees in the State Personnel System.  An employee who violates or fails to comply with these rules may be disciplined or separated from state employment. Any such actions involving a covered employee shall be in accordance with the rules in Subchapter B, Article 3.

**B.** Temporary procedures. The Director may:

  1.  Unless otherwise prescribed by statute, waive any rule and implement temporary procedures if the Director determines that essential public services are being hampered or it is in the best interest of the state.

  2.  Implement a temporary pilot project to improve efficiency, productivity, or accountability in the State Personnel System. The project may include an activity or procedure that is not in accordance with these rules and shall not exceed two years in duration.

**R2-5A-104.    Prohibition Against Discrimination, Harassment and Retaliation**

**A.** General. Agencies shall comply with all federal and state anti-discrimination laws.  Agencies shall not unlawfully discriminate against any individual with regard to the terms and conditions of employment, including hiring, pay, leave, insurance benefits, retention, and rehiring.  The information provided in this rule is intended to serve as a summary of agencies' and employees' obligations with regard to compliance with applicable federal and state laws, rules and regulations.  Nothing in these rules shall be construed as providing rights in excess of, or in addition to those authorized under federal laws and Arizona Revised Statutes.

**B.** Equal Employment Opportunity. Each agency shall provide equal employment opportunity for all individuals regardless of race, color, national origin, religion, age, disability, genetic information, sex, pregnancy, military or veteran status, or any other status protected by federal law, state law, or regulation. It is the policy of this state that all individuals are treated in a fair and non-discriminatory manner throughout the application and employment process.

**C.** Harassment Prohibited. Harassment of a sexual nature or harassment based on race, color, national origin, religion, age, disability, genetic information, sex, pregnancy, military or veteran status, or any other status protected by federal law, state law, or regulation is prohibited. An agency shall prohibit the unlawful harassment of any employee in the course of the employee's work by supervisors, coworkers, or third parties, such as vendors or customers.  Any employee who engages in unlawful harassment may be subject to disciplinary action, up to and including termination of employment.

**SOA000773**

**D.** Protection from Retaliation.  The state prohibits retaliation against anyone for raising a concern about, assisting in an investigation of, or filing a complaint concerning unlawful discrimination or unlawful harassment.

**E.** Complaints.

    1.  An applicant for state employment who has a complaint alleging discrimination or harassment may file a complaint under the procedures in R2-5A-308.

    2.  It is every employee's responsibility to promptly bring any allegation of discrimination, harassment or retaliation to the attention of the employing agency.  Such complaints shall be filed under the procedures established under Article 9.

**R2-5A-105.      Records**

**A.** Definitions. For the purposes of this Section, "record" generally refers to a paper document; however, a document may be maintained electronically.

**B.** Application Materials.

    1.  An agency head shall maintain and keep confidential all resumés, applications, tests, test results, records, correspondence, and other documents used to seek state employment.  The agency head shall not release any materials that the agency head determines would compromise the application process for future applicants and shall restrict the review of the applicant's application materials to:

        a.  The applicant,

        b.  An individual who has written authorization from the applicant,

        c.  State officials in the normal line of duty, or,

        d.  Officials acting in response to court orders or subpoenas.

    2.  The Director, or designee, shall ensure that when a person makes a public records request under A.R.S. Title 39, Chapter 1, Article 2 for applicant information:

        a.  Information shall only be provided if the position under recruitment is a high-level position and the public has a legitimate interest in the names of persons being seriously considered for the position, as determined by the Director; and

        b.  Only the names and resumés of the final candidates for the position as determined by the Director shall be released.

**C.** Official Personnel File.

    1.  An employee's official personnel file is the official record and documentation of the employee's employment.

    2.  An agency head shall, for each agency employee, maintain an official personnel file that contains:

**SOA000774**

a.  A copy of the job application for the employee's current position;

b.  A copy of all performance appraisals completed as required by Article 7;

c.  Personnel action forms that authorize changes in employment status, position, classification, pay, or leave status;

d.  Letters of commendation as established by agency policy; and

e.  Correspondence consisting of:

    i.  Letters of reprimand, suspension, demotion or dismissal;

    ii.  Acknowledgments of receipt of letters of reprimand or other disciplinary communications; and

    iii.  Employee objections or responses to correspondence described in subsection (C)(2)(e)(i) that are not filed as complaints under Article 9 or grievances under Subchapter B, Article 4, if the objection or response is received within 30 calendar days of the date of the disciplinary action or letter of reprimand.

3.  For the purpose of this subsection, an official is an individual who provides identification verifying that the individual is exercising powers and duties on behalf of the chief administrative head of a public body. An agency head shall limit access to an employee's official personnel file to:

a.  The employee;

b.  The employee's attorney or an individual who has written authorization from the employee to review the personnel file;

c.  Agency personnel designated by the agency head as having a need for the information;

d.  A Department official in the normal line of duty;

e.  An official acting in response to a court order or subpoena;

f.  An official of an agency to which the employee has applied; and

g.  An official of an agency of the federal government, state government, or political subdivision, if the agency head of the employing agency deems access to the file to be appropriate.

4.  When an employee moves from one state agency to another, the gaining agency shall request that the losing agency forward the employee's official personnel file to the gaining agency.  The losing agency shall forward the file within 20 business days of the receipt of the request.

5.  When a former employee returns to state employment within five years of the former employee's separation to an agency other than the agency in which the employee was last employed, the gaining agency shall request that the last agency forward the employee's official personnel file. The last agency shall forward the file within 20 business days of the receipt of the request.

SOA000775

**D.** Disclosure of information.

    1. Definitions. For the purposes of this subsection:

        a. "Disciplinary actions" means letters of reprimand, suspension, demotion or dismissal.

        b. "Records that are reasonably necessary or appropriate to maintain an accurate knowledge of the employee's disciplinary actions" means the correspondence listed in subsection (D)(1)(a) and includes an official notice of charges of misconduct as applicable to covered employees, the final disciplinary letter, and any responses related to complaints, grievances or appeals upholding, amending, or overturning the discipline.

        c. "Employee responses" means any written documents, submitted and signed by the employee, either:

            i. In response to an official notice of charges of misconduct;

            ii. As a formal complaint filed under the provisions of Article 9 or a formal grievance under Subchapter B, Article 4, of these rules pertaining to a specific disciplinary action; or

            iii. As an objection to a specific disciplinary action and contained in the employee's official personnel file under subsection (C)(2)(e)(iii).

    2. Personnel records are confidential and an agency head shall ensure that except as provided in subsection (C)(3), only the following information about a current or former employee is provided to any person making a public records request under A.R.S. Title 39, Chapter 1, Article 2.

        a. Name of employee;

        b. Date of employment;

        c. Current and previous class titles and dates of appointment to the class;

        d. Current and previous agencies to which the employee has been assigned and the location of the main office for each agency;

        e. Current and previous salaries and dates of each change;

        f. Name of employee's current or last known supervisor; and

        g. Records that are reasonably necessary or appropriate to maintain an accurate knowledge of the employee's disciplinary actions, including the employee responses to all disciplinary actions, unless providing this information is contrary to law.

**E.** Insurance and medical records. An agency head:

    1. May maintain group insurance enrollment forms in an employee's official personnel file for an employee hired prior to September 29, 2012.

    2. Shall maintain in a separate file that is not part of the employee's official personnel file:

        a. Medical records, and

        b. Group insurance enrollment forms for an employee hired on or after September 29, 2012.

SOA000776

**F.** Employment eligibility records. An agency head shall retain I-9 forms and other documents required by law to prove employment eligibility in a separate file that is not part of the employee's official personnel file.

**G.** Employee access to files. An employee has the right to review only the employee's official personnel file.

**H.** Recordkeeping Requirements. An agency head shall ensure that agency recruitment and employee records are maintained in accordance with the General Records Retention Schedule for Human Resources/Personnel Records published by and on file with the Secretary of State, Arizona State Library, Archives and Public Records.

**ARTICLE 2. CLASSIFICATION SYSTEM**

**R2-5A-201.    Classification Plan**

**A.** General. The Director shall group positions into classes based on similarities of duties and responsibilities. All positions are assigned a class specification with a specific title. An agency head may not appoint, transfer, promote, or demote an employee, or make any change in salary for any position until the position is allocated to a class.

**B.** Class title. An agency head shall use the class title of a position to designate the position in all budget estimates, payrolls, vouchers, and communications in connection with personnel processes.

**C.** Class specification. A class specification indicates the kinds of positions to be allocated to the class, as determined by the duties and responsibilities described for that class. Each class specification shall contain a statement of the minimum education, experience, competencies, and other qualifications required to perform the work. Required postsecondary education shall be attained in an institution that meets the standards established by an accrediting agency recognized by the U.S. Department of Education.

**D.** Position description. An agency head shall ensure that every position in the agency has a completed position description describing the current duties, responsibilities, and essential job functions specific to the position.

**E.** Allocation. The Director shall place every position in a class based on its duties and responsibilities.

**F.** Reallocation.   Upon completion of a review of a position, the Director may determine that the position should be placed in a different class.

**G.** Regrade. Upon completion of a review of a classification, the Director may determine that the class should be placed in a different grade.

**SOA000777**

**R2-5A-202.** **Change in Classification**

**A.** Change in classification plan. The Director may establish new classes and divide, combine, alter, or abolish existing classes, grades, or both, in consultation with affected agency heads.

**B.** Change in job duties.

    1. An employee in a position or the agency head may file a written request with the Director for review of the classification of the position. The request shall contain an updated position description, a specific explanation of how and when the position's duties and responsibilities have changed and the reasons why the current classification does not match these job duties.

    2. If a material and permanent change takes place in the duties and responsibilities of a position, the agency head shall report this change to the Director in an updated position description. The Director may order a reallocation of the position. The employee in the position at the time of reallocation shall continue to serve in the position.

**C.** Effective date. The effective date of a change in classification shall be the first day of the pay period immediately following the Director's determination, unless the Director authorizes an exception.

**R2-5A-203.** **Second Level Review**

An employee in a position or the agency head may submit a written request for a second level review of a classification decision within 30 days of the initial determination. The request shall contain a concise and specific statement as to why the original decision was inappropriate. The Director may assign a different analyst to review the request and evaluate the proper classification of the position. The second level review shall be the final step in the classification review process.

## ARTICLE 3. RECRUITMENT, SELECTION AND APPOINTMENT

**R2-5A-301.** **General**

An agency head shall follow the requirements outlined in this Article to identify and appoint qualified candidates to fill vacancies. The Director shall establish and maintain a centralized employment system that includes a job board for announcing vacancies in state employment, applicant tracking and candidate identification. The Director shall establish procedures for state agencies to request approval for transportation or other travel expenses or moving expenses provided by A.R.S. § 35-196.01 for out of state candidates.

**SOA000778**

**R2-5A-302.    Recruitment**

**A.** Job posting.

    1.  Unless exempted by A.R.S. Title 41, Chapter 4, Article 4, an appointing authority shall post an open position to the state's centralized job board. This includes recruitments open to only employees currently employed by the agency, to state employees currently employed in any state agency, or the general public.    An agency head may authorize an exception to the job posting requirement for a position in an individual case. Any exceptions shall be documented by the agency head and subject to audit by the Director.

    2.  In addition to posting to the state's centralized job board, an appointing authority may post an open position in a publication or to a commercial job posting board or both, in compliance with applicable procurement rules.

**B.** Application form.

    1.  A candidate for a position shall complete the standardized application form developed by the Director.

    2.  In addition to the standardized application form, an agency head may develop supplemental application procedures and forms specific to the agency or to a certain class or classes within the agency.

**C.** Preferences.

    1.  The state will provide preference to qualified veterans and disabled veterans seeking employment with the state.

    2.  For positions in the covered service, preference points authorized by A.R.S. § 38-492 shall be added to an applicant's grade on any assessment or evaluation that results in a numeric grade after the final grade is determined, if a passing grade is earned without the addition of preference points. Preference points shall not be applied to promotional examinations. If an evaluation does not result in a numeric grade, preference shall be given by granting applicable preference codes to qualified applicants.

**R2-5A-303.    Reference and Background Checks**

A candidate may be required to furnish, at the candidate's own expense, evidence of education or other qualification. The appointing authority is responsible for verifying education, work experience, applicable license or licenses and references provided by candidates on the application form and in interviews. An appointing authority shall not conduct a criminal background check or a credit check on a candidate unless the agency has statutory or executive order authority to conduct such a check.

**SOA000779**

**R2-5A-304.   Qualifications of Selected Candidate**

An agency head shall ensure that any candidate selected for hire meets the established qualifications for the position filled.

**R2-5A-305.   Employment of Relatives**

**A.** Relationship to supervisors. An individual shall not be employed in a position if the immediate supervisor of the individual is related within the third degree of affinity (marriage) or consanguinity (blood), or by adoption.

**B.** Relationship to other employees. An individual shall not be employed in a position if the individual is related within the third degree to an employee who currently occupies a position under the same immediate supervisor.

**C.** Exceptions. The Director may grant an exception to the prohibitions in subsections (A) and (B) if there is no other qualified person for the position at the location.

**D.** Relationship to subordinate employees. A supervisor or manager at any level shall not make an employment decision specifically benefitting any individual who is related within the third degree, unless an exception under subsection (C) has been granted.

**E.** Relationship to interviewer or interview panel members. An employee shall not interview or serve on an interview panel of any job candidate if the candidate is related within the third degree.

**F.** Definition. For the purpose of this Section, persons related within the third degree include a spouse, child, parent, grandchild, grandparent, sister, brother, great grandchild, great grandparent, aunt, uncle, niece, nephew or first cousin.

**R2-5A-306.   Hiring Requirements**

Agencies shall comply with federal and state law, including the verification of employment eligibility pursuant to A.R.S. § 23-214.   An agency head shall ensure the completion of the Form I-9 and the employment eligibility verification process for all new hires.

**R2-5A-307.   Appointment**

**A.** General. Except as provided in A.R.S. Title 41, Chapter 4, Articles 4 and 5, all appointments shall be at will uncovered. An agency head may appoint a current state employee who accepts a change in assignment or an external candidate in accordance with these rules and the procedures established by the Director.

**B.** Types of Appointment.
   1. A regular appointment may be:

SOA000780

a.   Full-time employment;

b.   Part-time employment;

c.   Subject to funding availability, such as federal or grant funding; or

d.   To a trainee position.

2.   A temporary appointment may be made for a recurring period of time up to a maximum of 1500 hours in any one position per agency each calendar year. A temporary appointment employee may work full time for a portion of the year, intermittently, on a seasonal basis, or on an as needed basis. An employee in a pool classification is considered a temporary appointment.

3.   An agency head may place an employee on special assignment within the agency.  A special assignment may be made non-competitively and for up to 6 months with the concurrence of the agency head of the employing agency and the Director.  A special assignment shall not exceed 6 months unless extended by the Director. An agency head shall not make successive special assignments of the same person to the same class.

**R2-5A-308.     Applicant Complaint**

An applicant who has a complaint alleging discrimination or harassment relating to the procedures used in the selection or evaluation process shall submit the applicant complaint to the agency human resources representative within 90 days of the action giving rise to the complaint.  The agency human resources representative shall evaluate the complaint and notify the applicant of the final action to be taken.

## ARTICLE 4. COMPENSATION SYSTEM

**R2-5A-401.     Salary Plans**

**A.**  General. The Director shall establish a salary plan.  The salary plan shall allow for the following:

1.   Minimum and maximum rates of pay for classes outlined in the classification plan.

2.   Salary adjustments, including adjustments to base salary and pay supplements and incentives, including add-ons to base salary.

**B.**  Alternative salary plan. The Director may establish a special salary plan or pay practice determined to be the prevailing practice in the labor market and in the best interest of the state.

**R2-5A-402.     Salary Administration**

**A.**  General. The Director shall develop procedures for salary administration for use by all agencies when setting the salary of an employee.  In setting an employee's salary, an agency head shall consider such factors as the employee's education, experience, skills, performance, and current or former salary, as

well as the current salaries of employees in the same class in the agency and the relative experience and performance of those employees.

**B.** Classes.  The Director shall assign each class to a salary range and to a grade.

**C.** Salary.  The base salary of an employee shall be not less than the minimum nor more than the maximum of the salary range of the class to which the employee's position is allocated, except as provided by these rules.

**D.** Salary adjustment.  The salary used to compute a salary adjustment is the employee's base salary. Following an adjustment to the base salary, an agency shall add to the new rate of pay any special pay supplement still valid.

**E.** New hire starting rate.  An agency head may offer a salary to a new hire within the salary range of the class to which the employee is being appointed in accordance with the procedures and guidelines published by the Director, unless an exception is approved by the Director.

**F.** Promotion. An employee who has a change in assignment from a position in one class to a position in another class having a higher grade shall receive a salary increase as determined by the agency head in accordance with the procedures and guidelines published by the Director, unless an exception is approved by the Director.

**G.** Demotion.

    1.  An employee who has a change in assignment from a position in one class to a position in another class having a lower grade, whether voluntary or involuntary, shall receive a salary decrease as determined by the agency head in accordance with the procedures and guidelines published by the Director, unless an exception is approved by the Director.

    2.  A demoted employee shall not be eligible for an increase to base salary for six months after the effective date of the demotion to the new position, other than a salary increase that is legislatively mandated.  After six months, the employee may become eligible for a salary increase only after a performance evaluation in the new position for which the employee received an overall rating of "meets expectations" or higher.

**H.** Lateral transfer.  An employee who has a change in assignment from a position in one class to a position in another class having the same grade shall receive no increase in salary, unless an exception is approved by the Director.  The Director may approve a salary increase based upon documentation of recruitment difficulties to fill the position, specific needs identified by the agency, or the employee's qualifications. Transferred employees are not eligible for increases to base salary during their first six months in the new job unless approved by the Director.  An employee who transfers to another agency may become eligible for a salary increase only after a performance

**SOA000782**

evaluation in the new position for which the employee received an overall rating of "meets expectations" or higher.

I.  Reversion of covered employee. A covered employee who is reverted under the rules in Subchapter B shall be paid the same salary as that paid prior to the promotion, plus the percentage or dollar amount of increase of an intervening general salary adjustment for which the employee was eligible.

J.  Job reallocation.

1.  The base salary of an employee in a position that is reallocated to a class in a higher pay range may receive a salary increase in accordance with the procedures and guidelines published by the Director. If increasing the base salary of an employee would result in a salary level that is less than the minimum or greater than the maximum salary of the pay range, the employee's salary shall be the minimum or the maximum salary of the pay range, respectively.

2.  The base salary of an employee in a position that is reallocated to a class with the same or lower pay range shall remain the same provided that the employee's salary is within the pay range of the position. If the employee's salary is less than the minimum of the salary range or greater than the maximum salary of the new pay range, the employee's salary shall be the minimum salary or the maximum salary of the new pay range, respectively.

K.  Job regrade.

1.  The base salary of an employee in a class that is reassigned to a higher grade shall be adjusted by the amount determined by the Director. If adjusting the base salary of an employee would result in a salary level that is less than the minimum or greater than the maximum salary of the pay range, the employee's salary shall be the minimum or the maximum salary of the pay range, respectively.

2.  The base salary of an employee in a class that is reassigned to a lower grade shall remain the same provided that the employee's salary is at or above the minimum salary of the new pay range of the class, and may be greater than the maximum salary of the pay range. If the employee's salary is greater than the maximum, the employee is not eligible for an increase to base pay until the employee's salary is less than the maximum salary of the new pay range.

L.  Merit increases.

1.  The Director shall establish guidelines for merit increases to base pay.

2.  Merit increases shall be available:

a.  To uncovered employees.

b.  To covered employees only if such increases are legislatively appropriated.

3.  Subject to the guidelines established by the Director:

a.  Merit increases may be implemented at the discretion of the agency head.

SOA000783

    b.  Merit increases are subject to the availability of funding and must be within an agency's appropriation unless otherwise legislatively appropriated.

    4.  An agency head shall report to the Director on the utilization of merit increases pursuant to the reporting requirements in the guidelines established by the Director.

**M.** Legislatively-appropriated salary adjustments. Subject to legislative appropriation, the Director shall determine employee eligibility and criteria for salary adjustments.

### R2-5A-403.    Supplemental Pay

**A.** General. Supplemental pay is in addition to an employee's base pay.  The salary of an employee may exceed the maximum salary of the pay range for the employee's class if the excess amount is due to the receipt of supplemental pay.

**B.** Shift differential. The Director may authorize a shift differential to be paid to an employee on other than a day shift.  The Director shall establish a competitive shift differential rate periodically based on an annual survey of the market place.  Employees in the same class in the same agency who work on the same shift shall receive the same shift differential pay.

**C.** Special assignment. An employee on a special assignment shall remain in the employee's current position with no change to base salary. If the classification to which the employee is on a special assignment is a higher grade, the employee shall be provided a conditional pay supplement in an amount that, when added to the employee's base salary, would be within the range of the higher classification. If the classification to which the employee is on a special assignment is the same or a lower grade, the employee shall not be eligible for a conditional pay supplement while on special assignment. Any conditional pay supplement received by the employee for the special assignment shall be discontinued at the conclusion of the special assignment.

**D.** Conditional pay supplements. The Director may establish conditional pay supplements. A conditional pay supplement provides additional compensation to an eligible employee and shall be discontinued when the qualifying conditions no longer apply.  An employee may be awarded multiple conditional pay supplements. A conditional pay supplement does not:

    1.  Change base salary;

    2.  Provide a basis for the computation of a salary increase; or

    3.  Provide a basis for the computation of pay upon an employee's promotion, demotion or transfer.

**E.** Variable pay.

    1.  The Director may establish variable pay strategies determined to be the prevailing practices in the market and in the best interest of the state.

**SOA000784**

2.  If the Director establishes variable pay strategies, the Director shall establish guidelines for the administration of variable pay.

3.  Variable pay shall be available only to uncovered employees, except for employees in covered positions classified as Correctional Officers I, II, or III, or Community Corrections Officers, as specified in the guidelines established by the Director.

4.  Subject to the guidelines established by the Director:

    a.  Variable pay strategies may be implemented at the discretion of the agency head.

    b.  Variable pay strategies are subject to the availability of funding and must be within an agency's appropriation unless otherwise legislatively appropriated.

5.  An agency head shall report to the Director on the utilization of variable pay strategies pursuant to the reporting requirements in the guidelines established by the Director.


**R2-5A-404.    Overtime**

**A.**  Approval of overtime work. An agency head may require that an employee work overtime and:

1.  Shall approve in advance all work in excess of 40 hours per workweek or in excess of a work period as defined by the Fair Labor Standards Act (FLSA). FLSA Regulations 29 CFR 553 and 778 (July 2012), are incorporated by this reference and on file with the Department and available from the U.S. Government Printing Office, 732 North Capitol Street N.W., Washington, D.C. 20401. This incorporation by reference contains no future editions or amendments; and

2.  May assign an employee who volunteers for overtime before mandatory overtime is required.

**B.**  Exemptions. The Director shall determine exemptions from minimum wage and maximum hour requirements in accordance with the Fair Labor Standards Act, 29 U.S.C. 213, January 2004, incorporated by this reference and on file with the Department and available from the U.S. Government Printing Office, 732 North Capitol Street N.W., Washington, D.C. 20401. This incorporation by reference contains no future editions or amendments.

**C.**  Non-exempt employees.

1.  An agency shall compensate an employee in a non-exempt position who works in excess of 40 hours per workweek or in excess of a work period as defined by the FLSA by either:

    a.  Additional pay at the rate of 1 1/2 times the employee's regular rate for each excess hour worked, or

    b.  Compensatory leave at the rate of 1 1/2 hours for each excess hour worked.

2.  An employee shall select either overtime pay or compensatory leave for overtime compensation. If the employee selects both overtime pay and compensatory leave, the agency head shall

**SOA000785**

determine which applies. If an employee's compensatory leave balance reaches the maximum allowed in subsection (E), the agency head shall compensate the employee by overtime pay.

**D.** Exempt employees.

1. Unless otherwise provided by statute or as specified in subsection (D)(2), an employee who is in a position that is exempt from the FLSA is excluded from receiving either overtime pay or compensatory leave.

2. An employee who is in a position that is exempt from the FLSA who works in excess of 40 hours per workweek or in excess of an established work period shall receive for each hour of overtime worked, either one hour of additional pay or earn one hour of compensatory leave, at the option of the agency head, if the employee is either:

   a. Engaged in law enforcement activities;

   b. Engaged in firefighting activities; or

   c. A full authority peace officer as certified by the Arizona Peace Officer Standards and Training Board, is in a position that requires such certification, and is in the covered service.

3. An exempt employee may earn compensatory leave as provided by subsection (D)(2) until the employee's compensatory leave balance reaches the maximum allowed in subsection (E). When the maximum balance is reached, an agency head shall compensate the employee by overtime pay for excess hours worked.

4. For the purposes of this subsection, "engaged in law enforcement activities" has the same meaning as defined in A.R.S. Title 23, Chapter 2, Article 9.

**E.** Maximum accumulation. The maximum number of hours of accumulated compensatory leave is:

1. 480 hours for an employee who works in a public safety activity or an emergency response activity, or

2. 240 hours for an employee who works in any other activity.

**R2-5A-405.    Tuition Reimbursement for Education**

**A.** General. A state agency may assist an employee in the pursuit of educational goals by providing tuition reimbursement.

**B.** Procedures.  Prior to granting tuition reimbursement, an agency shall establish a policy which shall include the following conditions:

1. The educational program will provide a benefit to the state.

2. The employee shall successfully complete the required course work or the educational requirements of the program in order to receive reimbursement.

SOA000786

3. Education assistance may not exceed $5,250 per employee in any one calendar year unless approved in advance by the Director.

4. An employee who receives education assistance may be required to return all or a portion of the amount received if the employee does not remain employed with the agency for a defined period of time, as specified in the agency's policy.

**R2-5A-406.     Reimbursement for Relocation**

An agency head may reimburse reasonable relocation expenses to a current employee for a management initiated geographical transfer of more than 50 miles from the employee's current work site in accordance with the procedures established by the Director.

## ARTICLE 5. CONDITIONS OF EMPLOYMENT

**R2-5A-501.     Standards of Conduct**

**A.** Required conduct. A state employee shall at all times:

1. Comply with federal and state laws and rules, statewide policies and employee handbook, and agency policies and directives;

2. Maintain high standards of honesty, integrity, and impartiality, free from personal considerations, or favoritism;

3. Be courteous, considerate, and prompt in interactions with and serving the public and other employees; and

4. Conduct himself or herself in a manner that will not bring discredit or embarrassment to the state.

**B.** Prohibited conduct. A state employee shall not:

1. Use his or her official position for personal gain, or attempt to use, or use, confidential information for personal advantage;

2. Permit himself or herself to be placed under any kind of personal obligation that could lead a person to expect official favors;

3. Perform an act in a private capacity that may be construed to be an official act;

4. Accept or solicit, directly or indirectly, anything of economic value as a gift, gratuity, favor, entertainment, or loan that is, or may appear to be, designed to influence the employee's official conduct. This provision shall not prohibit acceptance by an employee of food, refreshments, or unsolicited advertising or promotional material of nominal value;

**SOA000787**

5. Directly or indirectly use or allow the use of state equipment or property of any kind, including equipment and property leased to the state, for other than official activities unless authorized by written agency policy or as otherwise allowed by these rules;

6. Inhibit a state employee from joining or refraining from joining an employee organization; or

7. Take disciplinary or punitive action against another employee that impedes or interferes with that employee's exercise of any right granted under the law or these rules.

**C.** Consequences of non-compliance. An employee who violates the standards of conduct requirements listed in subsection (A) or (B) may be disciplined or separated from state employment. Any such actions involving a covered employee shall be in accordance with the rules in Subchapter B, Article 3.

### R2-5A-502.    Hours of Work

**A.** State work week. The state work week is the period of seven consecutive days starting Saturday at 12:00 a.m. and ending Friday at 11:59 p.m. An agency head may apply to the Director for an exception from the work week period for all or part of an agency workforce. The Director may grant an exception from the work week period to promote efficiency in the State Personnel System.

**B.** Hours of employment.

1. An agency head shall determine the hours of employment in the work week for each agency employee.

2. An agency head may provide for breaks during the work period consistent with carrying out the duties of the agency.

3. An agency head may require an employee to work overtime.

**C.** Flexible work options. An agency head may offer a flexible 40-hour work week option to an employee if the agency head determines the agency's services can be maintained.

**D.** Attendance standards. An agency head may establish a standard of attendance.

### R2-5A-503.    Outside Employment

**A.** General. A state employee may seek employment and engage in a variety of activities outside of the employee's work for the state; however, the employee shall not engage in other employment or other activity that is not compatible with the full and proper discharge of the duties and responsibilities of state employment, or that tends to impair the employee's capacity to perform the employee's duties and responsibilities in an acceptable manner.

**B.** Definitions. For the purposes of this Section:

1. "Other employment" includes, but is not limited to:

**SOA000788**

a.   Working as an employee for any employer, including another state agency;

b.   Owning a business;

c.   Contracting to provide services for a fee; or

d.   Serving as a consultant for a fee or being self-employed;

e.   Holding any elected or appointed public office, whether federal, state, or local; or

f.   Holding a position in a political party or organization.

2.   "Primary agency" means the agency in which the employee is employed at the time of the employee's request to obtain outside employment with another agency.

3.   "Secondary agency" means the agency in which the employee is requesting to be employed while remaining employed with the primary agency.

C.   Notice requirement.   An employee who desires to engage in other employment shall notify the employee's supervisor and abide by the policies of the employing agency.   An employee engaged in outside employment, including consultant relationships, shall inform the supervisor of the nature of the employment and corresponding work hours. An employee shall also disclose actual or potential conflicts of interest related to outside employment activities as soon as the employee becomes aware of the conflict.   The determination as to whether a conflict or potential conflict exists shall be made by the agency head.

D.   Outside employment with another state agency.   An employee who seeks outside employment with another state agency must request approval from both the employee's primary agency and prospective secondary agency before commencing employment with the secondary agency.   The primary and secondary agencies must ensure that the request complies with state and federal guidelines.   Such request, if approved shall be in writing and on file with both agencies.   Employment records are to be maintained in accordance with the provisions of R2-5A-105.

E.   Outside employment as a paid public official or in a political party or organization.   All employees shall comply with A.R.S. § 41-752 pertaining to political activities.

F.   Termination of outside employment. If an agency head determines that an employee's outside employment interferes with the employee's performance or creates a conflict of interest, the employee will be required to terminate the outside employment.

G.   Consequences of non-compliance. An employee who fails to make required disclosures or to take action to resolve any conflict of interest may be disciplined or separated from state employment.   Any such actions involving a covered employee shall be in accordance with the rules in Subchapter B, Article 3.


**R2-5A-504.   Alcohol and Drug-free Workplace**

**SOA000789**

State agencies shall prohibit the manufacture, distribution, dispensation, possession or use of alcohol, illegal drugs, unauthorized drugs, inhalants, or other unauthorized controlled substances during an employee's working hours or while on state premises or worksites, including state vehicles and property leased to the state.  A state employee shall not be impaired by alcohol or drugs while on duty.

## ARTICLE 6. LEAVE

### PART A. GENERAL

**R2-5A-A601.   Leave Administration**

**A.** Leave plans.  The Director shall adopt leave plans.  Agency heads are responsible for administering leave for agency employees in accordance with the leave plans in this Article.

**B.** Eligibility for leave. All state employees, except temporary employees, are eligible for any type of leave with pay from the date of appointment. Temporary employees are eligible only for holidays subject to the provisions of R2-5A-B601, administrative leave, civic duty leave for the purpose of voting, living donor leave and military leave.

**C.** Amount of leave.  Leave amounts are based on full-time employment and shall be pro-rated for part-time employees, even if not specified in an individual rule.

**D.** Family and Medical Leave Act (FMLA) leave. FMLA Regulations, 29 CFR 825.100 through 29 CFR 825.800 (July 2012), are incorporated by this reference and on file with the Department and available from the U.S. Government Printing Office, 732 N. Capitol Street N.W., Washington, D.C. 20401. This incorporation by reference contains no future editions or amendments. An employee who meets FMLA eligibility requirements and uses leave for any of the situations covered by the FMLA shall be subject to the following:

    1. Counting FMLA leave. Periods of paid leave and periods of leave without pay shall count towards the employee's available FMLA leave.

    2. Use of accrued paid leave. An employee shall use available paid leave for all or part of the employee's FMLA leave under the conditions in:

        a. R2-5A-D602 for an employee on industrial leave,

        b. R2-5A-D601 for an employee on FMLA leave for any other reason.

**E.** Insurance benefits continuation. An employee remains eligible for continued participation in the employee insurance plans while on leave pursuant to this Article.

**F.** Requests for leave. Except in an emergency, an employee shall obtain approval in advance and in writing before taking any leave.

**SOA000790**

## PART B. PAID LEAVE

**R2-5A-B601.   Holidays**

A.  State holidays.

    1.   January 1, "New Year's Day."

    2.   Third Monday in January, "Martin Luther King, Jr./Civil Rights Day."

    3.   Third Monday in February, "Lincoln/Washington Presidents' Day."

    4.   Last Monday in May, "Memorial Day."

    5.   July 4, "Independence Day."

    6.   First Monday in September, "Labor Day."

    7.   Second Monday in October, "Columbus Day."

    8.   November 11, "Veterans Day."

    9.   Fourth Thursday in November, "Thanksgiving Day."

    10. December 25, "Christmas Day."

B.  Employees scheduled to work. Unless required to work to maintain essential state services, an employee who is regularly scheduled to work on a day on which one of the holidays listed in subsection (A) is observed is entitled to be absent with pay for the number of hours regularly scheduled to work, not to exceed eight hours, provided the employee is not on leave without pay on the employee's work days immediately preceding or following the day on which the holiday is observed.

    1.   Part-time employees who work 1/4 time, 1/2 time, or 3/4 time are entitled to a proportional amount of holiday pay. Part-time employees who work a percentage of full-time other than 1/4 time, 1/2 time, or 3/4 time are entitled to holiday pay at the next lower rate. An employee who works less than 1/4 time is not entitled to holiday pay.

    2.   Temporary employees shall receive holiday pay provided they are in pay status the day before and the day after the holiday.

C.  Employees not scheduled to work. An employee, excluding part-time and temporary employees, who is not scheduled to work on a day on which one of the holidays listed in subsection (A) above is observed shall receive holiday compensation for the number of hours normally worked per day, not to exceed eight, provided the employee is not on leave without pay on the employee's work days immediately preceding or following the day on which the holiday is observed.

D.  Employees required to work. An employee who is required to work on a day on which a holiday listed in subsection (A) is observed shall receive:

**SOA000791**

1. Both holiday compensation and one hour of pay at the employee's current salary rate for each hour worked if the employee is in a position that is either:

   a. FLSA non-exempt; or

   b. Exempt from the FLSA, but meets the conditions in R2-5A-404(D)(2).

2. No additional compensation if the employee is in a position that is exempt from the FLSA and is employed in any other capacity.

**E.** Holiday compensation.

1. Except as modified by subsection (E)(2), an employee who is eligible for holiday compensation pursuant to subsection (C) or (D) shall receive for each hour of holiday compensation authorized, at the option of the agency head, either:

   a. One hour of additional pay at the current salary rate; or

   b. One hour of annual leave; or

   c. One hour time off with pay on an alternate work day specified by the agency head after the holiday and during the pay period in which the holiday is observed, or the succeeding pay period.

2. Temporary employees do not accrue annual leave and shall receive either additional pay or time off as in subsection (E)(1)(c) above.

3. An employee may not receive more than eight hours of holiday compensation for any holiday.

**R2-5A-B602.   Annual Leave**

**A.** Definitions. For the purposes of this Section:

1. "Annual leave" means a period of approved absence with pay that is not chargeable to another category of leave.

2. "Hire date" means the employee's first day of work upon hire or, if the employee has a break in service, rehire.

**B.** Accrual.

1. All employees, except temporary and part-time employees shall accrue annual leave as follows:

   a. Covered employees shall accrue annual leave in accordance with the following schedule:

| Credited Service | Hours Bi-weekly |
|---|---|
| Fewer than 3 years | 3.70 |
| 3 years but fewer than 7 years | 4.62 |
| 7 years but fewer than 15 years | 5.54 |
| 15 years or more | 6.47 |

SOA000792

b. Except as provided in subsection (B)(1)(c), uncovered employees shall accrue leave based on the following schedule:

| Credited Service | Hours Bi-weekly |
|---|---|
| Fewer than 3 years | 4.00 |
| 3 years but fewer than 9 years | 5.54 |
| 9 years or more | 6.47 |

c. An uncovered employee shall accrue annual leave at the rate of 6.47 hours bi-weekly if:

   i. The employee's hire date is prior to September 29, 2012, the employee has remained employed without a break in service since that date, and the employee either was uncovered prior to September 29, 2012 or became uncovered in accordance with A.R.S. Title 41, Chapter 4, Article 4; or

   ii. The employee is in a position listed in A.R.S. § 41-742(F).

2. Temporary employees shall not accrue annual leave.

3. Part-time employees who:

   a. Work 1/4 time, 1/2 time, or 3/4 time shall accrue a proportional amount of annual leave;

   b. Work a percentage of full-time other than 1/4 time, 1/2 time, or 3/4 time shall accrue annual leave at the next lower rate;

   c. Work less than 1/4 time shall not accrue annual leave.

4. Except as provided by R2-5A-D602 for an employee on industrial leave, an eligible employee accrues annual leave each bi-weekly pay period if the employee is in pay status for at least one-half of the employee's scheduled work hours in that pay period.

5. An annual leave accrual is credited on the last day of the bi-weekly pay period in which the accrual is earned and is available for use on the first day of the following pay period.

   a. Annual leave accrued during the last pay period that begins in a calendar year is not subject to forfeiture under subsection (D).

   b. An employee who is separating from state employment is compensated in accordance with subsection (I) for annual leave accrued through the employee's last date of employment.

6. The effective date for change in the accrual rate is the first day of the pay period immediately following the attainment of the required credited service.

C. Credited service.

1. Credited service shall be calculated from the first day of the first complete pay period worked.

2. Credited service shall include:

SOA000793

    a.   A period of service as an employee of a state budget unit before a break in service of less than two years;

    b.   A period of leave without pay of 240 hours or less;

    c.   Family and Medical Leave Act (FMLA) leave;

    d.   Military leave taken under A.R.S. §§ 26-168, 26-171, or 38-610; and

    e.   Active military service of an employee who is restored to state employment under A.R.S. § 38-298.

**D.**  Accumulation.

   1.  Except as provided in subsections (D)(2) and (3), an employee shall forfeit annual leave in excess of the accumulation limit as of the last day of the last pay period that begins in a calendar year. The accumulation limit is:

    a.   240 hours for a covered employee.

    b.   320 hours for an uncovered employee.

   2.  An agency head may request an exception to the accumulation limit contained in subsection (D)(1) for an employee in an individual case.

    a.   An agency head seeking an exception shall submit a written request to the Director that contains a plan to use the excess hours during the following calendar year, pay the employee for the excess hours, or a combination of both.

    b.   The Director may approve, modify, or deny the request.

   3.  Annual leave earned for working on a day on which a state holiday is observed is not included in the accumulation limit specified in subsection (D)(1) and shall not be forfeited.

**E.**  Use of annual leave.

   1.  An employee may take annual leave at any time approved by the agency head.

   2.  An agency head shall not advance annual leave to an employee.

**F.**  Donation of annual leave.

   1.  Definitions. For the purposes of this subsection:

    a.   *"Immediate family" means the recipient employee's parent, spouse, or child, whether natural, adopted, foster, or step.* A.R.S. § 41-748(B)(1)

    b.   *"Family" means spouse, natural child, adopted child, foster child, stepchild, natural parent, stepparent, adoptive parent, grandparent, grandchild, brother, sister, sister-in-law, brother-in-law, son-in-law, daughter-in-law, mother-in-law, father-in-law, aunt, uncle, nephew, or niece.* A.R.S. § 41-748(B)(2)

    c.   "Disability that is caused by pregnancy or childbirth" means, as certified by a licensed health care practitioner:

**SOA000794**

      i.   An employee is unable to work due to the employee's pregnancy, childbirth, or medical care associated with the pregnancy or childbirth; or

     ii.   A member of the employee's immediate family requires assistance to perform regular daily activities due to the immediate family member's pregnancy, childbirth, or medical care associated with the pregnancy or childbirth.

  d.   "Extended" means a period of at least three consecutive weeks.

  e.   "Seriously incapacitating" means a licensed health care practitioner certifies that an illness, injury, or disability that is caused by pregnancy or childbirth:

      i.   Involves in-patient care, or

     ii.   Involves continuing treatment.

2.  Eligibility to receive donation of annual leave. An employee who has exhausted all available leave balances is eligible to receive donations of annual leave if, as certified by a licensed health care practitioner:

  a.   The employee is unable to work due to:

      i.   A seriously incapacitating and extended illness or injury, or

     ii.   A seriously incapacitating and extended disability that is caused by pregnancy or childbirth, or

  b.   The employee needs to care for a member of the employee's immediate family who has:

      i.   A seriously incapacitating and extended illness or injury, or

     ii.   A seriously incapacitating and extended disability that is caused by pregnancy or childbirth.

3.  Eligibility to donate annual leave. An employee may donate annual leave to another employee who has exhausted all available leave balances if:

  a.   The recipient employee is employed in the same state agency as the donating employee, or

  b.   The recipient employee is a family member of the donating employee and employed in another state agency.

4.  Exhaustion of available leave. Before using donated annual leave, a recipient employee:

  a.   Who has a qualifying illness, injury, or disability caused by pregnancy or childbirth shall exhaust all available sick leave, compensatory leave, annual leave earned for working on a day on which a state holiday is observed and accrued annual leave; or

  b.   Whose immediate family member has a qualifying illness, injury, or disability caused by pregnancy or childbirth shall exhaust sick leave granted in accordance with R2-5A-B603(A)(4), if available, and all available compensatory leave, annual leave earned for working on a day on which a state holiday is observed and accrued annual leave.

SOA000795

5.  Calculation of hours donated. An agency head shall adjust the number of hours of annual leave donated in proportion to the hourly rate of pay of the donating employee and the recipient employee. To calculate the number of hours of donated annual leave:

    a.  Multiply the actual number of hours donated by the donating employee's hourly rate of pay, and

    b.  Divide the result by the recipient employee's hourly rate of pay.

6.  Maximum duration. A recipient employee is limited to using donated annual leave to allow the employee to be absent from work for a maximum of six consecutive months, or if the leave is intermittent, 1040 hours (the employee's available leave plus leave donated to the employee) for each qualifying occurrence.  If the recipient employee has a seriously incapacitating and extended illness or injury, or a seriously incapacitating and extended disability that is caused by pregnancy or childbirth and the employee applies for Long-term Disability (LTD) by the end of the fifth month of the employee's leave, the recipient employee may continue to use donated annual leave for up to 60 additional days or until LTD benefit payments begin, whichever is sooner.

7.  Unused donated leave. If the recipient employee separates from state employment, recovers before using all donated leave, attains the maximum donation of annual leave as permitted under subsection (F)(6), or the need for the donated annual leave is otherwise abated, the agency head shall return unused donated leave to employees who donated leave on a pro-rata basis.

G.  Payment of annual leave. Subject to funding availability:

1.  An agency head may pay an employee at any time at the employee's current rate of pay for all or any portion of the employee's annual leave that was earned as the result of working on a day on which a state holiday is observed.

2.  An agency head may approve pay to a non-separating employee for all or any portion of the employee's accumulated and unused annual leave at the employee's current rate of pay subject to the following:

    a.  Agency procedures. Before paying an employee under this subsection, an agency head shall develop written standards and procedures that provide for equal consideration of all employees similarly situated. The agency head shall submit proposed standards and procedures and any subsequent changes to the Director for approval. The agency's procedures shall include at minimum:

        i.   Request and approval procedures;

        ii.  Documentation required to support the request for payment;

        iii. Any limitations, as applicable, including, but not limited to: the maximum number of times an employee may receive payment under this subsection; the maximum number of

**SOA000796**

hours an employee may be paid per occurrence; the minimum number of hours of annual leave an employee must have used in the previous 12 months; and the minimum balance an employee is required to maintain after payout, if any.

b. Restrictions. The agency head shall obtain the employee's concurrence if the payment would reduce the employee's annual leave balance to fewer than:

    i.   240 hours for a covered employee;

    ii.  320 hours for an uncovered employee.

**H.** Movement.

1. To another state agency. If an employee moves from one agency to another state agency, the employee's accumulated and unused annual leave shall be transferred to the employee's annual leave account in the new state agency, unless:

    a.   The provisions of subsection (H)(2) apply; or

    b.   The employee's leave exceeds the accumulation limit contained in subsection (D)(1). An agency head may pay an employee who transfers to another state agency for all excess annual leave at the time of the transfer. An agency head may transfer part or all of the employee's excess annual leave accumulated by the employee who transfers to another agency with the gaining agency's concurrence. If the gaining agency does not concur, the losing agency shall pay all of the unused excess annual leave that the gaining agency will not accept.

2. To an employment status ineligible for leave accrual. If an employee becomes ineligible for accrual of annual leave under R2-5A-A601(B), the agency head or the agency head of the losing agency if the employee moves to another state agency, shall pay the employee for all unused and unforfeited annual leave at the employee's current rate of pay immediately before the change in status.

**I.** Separation. An agency head shall pay an employee who separates from state employment for all unused and unforfeited annual leave at the employee's current rate of pay.

**R2-5A-B603.   Sick Leave**

**A.** Definition. "Sick leave" is any approved period of paid absence granted an employee due to:

1. Illness or injury that renders the employee unable to perform the duties of the employee's position.

2. Disability of the employee that is caused by pregnancy, childbirth, miscarriage, or abortion.

3. Examination or treatment of the employee by a licensed health care practitioner.

4. Illness, injury, disability caused by pregnancy or childbirth, or examination or treatment by a licensed health care practitioner of an employee's spouse, dependent child, or parent. Sick leave

**SOA000797**

granted for this purpose shall be charged to the employee's sick leave account and shall not exceed 40 hours per calendar year. For the purposes of this Section:

    a.   The term "dependent child" means a natural child, an adopted child, a foster child, or a stepchild, more than one-half of whose support is received from the employee.

    b.   The term "parent" means a birth parent, adoptive parent, stepparent, foster parent, grandparent, parent-in-law, or an individual who stood "in loco parentis."

**B.**  Accrual.

    1.   All state employees, except temporary and part-time employees, shall accrue sick leave at the rate of 3.70 hours bi-weekly

    2.   Temporary employees shall not accrue sick leave

    3.   Part-time employees who:

        a.   Work 1/4 time, 1/2 time, or 3/4 time shall accrue a proportional amount of sick leave;

        b.   Work a percentage of full-time other than 1/4 time, 1/2 time, or 3/4 time will accrue sick leave at the next lower rate;

        c.   Work less than 1/4 time shall not accrue sick leave.

    4.   Except as provided by R2-5A-D602 for an employee on industrial leave, an eligible employee accrues sick leave each bi-weekly pay period if the employee has been in a pay status for at least one-half of the employee's scheduled work hours in that pay period or month.

    5.   A sick leave accrual is credited on the last day of the bi-weekly pay period or month in which the accrual is earned and is available for use on the first day of the following pay period or month. An employee who is separating from state employment accrues leave through the employee's last date of employment for the purpose of determining the employee's accumulated sick leave at the time of the employee's separation pursuant to subsection (F).

**C.**  Accumulation. Sick leave accumulates without limit.

**D.**  Use of sick leave.

    1.   Sick leave may be taken when approved by the agency head.

    2.   The agency head may require submission of evidence substantiating the need for sick leave. If the agency head determines the evidence is inadequate, the absence shall be charged to another category of leave or considered absence without leave.

    3.   An agency head may require an employee to be examined by a licensed health care practitioner designated by the agency head.

        a.   If the licensed health care practitioner determines that the employee should not work due to illness or injury, the agency head may place the employee on sick leave or, if the employee's sick leave is exhausted, charge the absence to another category of leave or leave without pay.

SOA000798

    b.   The agency head may require the employee to obtain approval from the licensed health care practitioner before returning to work.

    c.   The agency shall pay for all examinations required pursuant to this subsection. The employee shall not be charged any leave while participating in or traveling to or from any examination required pursuant to this subsection.

**E.**  Movement to another state agency. An employee who moves to another state agency shall transfer all accumulated and unused sick leave to the employee's sick leave account in the new state agency.

**F.**  Separation. All sick leave credits are forfeited upon separation from state employment except as provided in A.R.S. § 38-615 or otherwise provided by law. However, an employee who returns to state employment within two years after separation shall be credited with all unused sick leave accumulated at the time of separation if the employee was not paid for accumulated sick leave pursuant to A.R.S. § 38-615.


### R2-5A-B604.   Administrative Leave

**A.**  General. An agency head may authorize an employee to be absent with pay on administrative leave during a state of emergency declared by the Governor or:

    1.   In other emergency situations such as extreme weather conditions, fire, flood, or malfunction of publicly-owned or controlled machinery or equipment.

    2.   To relieve an employee of duties temporarily during the investigation of alleged wrongdoing by the employee or during a disciplinary or dismissal process, subject to the requirements outlined in subsections (B) and (C).

**B.**  Reporting administrative leave. If an employee's administrative leave totals 80 consecutive hours, the agency head shall submit a report to the Director and for each week thereafter, until the employee's administrative leave is terminated. The report shall include:

    1.   The name of the agency,

    2.   The employee identification number (EIN) of the employee,

    3.   The name of the employee,

    4.   The employment status of the employee,

    5.   The date the employee was placed on administrative leave,

    6.   The number of hours the employee has been on administrative leave as of the date of the report, and

    7.   A brief description as to why the employee is on administrative leave.

**C.**  Approval of Director. If an employee's administrative leave is anticipated to exceed 240 consecutive working hours, the agency head shall obtain the approval of the Director.

**SOA000799**

1. An agency head requesting approval to continue an employee's administrative leave for more than 240 working hours shall submit a request to the Director for approval at least five business days before the employee's administrative leave will total 240 working hours. If circumstances beyond the agency's control do not permit at least five business days' notice, the agency head shall submit the request as soon as the agency head is aware of the necessity for the request. The request shall include all of the information listed in subsection (B), the reason the administrative leave will extend beyond 240 working hours and the anticipated date the administrative leave will be terminated.

2. The Director shall review the request and approve, modify or deny the request within three business days of receipt.

**R2-5A-B605.   Bereavement Leave**

**A.** General. An employee may be absent with pay due to the death or funeral of a spouse, natural child, adopted child, foster child, stepchild, natural parent, stepparent, adoptive parent, an individual who stood "in loco parentis," grandparent, grandchild, brother, sister, brother-in-law, sister-in-law, mother-in-law, father-in-law, son-in-law, or daughter-in-law.

**B.** Amount of bereavement leave.

1. A full-time employee may be absent with pay for up to 24 regularly scheduled work hours. An agency head may extend the bereavement leave for up to 16 additional work hours if the employee travels out-of-state for the funeral.

2. A part-time employee who works 1/4 time, 1/2 time, or 3/4 time may be absent with pay for a proportional amount of bereavement leave. A part-time employee who works a percentage of full-time other than 1/4 time, 1/2 time, or 3/4 time may be absent with pay at the next lower rate. An employee who works less than 1/4 time is not entitled to bereavement leave.

**R2-5A-B606.   Civic Duty Leave**

**A.** General. Upon substantiated application, an employee shall receive absence with pay as civic duty leave while serving as a juror, complying with a subpoena, voting, or serving as a member of a governmental board, commission, or similarly constituted governmental body, subject to the conditions set forth in this rule and the limitations in R2-5A-A601(B).

**B.** Use of civic duty leave. Except for voting pursuant to A.R.S. § 16-401 (primary elections) or A.R.S. § 16-402 (general elections), an employee granted civic duty leave shall report for duty with the employing agency whenever the employee's presence is not required for the civic duty, unless:

1. The distance to the work location would preclude timely reporting for the civic duty, or

**SOA000800**

2.   The employee cannot return to work at least one hour before the end of the work shift.

**C.**   Appearance as a witness. An employee who is subpoenaed as a witness by any court or administrative, executive, or judicial body in this state may be absent with pay unless the testimony or evidence to be given relates to the employee's commercial, business, or personal matters.

**D.**   Jury and witness fees. Employees who are granted civic duty leave when called for jury duty or subpoenaed as a witness shall remit any fees to the employing agency, except for mileage allowance.

**E.**   Membership on a public service body. An employee serving as a member of a governmental board, commission, or similarly constituted governmental body may be absent with pay while performing official duties with the body.


**R2-5A-B607.   Compensatory Leave**

**A.**   General. Compensatory leave is leave that has been earned by an employee under the provisions of R2-5A-404.

**B.**   Use of compensatory leave. An agency head:

1.   Shall approve an employee's request for earned compensatory time off within a reasonable time after the employee makes the request if the use of such time off would not unduly disrupt agency operations.

2.   May require an employee to use the employee's available compensatory leave during a period specified by the agency head.

**C.**   Payment. Subject to funding availability, an agency head may pay an employee at any time for all or any portion of the employee's earned compensatory leave balance at the employee's regular rate of pay.

**D.**   Movement.

1.   To another state agency. An agency head may pay an employee who transfers to another state agency for all unused compensatory leave at the time of the transfer. An agency head may transfer part or all of the compensatory leave earned by an employee who transfers to another agency with the gaining agency's concurrence. If the gaining agency does not concur, the losing agency shall pay all of the unused compensatory leave that the gaining agency will not accept.

2.   To an employment status or a position ineligible for compensatory leave. If an employee has a change in employment status or position that results in the employee being ineligible to earn compensatory leave, the agency head or the agency head of the losing agency if the employee moves to another state agency, shall pay the employee for all unused compensatory leave at the employee's regular rate of pay immediately before the employee's change in status or position.

**E.**   Separation. An agency head shall pay an employee who separates from state employment for all

**SOA000801**

unused compensatory leave at a rate of compensation not less than the higher of:

1. The average regular rate received by such employee during the last three years of the employee's employment, or

2. The final regular rate received by such employee.

### R2-5A-B608.   Educational Leave

**A.** General. An employee may be sent with pay to participate in a formal educational or training course of study at a college, university, or technical school with the approval of the agency head and the Director, based on the determination that the leave is in the best interest of the state.

**B.** Application. The approved application shall be accompanied by a written agreement signed by the agency head and the employee containing the following provisions at a minimum:

1. A statement of the payments, if any, to be provided to the employee and the manner of their payment.

2. An agreement by the employee to return to or continue in state employment upon the completion of the educational or training course of study for a period of time specified by the agency head.

3. A statement by the employee that failure to successfully complete the course, to complete the specified state employment, or to fulfill all of the terms of the agreement, shall result in the employee's being required to repay all or a proportionate part of the salary and other payments received, if any.

### R2-5A-B609.   Living Donor Leave

An employee who requests absence with pay for living donor leave under A.R.S. § 41-706 shall submit written verification that the employee is to serve as a donor. An employee may be absent with pay for the time specified for the following purposes:

1. Up to 40 working hours to serve as a bone marrow donor.

2. Up to 240 working hours to serve as an organ donor.

### R2-5A-B610.   Leave for National Disaster Medical System (NDMS) Training

An employee who requests absence with pay on national disaster medical system leave under A.R.S. § 38-610 is entitled to be absent with pay for the number of hours regularly scheduled to work on all days the employee is on training duty.

### R2-5A-B611.   Meritorious Service Leave

**A.** The Director shall establish guidelines for meritorious service leave.

SOA000802

**B.** Except for employees in covered positions classified as Correctional Officers I, II, or III, or Community Corrections Officers, meritorious service leave is only available to uncovered employees.

**C.** The guidelines established by the Director shall include at a minimum:

1. The maximum number of hours of meritorious service leave that may be awarded to an employee per calendar year;

2. The maximum percentage of agency employees eligible for meritorious service leave;

3. A requirement that an employee shall use meritorious service leave within 12 months of receipt of the leave;

4. A requirement that if the employee does not use the meritorious service leave within 12 months of receipt, that the leave is forfeited; and

5. A statement that unused meritorious service leave is forfeited upon separation from state employment.

**D.** Subject to the guidelines established by the Director, a meritorious service leave program may be implemented at the discretion of the agency head.

**E.** An agency head shall report to the Director on the utilization of meritorious service leave pursuant to the reporting requirements in the guidelines established by the Director.

## PART C. UNPAID LEAVE

### R2-5A-C601.   Furlough

**A.** Definition. A furlough is the involuntary placement of an employee on leave of absence without pay for budgetary reasons.

**B.** Types of furloughs. A furlough may be authorized by legislative action. In addition, the Director may approve:

1. A reduction of funding furlough that allows an agency head to place employees on furlough for any combination of consecutive or non-consecutive days. There is no maximum number of days an employee may be placed on furlough, but consecutive furlough days shall not exceed five consecutive days or more than one-half the employee's regularly scheduled hours in a pay period, whichever is less; and

2. A suspension of funding furlough that allows an agency head to place employees on furlough indefinitely until funding is restored.

**C.** General.

1. The total number of days an employee is placed on furlough may vary based on the amount of the reduction or length of suspension of funding.

**SOA000803**

2. A furlough day equals eight hours for full-time employees and is pro-rated for part-time employees. Furlough hours for part-time employees are calculated by multiplying the number of hours the employee is scheduled to work in a week by 0.2. If the calculation results in a fraction, the furlough hours shall be rounded to the nearest whole hour, as follows:

    a.   0.5 or above is rounded up, and

    b.   Less than 0.5 is rounded down.

3. A furlough is unpaid.

4. Unless a work emergency occurs under subsection (D)(5)(d), while on furlough, an employee shall not conduct state work or volunteer to conduct state work, either with or without compensation.

5. Paid leave shall not be substituted for furlough days.

6. All state employees within the scope of the furlough shall be subject to the furlough in the same manner. Exceptions may be granted when an agency head determines certain employees within the scope of the furlough have unique knowledge or skills or are considered mission critical and need to be excluded from the furlough.

7. Unless the employee is in a physician or attorney position, an employee who is in a position that has been determined to be exempt from the provisions of the Fair Labor Standards Act (FLSA) will lose the exemption for any work week in which the employee is furloughed for less than the full work week.

8. A furlough shall not adversely affect an employee's service anniversary date or create a break in service.

9. Upon conclusion of the furlough period, an agency head shall return an employee to the employee's status and position held prior to the furlough, unless a personnel action taken in accordance with State Personnel System rules authorizes a change to the employee's record.

10. An employee's failure or inability to return to work upon conclusion of the furlough period may, in accordance with applicable State Personnel System rules:

    a.   Result in the employee being placed on leave,

    b.   Be considered a resignation,

    c.   Result in separation without prejudice, or

    d.   Be cause for dismissal of a covered employee.

**D.** Reduction of funding furlough.

1. An agency head shall submit to the Director a furlough plan for approval if the agency head determines a furlough is necessary due to a reduction of funding. An agency head is not required to implement or exhaust other cost-savings measures prior to initiating a furlough plan.

SOA000804

2. The agency head shall submit the furlough plan for approval at least 30 business days prior to the proposed implementation date of the furlough. If circumstances beyond the agency head's control do not permit at least 30 business days' notice, the agency head shall submit the furlough plan as soon as the agency head is aware of the necessity for the furlough and provide a written explanation of why the 30 business day requirement was not met.

3. An agency head shall include all of the following in the furlough plan:

    a. The proposed scope of the furlough plan, which shall be either agency-wide or limited to:

        i. Agency operations in one or more geographic areas,

        ii. One or more organizational units of the agency,

        iii. One or more funding sources,

        iv. One or more job classes,

        v. One or more class series, or

        vi. Any combination of the above.

    b. If the furlough will not be conducted on an agency-wide basis, each affected:

        i. Geographic location,

        ii. Organizational unit,

        iii. Funding source,

        iv. Job class, and

        v. Class series.

    c. For each affected geographical location, organizational unit, funding source, job class, and class series specified in the furlough plan, the total number of employees scheduled for furlough;

    d. If requesting any exceptions within the scope of the furlough under subsection (C)(6), the total number of employees within the scope of the furlough, the number of employees for whom an exception is requested, and the reason for the request;

    e. The number of days and date ranges for the furlough;

    f. The anticipated cost savings due to the furlough;

    g. The agency's procedures for scheduling furloughs; and

    h. The procedures for notifying employees of the furlough.

4. The Director shall review and provide written notification of approval, modification, or denial of an agency's furlough plan within 20 business days of receipt.

5. Upon approval of the Director to conduct a reduction of funding furlough, an agency head:

    a. May place an employee on furlough for any combination of consecutive or non-consecutive days, subject to the limits in subsection (B)(1);

SOA000805

b. Shall determine the scheduling of furloughs that provide for the continuation of any agency operations required by law;

c. May cancel or rescind any approved paid or unpaid leave in progress or scheduled for an employee who is designated for furlough and shall notify the affected employee in writing of the cancellation of the approved leave for the duration of the furlough. If the previously approved leave was scheduled to extend beyond the furlough, the employee may return to paid leave status, if available, following the furlough period. If the agency head cancels an employee's paid leave and:

   i. The employee is on leave pursuant to the provisions of the federal Family and Medical Leave Act (FMLA) during a scheduled furlough day, the furlough day shall not count against the employee's FMLA entitlement and the employee's leave balance shall not be charged for the furlough day; or

   ii. The employee is on military leave during a scheduled furlough day, the furlough day shall not count against the employee's military leave and the employee's leave balance shall not be charged for the furlough day; and

d. Shall prohibit an employee from working during the period of the furlough, unless a work emergency arises. In the event of a work emergency, an agency head may revoke the furlough for an employee in an individual case. An employee whose furlough is revoked due to an emergency shall be paid for time required to work and shall be required to take the furlough on another day, unless otherwise exempted.

E. Suspension of funding furlough - agency head request.

1. An agency head shall submit to the Director for approval a furlough plan if the agency head determines a furlough is required due to a suspension of funding to pay employees.

2. The agency head shall submit the furlough plan for approval at least 15 business days prior to the proposed implementation date of the furlough. If circumstances beyond the agency head's control do not permit at least 15 business days' notice, the agency head shall submit the furlough plan as soon as the agency head is aware of the necessity for the furlough and provide a written explanation of why the 15 business day requirement was not met.

3. An agency head shall include all of the following in the furlough plan:

   a. The proposed scope of the furlough plan, which shall be either agency-wide or limited to:

      i. Agency operations in one or more geographic areas,

      ii. One or more organizational units of the agency,

      iii. One or more funding sources,

      iv. One or more job classes,

SOA000806

      v.  One or more class series, or

      vi. Any combination of the above.

  b.  If the furlough will not be conducted on an agency-wide basis, each affected:

      i.   Geographic location,

      ii.  Organizational unit,

      iii. Funding source,

      iv. Job class, and

      v.  Class series.

  c.  For each affected geographical location, organizational unit, funding source, job class, and class series specified in the furlough plan, the total number of employees scheduled for furlough;

  d.  If requesting any exceptions within the scope of the furlough under subsection (C)(6), the total number of employees within the scope of the furlough, the number of employees for whom an exception is requested, and the reason for the request;

  e.  The procedures for notifying employees of the furlough; and

  f.  The procedures for notifying employees of restoration of funding and when to return to work.

4.  The Director shall review and provide written notification of approval, modification, or denial of an agency's furlough plan within 10 business days of receipt.

5.  Upon approval of the Director to conduct a suspension of funding furlough, an agency head:

  a.  Shall freeze all personnel actions except for those actions that would accomplish, or assist in accomplishing the purpose of the furlough;

  b.  May place employees on furlough indefinitely until the reason for the furlough is abated;

  c.  Shall notify affected employees of the furlough and that while on furlough, an employee:

      i.   Shall not report to work or work from any location until notified to return to work; and

      ii.  Will not receive pay for any unused and unforfeited annual leave, should the employee resign or be terminated, until funding is restored;

  d.  May cancel or rescind any approved paid or unpaid leave in progress or scheduled for an employee who is designated for furlough and shall notify the affected employee in writing of the cancellation of the approved leave for the duration of the furlough. If the previously approved leave was scheduled to extend beyond the furlough, the employee may return to paid leave status, if available, following the furlough period; and

  e.  Shall notify employees upon restoration of funding and when to return to work.

SOA000807

**F.** Suspension of funding furlough - failure to pass state budget.

If the state fails to pass a budget and funds are not appropriated for the following fiscal year, the Director may authorize an agency head to implement a suspension of funding furlough. Upon such notification by the Director, an agency head:

1. Shall freeze all personnel actions except for those actions that would accomplish, or assist in accomplishing the purpose of the furlough;

2. Unless an exception has been authorized as provided in subsection (F)(4), shall place all employees on furlough indefinitely until the reason for the furlough is abated;

3. Shall require all employees to be subject to the furlough in the same manner;

4. May establish exceptions when only a portion of the employees in a particular class are necessary to perform mission critical services;

5. Shall notify affected employees of the furlough and that while on furlough, an employee:
   a. Shall not report to work or work from any location until notified to return to work; and
   b. Will not receive pay for any unused and unforfeited annual leave, should the employee resign or be terminated, until funding is restored;

6. Shall cancel or rescind any approved paid or unpaid leave in progress or scheduled for an employee who is designated for furlough and shall notify the affected employee in writing of the cancellation of the approved leave for the duration of the furlough. If the previously approved leave was scheduled to extend beyond the furlough, the employee may return to paid leave status, if available, following the furlough period; and

7. Shall notify employees upon restoration of funding and when to return to work.

**G.** Employee request for review.

1. An employee may submit a request for review of the employee's placement on furlough. The employee shall make the request for review in writing to the agency head no later than three business days after the employee's receipt of a furlough notice. The employee shall limit the request for review to the determination resulting in the employee's furlough and include a proposed resolution.

2. The agency head shall provide a written response to the employee with a final decision within:
   a. Five business days after receipt of the request if a reduction of funding furlough, or
   b. Fifteen business days after the employee returns to work if a suspension of funding furlough.

3. A request for review shall not delay implementation of the furlough.

**SOA000808**

**R2-5A-C602.   Leave Without Pay**

**A.**  Approval. All leave without pay requires a written request by an employee in advance, including the reason for the employee's request, and approval by the agency head.

**B.**  Use of leave. Except for military leave, an agency head shall not grant leave without pay in excess of 80 consecutive hours until all annual leave earned for working on a day on which a state holiday is observed, all accrued annual leave and, if the leave without pay is for medical reasons, sick leave are exhausted.

**C.**  Return to work.

1.  An employee who returns to work after an authorized period of leave without pay of 80 consecutive hours or less shall return to the same position occupied at the start of the leave without pay.

2.  Except as provided in subsection (C)(4), an employee who returns to work after a period of leave without pay in excess of 80 consecutive hours  may return to a position in the class held at the start of the leave without pay, if a position is available and funded, and if the leave without pay is terminated in one of the following ways:

    a.  Expiration of its term and the employee's return to work;

    b.  Rescission of the leave without pay by the agency head before its scheduled expiration due to an unforeseen need that results in an insufficient number of employees available to provide service and for which:

        i.   The agency head provides written notice of the rescission to the employee's last known address at least 15 days before the date the employee is directed to return to work; or

        ii.  If circumstances beyond the agency's control do not permit at least a 15-day notice, the agency head provides notice as soon as possible after becoming aware of the need for the employee to return to work; or

    c.  Curtailment of the leave without pay before its scheduled expiration date upon request of the employee and with approval of the agency head.

3.  An agency head may consider the failure or inability of an employee to return to work on the first work day after an approved leave without pay as a resignation.

4.  An employee returning to work from leave without pay granted:

    a.  For industrial illness or injury for up to six months shall return to the position occupied at the start of the leave without pay. If this position or a position in the same class is not available and funded, the agency head shall conduct a layoff or, if the employee is covered, a reduction in force in accordance with Subchapter B.

**SOA000809**

    b.  As military leave is subject to the provisions of the USERRA regulations incorporated by reference in R2-5A-D603.

    c.  As FMLA leave is subject to the provisions of the FMLA regulations incorporated by reference in R2-5A-D601.

**D.** Insurance benefits continuation. An employee who is on leave without pay may continue to participate in the employee insurance plans as follows:

  1.  Health benefit plan participation.

    a.  An employee who is on FMLA leave is eligible to continue to participate in the health benefit plan for the duration of the FMLA leave by paying the employee premium/contribution. An agency head may recover the state's portion of premium/contributions paid to maintain health coverage for an employee if the employee fails to return from FMLA leave under certain circumstances, in accordance with FMLA regulations incorporated by reference in R2-5A-D601.

    b.  An employee who is on leave without pay for a health-related reason that is not an industrial illness or injury and who either does not meet FMLA eligibility requirements or has exhausted FMLA leave and remains absent from work may continue to participate in the health benefit plan by paying both the state and employee premium/contribution. Authority to continue participation in the health benefit plan shall terminate on the earliest of:

      i.  Receipt of long-term disability benefits for which there is eligibility to continue health benefit plan participation under a state-sponsored retirement plan,

      ii.  A determination of eligibility for Medicare coverage, or

      iii.  30 months after the incapacity began.

    c.  An employee who is on leave without pay for reasons other than those outlined in subsection (D)(1)(a), (b), or R2-5A-D602 pertaining to industrial leave, may continue to participate in the health benefit plan for a maximum of six months by paying both the state and employee premiums/contributions.

  2.  Life insurance plan participation.

    a.  An employee who is on FMLA leave continues to participate in the Basic Life and Accidental Death and Dismemberment Insurance Plan and may continue to participate in the supplemental life and dependent life insurance coverage by paying the full premium/contribution.

    b.  An employee who is on leave without pay for a health-related reason that is not an industrial illness or injury and who either does not meet FMLA eligibility requirements or has exhausted FMLA leave and remains absent from work may continue to participate in the

**SOA000810**

basic life insurance plan by paying the state premium/contribution. An employee who elects to continue to participate in the basic plan may also continue any supplemental or dependent life coverage that is in force at the beginning of the leave without pay by continuing to pay the premium/contribution. Authority to continue in the life insurance plan shall terminate in accordance with the time limits specified in subsection (D)(1)(b).

   c.  An employee who is on leave without pay for reasons other than those outlined in subsection (D)(1)(a), (b), or R2-5A-D602 pertaining to industrial leave, may continue to participate in the basic life insurance plan by paying the state premium/contribution. An employee who elects to continue to participate in the basic plan may also continue any supplemental or dependent life coverage that is in force at the beginning of the leave without pay by continuing to pay the premium/contribution. Authority to continue in the life insurance plan shall be available for a maximum of six months.

3.  Termination of insurance. The insurance coverage of an individual on leave without pay who fails to pay insurance premiums/contributions when due shall terminate at 11:59 p.m. on the last day of the period covered by the last premium/contribution paid.

## PART D. LEAVE THAT COULD BE EITHER PAID OR UNPAID

### R2-5A-D601.   Family and Medical Leave Act (FMLA) Leave

**A.**  General. All state agencies are responsible for complying with the federal Family and Medical Leave Act (FMLA) of 1993 and all applicable revisions. FMLA Regulations, 29 CFR 825.100 through 29 CFR 825.800 (July 2012), are incorporated by this reference and on file with the Department and available from the U.S. Government Printing Office, 732 North Capitol Street N.W., Washington, D.C. 20401. This incorporation by reference contains no future editions or amendments. Any interference with, restraint of, or denial of an employee's rights provided by the FMLA is strictly prohibited.

**B.**  Eligible employee.

   1.  An eligible employee for the purposes of the FMLA is an employee who:

      a.  Is an employee of the state of Arizona;

      b.  Has been employed by the state of Arizona for at least 12 months; and

      c.  Worked for at least 1,250 hours of service during the 12 months immediately preceding commencement of the leave.

   2.  An agency head shall not extend FMLA benefits to an ineligible employee.

**SOA000811**

**C.** Situations covered by the FMLA. A state agency shall grant an eligible employee FMLA leave when the employee takes leave for one or more of the following reasons:

1. The birth of a child or placement of a child with the employee for adoption or foster care, provided the leave concludes within 12 months of the birth or placement.

2. To care for the employee's spouse, child or parent with a serious health condition.

3. The employee is unable to work because of the employee's own serious health condition.

4. Any qualifying exigency arising out of the fact that the employee's spouse, child or parent is a covered military member on active duty or call to active duty status in support of a contingency operation.

5. To care for a covered servicemember with a serious injury or illness when the covered servicemember is the employee's spouse, child, parent or next of kin.

**D.** Amount of FMLA leave.

1. An employee who takes FMLA leave for any of the situations described in subsections (C)(1), (2), (3) or (4) may take a maximum of 12 workweeks of leave during any rolling 12-month period, measured backward from the first day of each approved period of FMLA leave.

2. An employee who takes FMLA leave for the situation described in subsection (C)(5) may take up to 26 workweeks of leave in a single 12-month period.

3. During a 12-month period, an eligible employee is able to take no more than 12 workweeks of leave for any of the situations described in subsections (C)(1), (2), (3) or (4) and a combined total of 26 workweeks of leave if the leave includes the situation described in subsection (C)(5).

4. If a husband and wife are both state employees, the husband and wife are limited in the amount of FMLA leave taken to a combined total of:

   a. 12 workweeks of leave for the birth and care of a newborn child, placement of a child for adoption or foster care, or to care for a parent who has a serious health condition.

   b. 26 workweeks of leave to care for a covered servicemember with a serious injury or illness.

**E.** Designation of FMLA leave. An employee need not specifically request FMLA leave to be placed on FMLA leave. If an eligible employee takes leave for any reason covered by the FMLA and has not already exhausted the employee's available FMLA leave, the agency head shall designate the employee's leave as FMLA leave.

**F.** Use of paid leave. Except for portions of industrial leave, an employee on FMLA leave shall be required to use the employee's available paid leave while on FMLA leave as follows and in the following order:

1. Sick leave or, as applicable, family sick leave subject to the provisions of R2-5A-B603.

2. Compensatory leave subject to the provisions of R2-5A-B607.

04/13/2013

SOA000812

3. Annual leave subject to the provisions of R2-5A-B602.

4. Leave without pay subject to the provisions of R2-5A-C602.

**G.** Insurance benefits continuation. An employee who is using leave with pay remains eligible for continued participation in the employee insurance plans and the employee's share of premiums/contributions is paid through payroll deduction. An employee who is on leave without pay while on FMLA leave may continue to participate in the employee insurance plans as follows:

1. Health benefit plan participation. An employee is eligible to continue to participate in the health benefit plan for the duration of the FMLA leave by paying the employee premium/contribution. An agency head may recover the state's portion of premium/contributions paid to maintain health coverage for an employee if the employee fails to return from FMLA leave under certain circumstances, in accordance with FMLA regulations incorporated by reference in subsection (A).

2. Life insurance plan participation. An employee continues to participate in the Basic Life and Accidental Death and Dismemberment Insurance Plan and may continue to participate in the supplemental life and dependent life insurance coverage by paying the full premium/contribution.

3. Termination of insurance. The insurance coverage of an employee on leave without pay who fails to pay insurance premiums/contributions when due shall terminate at 11:59 p.m. on the last day of the period covered by the last premium/contribution paid.

**H.** Return from FMLA leave. An agency head shall restore an employee returning from FMLA leave to the employee's original job, or to an equivalent job with equivalent pay, benefits, and other terms and conditions of employment. The provisions of the FMLA, not the provisions of R2-5A-C602(C), shall govern return to work from leave without pay granted to complete an FMLA-qualified leave.

**I.** Employee responsibilities.  An employee is required to adhere to the employing agency's call-in procedures, give the agency 30 days' notice in the event of a foreseeable leave, provide requested documentation, and periodic updates of the employee's status and intent to return to work as requested by the agency.

**J.** Agency rights. Nothing in the FMLA or this rule should be construed as limiting an agency's right to manage, discipline or terminate an employee, including an employee's failure to comply with the agency's request for appropriate documentation to substantiate the employee's need for the leave. However, an employee's use of FMLA leave cannot be considered as a negative factor in any employment decision.

**K.** Conflict. If there is a conflict between the provisions of these rules and the FMLA, the provisions of the FMLA govern.

SOA000813

**R2-5A-D602.    Industrial Leave**

A.  Use of leave.

    1.  An agency head shall place an employee who sustains a job-related illness or injury that is compensable under the Workers' Compensation Law, A.R.S. Title 23, Chapter 6 on sick leave.

    2.  If an employee who is on leave under the Worker's Compensation laws meets Family and Medical Leave Act (FMLA) eligibility requirements and the leave qualifies for FMLA leave, an agency head shall count it as FMLA leave. An agency head shall apply industrial leave and FMLA concurrently.

    3.  An employee shall use leave in an amount necessary to receive total payments (leave payments plus Workers' Compensation payments) that do not exceed the gross salary of the employee.

    4.  If an employee exhausts all sick leave, compensatory leave and annual leave, an agency head shall place the employee on leave without pay.

B.  Payments. If an employee receives a retroactive Workers' Compensation payment for any period of industrial illness or injury for which leave payments were received, the employee shall reimburse the agency for Workers' Compensation payments that exceed 100% of the employee's base pay before the illness or injury, and the agency head shall restore the equivalent value of leave to the employee's appropriate leave account.

C.  Light duty. If an employee has a job-related illness or injury that impairs performance on the former job, the agency head shall make every effort to place the employee in a suitable position within the agency, including a light duty assignment.

D.  Restriction. An agency head shall not grant sick leave or leave without pay to an employee who fails to accept compensation available under the industrial injury and disease provisions of A.R.S. §§ 23-901 to 23-1091.

E.  Insurance benefits continuation. An employee who is using leave with pay in accordance with subsection (A) remains eligible for continued participation in the employee insurance plans and the employee's share of premiums/contributions is paid through payroll deduction. An employee who is on leave without pay due to an industrial illness or injury may continue to participate in the employee insurance plans as follows:

    1.  Health benefit plan participation.

        a.  An employee may continue to participate in the health benefit plan for a maximum of six months from the date of illness or injury by paying the employee premium/contribution.

        b.  At the end of the six-month period, an employee who remains on leave without pay due to industrial illness or injury may continue to participate in the health benefit plan by paying both the state and employee premiums/contributions, until the employee returns to work or is

**SOA000814**

determined to be eligible for Medicare coverage or Long-term Disability, whichever occurs first.

2. Life insurance plan participation. An employee who is on leave without pay continues to participate in the basic life and accidental death and dismemberment insurance plan without cost for six months after the month in which the illness or injury occurs. During this six-month period, the employee may continue supplemental life and dependent life coverages that were in effect at the start of the leave by paying the applicable premium/contribution.

3. Termination of insurance. The insurance coverage of an employee on leave without pay who fails to pay insurance premiums/contributions when due shall terminate at 11:59 p.m. on the last day of the period covered by the last premium/contribution paid.

F. Accrual of leave. An employee shall continue to receive full leave accrual as long as the employee uses two or more hours of paid leave each day.

**R2-5A-D603.   Military Leave**

An employee who requests absence with pay on military leave under A.R.S. § 26-168, 26-171, or 38-610 shall submit a copy of the orders for duty with the request for military leave. An employee may be absent with pay for military purposes for up to thirty days in any two consecutive federal fiscal years. All state agencies are responsible for complying with the federal Uniformed Services Employment and Reemployment Rights Act (USERRA) of 1994 and all applicable revisions.  USERRA Regulations, 20 CFR 1002.1 through 20 CFR 1002.314 (April 2012), are incorporated by this reference and on file with the Department and available from the U.S. Government Printing Office, 732 North Capitol Street N.W., Washington, D.C. 20401. This incorporation by reference contains no future editions or amendments.

**R2-5A-D604.   Victim Leave**

An employee who is a victim of a juvenile offense or a crime and who requests absence from work to attend court-related proceedings under A.R.S. § 8-420 or 13-4439 shall submit a copy of the form provided to the employee by the law enforcement agency or a copy of the information the law enforcement agency provided to the employee with the request for victim leave.  An employee shall use the employee's available sick leave, compensatory leave or annual leave for such absence. If an employee exhausts all sick leave, compensatory leave and annual leave, an agency head shall place the employee on leave without pay.

**SOA000815**

## ARTICLE 7. PERFORMANCE MANAGEMENT

**R2-5A-701.**   **General**

**A.** Performance management system.   The Director shall establish a performance management system to evaluate the job performance of state employees. The performance management system established by the Director shall contain performance rating levels and shall contain numerical points to apply to each performance rating level established.

**B.** Administration. The Director shall develop an administrative manual and training on the performance management system.

**C.** Exceptions. The performance management system may be used:

    1.   As determined by the appointing authority for the agency head, to evaluate the job performance of the agency head.

    2.   As determined by the agency head, to evaluate the job performance of:

        a.   Each deputy director, or equivalent, of the agency.

        b.   Each assistant director, or equivalent, of the agency.

**R2-5A-702.**   **Performance Management Process**

**A.** Performance plan. For the purposes of this subsection, "performance plan" means a document prepared by an employee's supervisor that outlines what is expected of the employee and how the employee's performance will be measured. Subject to review by agency management, a supervisor:

    1.   Shall administer a performance plan for each employee within 30 days of becoming the employee's supervisor.

    2.   May modify a performance plan at any time during a performance period.

    3.   Shall modify a performance plan when significant responsibilities or expectations are added to or removed from a position.

    4.   Shall notify the affected employee of any modifications made to a performance plan under subsection (A)(2) or (3).

**B.** Performance evaluation requirements.

    1.   Informal evaluation.  A supervisor shall:

        a.   Monitor and evaluate an employee's performance throughout the rating period,

        b.   Provide feedback to the employee on a regular basis, and

        c.   Attempt to correct inadequate performance where possible and appropriate.

    2.   Formal evaluation.  A supervisor shall:

        a.   Formally evaluate, document and rate the performance of each employee at least annually.

**SOA000816**

    b.  Submit the evaluation to agency management for review prior to the evaluation being administered to the employee.

  3.  Covered probationary employees.  Prior to granting a covered probationary employee permanent status, a supervisor shall evaluate a probationary employee at least once prior to the end of the employee's probationary period.

**C.** Responsibilities.

  1.  An employee shall comply with the performance plan established by the supervisor.

  2.  A supervisor shall comply with performance evaluation requirements.

  3.  An agency head shall ensure that all performance evaluations are completed as required by this Section.

## ARTICLE 8. DISCIPLINARY ACTIONS

**R2-5A-801.**    **General**

**A.** Authority.  An agency head has the primary authority and responsibility for managing the conduct of all employees within an agency. A covered employee may be disciplined only for cause. An agency head shall discipline a covered employee in accordance with this Article and the rules in Subchapter B of this Chapter. An uncovered employee serves at the pleasure of the appointing authority and may be dismissed at will. Except for an employee who is in a position listed in A.R.S. § 41-742(F), any action that involves a suspension greater than 80 working hours, an involuntary demotion, or a dismissal requires review by the Director prior to the agency head administering such action.

**B.** Level of discipline.

  1.  If an agency head deems it necessary to discipline an employee, the agency head may determine the level of discipline to be imposed, up to and including dismissal, subject to review by the Director, if applicable.

  2.  In determining the level of discipline to be imposed, the agency head may consider the following factors:

    a.  Consistent application of rules and standards,

      i.  Unless otherwise prescribed by statute, the agency head need only consider those cases decided under the administration of the current agency head.  Decisions in cases prior to the administration of the current agency head are not binding upon the current agency head and are not relevant in determining consistent application of rules and standards.

      ii.  In determining consistent application of rules and standards, the disciplinary actions imposed by one agency may not be binding upon any other agency and may not be used

**SOA000817**

for comparison purposes in hearings wherein the consistent application of rules and standards is at issue.

    b.   Prior knowledge of rules and standards,

    c.   The severity of the infraction,

    d.   The repeated nature of violations,

    e.   Prior corrective or disciplinary actions,

    f.   Previous oral discussions,

    g.   The employee's past work record,

    h.   The effect on agency operations,

    i.   The potential of the violations for causing damage to persons or property.

**C.** Limitations.

    1.   Except as otherwise provided by statute or rule, suspensions shall not exceed a total of 30 working days during any 12-month period. The 12-month period begins with the first day of the first suspension.

    2.   An employee who is involuntarily demoted must possess the qualifications for the position and:

        a.   A covered employee who has attained permanent status may be involuntarily demoted only to a regular position in the covered service.

        b.   An uncovered employee may be involuntarily demoted only to a position in the uncovered service.

**D.** Review by Director.

    1.   Letters of reprimand and suspensions without pay of 80 working hours or less are not subject to review by the Director.

    2.   Prior to imposing a suspension greater than 80 working hours, an involuntary demotion, or dismissal, the agency head shall submit the proposed action to the Director for review as prescribed in R2-5A-802, unless the employee is in a position listed in A.R.S. § 41-742(F). If the employee is in a position listed in A.R.S. § 41-742(F), a review by the Director is not required.

**R2-5A-802.**    **Procedures for Review by the Director**

**A.** Prior to administering any action requiring review by the Director, the agency head shall submit the proposed letter to the Director prior to the date the agency head intends to issue the letter to the employee.

**B.** The Director shall review the agency head's proposed action and provide notification of concurrence or recommend modification to the proposed action.

SOA000818

**C.** When the agency head administers the action to an employee, the agency head shall also send a copy of the employee's letter to the Director.  If the agency head determines that no action will be taken, the agency head shall notify the Director.

**R2-5A-803.**    **Employee Request for Review of Disciplinary Action**

**A.** A covered employee who is issued a disciplinary action may have grievance or appeal rights, as applicable.

**B.** An uncovered employee does not have grievance rights or the right of appeal to a state merit board or council.

**C.** A covered employee who files a complaint on a disciplinary action alleging discrimination or harassment is precluded from also filing a grievance through the agency's grievance procedure on the same disciplinary action that is the subject of the employee's complaint.

**ARTICLE 9. COMPLAINTS**

**R2-5A-901.**    **Complaint System**

**A.** General. Each agency head shall:

 1. Adopt a procedure to address employee complaints concerning discrimination or harassment in compliance with this rule.

 2. Designate an employee of the agency to serve as the agency's complaint coordinator, who shall be responsible for receiving complaints, determining applicability under the complaint system, investigating or assigning the complaint to the appropriate individual within the agency for review or investigation, and tracking the processing of complaints.

**B.** Matters subject to the complaint system. The adopted complaint procedure shall require the complainant to file the complaint with the agency complaint coordinator within 180 days of the action giving rise to the complaint and to clearly outline the allegations to be addressed, including whether the basis of the complaint is based on:

 1. Unlawful discrimination based on race, color, religion, sex (including pregnancy), age, national origin, genetic information or on the basis of a disability.

 2. Allegation of sexual harassment or other form of harassment.

 3. Retaliation for filing a complaint.

 4. Retaliation or intimidation for exercising any right under state or federal law.

**C.** Preparation. A complainant shall not be allowed the use of state time or state property to prepare a complaint, prepare for a meeting with agency management or to meet with a representative. Subject

**SOA000819**

to supervisory approval, a complainant may request available compensatory or annual leave for this purpose.

**D.** Multiple complaints. Multiple complaints by an employee may be consolidated into a single complaint. Separate complaints filed by two or more employees regarding the same issue or issues may be consolidated into a group complaint. Employees having a common complaint may submit one group complaint, identifying one complainant as the selected spokesperson for the group. Employees who choose to file a group complaint are prohibited from filing separate complaints on the same issue.

**E.** Amendments. Once a complaint is submitted to the agency complaint coordinator, it may not be amended. If additional documentation is submitted by the complainant after the initiation of the complaint, the reviewing or investigating official may remand the complaint to the complainant for reconsideration and resubmission.

**F.** Approval. Each agency will submit its proposed complaint procedure and any subsequent changes to the Director for approval.

### R2-5A-902.    Complaint Procedures

**A.** Content. Each agency complaint procedure shall include as a minimum that:

1. The agency head be notified of all verbal or written complaints of discrimination or harassment reported by an employee immediately upon receipt of a complaint.

2. Employees who are told or otherwise become aware that discrimination or harassment is occurring must immediately report the allegation or complaint to the agency's complaint coordinator.

3. The complaint include all facts and circumstances involved in the alleged violation, including:

   a.   Description of the incident(s),

   b.   Name(s) of individual(s) involved,

   c.   Name(s) of witness(es),

   d.   The date(s) the discrimination or harassment occurred (if known),

   e.   Resolution sought,

   f.   Federal or state law alleged to have been violated.

4. The agency complaint coordinator shall acknowledge receipt of the complaint in writing to the complainant not later than five business days after receipt of the written complaint.

5. The agency complaint coordinator shall initiate an investigation into the alleged complaint or assign the complaint to the appropriate individual within the agency for review or investigation within 10 business days and the review or investigation shall be completed within 60 business

**SOA000820**

days of receipt of the written complaint. If extenuating circumstances exist, an extension shall be requested through the agency complaint coordinator.

6. Barring resolution of the complaint by agreement of the parties, the agency complaint coordinator shall forward a written recommendation to the agency head, or designee, within 10 business days of completion of the review or investigation.

7. The agency head, or designee, shall review the findings and recommendations and issue a decision in writing to the complainant.

8. A statement advising that retaliation against an employee for filing a complaint in good faith will not be tolerated or permitted.

9. A statement specifying that a grievance filed by a covered employee under R2-5B-403 that includes an allegation of discrimination or harassment shall be reviewed or investigated under the provisions of this Article, and not the grievance system.

**B.** Review by Director.

1. An employee, other than a Department of Administration employee, who is not satisfied with the agency head's response to a complaint alleging discrimination or harassment, may elevate the complaint to the Director within five business days after the receipt of the agency head's response. The Director will furnish a copy of the final decision to the agency head and the complainant within 20 business days following receipt of the complaint by the Director. The 20 business days may be extended by the Director with the concurrence of the complainant. The decision of the Director is the final step in the complaint procedure.

2. A complainant who is a Department of Administration employee and who is not satisfied with the Director's decision on a complaint alleging discrimination or harassment may resubmit the complaint to the Director within five business days after receipt of the Director's decision. The Director will appoint an individual who is not an employee of the Department of Administration and who serves in a position that is assigned to manage an agency's employee relations or investigations work unit to investigate the resubmitted complaint. The investigator shall conduct an investigation and furnish a copy of the findings and final decision to the Director and the complainant within 20 business days following receipt of the complaint by the investigator. The 20 business days may be extended by the investigator with the concurrence of the complainant. The decision of the investigator is the final step in the complaint procedure.

3. The response will refer the employee to the appropriate entity if the employee is dissatisfied with the final step of the complaint procedure.

SOA000821

## ARTICLE 10. SEPARATIONS

**R2-5A-1001.    Voluntary Separation**

**A.** Resignation. An employee may terminate employment with the state by submitting a written resignation to the agency head.  An employee should submit a resignation at least 10 business days prior to the effective date of the resignation.  If an employee resigns orally, the agency head shall confirm the resignation in writing. An agency head may refuse to accept a resignation and separate the employee pursuant to R2-5A-1002.

**B.** Job abandonment. An agency head may consider an employee to have voluntarily resigned from employment with the agency when the employee is absent from duty for three consecutive workdays or equivalent without proper authorization.

**R2-5A-1002.    Involuntary Separation**

**A.** General. An agency head may terminate an employee as deemed necessary to meet the needs of the agency and in keeping with federal and state laws and regulations. A covered employee may be dismissed only for cause. An agency head shall dismiss a covered employee in accordance with Article 8 and the rules in Subchapter B of this Chapter.

**B.** Staff reduction. At times, a staff reduction is necessary due to lack of work, lack of funds, economic slowdowns, technological or structural changes in the agency's operations, or because a staff reduction is determined to be necessary to ensure the financial health and viability of the agency.

   1. Except for an employee who is in a position listed in A.R.S. § 41-742(F), a staff reduction of an uncovered employee requires review by the Director prior to the agency head administering such action.

   2. An agency head shall conduct staff reductions of covered employees in accordance with Subchapter B, Article 6, Reduction in Force.

## SUBCHAPTER B. COVERED EMPLOYEES

### ARTICLE 1. GENERAL

**R2-5B-101.      Definitions**

In addition to the definitions provided in Subchapter A of this Chapter, the following definitions apply to this Subchapter:

"Limited appointment employee" means an employee who, before September 29, 2012, was subject to the provisions of A.R.S. Title 41, Chapter 4, Articles 5 and 6 that were in effect before September 29, 2012, was appointed to a position that was based on the duration of funding, and was not eligible to acquire reduction in force rights.

*"Original probationary period" means the specified period following initial appointment to covered service.* A.R.S. § 41-741(10)

"Permanent status" means the standing a covered employee achieves after the completion of an original probation or a promotional probation.

*"Probationary period" means a working test period of employment in a covered service position for evaluation of the employee's work.* A.R.S. § 41-741(11)

*"Promotional probation" means the specified period of employment following promotion of a permanent status employee to another covered position that has a higher pay grade.* A.R.S. § 41-741(12)

**R2-5B-102.      Applicability**

**A.**  The rules in this Subchapter are applicable to covered positions, applicants for covered positions and covered employees in the State Personnel System.

**B.**  Covered service is limited to the following:

    1.  An employee who was in the state service as either a probationary or permanent status employee, was not required to become at will uncovered in accordance with A.R.S. Title 41, Chapter 4, Article 4, and who does not:

        a.  Voluntarily elect to become uncovered at will.

        b.  Voluntarily accept a change in assignment to a position in the uncovered service.

        c.  Have a break in service.

    2.  A newly hired employee who is appointed or a current uncovered employee who voluntarily accepts a change in assignment to:

        a.  A position in the Arizona Department of Corrections that is classified as a Correctional Officer I, Correctional Officer II, Correctional Officer III, or a Community Corrections

Officer; or

b.   A position in any state agency that requires certification as a full authority peace officer by the Arizona Peace Officer Standards and Training Board, provided the position is not in the uncovered service.

## ARTICLE 2. EMPLOYMENT STATUS

**R2-5B-201.**   **Applicability**

The rules under this Article are applicable only to positions in the covered service and covered employees.

**R2-5B-202.**   **Original Probation**

**A.**  General. A new employee hired into a position in the covered service shall serve an original probation period of one year.

**B.**  Extension of probation.

    1.   An agency head may extend an employee's original probation up to six additional months for employment-related reasons.

    2.   The probationary period shall be extended for any period for which a probationary employee is on leave without pay for more than 80 consecutive working hours. If original probation is extended for this reason, the employee's probation may exceed 18 months.

**C.**  Completion of original probation.

    1.   In accordance with the rules in Subchapter 5A, Article 7, a supervisor shall evaluate an original probationary employee and submit a report to the agency head before expiration of the employee's probationary period. If the agency head takes no action to extend the probationary period or to terminate the employee, the agency head shall grant permanent status to the employee upon completion of the probationary period.

    2.   If an agency head determines at any time during an original probationary period that the services of a probationary employee are no longer required in that position for any reason or for no reason, the agency head may:

        a.   Dismiss the employee without a stated reason and without the right of appeal, providing the employee a letter of dismissal; or

        b.   Offer the employee another position for which the employee possesses the qualifications. An employee who accepts a position that is not in the covered service is an at will uncovered employee.

**SOA000824**

**D.** Change in position. An original probation employee who is selected for another position in the covered service shall serve an original probation period in the new position.

**R2-5B-203.**     **Promotional Probation**

**A.** General. A permanent-status employee who is promoted to a position in the covered service shall serve a promotional probation period of six months.

**B.** Extension of probation.

    1.   An agency head may extend an employee's promotional probation up to six additional months for employment-related reasons.

    2.   The probationary period shall be extended for any period for which a probationary employee is on leave without pay for more than 80 consecutive working hours. If promotional probation is extended for this reason, the employee's probation may exceed one year.

**C.** Completion of promotional probation.

    1.   In accordance with the rules in Subchapter 5A, Article 7, a supervisor shall evaluate a promotional probationary employee and submit a report to the agency head before expiration of the employee's probationary period. If the agency head takes no action to extend the probationary period, to revert or separate the employee, or offer the employee another position, the agency head shall grant permanent status to the employee upon completion of the probationary period.

    2.   If an employee fails to complete a promotional probation successfully the agency head may revert the employee in the current employing agency to:

        a.   A vacant position in the class in which the employee held permanent status immediately before promotion, or

        b.   A similar position in another class at the same grade as the class that the employee holds permanent status if the employee possesses the qualifications for that position.

**D.** Discipline. Neither subsection (C)(2)(a) nor (b) shall preclude the imposition of disciplinary action.

**E.** Failure to complete promotional probation. An employee who is reverted shall not have the right to appeal.

**R2-5B-204.**     **Permanent Status**

A covered employee who has successfully completed the employee's probationary period shall attain permanent status in the position.

SOA000825

**R2-5B-205.     Change from Covered to Uncovered Service**

**A.** Voluntary election.  A covered employee may voluntarily elect to become an at will uncovered employee without a change in assignment.  Such an election is subject to the approval of the head of the employing agency and the Director.  If approved, the effective date of the employee's change to uncovered service shall be the first day of the pay period immediately following the Director's approval.

**B.** Change in assignment. Except for a special assignment, a covered employee who voluntarily accepts a change in assignment to a position that is not in the covered service, regardless of whether the voluntary change in assignment is a promotion, demotion, or lateral transfer, is an at will uncovered employee. The effective date of the employee's change to uncovered service shall be the same as the effective date of the change in assignment. A special assignment is not a change in assignment.

**C.** Return to state employment. A covered employee who has a break in service and returns to employment in an agency in the State Personnel System in any capacity shall be an at will uncovered employee, unless the appointment is to a position in the covered service.

## ARTICLE 3. DISCIPLINARY ACTIONS

**R2-5B-301.     General**

**A.** Applicability. The rules under this Article are applicable only to covered employees.

**B.** Review by Director.  Disciplinary actions for covered employees are subject to the review requirements outlined in R2-5A-801(D) and R2-5A-802.

**R2-5B-302.     Reprimand**

**A.** Authority.  An agency head may issue a written reprimand to an employee for cause.

**B.** Reprimand Procedures. The agency head shall provide the employee with a written statement of the reasons for the reprimand and the employee's grievance rights.

**R2-5B-303.     Suspension**

**A.** Authority. An agency head may suspend an employee without pay for cause.

**B.** Limitation. Except as otherwise provided by statute or rule, suspensions shall not exceed a total of 30 working days during any 12-month period. The 12-month period begins with the first day of the first suspension.

**C.** Pre-suspension procedures for suspensions exceeding 80 working hours.  Before an employee with permanent status can be suspended for more than 80 working hours, the agency head shall submit the

**SOA000826**

proposed action to the Director for review as prescribed in R2-5A-802, give the employee written notice of the charges, a summary of the agency head's basis for the charges, and an opportunity for the employee to present a written response. The employee's response shall be made not later than three business days after the employee receives notice of the charges, unless extended in writing by the agency head.

**D.** Suspension procedures. The agency head shall provide the employee with a written statement of the reasons for the suspension. The statement shall specify the period of suspension and the employee's grievance or appeal rights.

**R2-5B-304.    Involuntary Demotion**

**A.** Authority. An agency head may involuntarily demote a permanent status employee for cause to any covered position in the employing agency, provided the employee possesses the qualifications for such position.

**B.** Pre-demotion procedures.  Before an employee with permanent status can be involuntarily demoted, the agency head shall submit the proposed action to the Director for review as prescribed in R2-5A-802, give the employee written notice of the charges, a summary of the agency head's basis for the charges, and an opportunity for the employee to present a written response. The employee's response shall be made not later than three business days after the employee receives notice of the charges, unless extended in writing by the agency head.

**C.** Involuntary demotion procedures. Prior to the effective date of the involuntary demotion, a written notice containing specific reasons for the demotion and the employee's right of appeal shall be provided to the employee and the Director.

**D.** Probation. Except as otherwise provided in these rules, an employee who is involuntarily demoted shall not be required to serve a probationary period in the position to which demoted.

**R2-5B-305.    Dismissal**

**A.** Relief from duty. Nothing in this rule shall preclude the agency head from immediately placing an employee on administrative leave pending implementation of procedures under this Section, but no pay shall be withheld for such period.

**B.** Dismissal during original probation. An employee on original probation may be dismissed without a stated reason and without the right of appeal.

**C.** Pre-dismissal procedures. Before an employee with permanent status can be dismissed, the agency head shall submit the proposed action to the Director for review as prescribed in R2-5A-802, give the employee written notice of the charges, a summary of the agency head's basis for the charges, and an

SOA000827

opportunity for the employee to present a written response. The employee's response shall be made not later than three business days after the employee receives notice of the charges, unless extended in writing by the agency head.

**D.** Dismissal procedures. The agency head may dismiss an employee with permanent status only for cause but not before attempting to serve the employee personally or by registered or certified mail, return receipt requested (addressee only), with written notice of the specific reasons for dismissal in sufficient detail to inform the employee of the facts, with a copy to the Director. The agency head shall include a statement of the employee's right to appeal.

**E.** Effective date of dismissal. The dismissal action is not effective until one of the following occurs:

1. The employee signs for receipt of the dismissal letter personally served or served by mail;

2. Three business days have passed since the letter was mailed to the employee; or

3. An attempt is made to personally serve the dismissal letter, but the employee refuses to sign for the letter. Such attempt to personally serve the letter shall be witnessed.

## ARTICLE 4. GRIEVANCES

**R2-5B-401.     Applicability**

The rules under this Article are applicable only to covered employees.

**R2-5B-402.     Grievance System**

**A.** General. Each agency that has one or more covered employees shall:

1. Adopt a grievance procedure which will afford each covered employee a systematic means of resolving an employee's disagreement with the receipt of a disciplinary action that is either:

   a.   A written reprimand, or

   b.   A suspension of:

      i.   40 working hours or less if the employee is a full authority peace officer, or

      ii.  80 working hours or less if the employee is a covered employee in any other capacity.

2. Designate an employee of the agency to serve as the agency's grievance coordinator, who shall be responsible for receiving grievances, determining applicability under the grievance system, forwarding the grievance to the appropriate individual within the agency for review or investigation, and tracking the processing of grievances.

**B.** Non-applicable matters. The adopted grievance procedure shall not apply to any matter for which another method of review is provided, including but not limited to:

1. Retirement, Life Insurance, or Health Insurance;

**SOA000828**

2. Any classification action;

3. Any recruitment, selection, or appointment;

4. Any compensation action;

5. A disciplinary action that is either:

    a. A suspension of:

        i. More than 40 working hours if the employee is a full authority peace officer, or

        ii. More than 80 working hours if the employee is a covered employee in any other capacity,

    b. A demotion, or

    c. A dismissal.

6. A complaint alleging discrimination or harassment; or

7. Any reduction in force action.

**C.** Restrictions. An employee may not submit a grievance challenging the following management rights:

1. An agency head's right to direct agency employees.

2. An agency head's right to hire, promote, transfer, assign, and retain employees.

3. An agency head's right to maintain efficiency of government operations and to determine the methods, means, and personnel by which these operations are to be conducted.

**D.** Preparation. A grievant shall not be allowed the use of state time or state property to prepare a grievance, prepare for a meeting with agency management or to meet with a representative. Subject to supervisory approval, a grievant may request available compensatory or annual leave for this purpose.

**E.** Steps. An agency's grievance procedure shall have two steps for review.

1. As determined by the agency head, the first step in the grievance procedure shall be:

    a. The employee's second line supervisor,

    b. The assistant director or equivalent, or

    c. Any level of management between (a) and (b).

2. The final step in the grievance procedure shall be the agency head, or designee.

3. An agency head may choose to incorporate an additional step in the agency grievance procedure after the first step review.

**F.** Amendments. Once a grievance is submitted to the first step, it may not be amended. If additional documentation is submitted by the grievant after the initiation of the grievance, the reviewing official may remand the grievance to the appropriate previous level for reconsideration.

**G.** Approval. Each agency head will submit the agency's proposed grievance procedure and any subsequent changes to the Director for approval.

**SOA000829**

**R2-5B-403.     Grievance Procedures**

Content. The grievance procedure established in each state agency shall include as a minimum:

1. An initial statement that any complaint alleging unlawful discrimination or unlawful harassment will be reviewed or investigated according to the provisions of the separate complaint process outlined in Subchapter A, Article 9, and not the grievance system.

2. A requirement that the grievant have an oral discussion with the immediate supervisor in an attempt to resolve the employee's disagreement with the disciplinary action, prior to initiating the written grievance procedure.

3. A requirement that the employee file the grievance in writing with the agency grievance coordinator, within 10 business days after the occurrence of the action being grieved. The date of occurrence of a:

   a. Reprimand is the date the reprimand was issued to the employee.

   b. Suspension is the first day of suspension.

4. A requirement that the grievance contain a complete statement of all the facts and circumstances involved and the specific redress sought.

5. A provision that the grievant may select a representative at any step in the procedure after the oral discussion with the immediate supervisor.

6. A requirement that another state employee who serves as the representative of a grievant must receive approval for annual or compensatory leave to represent the grievant.

7. A requirement that the grievant must have a minimum of five business days after receipt of a response to forward the grievance at any step, must sign the grievance at each step, and must state the reasons why the response at the previous step was unsatisfactory.

8. A requirement that the agency head will respond to the grievant not later than 30 business days after receipt of the grievance at the first step. Within the 30 business day period, the time for any step may be extended by the agency head with the concurrence of the grievant.

9. A statement that the decision of the agency head is the final step in the grievance process.

## ARTICLE 5. APPEALS

**R2-5B-501.     Applicability**

The rules under this Article are applicable only to covered employees who have attained permanent status.

**R2-5B-502.      General**

**A.**  Except for an employee who is a full authority peace officer, an employee may file an appeal on the receipt of a disciplinary action that is either:

1.   A suspension for more than 80 working hours,

2.   An involuntary demotion, or

3.   A dismissal.

**B.**  Such appeals shall be filed with the State Personnel Board and in accordance with the rules established by the Board.

**R2-5B-503.      Full Authority Peace Officers**

**A.**  A full authority peace officer may file an appeal on the receipt of a disciplinary action that is either:

1.   A suspension for more than 40 working hours,

2.   An involuntary demotion, or

3.   A dismissal.

**B.**  Such appeals shall be filed with the Law Enforcement Merit System Council and in accordance with the rules established by the Council.

## ARTICLE 6. REDUCTION IN FORCE

**R2-5B-601.      Applicability**

The rules under this Article are applicable only to covered positions and covered employees.

**R2-5B-602.      Reduction in Force Procedures**

**A.**  General.

1.   An agency head shall submit to the Director a proposal to conduct a reduction in force if required for one or more of the following reasons:

a.   Lack of funds or work,

b.   Abolition of one or more covered positions,

c.   Material change in job duties or agency organization, or

d.    Introduction of a cost reduction initiative.

2.   An agency head shall submit the proposal for a reduction in force at least 30 business days before the proposed effective date of the reduction in force. If circumstances beyond the agency's control do not permit at least 30 business days' notice, the agency head shall submit the proposal as soon as the agency head is aware of the necessity for a reduction in force.

**SOA000831**

3. An agency head shall include all of the following in the proposal for a reduction in force:

    a. The reason for the reduction in force;

    b. The proposed scope of the reduction in force, which shall be limited to either:

        i. The agency,

        ii. An organizational unit of the agency, or

        iii. Agency operations within a geographic area,

    c. Each specific covered position proposed for elimination and an organization chart identifying each position, and

    d. The proposed effective date of the reduction in force.

4. An agency head shall submit a proposal that is consistent with A.R.S. § 41-772 and this Section.

5. An agency head shall not approve a personnel action that would have an effect on the reduction in force after the agency head has submitted a proposal for a reduction in force.

6. An agency head shall not re-establish a position that was abolished as a result of a reduction in force for two years if the position was filled when the reduction in force occurred, unless the position was abolished due to fiscal constraints, legislative action, or court order.

B. Administration of reduction in force. The Director shall review and approve, modify or deny a reduction in force within 20 business days of receipt. Upon approval of the Director to conduct a reduction in force:

1. An agency head shall separate a covered employee who is not a permanent status employee in the class affected by the reduction in force in the following order before any reduction in force action is taken that affects a permanent status employee, provided the separation of the non-permanent status employee will accomplish, or assist in accomplishing, the purpose of the reduction in force:

    a. Temporary employee,

    b. Original probationary employee, and

    c. Limited appointment employee.

2. An agency head shall use retention points to identify a permanent status employee within a class series affected by a reduction in force for retention in the employee's current position, transfer, reduction, or separation based on the employee's relative standing on the retention point list.

3. An agency head shall base retention points upon performance calculated in accordance with the instructions in subsections (C) and (D).

4. An employee on promotional probation or special assignment shall compete for retention in the employee's permanent status class.

5. An employee in an underfill position shall compete for retention in the employee's permanent status class.

SOA000832

6.   A permanent part-time employee shall compete for retention against another permanent part-time employee in the same class.

C.   Calculation of retention points. An agency head shall compute the average score of a maximum of the three most recent performance evaluations in the 24 months concluded before the date of proposal for a reduction in force. An employee's average score shall be the employee's retention points. If an employee has not had a performance evaluation in the past 24 months, the employee shall receive 2.0 retention points.

D.   Resolution of ties. An agency head shall break any tie in total retention points in the following manner and order:

1.   The employee with the highest most recent performance evaluation shall be given preference.

2.   If a tie continues to exist, the agency head shall break the tie by lot.

E.   Offer of position.

1.   An agency head shall provide written notice at least five business days in advance to each employee identified for transfer, reduction, or separation. If circumstances beyond the agency's control do not permit at least five business days' notice, the agency head shall provide notice as soon as the agency head is aware of the necessity to transfer, reduce, or separate the employee.

2.   The notice shall include:

a.   The reason for and effective date of the action;

b.   A job offer, if any, including the salary, location of the position, and supervisor's name;

c.   The availability of reduction in force procedures and records for review, with references to relevant statutes and rules; and

d.   The employee's right to request a review of the determination as provided in R2-5B-603.

3.   An agency head shall offer a position to an employee identified for transfer, reduction, or separation with the highest number of points on the retention point list in descending order as follows:

a.   If a vacant covered position exists and an employee possesses the required qualifications for the position, an agency head shall make the single best offer, in terms of pay range, within the agency of:

i.   A regular position at the same or lower pay range in the same class series as the employee's present permanent status position;

ii.   A regular position at the same or lower pay range in any class series in which the employee has held permanent status during the past five years; or

iii.   If both positions described in subsections (E)(3)(a)(i) and (ii) are available, the position described in subsection (E)(3)(a)(i).

SOA000833

      b.  If the offer under subsection (E)(3)(a) is a position at a lower pay range, the agency head shall provide the employee the option of accepting a vacant covered:

          i.  Funded, regular position at the employee's present pay range in a class series in which the employee has never held permanent status for which the employee is qualified; or

          ii.  Temporary or part-time position at the employee's present pay range for which the employee is qualified.

4.  An employee shall possess the qualifications required when the position was last filled, unless the Director grants an exception.

5.  Any job offer shall contain a time period of not less than three business days in which the employee may accept the offer. Failure of an employee to reply in writing within the stated time period, or failure to accept the job offer, shall constitute a resignation. An employee may accept a job offer and retain the right to request a review of the determination.

6.  If no position exists, the agency head may separate the employee.

**R2-5B-603.    Employee Request for Review**

**A.**  An employee may request a review of the following determinations made during a reduction in force:

    1.  Calculation of the employee's retention points,

    2.  A job offer resulting in the employee's transfer or reduction, and

    3.  Notification of the employee's separation.

**B.**  Within three business days of receipt of a determination notice, unless a longer period is authorized by an agency head, an employee may submit a written request to the agency head for a review of the determination. The request for review shall be based upon an error, contain specific information concerning the error involved, and include a proposed resolution of the problem.

**C.**  The agency head shall review the request and respond to the employee within five business days after receipt of the request.

**D.**  An agency head may postpone any portion of a reduction in force until completion of an employee request for review.

**SOA000834**

| Issued: June 2013<br>Effective: 9/29/12<br>Revised: | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br># POLICY & PROCEDURE | NO.    HR-7 |
|---|---|---|
| SUPERSEDES All rules prior to 9/29/12 | | SHEET   1 of 4 |
| **SUBJECT:**<br><br>ANNUAL LEAVE | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:    Human Resources<br>As item:   HR-7 |

This policy does not create a contract for employment between any Attorney General's Office (AGO) employee and the Agency.  Nothing in this policy changes the fact that all uncovered AGO employees are at-will employees and serve at the pleasure of the appointing authority.

*All AG employees are required to electronically sign each new and updated guideline and procedure issued, acknowledging that they have read and understand each policy.*

## I.    PURPOSE
The purpose of this guideline is to outline the **Annual Leave** for employees at the Attorney General's Office (AGO).  Please refer to Department of Administration State Personnel System Rule(s) R2-5A-B602 for further details on Annual Leave.

## II.    SCOPE
This policy applies to all AGO employees.

## III.    AUTHORITY
R2-5A-B602, Annual Leave

## IV.    DEFINITIONS
"*Covered employee*" is defined in A.R.S. § 41-741 and means an employee who:
- Before September 29, 2012, is in the state service, is not uncovered pursuant to A.R.S. § 41-742, subsection A and has remained in covered status without a break in service since that date.
- Before September 29, 2012, is in the state service, is a full authority peace officer as certified by the Arizona peace officer standards and training board and has remained in that status without a break in service since that date.
- On or after September 29, 2012, is a correctional officer I, correctional officer II, correctional officer III or community corrections officer and is appointed to a position in the covered service, but does not include a position in any other class in the correctional officer class series or the community correctional officer class series or in any other correctional class series.
- On or after September 29, 2012, is a full authority peace officer as certified by the Arizona peace officer standards and training board and is appointed to a position that is covered and that requires such a certification.

"*Covered position*" means a position in the covered service.

"*Part-time*" means employment scheduled for less than 40 hours per week.
"3/4 time" means employment regularly scheduled for at least 30 hours but fewer than 40 hours per week.
"1/2 time" means employment regularly scheduled for at least 20 hours but fewer than 30 hours per week.

SOA000835

| Issued: June 2013<br>Effective: 9/29/12<br>Revised: | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br># POLICY & PROCEDURE | NO.   HR-7 |
|---|---|---|
| SUPERSEDES All rules prior to 9/29/12 | | SHEET   2 of 4 |
| **SUBJECT:**<br><br>ANNUAL LEAVE | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:   Human Resources<br>As item:   HR-7 |

"1/4 time" means employment regularly scheduled for at least 10 hours but fewer than 20 hours per week.

*"Supervisor"* means a state employee who has one or more other state employees reporting directly to the person and, for those state employees, typically has the authority to:  (a) Approve sick or annual leave; (b) Recommend hiring, discipline or dismissal; (c) Assign or schedule daily work; and, (d) Complete a performance evaluation. A.R.S. § 41-741(18).

## V.    POLICY – ANNUAL LEAVE

### A. ACCRUAL OF ANNUAL LEAVE
- **Uncovered Employees Hired Prior to September 29, 2012**

Employees in uncovered positions prior to 09/29/12 shall accrue annual leave at the following rate:

| Credited State Service | Hours Per Month | Hours Per Pay Period |
|---|---|---|
| Any amount of years | ~ 14 | 6.47 |
| Division/Section Chiefs | ~ 16 | 7.39 |

*Annual Leave is pro-rated for less than full time employees*

- **Uncovered Employees Hired on and after September 29, 2012**

Employees hired into uncovered positions on and after September 29, 2012, shall accrue annual leave at the following rate:

| Credited State Service | Hours Per Month | Hours Per Pay Period |
|---|---|---|
| Fewer than 3 years | ~ 8.5 | 4.00 |
| 3 years but fewer than 9 years | ~ 12 | 5.54 |
| 9 years or more | ~ 14 | 6.47 |

*Annual Leave is pro-rated for less than full time employees*

- **Uncovered Employees who are considered Political Appointees** (as defined by A.R.S. § 41-742(F) **hired on and after September 29, 2012**

Shall accrue annual leave at the following rate (regardless of position):

| Credited State Service | Hours Per Month | Hours Per Pay Period |
|---|---|---|
| Any amount of years | ~ 14 | 6.47 |

*Annual Leave is pro-rated for less than full time employees*

**SOA000836**

| Issued: June 2013<br>Effective: 9/29/12<br>Revised: | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br><br>**POLICY & PROCEDURE** | NO.    HR-7 |
|---|---|---|
| SUPERSEDES All rules prior to 9/29/12 | | SHEET    3 of 4 |
| **SUBJECT:**<br><br>ANNUAL LEAVE | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:    Human Resources<br>As item:    HR-7 |

- **Current Covered Employees hired before September 29, 2012 and New Hires into covered positions**
(only covered positions that require Full Authority Peace Officer certification), shall accrue annual leave at the following rate:

| Credited State Service | Hours Per Month | Per Pay Period |
|---|---|---|
| Less than 3 years | ~ 8 | 3.70 |
| 3 years but less than 7 years | ~ 10 | 4.62 |
| 7 years but less than 15 years | ~ 12 | 5.54 |
| 15 years or more | ~ 14 | 6.47 |

*Annual Leave is pro-rated for less than full time employees*

## B. PROCEDURE FOR REQUESTING ANNUAL LEAVE

An employee's supervisor must approve annual leave in advance using the Leave Request Form. An employee can check their leave balances through Y.E.S.

## C. ACCUMULATION OF ANNUAL LEAVE

The accumulation limit is 240 hours for a covered employee and 320 hours for an uncovered employee at the end of every calendar year. Uncovered employees hired by the AGO prior to March 26, 2003, Division Chiefs and Division Directors are allowed to accumulate a maximum of 400 hours at the end of every calendar year. Effective 09/29/12, any new employees (regardless of position) will be unable to carry over more than the maximum 320 hours for uncovered employees.

## D. DONATION OF ANNUAL LEAVE

An employee who has exhausted all available leave balances is eligible to receive donations of annual leave if the employee is unable to work due to:
- a seriously incapacitating and extended illness or injury
- a seriously incapacitating and extended illness or injury caused by pregnancy or childbirth
- to care for a member of the employee's immediate family who has a seriously incapacitating and extended illness or injury or childbirth/pregnancy

An employee may donate annual leave to another employee who has exhausted all available leave balances if the employee is in the same state agency or to a family member employed in another state agency. An employee must exhaust all available sick leave (or available family sick leave if employee is absent to care for a family member), compensatory leave annual leave (including any accrued annual leave earned for working on a state holiday) before using any donated annual leave. Please see the Personnel Rule R2-5A-B602 (F) for additional details and definitions.

## E. PROCEDURE FOR REQUESTING DONATED ANNUAL LEAVE

**SOA000837**

| Issued: June 2013<br>Effective: 9/29/12<br>Revised: | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br># POLICY & PROCEDURE | NO.    HR-7 |
|---|---|---|
| SUPERSEDES All rules prior to 9/29/12 | | SHEET    4 of 4 |
| **SUBJECT:**<br><br>ANNUAL LEAVE | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:    Human Resources<br>As item:    HR-7 |

Please contact Human Resources for the procedure to request Donated Annual Leave during an approved Leave of absence.

**F. SEPARATION**
Upon separation an employee will be paid for all unused and un-forfeited annual leave at the employee's current rate of pay.

**VI.    RELATED FORMS**
*Leave Request Form*

**VII.    CORRESPONDING POLICIES**
None

**VIII.    CONTACT**
If you have any questions related to this policy, please contact the Human Resources Section.

**SOA000838**

| Revised: July 2015 | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br><br>POLICY & PROCEDURE | NO.     HR-7 |
|---|---|---|
| SUPERSEDES  June 2013 | | SHEET     1 of 4 |
| **SUBJECT:**<br><br>ANNUAL LEAVE | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:    Human Resources<br>As item:   HR-7 |

This policy does not create a contract for employment between any Attorney General's Office (AGO) employee and the Agency. Nothing in this policy changes the fact that all uncovered AGO employees are at-will employees and serve at the pleasure of the appointing authority.

## I.      PURPOSE
The Attorney General's Office shall comply with the State Personnel rules regarding annual leave as defined in R2-5A-B602 of the Arizona Administrative Code. Therefore, this policy is intended to be a guideline for AGO employees.

## II.     SCOPE
This policy applies to all AGO employees.

## III.    AUTHORITY
R2-5A-B602, Annual Leave

## IV.     DEFINITIONS

    A.   "Annual leave" means a period of approved absence with pay that is not chargeable to another category of leave.

    B.   "Hire date" means the employee's first day of work upon hire or, if the employee has a break in service, rehire.

## V.      POLICY – ANNUAL LEAVE

### A.  ACCRUAL OF ANNUAL LEAVE
- **Uncovered Employees Hired Prior to September 29, 2012 shall accrue annual leave at the following rate:**

| Credited State Service | Hours Per Pay Period |
|---|---|
| Any amount of years | 6.47 |
| Division/Section Chiefs | 7.39 |

*Annual Leave is pro-rated for less than full time employees*

- **Uncovered Employees Hired on and after September 29, 2012 shall accrue annual leave at the following rate:**

| Credited State Service | Hours Per Pay Period |
|---|---|
| Fewer than 3 years | 4.00 |
| 3 years but fewer than 9 years | 5.54 |
| 9 years or more | 6.47 |

*Annual Leave is pro-rated for less than full time employees*

**SOA000839**

| Revised: July 2015 | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br># POLICY & PROCEDURE | NO.    HR-7 |
|---|---|---|
| SUPERSEDES  June 2013 | | SHEET    2 of 4 |
| **SUBJECT:**<br><br>ANNUAL LEAVE | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:    Human Resources<br>As item:    HR-7 |

- **Uncovered Employees who are considered Political Appointees (as defined by A.R.S. § 41-742(F) hired on and after September 29, 2012, shall accrue annual leave at the following rate (regardless of position):**

| *Credited State Service* | *Hours Per Pay Period* |
|---|---|
| Any amount of years | 6.47 |

*Annual Leave is pro-rated for less than full time employees*

- **Current Covered Employees hired before September 29, 2012 and New Hires into covered positions that require Full Authority Peace Officer certification shall accrue annual leave at the following rate:**

| *Credited State Service* | *Per Pay Period* |
|---|---|
| Less than 3 years | 3.70 |
| 3 years but less than 7 years | 4.62 |
| 7 years but less than 15 years | 5.54 |
| 15 years or more | 6.47 |

*Annual Leave is pro-rated for less than full time employees*

## B. PROCEDURE FOR REQUESTING ANNUAL LEAVE
An employee's supervisor must approve annual leave in advance. Although the procedure for requesting leave is at the discretion of the supervisor, email requests/approvals or use of the Leave Request Form are recommended.

## C. ACCUMULATION OF ANNUAL LEAVE
The annual leave accumulation limit at the end of every calendar year is 240 hours for a covered employee and 320 hours for an uncovered employee. Any annual leave in excess of the accumulation limit will not be carried over into the next calendar year.  Uncovered employees hired by the AGO prior to March 26, 2003 are allowed to carry over a maximum of 400 hours at the end of every calendar year. However, at the end of calendar year 2016, and in future calendar years beyond that, the accumulation limit for all uncovered AGO employees will be 320 hours. Therefore, on the last day of the pay period in which December 31, 2016 falls— i.e., **January 13, 2017**—all accumulated annual leave over 320 hours will be forfeited by all uncovered employees, regardless of hire date.

## D. DONATION OF ANNUAL LEAVE
An employee who has exhausted all available leave balances is eligible to receive donations of annual leave if the employee is unable to work due to:
- a seriously incapacitating and extended illness or injury
- a seriously incapacitating and extended illness or injury caused by pregnancy or childbirth

**SOA000840**

| Revised: July 2015 | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br># POLICY & PROCEDURE | NO.       HR-7 |
|---|---|---|
| SUPERSEDES  June 2013 | | SHEET     3 of 4 |
| **SUBJECT:**<br><br>ANNUAL LEAVE | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:     Human Resources<br>As item:    HR-7 |

- to care for a member of the employee's immediate family who has a seriously incapacitating and extended illness or injury or childbirth/pregnancy

An employee may donate annual leave to another employee who has exhausted all available leave balances if the employee is in the same state agency or to a family member employed in another state agency.  An employee must exhaust all available sick leave (or available family sick leave if employee is absent to care for a family member), compensatory leave annual leave (including any accrued annual leave earned for working on a state holiday) before using any donated annual leave.  Please see the Personnel Rule R2-5A-B602 (F) for additional details and definitions.

### E.  PROCEDURE FOR REQUESTING DONATED ANNUAL LEAVE

Please contact Human Resources for the procedure to request Donated Annual Leave during an approved Leave of absence.

### F.  SEPARATION

Upon separation an employee will be paid for all unused and un-forfeited annual leave at the employee's current rate of pay**.**

## VI.     RELATED FORMS

*Leave Request Form*

## VII.    CORRESPONDING POLICIES

None

## VIII.   CONTACT

If you have any questions related to this policy, please contact the Human Resources Section.

SOA000841



# OFFICE OF THE ATTORNEY GENERAL

## LEAVE REQUEST FORM

Employee Name: _____     EIN: _____

DIV/SEC: _____     Effective Date: _____

Please note:
- With the exception of Sick Leave, all leave must be approved in advance.
- In the event of Sick Leave, this request is to be completed **immediately** upon the employee's return to duty

| Type of Leave | Total Hours | From | | To | |
|---|---|---|---|---|---|
| | | *Hour* | *Date* | *Hour* | *Date* |
| ☐ Annual Leave | | | | | |
| ☐ Sick Leave | | | | | |
| ☐ Family Sick Leave | | | | | |
| ☐ Compensatory Leave | | | | | |
| ☐ Bereavement Leave  ☐ Out of State | | | | | |
| ☐ Civic Duty Leave | | | | | |
| ☐ LWOP | | | | | |
| ☐ Other | | | | | |
| Additional comments: | | | | | |

I have read and understand the Office of the Attorney General's HR-34 Working Hours Policy and Procedure.

_____
Employee Signature                                          Date

| Supervisor Determination: | |
|---|---|
| ☐ **Approve**   ☐ **Disapprove** | |
| Supervisor: | Date: |

Updated 07/2015

SOA000842

OFFICE OF THE ATTORNEY GENERAL

## LEAVE REQUEST

| Employee | | Date | | Division/Section | |
|---|---|---|---|---|---|

> With the exception of sick leave, all leave must be approved in advance.
> In the event of sick leave, this request is to be completed *immediately* upon the employee's return to duty.
> This form must be typed or in ink.

I hereby request:

| Type of Leave | Total Hours | From | | To | |
|---|---|---|---|---|---|
| | | *Hour* | *Date* | *Hour* | *Date* |
| ☐ Annual | | | | | |
| ☐ Sick | | | | | |
| ☐ Family Sick / *Family Member:* | | | | | |
| ☐ Compensatory | | | | | |
| ☐ Bereavement / *Family Member:* ☐ In State  ☐ Out of State | | | | | |
| ☐ Civic Duty | | | | | |
| ☐ Short Term LWOP *Leave Without Pay (no more than 80 hours)* [1] | | | | | |
| ☐ Long Term LWOP [2] *Leave Without Pay (more than 80 hours)* [1] | | | | | |
| ☐ FLSA Partial Work Day *(excluded employees)* | | | | | |
| ☐ Other: | | | | | |

Additional comments or explanation:

[1] *Leave Without Pay* is not approved unless specifically noted.

[2] For *Long Term Leave Without Pay,* employee acknowledges and understands that to continue insurance coverage, employee must make personal arrangements for payment of their monthly health, dental and/or life insurance premiums during the time of Long Term (more than 80 hours) Leave Without Pay. In addition, employee's merit increase eligibility date will be advanced by the number of calendar days employee was on Long Term Leave Without Pay.

| | Supervisor's Name | Date |
|---|---|---|
| ☐ Prior verbal approval obtained from | | |

| | *Supervisor's Action* | |
|---|---|---|
| | ☐ Approves          ☐ Disapproves | |

| Employee's Signature | Date | Supervisor's Signature [3] | Date |
|---|---|---|---|

[3] The signature of a supervisor does not constitute affirmation that employee has accumulated the necessary leave hours to fulfill this request. It is employee's responsibility to keep track of leave balances to ensure that the hours requested are available for employee's use.

Rev. Oct. 2008

SOA000843

| Issued: 05/2013<br>Effective: 05/2013<br>Revised: | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br><br>**POLICY & PROCEDURE** | NO.    HR-12 |
|---|---|---|
| SUPERSEDES    All<br>complaint policies prior<br>to 05/2013 | | PAGE    1 of 7 |
| **SUBJECT:**        COMPLAINTS<br>Allegations of Unlawful Discrimination or Harassment | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:    Human Resources<br>As item:    HR-12 |

This policy does not create a contract for employment between any Attorney General's Office (AGO) employee and the Agency. Nothing in this policy changes the fact that all uncovered AGO employees are at-will employees and serve at the pleasure of the appointing authority.

*All AG employees are required to electronically sign each new and updated guideline and procedure issued, acknowledging that they have read and understand each policy.*

I.   PURPOSE
The purpose of this guideline is to outline the policy for Complaints alleging unlawful discrimination or harassment for employees at the Attorney General's Office (AGO). Please refer to the Department of Administration State Personnel System Rules Article 9 for further details on Complaints.

II.   SCOPE
This policy applies to all AGO employees.

III.   AUTHORITY
A.R.S. § 41-1401 et seq., Arizona Civil Rights Act (ACRA)
Civil Rights Act of 1991, as amended
R2-5A-104, Prohibition Against Discrimination, Harassment and Retaliation
R2-5A-501, Standards of Conduct
R2-5A-901, Complaint System
R2-5A-902, Complaint Procedures
Title VII of the Civil Rights Act of 1964, as amended

IV.   DEFINITIONS
"*AGO Complaint Coordinator*" means the Ombudsman within the Agency who is receiving complaints, determining applicability under the complaint system, investigating or assigning the complaint to the appropriate individual within the agency for review or investigation, and tracking the processing of complaints.

"*Disability*" refers to:
- A physical or mental impairment that substantially limits a major life function of an individual;
- Having a history of such an impairment; or
- Being regarded as having such impairment.

"*Discrimination*" includes, but is not limited to:
- Preferential treatment of one individual or group over another similarly situated individual or group because of the individual's or group because of the individual's or group's race, color, religion, sex, pregnancy, age, national origin, genetic information or disability.
- Sexual harassment;
- Harassment of any individual because of the individual's race, color, religion, sex, pregnancy, age, national origin, genetic information or disability; and

**SOA000844**

| Issued: 05/2013<br>Effective: 05/2013<br>Revised:<br><br>SUPERSEDES   All<br>complaint policies prior<br>to 05/2013 | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br><br>POLICY & PROCEDURE | NO.    HR-12<br><br>PAGE    2 of 7 |
|---|---|---|
| **SUBJECT:**          COMPLAINTS<br>Allegations of Unlawful Discrimination or Harassment | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:    Human Resources<br>As item:    HR-12 |

- Failing or refusing to provide a reasonable accommodation to a qualified person with a disability.

*"Discrimination because of disability"* refers to:
- Treating an individual with a disability less favorably than a similarly situated person without a disability;
- Favoring a person with one disability over a person with a different disability; and
- Refusing to provide a reasonable accommodation which is necessary to enable a qualified individual with a disability to perform the essential functions of his or her job.

*"Harassment because of race, color, religion, sex, pregnancy, national origin, age, genetic information or disability"* involves unwelcome and unsolicited conduct which is predicated upon an individual's race, color, religion, sex, pregnancy, national origin, age, genetic information or disability when (1) submission to the conduct is made either explicitly or implicitly a term or condition of employment;  (2) submission to or rejection of such conduct by an employee is used as a basis for an employment decision affecting the employee;  or (3) the conduct has the purpose or effect of substantially interfering with an employee's work performance and creating a hostile, intimidating or otherwise offensive working environment.  Prohibited harassment includes, but is not limited to:
- Derogatory comments, epithets or slurs directed at an individual because of that individual's race, color, religion, sex, pregnancy, national origin, age, genetic information and/or disability;
- Posting or circulating written or graphic materials, including but not limited to, cartoons, pictures, posters or calendars containing derogatory comments, epithets or slurs based upon an individual's race, color, religion, sex, pregnancy, national origin, age, genetic information and/or disability;  and
- Abusive or derogatory remarks or conduct targeted at identifiable groups which are identified based upon their race, color, religion, sex, pregnancy, national origin, age, genetic information and/or disability.

"Sexual Harassment" means unwelcome and unsolicited conduct of a sexual nature when (1) submission to the conduct is made either explicitly or implicitly a term or condition of employment;  (2) submission to or rejection of such conduct by an employee is used as a basis for an employment decision affecting the employee;  or (3) the conduct has the purpose or effect of substantially interfering with an employee's work performance and creating a hostile, intimidating or otherwise offensive working environment.  Examples of conduct that can violate this policy include, but are not limited to:
- Explicit sexual behavior by a supervisor, manager, co-worker, visitor, client or other entity with whom the employee interacts during the course of employment
- Implicit request for sex
- Direct or indirect pressure for dates or sexual activity
- Pinching, patting or other unwelcome touching
- Leering or gawking
- Posting or circulating of sexually graphic materials including, but not limited to pictures, posters or calendars

SOA000845

| Issued: 05/2013<br>Effective:  05/2013<br>Revised: | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br>POLICY & PROCEDURE | NO.   HR-12 |
|---|---|---|
| SUPERSEDES   All<br>complaint policies prior<br>to 05/2013 | | PAGE   3 of 7 |
| **SUBJECT:**   COMPLAINTS<br>Allegations of Unlawful Discrimination or Harassment | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:   Human Resources<br>As item:   HR-12 |

- Sexually derogatory comments, including slurs, jokes and other inappropriate remarks
- Reprisals or threats after a negative response to sexual advances
- Unwelcome sexual advances
- Conditioning favorable terms and conditions of employment upon a positive response to abusive remarks or conduct targeted at only one sex, even if the context of the abusive remarks is not sexual

V.  POLICY – COMPLAINTS (Allegations of Unlawful Discrimination or Harassment)

The Office of the Attorney General is committed to a work environment in which all individuals are treated with respect and dignity.  Each individual has the right to work in a professional atmosphere that promotes equal employment opportunity and prohibits discriminatory practices, including harassment.

The AGO is committed to the prohibition against unlawful discrimination, harassment and retaliation in the workplace.  It is the policy of the AGO that all AGO employees shall comply with all federal and state anti-discrimination laws.  AGO and its employees shall not unlawfully discriminate against any individual with regard to the terms and conditions of employment, including hiring, pay, leave, insurance benefits, retention, and rehiring.  All allegations of discrimination will be promptly investigated, and any employee who engages in conduct in violation of this policy may be disciplined or separated from state employment.

A. Equal Employment Opportunity
   AGO shall provide equal employment opportunity for all individuals regardless of race, color, national origin, religion, age, disability, genetic information, sex, pregnancy, military or veteran status, or any other status protected by federal law, state law, or regulation.  It is the policy of ADOA that all individuals are treated in a fair and non-discriminatory manner throughout the application and employment process.

B. Harassment Prohibited
   Harassment of a sexual nature or harassment based on race, color, national origin, religion, age, disability, genetic information, sex, pregnancy, military or veteran status, or any other status protected by federal law, state law or regulation is prohibited.  AGO prohibits the unlawful harassment of any employee in the course of the employee's work by supervisors, coworkers, or third parties, such as vendors or customers.  Any AGO employee who engages in unlawful harassment may be disciplined or separated from state employment.

C. Protection from Retaliation
   AGO does not permit or tolerate retaliation against anyone for raising a concern about, assisting in an investigation of, or filing a complaint in good faith concerning unlawful discrimination or harassment.  Any AGO employee found to have engaged in retaliation against another individual for reporting or assisting in the investigation of any allegation of unlawful discrimination may be disciplined or separated from state employment.

SOA000846

| Issued: 05/2013<br>Effective: 05/2013<br>Revised:<br><br>SUPERSEDES   All<br>complaint policies prior<br>to 05/2013 | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br>**POLICY & PROCEDURE** | NO.   HR-12<br><br>PAGE   4 of 7 |
|---|---|---|
| **SUBJECT:**  COMPLAINTS<br>Allegations of Unlawful Discrimination or Harassment | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:   Human Resources<br>As item:   HR-12 |

It is the responsibility of all AGO employees to promptly bring any allegation of unlawful discrimination, harassment or retaliation to the attention of their Section Chief and the AGO Complaint Coordinator, Debbie Jackson. Additionally, any complaint alleging unlawful discrimination, harassment or retaliation must be submitted in accordance with the procedures described in this policy and not under the AGO Employee Grievance Policy.

This policy does not affect other rights and remedies under federal and state statutes prohibiting employment discrimination. Employees who believe that they have been subjected to discrimination because of their race, color, religion, sex, pregnancy, age, national origin, genetic information or disability may also file charges of employment discrimination with the Governor's Office of Equal Opportunity and the Equal Employment Opportunity Commission (EEOC). Charges filed with the EEOC must be filed within 300 days following the most recent act of discrimination. The filing of an internal complaint of discrimination pursuant to this policy will not impact those statues of limitations. No employee of the AGO who elects to file a charge with the Governor's Office of Equal Opportunity or the EEOC, or who testifies in an investigation by the Governor's Office of Equal Opportunity or the EEOC, will be retaliated against or denied internal rights or remedies on account of that charge filing or testimony.

VI. PROCEDURE
  A.  Matters Subject to the Complaint Procedure
      This procedure shall be used by an employee to file a formal complaint with the AGO Complaint Coordinator, Debbie Jackson, within 180 calendar days of the action giving rise to the complaint. An employee who does not initiate the complaint within the 180 calendar date period waives the right to file that complaint. The complaint must clearly outline the allegations to be addressed, including whether the basis of the complaint is based on:
      1.  Unlawful discrimination based on race, color, religion, sex (including pregnancy), age, national origin, genetic information or on the basis of a disability.
      2.  Allegation of sexual harassment or other form of harassment.
      3.  Retaliation for filing a complaint.
      4.  Retaliation or intimidation for exercising any right under state or federal law.

  B.  Preparation
      A complaint shall not be allowed the use of state time or state property to prepare a complaint, prepare for a meeting with agency management or to meet with a representative. Subject to supervisory approval and the operational needs of the unit, a complainant may request available compensatory or annual leave for this purpose.

  C.  Multiple Complaints
      Multiple complaints by an employee may be consolidated into a single complaint. Separate complaints filed by two or more employees regarding the same issue or issues may be consolidated into a group complaint. Employees having a common complaint may submit one group complaint, identifying one complainant as the selected spokesperson for the group.

**SOA000847**

| Issued: 05/2013<br>Effective: 05/2013<br>Revised: | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br><br>**POLICY & PROCEDURE** | NO.     HR-12 |
|---|---|---|
| SUPERSEDES   All<br>complaint policies prior<br>to 05/2013 | | PAGE     5 of 7 |
| **SUBJECT:**      COMPLAINTS<br><br>Allegations of Unlawful Discrimination or Harassment | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:     Human Resources<br>As item:     HR-12 |

Employees who choose to file a group complaint are prohibited from filing separate complaints on the same issue.

D. <u>Amendments</u>

Once a complaint is submitted to the AGO Complaint Coordinator, it may not be amended. If additional documentation is submitted by the complainant after the initiation of the complaint, the reviewing or investigating official may remand the complaint to the complainant for reconsideration and resubmission.

E. <u>Complaint Procedure</u>

The AGO encourages reporting of all perceived incidents of discrimination, harassment or retaliation, regardless of the offender's identity or position. Individuals who believe that that they have been the victim of such conduct should discuss their concerns with their Section Chief and the AGO Complaint Coordinator.

In addition, the Office of the Attorney General encourages individuals who believe they are being subjected to such conduct promptly to advise the offender that his or her behavior is unwelcome and request that it be discontinued. The AGO recognizes, however, that an individual may prefer to pursue the matter through informal or formal complaint procedures.

Misconduct constituting harassment, discrimination or retaliation will be dealt with appropriately. Responsive action may include, for example, training, referral to counseling and/or disciplinary action such as a reprimand, suspension without pay or termination, as the AGO believes appropriate under the circumstances. Responsive action may also include a reassignment or transfer.

- *Informal Procedure*
  If for any reason an individual does not wish to address the offender directly, or if such action does not successfully end the offensive conduct, the individual should promptly notify his/her Section Chief and the AGO Complaint Coordinator, Debbie Jackson. The AGO Complaint Coordinator can be reached at 602-542-8056 or Debbie.Jackson@azag.gov. The AGO Complaint Coordinator will notify the Attorney General, the Chief of Staff and the appropriate Division Chief of the verbal complaint. An individual reporting harassment, discrimination or retaliation should be aware, however, that the AGO may decide it is necessary to take formal action to address such conduct beyond an informal discussion. This decision will be discussed with the individual. The informal procedure is not a required first step for the reporting individual.

- *Formal Procedure*
  1. An employee, who has an allegation of or becomes aware of a situation involving unlawful discrimination, harassment or retaliation, shall report the allegation or complaint by submitting an Employee Complaint form to the AGO Complaint Coordinator, Debbie Jackson. The AGO Complaint Coordinator can be reached at **SOA000848**

| Issued: 05/2013<br>Effective: 05/2013<br>Revised: | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br><br>POLICY & PROCEDURE | NO.   HR-12 |
|---|---|---|
| SUPERSEDES   All<br>complaint policies prior<br>to 05/2013 | | PAGE   6 of 7 |
| **SUBJECT:**              COMPLAINTS<br>Allegations of Unlawful Discrimination or Harassment | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:   Human Resources<br>As item:   HR-12 |

Debbie.Jackson@azag.gov, 602-542-8056 or 1275 West Washington Ave., Phoenix, AZ 85007.

2. The complaint shall include all the facts and circumstances involved in the alleged violation, including the following information:
   - Description of the incident(s),
   - Name(s) of individual(s) involved,
   - Name(s) of witness(es),
   - The date(s) the discrimination or harassment occurred (if known),
   - Resolution sought,
   - Federal or state law alleged to have been violated.

3. The AGO Complaint Coordinator shall:
   - Notify the Attorney General, the Chief of Staff, the appropriate Division Chief and the appropriate Section Chief.
   - Acknowledge receipt of the complaint in writing to the complainant not later than five business days after receipt of the written complaint.
   - Initiate an investigation into the alleged complaint or assign the complaint to a qualified individual within the AGO Civil Rights Division for review or investigation within 10 business days.  The review or investigation shall be completed within 60 business days of receipt of the written complaint.  If extenuating circumstances exist, an extension shall be granted with the approval of the AGO Complaint Coordinator.
   - Forward a written recommendation to the Chief of Staff within 10 business days of completion of the review or investigation barring resolution of the complaint by agreement of the parties.  The Chief of Staff will review the findings and recommendations and approve the decision.
   - Issue the decision in writing to the complainant.
   - If the complainant is not satisfied with the decision on a complaint alleging unlawful discrimination, harassment or retaliation, he/she may submit the complaint to the Arizona Department of Administration (ADOA) Director within five business days after receipt of the decision.  The ADOA Director shall conduct an investigation and furnish a copy of the findings and final decision to the AGO Complaint Coordinator and the complainant within 20 business days following receipt of the complaint by the complainant.  The 20 business days may be extended by the ADOA Director with the concurrence of the complainant.  The decision of the ADOA Director is the final step in the complaint procedure.  The response must refer the employee to the appropriate entity if the employee is dissatisfied with the final step of the complaint procedure.

Confidentiality will be maintained throughout the investigatory process to the extent consistent with appropriate investigation and corrective action.  Depending on the nature of the complaint, it may not be possible to preserve confidentiality.

SOA000849

| Issued: 05/2013<br>Effective: 05/2013<br>Revised: | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br><br>POLICY & PROCEDURE | NO.    HR-12 |
|---|---|---|
| SUPERSEDES    All<br>complaint policies prior<br>to 05/2013 | | PAGE    7 of 7 |
| **SUBJECT:**    COMPLAINTS<br>Allegations of Unlawful Discrimination or Harassment | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:    Human Resources<br>As item:    HR-12 |

Retaliation against an individual for reporting harassment or discrimination or for participating in an investigation of a claim of harassment or discrimination is a serious violation of this policy and, like harassment or discrimination itself, will be subject to disciplinary action.  Acts of retaliation should be reported immediately and will be promptly investigated and addressed.

False complaints of harassment, discrimination or retaliation as opposed to complaints that, even if erroneous, are made in good faith, may be the subject of appropriate disciplinary action

VII. RELATED FORMS
*Employee Complaint Form*

VIII.    CORRESPONDING POLICIES
AGO Non Discrimination Policy

IX. CONTACT
If you have any questions related to this policy, please contact the Human Resources Section.

SOA000850

| Revised: 03/2015<br><br>Replaces: 05/2013<br><br>SUPERSEDES   All<br>complaint policies prior<br>to 01/2015 | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br><br>POLICY & PROCEDURE | NO.   HR-12 |
|---|---|---|
| | | PAGE   1 of 7 |

| **SUBJECT:**        COMPLAINTS<br>Allegations of Unlawful Discrimination or Harassment | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:    Human Resources<br>As item:    HR-12 |
|---|---|

This policy does not create a contract for employment between any Attorney General's Office (AGO) employee and the Agency. Nothing in this policy changes the fact that all uncovered AGO employees are at-will employees and serve at the pleasure of the appointing authority.

*All AG employees are required to electronically sign each new and updated guideline and procedure issued, acknowledging that they have read and understand each policy.*

I.  PURPOSE
The purpose of this guideline is to outline the policy for Complaints alleging unlawful discrimination or harassment for employees at the Attorney General's Office (AGO). Please refer to the Department of Administration State Personnel System Rules Article 9 for further details on Complaints.

II.  SCOPE
This policy applies to all AGO employees.

III.  AUTHORITY
A.R.S. § 41-1401 et seq., Arizona Civil Rights Act (ACRA)
Civil Rights Act of 1991, as amended
R2-5A-104, Prohibition Against Discrimination, Harassment and Retaliation
R2-5A-501, Standards of Conduct
R2-5A-901, Complaint System
R2-5A-902, Complaint Procedures
Title VII of the Civil Rights Act of 1964, as amended

IV.  DEFINITIONS
"*AGO Complaint Coordinator*" means the Ombudsman within the Agency who is receiving complaints, determining applicability under the complaint system, investigating or assigning the complaint to the appropriate individual within the agency for review or investigation, and tracking the processing of complaints.

"*Disability*" refers to:
- A physical or mental impairment that substantially limits a major life function of an individual;
- Having a history of such an impairment; or
- Being regarded as having such impairment.

"*Discrimination*" includes, but is not limited to:
- Preferential treatment of one individual or group over another similarly situated individual or group because of the individual's or group because of the individual's or group's race, color, religion, sex, pregnancy, age, national origin, genetic information or disability.
- Sexual harassment;
- Harassment of any individual because of the individual's race, color, religion, sex, pregnancy, age, national origin, genetic information or disability; and

SOA000851

| Revised: 03/2015<br><br>Replaces: 05/2013<br><br>SUPERSEDES   All complaint policies prior to 01/2015 | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br><br>**POLICY & PROCEDURE** | NO.   HR-12<br><br>PAGE   2 of 7 |
|---|---|---|
| **SUBJECT:**   COMPLAINTS<br>Allegations of Unlawful Discrimination or Harassment | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:   Human Resources<br>As item:   HR-12 |

- Failing or refusing to provide a reasonable accommodation to a qualified person with a disability.

*"Discrimination because of disability"* refers to:
- Treating an individual with a disability less favorably than a similarly situated person without a disability;
- Favoring a person with one disability over a person with a different disability; and
- Refusing to provide a reasonable accommodation which is necessary to enable a qualified individual with a disability to perform the essential functions of his or her job.

*"Harassment because of race, color, religion, sex, pregnancy, national origin, age, genetic information or disability"* involves unwelcome and unsolicited conduct which is predicated upon an individual's race, color, religion, sex, pregnancy, national origin, age, genetic information or disability when (1) submission to the conduct is made either explicitly or implicitly a term or condition of employment;  (2) submission to or rejection of such conduct by an employee is used as a basis for an employment decision affecting the employee;  or (3) the conduct has the purpose or effect of substantially interfering with an employee's work performance and creating a hostile, intimidating or otherwise offensive working environment.  Prohibited harassment includes, but is not limited to:
- Derogatory comments, epithets or slurs directed at an individual because of that individual's race, color, religion, sex, pregnancy, national origin, age, genetic information and/or disability;
- Posting or circulating written or graphic materials, including but not limited to, cartoons, pictures, posters or calendars containing derogatory comments, epithets or slurs based upon an individual's race, color, religion, sex, pregnancy, national origin, age, genetic information and/or disability;  and
- Abusive or derogatory remarks or conduct targeted at identifiable groups which are identified based upon their race, color, religion, sex, pregnancy, national origin, age, genetic information and/or disability.

"Sexual Harassment" means unwelcome and unsolicited conduct of a sexual nature when (1) submission to the conduct is made either explicitly or implicitly a term or condition of employment;  (2) submission to or rejection of such conduct by an employee is used as a basis for an employment decision affecting the employee;  or (3) the conduct has the purpose or effect of substantially interfering with an employee's work performance and creating a hostile, intimidating or otherwise offensive working environment.  Examples of conduct that can violate this policy include, but are not limited to:
- Explicit sexual behavior by a supervisor, manager, co-worker, visitor, client or other entity with whom the employee interacts during the course of employment
- Implicit request for sex
- Direct or indirect pressure for dates or sexual activity
- Pinching, patting or other unwelcome touching
- Leering or gawking
- Posting or circulating of sexually graphic materials including, but not limited to, cartoons, pictures, posters or calendars

SOA000852

| Revised: 03/2015<br><br>Replaces: 05/2013 | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br># POLICY & PROCEDURE | NO.   HR-12 |
|---|---|---|
| SUPERSEDES   All<br>complaint policies prior<br>to 01/2015 | | PAGE   3 of 7 |
| **SUBJECT:**   COMPLAINTS<br>Allegations of Unlawful Discrimination or Harassment | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:   Human Resources<br>As item:   HR-12 |

- Sexually derogatory comments, including slurs, jokes and other inappropriate remarks
- Reprisals or threats after a negative response to sexual advances
- Unwelcome sexual advances
- Conditioning favorable terms and conditions of employment upon a positive response to abusive remarks or conduct targeted at only one sex, even if the context of the abusive remarks is not sexual

## V.  POLICY – COMPLAINTS (Allegations of Unlawful Discrimination or Harassment)

The Office of the Attorney General is committed to a work environment in which all individuals are treated with respect and dignity.  Each individual has the right to work in a professional atmosphere that promotes equal employment opportunity and prohibits discriminatory practices, including harassment.

The AGO is committed to the prohibition against unlawful discrimination, harassment and retaliation in the workplace.  It is the policy of the AGO that all AGO employees shall comply with all federal and state anti-discrimination laws.  AGO and its employees shall not unlawfully discriminate against any individual with regard to the terms and conditions of employment, including hiring, pay, leave, insurance benefits, retention, and rehiring.  All allegations of discrimination will be promptly investigated, and any employee who engages in conduct in violation of this policy may be disciplined or separated from state employment.

A. Equal Employment Opportunity
   AGO shall provide equal employment opportunity for all individuals regardless of race, color, national origin, religion, age, disability, genetic information, sex, pregnancy, military or veteran status, or any other status protected by federal law, state law, or regulation.  It is the policy of ADOA that all individuals are treated in a fair and non-discriminatory manner throughout the application and employment process.

B. Harassment Prohibited
   Harassment of a sexual nature or harassment based on race, color, national origin, religion, age, disability, genetic information, sex, pregnancy, military or veteran status, or any other status protected by federal law, state law or regulation is prohibited.  AGO prohibits the unlawful harassment of any employee in the course of the employee's work by supervisors, coworkers, or third parties, such as vendors or customers.  Any AGO employee who engages in unlawful harassment may be disciplined or separated from state employment.

C. Protection from Retaliation
   AGO does not permit or tolerate retaliation against anyone for raising a concern about, assisting in an investigation of, or filing a complaint in good faith concerning unlawful discrimination or harassment.  Any AGO employee found to have engaged in retaliation against another individual for reporting or assisting in the investigation of any allegation of unlawful discrimination may be disciplined or separated from state employment.

SOA000853

| Revised: 03/2015<br><br>Replaces: 05/2013 | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br>**POLICY & PROCEDURE** | NO.    HR-12 |
|---|---|---|
| SUPERSEDES   All<br>complaint policies prior<br>to 01/2015 | | PAGE    4 of 7 |

| **SUBJECT:**   COMPLAINTS<br>Allegations of Unlawful Discrimination or Harassment | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:   Human Resources<br>As item:   HR-12 |
|---|---|

It is the responsibility of all AGO employees to promptly bring any allegation of unlawful discrimination, harassment or retaliation to the attention of their Section Chief and the AGO Complaint Coordinator, Leslie Welch.  Additionally, any complaint alleging unlawful discrimination, harassment or retaliation must be submitted in accordance with the procedures described in this policy and <u>not</u> under the AGO Employee Grievance Policy.

This policy does not affect other rights and remedies under federal and state statutes prohibiting employment discrimination.  Employees who believe that they have been subjected to discrimination because of their race, color, religion, sex, pregnancy, age, national origin, genetic information or disability may also file charges of employment discrimination with the Governor's Office of Equal Opportunity and the Equal Employment Opportunity Commission (EEOC).  Charges filed with the EEOC must be filed within 300 days following the most recent act of discrimination.  The filing of an internal complaint of discrimination pursuant to this policy will not impact those statues of limitations.  No employee of the AGO who elects to file a charge with the Governor's Office of Equal Opportunity or the EEOC, or who testifies in an investigation by the Governor's Office of Equal Opportunity or the EEOC, will be retaliated against or denied internal rights or remedies on account of that charge filing or testimony.

VI. PROCEDURE
   A. <u>Matters Subject to the Complaint Procedure</u>
      This procedure shall be used by an employee to file a formal complaint with the AGO Complaint Coordinator, Leslie Welch, within 180 calendar days of the action giving rise to the complaint.  An employee who does not initiate the complaint within the 180 calendar date period waives the right to file that complaint. The complaint must clearly outline the allegations to be addressed, including whether the basis of the complaint is based on:
      1. Unlawful discrimination based on race, color, religion, sex (including pregnancy), age, national origin, genetic information or on the basis of a disability.
      2. Allegation of sexual harassment or other form of harassment.
      3. Retaliation for filing a complaint.
      4. Retaliation or intimidation for exercising any right under state or federal law.

   B. <u>Preparation</u>
      A complaint shall not be allowed the use of state time or state property to prepare a complaint, prepare for a meeting with agency management or to meet with a representative.  Subject to supervisory approval and the operational needs of the unit, a complainant may request available compensatory or annual leave for this purpose.

   C. <u>Multiple Complaints</u>
      Multiple complaints by an employee may be consolidated into a single complaint.  Separate complaints filed by two or more employees regarding the same issue or issues may be consolidated into a group complaint.  Employees having a common complaint may submit one group complaint, identifying one complainant as the selected spokesperson for the group.

SOA000854

| Revised: 03/2015<br><br>Replaces: 05/2013 | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br><br>POLICY & PROCEDURE | NO.    HR-12 |
|---|---|---|
| SUPERSEDES   All<br>complaint policies prior<br>to 01/2015 | | PAGE    5 of 7 |

| **SUBJECT:**    COMPLAINTS<br>Allegations of Unlawful Discrimination or Harassment | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:    Human Resources<br>As item:    HR-12 |
|---|---|

Employees who choose to file a group complaint are prohibited from filing separate complaints on the same issue.

D. Amendments
Once a complaint is submitted to the AGO Complaint Coordinator, it may not be amended.  If additional documentation is submitted by the complainant after the initiation of the complaint, the reviewing or investigating official may remand the complaint to the complainant for reconsideration and resubmission.

E. Complaint Procedure
The AGO encourages reporting of all perceived incidents of discrimination, harassment or retaliation, regardless of the offender's identity or position.  Individuals who believe that that they have been the victim of such conduct should discuss their concerns with their Section Chief and the AGO Complaint Coordinator.

In addition, the Office of the Attorney General encourages individuals who believe they are being subjected to such conduct promptly to advise the offender that his or her behavior is unwelcome and request that it be discontinued.  The AGO recognizes, however, that an individual may prefer to pursue the matter through informal or formal complaint procedures.

Misconduct constituting harassment, discrimination or retaliation will be dealt with appropriately. Responsive action may include, for example, training, referral to counseling and/or disciplinary action such as a reprimand, suspension without pay or termination, as the AGO believes appropriate under the circumstances. Responsive action may also include a reassignment or transfer.

- *Informal Procedure*
  If for any reason an individual does not wish to address the offender directly, or if such action does not successfully end the offensive conduct, the individual should promptly notify his/her Section Chief and the AGO Complaint Coordinator, Leslie Welch.  The AGO Complaint Coordinator can be reached at 602-542-8046 or Leslie.Welch@azag.gov.  The AGO Complaint Coordinator will notify the Attorney General, the Chief of Staff and the appropriate Division Chief of the verbal complaint.  An individual reporting harassment, discrimination or retaliation should be aware, however, that the AGO may decide it is necessary to take formal action to address such conduct beyond an informal discussion. This decision will be discussed with the individual.  The informal procedure is not a required first step for the reporting individual.

- *Formal Procedure*
  1. An employee, who has an allegation of or becomes aware of a situation involving unlawful discrimination, harassment or retaliation, shall report the allegation or complaint by submitting an Employee Complaint form to the AGO Complaint Coordinator, Leslie

SOA000855

| Revised: 03/2015<br><br>Replaces: 05/2013 | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br><br>POLICY & PROCEDURE | NO.    HR-12 |
|---|---|---|
| SUPERSEDES    All<br>complaint policies prior<br>to 01/2015 | | PAGE    6 of 7 |
| **SUBJECT:**    COMPLAINTS<br>Allegations of Unlawful Discrimination or Harassment | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:    Human Resources<br>As item:    HR-12 |

Welch.  The AGO Complaint Coordinator can be reached at Leslie.Welch@azag.gov, 602-542-8046 or 1275 West Washington Ave., Phoenix, AZ 85007.

2. The complaint shall include all the facts and circumstances involved in the alleged violation, including the following information:
   - Description of the incident(s),
   - Name(s) of individual(s) involved,
   - Name(s) of witness(es),
   - The date(s) the discrimination or harassment occurred (if known),
   - Resolution sought,
   - Federal or state law alleged to have been violated.

3. The AGO Complaint Coordinator shall:
   - Notify the Attorney General, the Chief of Staff, the appropriate Division Chief and the appropriate Section Chief.
   - Acknowledge receipt of the complaint in writing to the complainant not later than five business days after receipt of the written complaint.
   - Initiate an investigation into the alleged complaint or assign the complaint to a qualified individual within the AGO Civil Rights Division for review or investigation within 10 business days.  The review or investigation shall be completed within 60 business days of receipt of the written complaint.  If extenuating circumstances exist, an extension shall be granted with the approval of the AGO Complaint Coordinator.
   - Forward a written recommendation to the Chief of Staff within 10 business days of completion of the review or investigation barring resolution of the complaint by agreement of the parties.  The Chief of Staff will review the findings and recommendations and approve the decision.
   - Issue the decision in writing to the complainant.
   - If the complainant is not satisfied with the decision on a complaint alleging unlawful discrimination, harassment or retaliation, he/she may submit the complaint to the Arizona Department of Administration (ADOA) Director within five business days after receipt of the decision.  The ADOA Director shall conduct an investigation and furnish a copy of the findings and final decision to the AGO Complaint Coordinator and the complainant within 20 business days following receipt of the complaint by the complainant.  The 20 business days may be extended by the ADOA Director with the concurrence of the complainant.  The decision of the ADOA Director is the final step in the complaint procedure.  The response must refer the employee to the appropriate entity if the employee is dissatisfied with the final step of the complaint procedure.

Confidentiality will be maintained throughout the investigatory process to the extent consistent with appropriate investigation and corrective action.  Depending on the nature of the complaint, it may not be possible to preserve confidentiality.

SOA000856

| Revised: 03/2015

Replaces: 05/2013 | **ARIZONA**
**OFFICE OF THE ATTORNEY GENERAL**
# POLICY & PROCEDURE | NO.    HR-12 |
|---|---|---|
| SUPERSEDES    All complaint policies prior to 01/2015 | | PAGE    7 of 7 |
| **SUBJECT:**          COMPLAINTS
Allegations of Unlawful Discrimination or Harassment | | FILING INSTRUCTIONS
(Guidelines & Procedures Manual)
Section:    Human Resources
As item:    HR-12 |

Retaliation against an individual for reporting harassment or discrimination or for participating in an investigation of a claim of harassment or discrimination is a serious violation of this policy and, like harassment or discrimination itself, will be subject to disciplinary action.  Acts of retaliation should be reported immediately and will be promptly investigated and addressed.

False complaints of harassment, discrimination or retaliation as opposed to complaints that, even if erroneous, are made in good faith, may be the subject of appropriate disciplinary action

VII. RELATED FORMS
*Employee Complaint Form*

VIII.    CORRESPONDING POLICIES
AGO Non Discrimination Policy

IX. CONTACT
If you have any questions related to this policy, please contact the Human Resources Section.

**SOA000857**

# ARIZONA ATTORNEY GENERAL'S OFFICE
# EMPLOYEE COMPLAINT FORM

**Employee Instructions:** Please provide all information and retain a copy for your records.  Type or print legibly.  Information concerning the complaint process is provided on the next page.  Complaints shall be submitted to the AGO Complaint Coordinator/ Director of Operations, 1275 W. Washington Street, Phoenix, AZ 85007

**Complaint Tracking #**_____
(To be assigned by the AGO Complaint Coordinator)

| NAME | EIN | WORK PHONE |
|---|---|---|
| JOB TITLE | DIVISION | SUPERVISOR'S NAME |

### Complaint of Alleged Discrimination Based On (Check appropriate box or boxes):

☐ Race　　　　☐ Age　　　　　　☐ Pregnancy　　　　☐ Other (Specify)_____
☐ Color　　　　☐ National Origin　☐ Genetic Information
☐ Religion　　　☐ Sex　　　　　　☐ Disability

☐ Retaliation for Prior Civil Rights Activity

### Type of Action (Check appropriate box or boxes):

☐ Demotion　　　　☐ Discharge/Termination　　☐ Reasonable Accommodation
☐ Failure to Hire　　☐ Forced Resignation　　　☐ Sexual Harassment
☐ Non-Promotion　　☐ Reduction-In-Force (RIF)　☐ Non-Sexual Harassment
☐ Discipline　　　　☐ Equal Pay　　　　　　　☐ Other (Specify)_____

Date(s) of Occurrence: _____

Please describe the incident that occurred in detail.  Include all relevant information including name(s) of individual(s) involved, witness(es), state or federal law allegedly violated, etc.  Use additional sheets to explain the issue(s) if necessary.

What resolution are you seeking?

Employee Signature_____　Date_____

### *All complaints must be processed through the AGO Complaint Coordinator*

Date

SOA000858

## ARIZONA ATTORNEY GENERAL'S OFFICE
## EMPLOYEE COMPLAINT PROCESS

### Responsibilities

The Arizona Attorney General's Office is committed to the prohibition against unlawful discrimination, harassment and retaliation in the workplace. It is the responsibility of all AGO employees to promptly bring any allegation of unlawful discrimination, harassment or retaliation to the attention of the AGO. Any complaint alleging unlawful discrimination, harassment or retaliation must be submitted in accordance with the procedure described in the Employee Complaint Process – Allegations of Unlawful Discrimination or Harassment Policy (HR-12).

### Initiating the Complaint

To initiate the complaint process, the Employee Complaint Form must be completed and submitted to the AGO Complaint Coordinator as soon as possible after the occurrence of the act or condition complained of and not later than 180 calendar days after the action giving rise to the complaint. The complaint shall include a description of the incident(s), list of individual(s) and witness(es) involved, date(s) the discrimination, harassment or retaliation occurred (if known), the resolution sought, and the state or federal law alleged to have been violated. The AGO Complaint Coordinator can be reached at 602-542-8046 or Human Resources, 1275 W. Washington St, Phoenix, AZ, 85007. The review or investigation of the complaint shall be completed within 60 business days of receipt of the written complaint. The Chief Deputy or designee shall review the findings and recommendations and issue a decision in writing to the complainant. An employee who does not initiate the complaint within the 180 calendar day period waives the right to file that complaint.

### Elevating the Complaint

If the complainant is not satisfied with the Chief Deputy's response to a complaint alleging unlawful discrimination, harassment or retaliation, he/she may elevate the complaint to the ADOA Director within five business days after receipt of the ADG Director's response. The ADOA Director shall furnish a copy of the final decision to the ADG Director and the complainant within 20 business days following receipt of the complaint by the ADOA Director. This is the final step in the agency complaint process.

Date

SOA000859

| Revised        11/13 | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br><br># POLICY & PROCEDURE | NO.     AG-6 |
|---|---|---|
| SUPERSEDES    05/11 | | SHEET     1     of    1 |

| **SUBJECT:**<br>COMPLIANCE WITH STATUTES/POLICIES/<br>PROCEDURES/RULES/PRACTICES/REGULATIONS | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:     General<br>As item:    AG-6 |
|---|---|

## I. PURPOSE

All staff of the Attorney General's Office (AGO) must review and understand the policies and procedures that govern the operation of the agency.  These policies and procedures are contained online via SharePoint.

## II. POLICY

All AGO employees are required to acknowledge that they have read and understand each guideline.

## III. PROCEDURE

A. Attorney General staff members not complying with statutes, policies, procedures, rules, practices, and regulations set forth in the following publications may be subject to disciplinary action:

  a.  Arizona Revised Statutes
  b.  Arizona Office of the Attorney General Policies and Procedures
  c.  State Personnel Board Rules

B. Those staff designated as policy holders by the Human Resources office will maintain both a master and routing copy of this manual. The routing manuals will serve as a permanent file of employee acknowledgement signatures. Master copies are available in the Human Resources Office.

C. Human Resources will ensure that all new employees, within two weeks of employment, have acknowledged and understood all policies and procedures.

D. Human Resources will ensure that each new employee has access to current AGO Policies and Procedures online.



**OFFICE OF THE ARIZONA ATTORNEY GENERAL**

TOM HORNE
ATTORNEY GENERAL

## NON-DISCRIMINATION POLICY

The Office of the Attorney General is committed to a work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in a professional atmosphere that promotes equal employment opportunity and prohibits discriminatory practices, including harassment. Therefore, the Office of the Attorney General commits itself to the following non-discrimination policy.

### Equal Opportunity

It is the policy of the Office of the Attorney General to ensure equal employment opportunity without discrimination or harassment on the basis of race, color, religion, sex, age, disability, national origin, or any other characteristic protected by law. The Office of the Attorney General prohibits any such discrimination or harassment.

### Retaliation Is Prohibited

The Office of the Attorney General encourages reporting of all perceived incidents of discrimination or harassment. It is the policy of the Office of the Attorney General to investigate such reports. The Office of the Attorney General prohibits retaliation against any individual who reports discrimination or harassment or participates in an investigation of such reports.

### Definitions of Harassment

Harassment on the basis of any protected characteristic is strictly prohibited. Under this policy, harassment is verbal or physical conduct that denigrates or shows hostility toward an individual because of his/her race, color, religion, sex, sexual orientation, national origin, age, disability, or any other characteristic protected by law or that of his/her relatives, friends or associates, and that:

- Has the purpose or effect of creating an intimidating, hostile or offensive work environment;
- Has the purpose or effect of unreasonably interfering with an individual's work performance; or,
- Otherwise adversely affects an individual's employment opportunities.

Harassing conduct includes, but is not limited to: epithets, slurs or negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes; and written or graphic material that denigrates or shows hostility or aversion toward an individual or group and that is placed on walls or elsewhere on the employer's premises or circulated in the workplace.

SOA000861

OFFICE OF THE ARIZONA ATTORNEY GENERAL

Sexual harassment constitutes discrimination and is illegal under federal, state and local laws.  For the purposes of this policy, sexual harassment is defined, as in the Equal Employment Opportunity Commission Guidelines, as unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when, for example:

- Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment;
- Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or
- Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Sexual harassment may include a range of subtle and not so subtle behaviors and may involve individuals of the same or different gender.

Sexually harassing conduct includes, but is not limited to: unwanted sexual advances or requests for sexual favors; sexual jokes and innuendo; leering, whistling or touching; insulting or obscene comments or gestures; display in the workplace of sexually suggestive objects or pictures; and other physical, verbal or visual conduct of a sexual nature.

**Individuals and Conduct Covered**

This policy applies to all applicants and employees, whether related to conduct engaged in by fellow employees or someone not directly connected to the Office of the Attorney General such as an outside vendor, consultant or customer.

Conduct prohibited by these policies is unacceptable in the workplace and in any work-related setting such as outside business trips, business meetings and business-related social events.

**Reporting an Incident of Harassment, Discrimination or Retaliation**

The Office of the Attorney General encourages reporting of all perceived incidents of discrimination, harassment or retaliation, regardless of the offender's identity or position. Individuals who believe that that they have been the victim of such conduct should discuss their concerns with their Section Chief and the Division Director of Administrative Services.

In addition, the Office of the Attorney General encourages individuals who believe they are being subjected to such conduct promptly to advise the offender that his or her behavior is unwelcome and request that it be discontinued.  The Office of the Attorney General recognizes, however, that an individual may prefer to pursue the matter through informal or formal complaint procedures.

SOA000862

OFFICE OF THE ARIZONA ATTORNEY GENERAL

### Complaint Procedures

#### Informal Procedure

If for any reason an individual does not wish to address the offender directly, or if such action does not successfully end the offensive conduct, the individual should promptly notify his/her Section Chief and the Division Director of Administrative Services. An individual reporting harassment, discrimination or retaliation should be aware, however, that the Office of the Attorney General may decide it is necessary to take action to address such conduct beyond an informal discussion. This decision will be discussed with the individual. The informal procedure is not a required first step for the reporting individual.

#### Formal Procedure

As noted above, individuals who believe they have been the victims of conduct prohibited by this policy statement or believe they have witnessed such conduct should discuss their concerns with their Section Chief or the Division Director of Administrative Services.

Any reported allegations of harassment, discrimination or retaliation will be investigated promptly. The investigation may include individual interviews with the parties involved and, where necessary, with individuals who may have observed the alleged conduct or may have other relevant knowledge.

Confidentiality will be maintained throughout the investigatory process to the extent consistent with appropriate investigation and corrective action. Depending on the nature of the complaint, it may not be possible to preserve confidentiality.

Retaliation against an individual for reporting harassment or discrimination or for participating in an investigation of a claim of harassment or discrimination is a serious violation of this policy and, like harassment or discrimination itself, will be subject to disciplinary action. Acts of retaliation should be reported immediately and will be promptly investigated and addressed.

Misconduct constituting harassment, discrimination or retaliation will be dealt with appropriately. Responsive action may include, for example, training, referral to counseling and/or disciplinary action such as a reprimand, suspension without pay or termination, as the Office of the Attorney General believes appropriate under the circumstances. Responsive action may also include a reassignment or transfer.

If a party to a complaint does not agree with its resolution, that party may contact the Governor's Office of Equal Opportunity and the Federal Equal Employment Opportunity Commission.

False complaints of harassment, discrimination or retaliation as opposed to complaints that, even if erroneous, are made in good faith, may be the subject of appropriate disciplinary action.

### Conclusion

- The Office of the Attorney General has developed this policy to ensure that all its employees can work in an environment free from harassment, discrimination and retaliation.

SOA000863

OFFICE OF THE ARIZONA ATTORNEY GENERAL

- The Office of the Attorney General will make every reasonable effort to ensure that all concerned are familiar with these policies and aware that any complaint of violation of such policies will be investigated and resolved appropriately.
- The Office of the Attorney General will post the Non-Discrimination Policy throughout departmental facilities.  This policy is accessible at www.azag.gov and in the display windows located in front of the Human Resources Section of the Law Building (1275 W. Washington, Phoenix, AZ 85007), and in the display window of the first floor of the Capital Center (15 S. 15th Avenue, Phoenix, AZ 85007) and the third floor of the Tucson 400 W. Congress building (400 W. Congress, Suite 315, Tucson, AZ 85701).  This policy is also accessible to employees on the linkAG intranet site, https://linkag.azag.gov, under policies and procedures.
- All employment announcements shall include the phrase:

"AN EQUAL EMPLOYMENT OPPORTUNITY AGENCY"

As Director of the Office of the Attorney General, I am committed to the principles of Equal Employment Opportunity.  To ensure the dissemination and implementation of the Equal Opportunity Policy throughout all levels of the Agency, Debbie Jackson shall serve as the Equal Opportunity Administrator for the Office of the Attorney General.  Contact information for Debbie Jackson is: 1275 West Washington, Phoenix, AZ 85007; Phone: 602-542-8050; Fax: 602-542-8000; Email: Debbie.Jackson@azag.gov.


_____          2/11/2013
Attorney General Tom Horne                         Date



Any employee who has any questions or concerns about these policies should talk with the Office's Human Resources Section, at humanresources@azag.gov, Phone: 602-542-8056, or the Governor's Office of Equal Opportunity, http://azgovernor.gov/eop/index.asp, or 602-542-3711.

SOA000864



**TOM HORNE**
**ATTORNEY GENERAL**

**OFFICE OF THE ARIZONA ATTORNEY GENERAL**

**ADMINISTRATIVE SERVICES DIVISION**

**DEBBIE JACKSON**
**HUMAN RESOURCES SECTION**

### NON-DISCRIMINATION POLICY

The Arizona Attorney General's Office (AGO) is committed to a work environment in which all individuals are treated with respect and dignity.  Each individual has the right to work in a professional atmosphere that promotes equal employment opportunity and prohibits discriminatory practices, including harassment. Therefore, the Arizona Attorney General's Office commits itself to the attached Non-Discrimination policy.

- The Arizona Attorney General's Office has developed this policy to ensure that all its employees can work in an environment free from harassment, discrimination and retaliation.
- The Arizona Attorney General's Office will make every reasonable effort to ensure that all concerned are familiar with this policy and aware that any complaint or violation of such policies will be investigated and resolved appropriately.
- The Arizona Attorney General's Office will post our Equal Opportunity Policy Statement.  This policy is available on the AGO Employee Intranet:  https://sharepoint.azag.gov/default.aspx; in the display windows located in front of the Human Resources Section in the Law Building (1275 W. Washington, Phoenix, AZ 85007), in the first floor of the Capital Center (15 S. 15th Avenue, Phoenix, AZ 85007) and in the third floor of the Tucson 400 W. Congress Building (400 W. Congress, Suite 315, Tucson, AZ 85701); and on the Arizona Attorney General's website: www.azag.gov.
- All employment announcements shall include the phrase:

**"Arizona State Government is an EOE/ADA Reasonable Accommodation Employer"**

As the Director of the Arizona Attorney General's Office, I am committed to the principles of Equal Employment Opportunity.  To ensure the dissemination and implementation of the Equal Opportunity Policy throughout all levels of the Department, Debbie Jackson shall serve as the Equal Opportunity Administrator for the Arizona Attorney General's Office.  Debbie Jackson may be contacted at (602) 542-8050 or Debbie.Jackson@azag.gov.

_____
Tom Horne, Attorney General

_2/11/14_
Date

Any employee who has any questions or concerns about this policy should talk with, the AGO Human Resources Section, at humanresources@azag.gov, 602-542-8056 or the Governor's Office of Equal Opportunity, http://azgovernor.gov/eop/index.asp, 602-542-3711.

SOA000865



**MARK BRNOVICH**
**ATTORNEY GENERAL**

**OFFICE OF THE ARIZONA ATTORNEY GENERAL**
**Operations Division**

**LESLIE WELCH**
**DIRECTOR OF OPERATIONS**

## NON-DISCRIMINATION POLICY

The Arizona Attorney General's Office (AGO) is committed to a work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in a professional atmosphere that promotes equal employment opportunity and prohibits discriminatory practices, including harassment. Therefore, the Arizona Attorney General's Office commits itself to the attached Non-Discrimination policy.

- The Arizona Attorney General's Office has developed this policy to ensure that all its employees can work in an environment free from harassment, discrimination and retaliation.
- The Arizona Attorney General's Office will make every reasonable effort to ensure that all concerned are familiar with this policy and aware that any complaint or violation of such policies will be investigated and resolved appropriately.
- The Arizona Attorney General's Office will post our Equal Opportunity Policy Statement. This policy is available on the AGO Employee Intranet: https://sharepoint.azag.gov/default.aspx; in the display windows located in front of the Human Resources Section in the Law Building (1275 W. Washington, Phoenix, AZ 85007), in the first floor of the Capital Center (15 S. 15th Avenue, Phoenix, AZ 85007) and in the third floor of the Tucson 400 W. Congress Building (400 W. Congress, Suite 315, Tucson, AZ 85701); and on the Arizona Attorney General's website: www.azag.gov.
- All employment announcements shall include the phrase:

**"Arizona State Government is an EOE/ADA Reasonable Accommodation Employer"**

As the Director of the Arizona Attorney General's Office, I am committed to the principles of Equal Employment Opportunity. To ensure the dissemination and implementation of the Equal Opportunity Policy throughout all levels of the Department, Leslie Welch shall serve as the Equal Opportunity Administrator for the Arizona Attorney General's Office. Leslie Welch may be contacted at (602) 542-8056 or Leslie.Welch@azag.gov.

_Mark B_                                    13 Feb 15
_____                    _____
Mark Brnovich, Attorney General                          Date

Any employee who has any questions or concerns about this policy should talk with, the AGO Human Resources Section, at humanresources@azag.gov, 602-542-8056 or the Governor's Office of Equal Opportunity, http://azgovernor.gov/eop/index.asp, 602-542-3711.

SOA000866

| Revised: 04/12 | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br><br>POLICY & PROCEDURE | NO.   HR-1 |
|---|---|---|
| SUPERSEDES: 01/2011 | | SHEET   1   of |
| **SUBJECT:**<br>PERSONNEL REQUISITIONS AND HIRING | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:   Human Resources<br>As item:   HR-1 |

I. PURPOSE

The purpose of this guideline is to establish the hiring process and procedures for the Office of the Attorney General.

II. GUIDELINE

A.   The Human Resources Section of the Office of the Attorney General shall provide administrative assistance to the Office in all personnel matters.  These include classification, recruitment, selection factors, position changes, employee relations, discipline actions, grievances, risk management and interpretation of Personnel Rules and Regulations.

B.   The Human Resources Section shall process all personnel transactions.  These transactions include, but are not limited to the following: hiring, transfers, reclassifications, supervisor changes, FMLA, leave without pay, promotions, demotions, suspensions, terminations, performance evaluations, performance salary increases, position control, name change, failure to complete probation, extension of probation or temporary appointment, issuance of identification badges, alternate transportation, insurance coverage and training coordination.

C.   For all positions, the responsible hiring supervisor (hereafter, "hiring supervisor") may establish a screening panel or interviewing panel.  The screening/interviewing panel must be composed of personnel familiar with the duties and qualifications of the position being filled.  If a person outside of the unit for which the position is being hired is asked to participate on a screening panel, that person should have experience that is relevant to the requirements of the position being filled.  All panel members, interviewers and observers should be at least at the same grade level of the position being recruited. The hiring supervisor shall interview the people recommended by the panel and at his/her discretion, interview additional people as deemed appropriate; however, all candidates to be interviewed must be selected from an approved hiring list (this hire list will be provided by the Human Resources Section).  At least three applicants must be interviewed for each vacancy.  Standard questions must be developed prior to the interview and submitted to the Human Resources Section for approval.  The hiring supervisor may conduct a second interview with one or more of the applicants.  If a second interview is to be given to more than one applicant, the questions to be used should be submitted in advance of the interview to the Human Resources Section for approval.

D.   Once the hiring supervisor chooses his/her top candidate or candidates, he/she shall submit a "Memorandum Requesting Approval to Hire Candidate" to their Section Chief and Division Chief for approval. Human Resources will complete a minimum of two references on the top candidate or candidates. Hiring supervisor may contact employment references when a Unit, Section and/or Division Chief submits a request to Human Resources.

**SOA000867**

| Revised: 04/12 | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br><br>POLICY & PROCEDURE | NO.    HR-1 |
|---|---|---|
| SUPERSEDES: 01/2011 | | SHEET    2    of |
| **SUBJECT:**<br>     PERSONNEL REQUISITIONS AND HIRING | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:    Human Resources<br>As item:    HR-1 |

E.    Recommendations to hire shall be reviewed and signed off by the hiring supervisor, Section Chief, and Division Chief and then forwarded to the Human Resources Section for approval. Once the recommendation has been received and approved, Human Resources will schedule the background check.    If the background check has been successfully passed, Human Resources will work with the applicant to offer the position and obtain salary verification (if applicable).    Once the offer has been accepted, Human Resources will send the Hiring Supervisor a hire approval email with the New Hire's start date, salary, etc.

F.    The initial hire request memorandum should include the supervisor's recommendation of salary. Hiring Supervisors are not permitted to request supporting salary information.    The Hiring Supervisor's salary recommendation may only be based on the salary provided on the candidate's application and will be contingent upon (1) the reference checks completed and (2) salary verification completed by Human Resources once a hire has been approved.    The justification for the recommendation should include salary history (based on the application only), experience and education.  In accordance with Personnel Rule R2-5-302.H., the following factors will be considered when considering a special entrance rate: (a) the unusual and outstanding character of the applicant's experience; (b) education and ability as they relate to the specific position; (c) the availability of qualified applicants; (d) the geographical location of the position; (e) and the applicant's earning history.  The special entrance rate request may be denied by Human Resources dependent on any budgetary and/or fiscal constraints it may place on the Office.

G.    Alternate hiring procedures may be used with prior written approval from the Human Resources Section.  This includes but is not limited to hiring panels and screening panels used to interview and/or select top candidates.

III.  PROCEDURE

| **Performed By** | **Action** |
|---|---|
| Hiring Supervisor | 1.  Submit resignation creating vacancy or applicable request to Human Resources. |
| Human Resources Section | 2.  Complete administrative sections of the Personnel Requisition and attach current Position Description Questionnaire (PDQ). |
| | 3.  Forward to the Hiring Supervisor. |
| Hiring Supervisor | 4.  Review the PDQ and make any necessary updates. |
| | 5.  Complete the Personnel Requisition in its entirety. Provide a realistic projection of salary for the position (to be used in the advertising process). |

**SOA000868**

| Revised: 04/12 | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br><br>**POLICY & PROCEDURE** | NO.    HR-1 |
|---|---|---|
| SUPERSEDES: 01/2011 | | SHEET    3    of |
| **SUBJECT:**<br><br>PERSONNEL REQUISITIONS AND HIRING | | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:    Human Resources<br>As item:    HR-1 |

6. Obtain approvals from the Section and Division Chief.

7. Forward Personnel Requisition and updated PDQ to Human Resources via email at humanresources@azag.gov.

8. Send the hard copy Requisition and PDQ with the approvals of Section and Division Chief to the Human Resources Section.

9. Prepare interview questions and designate the interviewer or panel.  Submit the interview questions to Human Resources for approval via email prior to receipt of hiring list.

Budget Office            10. Verify that funds and FTE position(s) are available.

11. Calculate total cost for the fiscal year.
    a. If funds are available, enter fund source, initial Personnel Requisition and send to Human Resources Section via email.
    b. If funds are not available, return to Human Resources Section with notation via email.

Human Resources          12. Based on recommendation of hiring supervisor, determine
Section                      whether recruiting should be internal, external or state promotion and indicate recommendation.

13. Evaluate whether special selection factors are necessary.

14. Indicate recommendations on the Personnel Requisition.

15. Coordinate with Budget Office.

16. Prepare a pending folder and Recruit/Advertise.  *All advertisements will have a salary range of the entrance of the grade up to the projection the Hiring Supervisor stated on the Requisition unless an alternative is discussed with HR.  All draft advertisements will be emailed to the Hiring Supervisor for approval.  Ads will not be posted until Human Resources receive an email approval back from the Hiring Supervisor.

    a.  Prepare Job Opportunity announcement and publish on web page and internal via email with closing date.

**SOA000869**

| | ARIZONA<br>OFFICE OF THE ATTORNEY GENERAL<br><br>POLICY & PROCEDURE | NO.    HR-1 |
|---|---|---|
| Revised: 04/12 | | |
| SUPERSEDES: 01/2011 | | SHEET    4    of |

| SUBJECT:<br><br>PERSONNEL REQUISITIONS AND HIRING | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:    Human Resources<br>As item:    HR-1 |
|---|---|

    b. When the position's advertisement closes, verify qualifications of all applicants applying to covered positions who self-nominated and add to the hire list if they meet the knowledge, skills and abilities required.

    c. Create a system match list for supervisor's review if needed. Supervisor will review match list and make selection of applicant's names they would like added (if qualified) to the hire list.

    d. Review supervisor's selection of applicants for qualifications and add to the hire list.

    e. Print hire list with self-nominations and supervisor's selections.

17. The Human Resources Manager will review and approve all interview questions.

18. HR will contact the Hiring Supervisor with approval of questions via email.

19. HR will send hiring packets to the requesting supervisor via email.

Hiring Supervisor

20. Approve advertisement draft via email to Human Resources.

21. Schedule applicants for interview.
    a. Schedule applicants via telephone calls where possible to speed up process.
    b. Contact persons who do not respond to telephone calls by first-class mail, if desired. (not required)
    c. Schedule interviews with at least three eligible applicants, if available.

22. Conduct interviews.

23. Complete the "contact information" and "comments" sections of the Hiring List.

24. Prepare memo with recommendation.

25. Forward completed hire packet to Human Resources Section.

26. Obtain approval signatures from Section and Division Chiefs

SOA000870

| Revised: 04/12 | **ARIZONA**<br>**OFFICE OF THE ATTORNEY GENERAL**<br><br>POLICY & PROCEDURE | NO.   HR-1 |
|---|---|---|
| SUPERSEDES: 01/2011 | | SHEET   5   of |

| **SUBJECT:**<br>PERSONNEL REQUISITIONS AND HIRING | FILING INSTRUCTIONS<br>(Guidelines & Procedures Manual)<br>Section:   Human Resources<br>As item:   HR-1 |
|---|---|

| | |
|---|---|
| Section/Division Chief | and send to Human Resources.<br>27. Approve or deny hiring supervisor's recommendation – send to Human Resources Office. |
| Human Resources Section | 28. Review all materials and ensure compliance with all guidelines, procedures and rules. |
| | 29. Contact candidate and schedule candidate for background check.  Explain any offer is contingent upon successful passing of the background check. |
| | 30. Upon receipt of background check completion from SIS, approve or reject hiring recommendation and consult with Personnel Committee when necessary. |
| | 31. If approved, offer position to candidate. |
| | 32. Notify hiring supervisor of approval or rejection of candidate. |
| | 33. Send confirmation of hiring acceptance letter to candidate with all applicable information (salary, state date, etc.). |
| | 34. Notify all candidates interviewed of the selection outcome within five working days after final approval is received. |

**SOA000871**

## PROTOCOL FOR ATTORNEY HIRING COMMITTEE

Whenever HR receives a requisition to hire an attorney position and that requisition has been approved by the budget committee and EXO, the Chief Deputy or his designee may assign a member(s) of the Hiring Committee ("Member") to serve on the panel[1] that screens and interviews for that approved position.

The Member(s), after advertisements have been concluded, shall, in conjunction with the hiring panel, be included in reviewing resumes received in response to advertisements as well as other resumes maintained by HR (particularly the "immortal list"). The Member(s) and the panel shall determine who and the number of applicant attorneys that shall be interviewed.

The Member(s) and the panel shall schedule times to interview those applicants that have been selected. The member and the panel shall be involved in all interviews. Standard procedures regarding writing samples and interview questions shall be followed. After the interviews and background checks[2] have been concluded, the Member(s) and the panel shall meet and select a first and second choice, in accordance with the HR forms and procedures.

---

[1] The panel shall consist, at a minimum, of the immediate supervisor of the attorney to be hired and one other attorney of the Division to be selected by the Division Chief.

[2] Background checks that involves contacting fellow attorneys, judges, former clients, etc. shall be conducted by the panel so as to determine the skills and effectiveness of the candidate for the position. HR shall make final reference checks once the No. 1 and No. 2 candidates have been selected.

**SOA000872**

**ARIZONA DEPARTMENT OF ADMINISTRATION
POLICIES AND PROCEDURES**

| | |
|---|---|
| **Policy Number:** ADOA/HRD PA6.03 | **Issued:** January 17, 2013 |
| **Subject:** Leave – Family and Medical Leave Act (FMLA) | **Effective:** September 29, 2012 |
| **Policy Section:** Human Resources | **Revised:** |
| **Policy Owner:** HRD – Shared Services Office | |

This policy does not create a contract for employment between any ADOA employee and the Department.   Nothing in this policy changes the fact that all uncovered employees of the Department are at will employees and serve at the pleasure of the appointing authority.

**Scope:**

This policy applies to all Arizona Department of Administration (ADOA) employees.

**Authority:**

- Family and Medical Leave Act (FMLA) of 1993, as amended
- 29 CFR Part 825
- National Defense Authorization Act for Fiscal Year 2010 (2010 NDAA)
- R2-5A-D601, Family and Medical Leave Act (FMLA) Leave

**Definitions:**

*"12-Month Period"* means a rolling 12-month period measured backward from the date leave is taken and continuous with each additional leave day taken.

*"Armed Forces"* includes the following military service branches:   Army, Army Reserve, Army National Guard, Marine Corps, Marine Corps Reserves, Navy, Navy Reserves, Air Force, Air Force Reserve, Air Guard, Coast Guard, and Coast Guard Reserves.

*"Contingency Operation"* means a military operation that is designated by the Secretary of Defense as an operation in which members of the armed forces are or may become involved in military actions, operations, or hostilities against an enemy of the United States or against an opposing military force or results in the call or order to, or retention on, active duty of members of the uniformed services during a war or during a national emergency declared by the President or Congress.

*"Continuing Treatment"* includes any one or more of the following:
1. A period of incapacity of more than three consecutive full calendar days combined with medical treatment, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
   a. Treatment two or more times within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
   b. Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider;

**Arizona Department of Administration (ADOA) Policies and Procedures**
**Subject:** Leave - Family and Medical Leave Act (FMLA)

---

    c. The requirement in (a) and (b) for treatment by a health care provider means an in-person visit to a health care provider. The first (or only) in-person treatment visit must take place within seven days of the first day of incapacity.

2. Any period of incapacity due to pregnancy or for prenatal care;

3. Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:
   a. Requires periodic visits (at least twice a year) for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;
   b. Continues over an extended period of time (including recurring episodes of a single underlying condition); and
   c. May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.)

4. A period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective (e.g., Alzheimer's, a severe stroke, or the terminal stages of a disease). The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by a health care provider; or

5. Any period of absence to receive multiple treatments (including any period of recovery) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for restorative surgery after an accident or other injury, or for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), kidney disease (dialysis).

*"Covered Active Duty"* means:
- For members of a **regular** component of the Armed Forces, duty during deployment of the member with the Armed Forces to a foreign country.
- For members of the **reserve** components of the Armed Forces (members of the U.S. National Guard and Reserves), duty during deployment of the member with the Armed Forces to a foreign country under a call or order to active duty in a contingency operation as defined in section 101(a) (13) (B) of title 10, United States Code.

*"Covered Service Member for Exigency Leave"* means an employee's spouse, son, daughter, or parent on active duty or call to active duty status in support of a contingency operation.

*"Covered Servicemember for Servicemember Caregiver Leave"* means:
- An employee's spouse, son, daughter, parent, or next of kin who is a **current** member of the Armed Forces including a member of the National Guard or Reserves who is undergoing medical treatment, recuperation, or therapy, is otherwise in outpatient status, or is otherwise on the temporary disability retired list, for a serious injury or illness incurred in the line of active duty.
- An employee's spouse, son, daughter, parent, or next of kin who is a **veteran** who is undergoing medical treatment, recuperation, or therapy for a serious injury of illness

**Arizona Department of Administration (ADOA) Policies and Procedures**
**Subject:** Leave - Family and Medical Leave Act (FMLA)

if the veteran was a member of the Armed Forces at any time during the period of five years preceding the date on which the veteran undergoes that medical treatment, recuperation, or therapy.

*"Hours of Service"* means the number of hours actually worked; does not include any type of paid or unpaid leave with the exception of military leave.

*"Intermittent Leave"* means leave taken in separate blocks or periods of time, due to a single qualifying reason, usually to accommodate some form of regularly scheduled medical treatment, or leave taken on an occasional basis for medical appointments or flare ups caused by an FMLA qualifying medical condition.

*"Key Employee"* means a salaried FMLA-eligible employee who is among the highest paid 10 percent of all the employees employed by the State of Arizona.

*"Medically Necessary"* is a medical need for the leave, as distinguished from voluntary treatments and procedures.

*"Next-of-Kin"* means the nearest blood relative of the servicemember, other than the spouse, son, daughter or parent, in the following order of priority: blood relatives who have been granted legal custody of the servicemember by court decree or statutory provisions, brothers and sisters, grandparents, aunts and uncles, and first cousins, unless the covered service member has specifically designated in writing another blood relative as his or her nearest blood relative for purposes of servicemember caregiver leave, in which case the designated individual shall be deemed to be the next of kin.

*"Parent"* means the biological, adoptive, step or foster father or mother of an employee or an individual who stands or stood in loco parentis to an employee when the employee was a son or daughter. Does not include parents-in-law.

*"Reduced Leave/Work Schedule"* means a work schedule that reduces an employee's usual number of hours per workweek, or hours per workday. A reduced leave/work schedule is a change in the employee's schedule for a period of time, normally from full-time to part-time.

*"Salaried"* means paid on a salary basis, as defined in 29 Code of Federal Regulations 541.118.

*"Serious Health Condition"* means an illness, injury, impairment, or a physical or mental condition that involves:
- Inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity, or any subsequent treatment in connection with such inpatient care; or
- Continuing treatment by a health care provider.

*"Serious Injury or Illness"* means an injury or illness incurred by a covered servicemember in the line of active duty on active duty that may render the servicemember medically unfit to perform the duties of the member's office, grade, rank, or rating.

*"Son or Daughter"* means a biological, adopted, or foster child, a stepchild, a legal ward, or a child of a person standing *in loco parentis*, who is under 18 years of age or 18 years of age or older and incapable of self-care because of a mental or physical disability. For the

**Arizona Department of Administration (ADOA) Policies and Procedures**
**Subject:** Leave - Family and Medical Leave Act (FMLA)

purpose of Servicemember leave, a son or daughter on "active duty or call to active duty status" can be older than 18 years of age.

*"Spouse"* means a husband or wife as defined or recognized under Arizona state law. It does not include unmarried domestic partners.

**Policy:**

A.  In accordance with the Family and Medical Leave Act (FMLA) of 1993 as amended, job protected unpaid family and medical leave will be granted to eligible employees for up to 12 weeks per 12-month period for any one or more of these reasons:

   1.  The birth of a son or daughter and in order to care for such son or daughter or the placement of a son or daughter with the employee for adoption or foster care (leave for this reason must be taken in the 12-month period following the son or daughter's birth or placement with employee);

   2.  In order to care for the spouse, son, daughter, or parent of the employee, if such spouse, son, daughter, or parent has a serious health condition.

   3.  The employee's own serious health condition that makes the employee unable to perform the functions of his/her position; or

   4.  A qualifying exigency arising out of the fact that the employee's spouse, son, daughter, or parent is a covered servicemember on active duty (or has been notified of an impending call or order to active duty) in support of a contingency operation.

      a.  A call to duty for purposes of leave taken due to a qualifying exigency refers only to Federal call to active duty. State calls to duty are not covered unless under the order of the President of the United States.

      b.  Qualifying exigencies include:
         - Issues arising from a covered servicemember's <u>short notice deployment</u> (i.e., deployment on seven or less days of notice) for a period of **seven** days from the date of notification;
         - <u>Military events and related activities</u>, such as official ceremonies, programs, or events sponsored by the military or family support or assistance programs and informational briefings sponsored or promoted by the military, military service organizations, or the American Red Cross that are related to the active duty or call to active duty status of a covered servicemember;
         - Certain <u>childcare and related activities</u> arising from the active duty or call to active duty status of a covered servicemember, such as arranging for alternative childcare, providing childcare on a non-routine, urgent, immediate need basis, enrolling or transferring a child in a new school or day care facility, and attending certain meetings at a school or a day care facility if they are necessary due to circumstances arising from the active duty or call to active duty of the covered servicemember;
         - Making or updating <u>financial and legal arrangements</u> to address a covered servicemember's absence;
         - Attending <u>counseling</u> provided by someone other than a health care provider for oneself, the covered servicemember, or the child of the covered

**Arizona Department of Administration (ADOA) Policies and Procedures**
**Subject:**  Leave - Family and Medical Leave Act (FMLA)

servicemember, the need for which arises from the active duty or call to active duty status of the covered servicemember;

- Taking up to **five** days of leave to spend time with a covered servicemember who is on short-term temporary, <u>rest and recuperation</u> leave during deployment;
- Attending to certain <u>post-deployment activities</u>, including attending arrival ceremonies, reintegration briefings and events, and other official ceremonies or programs sponsored by the military for a period of 90 days following the termination of the covered servicemember's active duty status, and addressing issues arising from the death of a covered servicemember;
- Any other event that the employee and employer agree is a qualifying exigency.

If a husband and wife, both of whom are employed by the State of Arizona, and each wishes to take leave for the birth of a son or daughter, adoption or placement of a son or daughter in foster care, to care for a parent (but not a parent-in-law) with a serious health condition, or for a qualifying military exigency, the husband and wife are only entitled to take a combined total of 12 weeks of FMLA leave.

B.  In accordance with the FMLA of 1993 as amended, an eligible employee who is the spouse, son, daughter, parent, or next of kin of a covered servicemember shall be entitled to a total of 26 workweeks of leave during a 12-month period to care for the servicemember who is undergoing medical treatment, recuperation or therapy or is in outpatient status or on the temporary disability retired list for a serious injury or illness incurred in the line of duty while on active duty.

If a husband and wife are both employed by the State of Arizona and each wish to take leave for the care of a qualified service member, the husband and wife shall be entitled to a combined total of 26 workweeks of FMLA leave.

C.  In accordance with the FMLA of 1993 as amended, an eligible employee shall be entitled to no more than 12 workweeks of leave for the reasons under paragraph (A), and a combined total of 26 workweeks of leave under paragraph (A) and (B) during a 12-month period.

D.  For part-time employees and those who work variable hours, the FMLA entitlement is calculated on a pro-rata basis.  A weekly average of the hours worked over the 12 weeks prior to the beginning of the leave will be used for calculating the employee's normal workweek, but shall not exceed 40 hours per week.

<u>**Coverage and Eligibility**</u>

A.  An eligible employee for the purposes of the FMLA is an employee who:

   1.  Is an employee of the State of Arizona;

   2.  Has been employed by the State of Arizona for at least 12 months (need not be continuous; however, employment prior to a break in service of 7 years or more need not be counted); and

   3.  Worked for at least 1,250 hours of service during the 12-months immediately preceding commencement of the leave.

**Arizona Department of Administration (ADOA) Policies and Procedures**
**Subject:** Leave - Family and Medical Leave Act (FMLA)

B. If at any time during the approved FMLA leave the employee notifies the employer that the employee will not be returning to work, FMLA leave entitlement shall cease.

**Paid Leave**

A. An employee on FMLA leave will be required to use appropriate accrued leave. Certain exceptions to an employee having to use accrued leave for unpaid FMLA leave exist, i.e., Industrial Leave.

B. When an employee has used all appropriate paid leave time for a portion of FMLA leave and additional time off is needed, the employee may request unpaid leave to be granted so that the total period of leave (paid and unpaid) equals 12 workweeks or 26 workweeks dependent on the reason for the leave.

C. All paid and unpaid leave taken for an FMLA qualifying event will be applied towards the employee's FMLA leave entitlement. For example, an employee using 10 weeks of industrial leave would simultaneously exhaust 10 weeks of his/her FMLA leave entitlement.

**Intermittent Leave or Reduced Schedule Leave**

A. An employee **may** take leave intermittently (a few days or a few hours at a time) or on a reduced leave schedule for birth or placement for adoption or foster care of a son or daughter.

B. An employee **may** take leave intermittently or on a reduced leave schedule to care for an immediate family member with a serious health condition or because of a serious health condition of the employee when "medically necessary."

C. An employee who needs intermittent or reduced schedule leave for foreseeable medical treatment must work with his/her supervisor to schedule the leave so as not to unduly disrupt the Department's operations.

D. The employee may be required to transfer temporarily to a position with equivalent pay and benefits that better accommodates recurring periods of leave when the leave is planned based on scheduled medical treatment.

E. While on intermittent FMLA leave, an employee may be required to call in to his/her immediate supervisor to provide notification that a current absence is for an FMLA qualifying reason. Failure to follow call-in procedures may result in disciplinary action or dismissal from employment.

F. While on reduced schedule leave, the Department will not reduce the employee's FTE. An employee on reduced schedule leave is required to use their paid leave balances for the periods of reduced schedule FMLA leave.

G. For uncovered and covered employees who are exempt from earning overtime, straight time or compensatory leave under the Fair Labor Standards Act (FLSA) for working in excess of 40 hours in a workweek and have been determined by the State to be FLSA exempt, (i.e., are not charged leave for absences of less than eight hours in one work day), if FMLA is taken:

**Arizona Department of Administration (ADOA) Policies and Procedures**
**Subject:** Leave - Family and Medical Leave Act (FMLA)

1. On an intermittent leave basis (i.e., the employee is absent from work on an occasional basis): If the employee's absence is one or more full work day(s), the employee must use their paid leave for each full day of FMLA absence. If the employee's absence is less than one work day, the employee does not use their paid leave balances (i.e., sick and annual leave) for the time they are absent from work. A supervisor may request an employee who is using intermittent leave for scheduled medical treatments to schedule the appointments at times that cause the least disruption to the work unit, such as early morning or late afternoon appointments.

   *Example:* An exempt employee's regular work schedule is Monday through Friday from 8:00 a.m. through 5:00 p.m. The employee's health care provider indicates they need to schedule four follow-up appointments for an FMLA-related reason over the next eight weeks. The employee schedules the appointments for when the health care provider's office opens, allowing the employee to arrive to work by 9:00 a.m. In this example, deductions are not made to either the employee's paid leave balances or the employee's available FMLA leave.

2. On a reduced schedule basis (i.e., the number of hours the employee may work per workweek or per workday is reduced as required through certification from their health care provider). On a reduced schedule FMLA, the employee retains their FTE status and must use their paid leave balances (i.e., sick and annual leave) for the time they are absent from work each day, even partial days.

   *Example 1 (reduced schedule, reduced hours per workweek):* An employee's regular schedule is Monday through Friday from 8:00 a.m. through 5:00 p.m. and their healthcare provider indicates they can only work 30 hours per week for the next eight weeks. The employee works with his/her supervisor to discuss the available options to meet the medical certification in a way that would be the least disruptive to the work unit. Unless the medical provider has also limited the number of hours the employee can work each day, possible schedules include, but are not limited to the following: three 10-hour days, such as Monday, Tuesday, Wednesday or Monday, Wednesday and Friday; five 6-hour days; or, three 8-hour days and one 6-hour day. In this example, the employee would code the time they are absent from work (the balance of the 40 hours, including partial days), as either FMLA sick leave (310F), FMLA annual leave (300F), FMLA LWOP (640F), or other FMLA pay codes as applicable.

   *Example 2 (reduced schedule, reduced hours per workday):* An employee's regular schedule is Monday through Friday from 8:00 a.m. through 5:00 p.m. and their healthcare provider indicates they can only work four hours per day for a period of two months. The employee would now work from 8:00 a.m. through noon each day for two months. This employee would code the time they are absent from work each day (four hours each work day) as either FMLA sick leave (310F), FMLA annual leave (300F), FMLA LWOP (640F), or other FMLA pay codes as applicable.

## Effect on Health Benefits

A. An employee granted leave under this policy will continue to be covered under the employee's group health insurance plan under the same conditions as coverage would have been provided if he/she had been continuously working during the leave period.

**Arizona Department of Administration (ADOA) Policies and Procedures**
Subject:  Leave - Family and Medical Leave Act (FMLA)

B. Employee contributions will be required either through payroll deduction or by direct payment to the Benefit Services Division if the employee is in a leave without pay status.  The employee will be advised in writing at the beginning of the leave without pay period as to the amount and method of payment.  Employee contribution amounts are subject to any change in rates that occurs while the employee is on leave.

C. If an employee's benefit contribution is more than 30 days late, the State has the option to terminate the employee's insurance coverage.

D. If the employee fails to return from paid or unpaid family/medical/servicemember caregiver leave for reasons other than (1) the continuation, recurrence, or onset of a condition of the employee or a covered family member that entitles an employee to leave under the FMLA or (2) circumstances beyond the employee's control (certification required within 30 days of failure to return for either reason), agency management will, in order to ensure consistency, seek reimbursement from the employee for the portion of the premiums paid by the State on behalf of that employee (also known as the employer contribution) during the period of leave.

E. An employee is not entitled to seniority or benefit accrual during periods of unpaid leave, but will not lose any paid leave accrued prior to the start of the unpaid leave.

**Job Protection**
A. If the employee returns to work within 12-26 workweeks (dependent on the category of leave) as provided by the FMLA following a family/medical/exigency/servicemember caregiver leave, the employee will be restored to the employee's former position or an equivalent position with equivalent pay, benefits, status and authority, unless the employee is determined to be a key employee.  If the employee is a key employee, restoration to employment may be denied following FMLA leave on the grounds that such restoration will cause substantial and grievous economic harm to the State.  Whether an employee is a key employee must be determined at the time of the request for leave.

B. The employee's restoration rights are the same as they would have been had the employee not been on leave.  Thus, if the employee's position would have been eliminated or the employee would have been terminated but for the leave, the employee would not have the right to be reinstated upon return from the leave.

C. If the employee fails to return to work within the approved period of time following a family/medical/exigency/servicemember caregiver leave, the employee may be separated, in accordance with applicable laws and Personnel Rules.

*NOTE: If any discrepancies exist between this policy, the FMLA and/or Arizona Revised Statutes or any other applicable State policies and/or rules, the FMLA and/or Arizona Revised Statutes or State policy and/or Rules will prevail.*

**Procedure:**
**General Notice Requirement:**
To comply with the general notice requirements of the Act, a link to the Notice to Employees of Rights Under FMLA (WH Publication 1420) is provided at the end of this document.

**Arizona Department of Administration (ADOA) Policies and Procedures**
**Subject:** Leave - Family and Medical Leave Act (FMLA)

<u>**Employee and Employer Notice Requirements**</u>:

A. An employee is required to give 30 days notice in the event of a foreseeable leave.  A "Family and Medical Leave Request Form" (see Division Personnel Coordinator for a copy) must be completed by the employee and returned to the ADOA FMLA Coordinator in the HRD Shared Services Office.  In unexpected or unforeseeable situations, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case.  Generally, it should be practicable for the employee to provide notice of leave that is unforeseeable within the time prescribed by the employer's call in procedures followed by a completed "Family and Medical Leave Request Form".  The ADOA FMLA Coordinator will prepare the appropriate FMLA letter and FMLA package, (as applicable) obtain the appropriate Assistant Director's signature, and process the letter.  The ADOA FMLA Coordinator will notify the appropriate Assistant Director, the employee's supervisor, personnel coordinator, benefits analyst, and payroll representative of the disposition of the request.

B. If an employee fails to give 30 days notice for a foreseeable leave with no reasonable excuse for the delay, the leave may be denied until 30 days after the employee provides notice.  The ADOA FMLA Coordinator will prepare the appropriate FMLA letter and FMLA package, (as applicable) obtain the appropriate Assistant Director's signature, and process the letter. The ADOA FMLA Coordinator will notify the appropriate Assistant Director, the employee's supervisor, personnel coordinator, benefits analyst, and payroll representative of the disposition of the request.

C. The employee will be required to furnish the ADOA FMLA Coordinator with periodic reports of his/her status and intent to return to work as requested or no more than every 30 days while on FMLA leave.  The ADOA FMLA Coordinator will notify the appropriate Assistant Director, the employee's supervisor, personnel coordinator, benefits analyst, and payroll representative of the employee's status.

D. If the leave is not designated timely as FMLA, the ADOA FMLA Coordinator may retroactively designate the leave as FMLA leave with appropriate notice to the employee, provided the failure to timely designate the leave does not cause harm or injury to the employee.  In all cases where leave would qualify for FMLA protections, the ADOA FMLA Coordinator and the employee can mutually agree that leave be retroactively designated as FMLA leave.

E. An employee need not specifically request FMLA leave to be placed on FMLA leave.  If the employee requests leave and, in explaining the reasons for the request, provides sufficient information to determine that the requested leave is for an FMLA-qualifying purpose, the employee's leave, paid or unpaid, shall be designated as FMLA leave and be appropriately substituted for all or some portion of the employee's FMLA leave entitlement.

<u>**Certification**</u>:

A. Medical Related

    1. When leave is taken due to the employee's serious health condition or a covered family member's serious health condition, the employee must submit a completed "Certification of Health Care Provider" form (see Division Personnel Coordinator or ADOA FMLA Coordinator for a copy of this form) and return the certification to the

**Arizona Department of Administration (ADOA) Policies and Procedures**
**Subject:**  Leave - Family and Medical Leave Act (FMLA)

ADOA FMLA Coordinator in the HRD Shared Services Office.  Medical certification must be provided by the employee within 15 calendar days after the employee requests leave, unless it is not practicable to do so under the circumstances.  Under such circumstances, the employee must contact the ADOA FMLA Coordinator.  The medical certification must be completed by a duly licensed doctor of medicine or osteopathy, podiatrist, dentist, clinical psychologist, optometrist, chiropractor (only for sublaxation of the spine demonstrated by x-ray), nurse practitioner, nurse-midwife, clinical social worker, or Christian Science Practitioner listed with the First Church of Christ, Scientist in Boston, Massachusetts, or any health care provider from whom the State will accept certification to substantiate a claim for benefits.  Agency management may require a second or third opinion (at its own expense) and/or periodic reports on the employee's status and intent to return to work.

2. When leave is taken to care for a covered servicemember with a serious injury or illness (servicemember caregiver leave), the employee must submit a "Certification for Serious Injury or Illness of Covered Servicemember -- for Military Family Leave" form   (Form WH-385) completed by an authorized health care provider of the covered servicemember or by a copy of an Invitational Travel Order (ITO) or Invitational Travel Authorization (ITA) issued to any member of the covered servicemember's family.

3. When leave is taken due to the employee's serious health condition, before being restored to the employee's former position, the employee must provide a Fitness-for-Duty medical release from the employee's health care provider releasing the employee to return to work and assume the employee's duties.

4. All documentation related to the employee's or family member's medical condition will be **held in strict confidence** and maintained in the employee's medical records file by the ADOA FMLA Coordinator and **not** in the employee's personnel file.

B. Other Related

When leave is taken because of a qualifying exigency, the employee must provide a copy of the covered servicemember's active duty orders or other documentation issued by the military which indicates that the covered servicemember is on active duty or call to active duty status in support of a contingency operation and a completed "Certification of Qualifying Exigency For Military Family Member" form (Form WH-384) to the ADOA FMLA Coordinator in the HRD Shared Services Office before leave is granted.

**Related Forms/Attachments:**
FMLA General Notice
FMLA Leave Request Form

**Corresponding Policies:**
Not Applicable

**Contact:**
If you have any questions related to this policy, please contact your division Personnel Coordinator or the Human Resources Division Shared Services Office.

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #127</u>

**Spoliation Letter to Defendants**

**MVP0002254-57, 11863, 12412,
9054, 11516-17, 14381-2,
11488-92, 11462-66**

# LUDWIG
## LAW OFFICES, LTD.

4242 N. 19th Ave., Ste. 150
Phoenix, AZ 85015
Phone: (602) 882-5417
LudwigLawOffices@gmail.com

April 27, 2018

Lindsay Schafer
Greg Coulter
LITTLER MENDELSON, PC
2425 E. Camelback Rd., Ste. 900
Phoenix, AZ 85016-2907

**V A   MA L O  L  :  LSchafer  Littler.com     Coulter   Littler.com**

RE:   *Parker v. State of Arizona, et. al* (U.S. District Court, District of Arizona; Case No.
2:17-CV-887-PHX-DLR)
**Missing emails  discovery dispute and spoliation**

Lindsay and Greg:

During the deposition of Plaintiff on April 25, 2018, he testified that at least 400 emails containing
factual information related to his employment and this litigation were missing from his Arizona
Attorney General's Office (AGO) email account.  He further stated that those emails were never
produced.  I am paraphrasing to the best of my ability due to the unavailability of the transcript, but
during this exchange between Greg and Plaintiff, Greg made a statement to the effect that he believed
all of the emails had been turned over and was unaware of this claim by Plaintiff.  I believe Greg
claimed that it was the first you heard about this issue.

Several exhibits were shown to Plaintiff during his deposition that, on their face supported Plaintiff's
position that a preservation request was sent by Plaintiff's counsel to the AGO and that after that date,
Plaintiff's immediate supervisor Charles Loftus requested access to Plaintiff's email address and
computer hard drive.  Plaintiff went on to testify that there was evidence contained in the
already-disclosed documents that emails were held back by the AGO and then deleted in violation of
the preservation notice.

Upon completion of the deposition, I asked Plaintiff to present me with these specific documents
supporting his statements at the deposition.  I just received them and, in reviewing the information
contained therein, your client admits that Mr. Loftus was given free access to Plaintiff's email account
and the AGO Information System Security (ISS) "is not able to determine how many times Mr. Loftus
may have accessed the email account.  ISS has no mechanism to track how many times users access the
email account of another user or what they may have done with that access."  ***See* BAT  S
MVP00011462-MVP00011463.**

Lindsey Schafer
Greg Coulter
April 26, 2018
Page 2 of 6

I am providing this letter to "meet-and-confer" about this issue and, as I referenced in my email to Lindsay yesterday, Thursday, April 26, 2018, I intend to include it in the statement of discovery dispute to be addressed by the Court next Thursday, May 3, 2018 but, as Judge Rayes suggested, perhaps you could resolve this particular issue by getting your client to verify the existence of the emails and forward them to me/Plaintiff before then.

I am aware that fact discovery closes this Monday, April 30, 2018 and that we're working within a compressed schedule.  However, in light of my April 17 email putting you on notice of this missing email issue and the presentation of documents to Plaintiff during his deposition evidencing the preservation letter and steps taken by the AGO regarding same, I believe that this issue is timely and that it is appropriate for the Court to consider it now because, the following evidence supports Plaintiff's position that the AGO, at worst, improperly destroyed/deleted these emails in violation of its duty to maintain them and, at best, failed to timely disclose them in this matter.

**P RT    T ACTS R  : M SS      MA LS**

**1. MARC  4, 2015; BAT S MVP0002254-2257**

A preservation demand letter was sent from Plaintiff's Fraternal Order of Police (FOP) attorney Neil Landeen to AGO Chief Counsel of the Employment Law Section Dennis Carpenter.  It states, in part:

"Plaintiff <u>currently has two pending matters before the State of Arizona</u>.  The first is an application for PSPRS retirement.  The <u>second is a worker's compensation claim appeal before the Industrial Commission</u> of Arizona.  Both of these matters are directly related to his employment as a Special Agent for the AGO.  <u>By suspending his email account</u> while he is still an employee, <u>the AGO has prevented Plaintiff from being able to review and provide necessary records related to his pending claims before the State of Arizona</u>.  Therefore, in lieu of Plaintiff requesting a subpoena duces tecum for those records, I am requesting you reauthorize Plaintiff's access to his email account effective immediately, as he is still an employee of the AGO, <u>or preserve the data as required by law pursuant to the following demand for preservation</u>:

[…] Notice is hereby given to the Arizona Attorney General's Office that they are not to destroy, conceal, or alter in any manner whatsoever any and all evidence, documents, information paper, or <u>electronic data</u>, and/ or other tangible items pertaining or relevant to, or property <u>discoverable</u> in relation to, the employment of Special Agent Matthew V. Parker... **t is anticipated that these items   ill be used in evidence in forthcoming litigation**.

Lindsey Schafer
Greg Coulter
April 26, 2018
Page 3 of 6

## 2.  MARC    6, 2015, 0852 A.M.; BAT   S MVP00011863

Plaintiff's immediate supervisor Charles Loftus emails Chief Special Agent Andy Rubalcava, Human Resources, and Office Administrator Autmyn Maya the following:

"Agent Parker told me he has planned on employment separation on March 9[th], 2015.  As a result, <u>I need access to several of his investigations contained **in his email** and K-drive.</u>

<u>Can you arrange that I have access to this email and K drive please</u>?

## 3.  MARC    6, 2015, 1109 A.M.; BAT   S MVP00011863

Rubalcava emails IT Director John Abretske, Office Administrator Lisa Rodriguez, and Criminal Division Chief Don Conrad:

"John, I support this request due to the time sensitive cases and projects which were assigned to SA Parker which now have to be quickly reviewed and reassigned. Andy"

## 4.  MARC    6, 2015, 1110 A.M.  BAT   S MVP00012412

Rubalcava emails Loftus:

"I forwarded your request with my support to John Abretske[1] and I copied Don Conrad."

## 5.  MARC    26, 2015  BAT   S MVP0009054

Prior to March 26, 2015, Plaintiff proposed entering into a Non-Disclosure Agreement (NDA) with the AGO and the AGO agreed to do so.  Plaintiff executed same and picked up a copy of his email account. The NDA states in relevant part:

"<u>The AGO is providing to you PDF's of **all of your emails** contained in your Microsoft Outlook folders</u>.  We our providing these emails to you because you have indicated to us that within these

---

[1] John Abretske was the Information System Security (ISS) Director during Plaintiff's employment and was in charge of the unit that managed AGO computers and email accounts.

Lindsey Schafer
Greg Coulter
April 26, 2018
Page 4 of 6

folders are emails that could be <u>relevant to a pending appeal you have with the Arizona Industrial Commission</u> as well as an <u>application for medical retirement</u> with the Public Safety Retirement System (PSPRS)…

I, Matthew Parker, understand and agree that the emails provided to me are the property of the Arizona Attorney General's Office and will not be further disseminated by me to third parties beyond the limited requirements <u>to support my appeals to the Arizona Industrial Commission and/or my application to the Public Safety Retirement System</u>."

## 6. April 17, 2015  BAT  S MVP00011516-11517

Parker submits a Public Records Request for all metadata related to his email account.

## 7.        5, 2015, 0843 A.M.  BAT  S MVP00014382

Loftus sends an email to Rubalcava and IT Director John Abretske.

"Andy,

I completed the redaction.

I used the following criteria for <u>redaction</u>:

- Any victim information such as names DOB.
- Any attorney agent communication regarding cases.
- **<u>Any case reports, notes, documents or communications still under investigation or not yet indicted</u>**.
- **Any MO   or interagency contracts under consideration**.
- Any ACJIC, TOC, or Coplink credentials, applications, materials, or employee information who has requested such credentials.
- Any material covered by the Bank Secrecy Act (FinCEN)

<u>These deleted documents are presently in a deleted folder</u>, **<u>not yet permanently deleted</u>**.  According to John Abretske  <span style="color:red">**need to delete these before    e send the file to Parker**</span>.  I want to confirm my analysis of redacted materials **before   <span style="color:red">permanently delete</span> these items**."

Lindsey Schafer
Greg Coulter
April 26, 2018
Page 5 of 6

**8.        5, 2015, 0851   O   RS   BAT   S MVP00014381**

Rubalcava replies to Loftus' email:

"Thanks Charlie.  While I concur with your redactions (initial production of emails to Parker was when he was a Special Agent on FMLA) due to Parker now being a former employee, I am sending this string of message to Ted Campagnolo seeking his guidance prior to finalizing the production.  Ted let me know if you would like to meet with Charlie and I on this to obtain the scope of our PRR response. Andy"

**9. S   PT   MB   R 6, 2016   BAT   S MVP00011488-11491**

Parker emails another preservation notice for emails and employment records, including emails related to another active lawsuit in which he is a plaintiff (16-cv-924-PHX-ROS).  That case is presently on appeal to the U.S. Ninth Circuit Court of Appeals.

**10. S   PT   MB   R 8, 2016   BAT   S MVP00011463**

Parker writes to Bethany Diaz (AGO PIO) in part:

"[…] 3) I had previously requested the metadata related to my email account. I alerted the AGO in 2015 that Charles Loftus had gained access to my email account and files while on leave and altered them. Located in the public records released to me are Loftus' requests for access to my emails, despite me still being employed and on FMLA date March 6, 2015. When I later received a download of my underacted email account on March 23, 2015 **it   as clear there   ere emails that   ere deleted, altered, or missing**. If you were to review a copy of the email records you would see that there were multiple emails that were sent from the account approximately two months after I no longer had access to my email account. **Pursuant to a Demand for Preservation from early 2015, the metadata   as to be preserved regarding this issue for future litigation**. Pursuant to A.R.S. 39-121 et. seq., I am requesting a copy of any and all information related to any and all documents, related to Loftus accessing my email accounts, who granted him authority, when he was granted access, when he accessed the files, and how many times he did, what IP address he accessed the records from and whether that IP address is an AGO / State registered IP address, and what changes he made. This is all information which ISS has access to and should be preserved based on the Demand for Preservation from 2015 **and the ongoing litigation   have had   ith the State.**

Lindsey Schafer
Greg Coulter
April 26, 2018
Page 6 of 6

**11.  S PT MB R 26, 2016  BAT S MVP00011462**

Bethany Diaz responds to email:

"[…] Item 3)  **SS ran an email search of your email account on March 20, 2015.** I am told that initially, it was provided as a PDF file.  <u>t is my understanding that the entire PD  as provided to you as you  ere still an employee at that time</u>. Subsequently, <span style="color:red">those <u>same</u> search results</span>  ere **provided in a PST file to accommodate your re uest for the email metadata**; however, prior to the AGO releasing the email metadata to you, <u>Charlie Loftus reviewed the emails in the PST file for confidential material because you were no longer an employee at the time of the subsequent release</u>. If, in the course of reviewing your email account Mr. Lofus considered material confidential or sensitive that would normally not be released to a third party, it was not provided in the subsequent release regardless of your status as a former employee. **This does not mean that information  as not preserved pursuant to any Demands for Preservation** but rather that the information was not released to you again because of your change in employment status and the lack of credentials within the AGO to be able to access otherwise confidential information.

**Mr. Loftus  as granted access to your email account based upon the  ritten re uest of Andre Rubalcava on March 6, 2015**. The request from Mr. Rubalcava is attached.  <span style="color:red">**SS is not able to determine ho  many times Mr. Loftus may have accessed the email account.  SS has no mechanism to track ho  many times users access the email account of another user or  hat they may have done  ith that access**</span>. It appears that Mr. Loftus was using two different AGO computers during the March 2015 to June 2015 timeframe. The IP address of those two computers were 10.246.22.95 and 10.246.9.4, both of which are private AGO IP addresses. The AGO has the 10.246.#.# IP range registered with AzNet."

Respectfully,

LUDWIG LAW OFFICES, LTD.

Aaron S. Ludwig

***Enclosures:*** 21 Page PDF file titled - "Relevant Bates docs re missing emails"

March 4, 2015

Arizona Attorney General's Office
c/o Human Resources and c/o Information Security
1275 W. Washington St.
Phoenix, Arizona 85007

# YP L
### YENPILCHLANDEEN

Re:    *Demand for Preservation*

To Whom It May Concern:

This firm represents Arizona Attorney General's Office ("AGO") Special Agent
Matthew V. Parker. On February 23, 2015, Mr. Parker forwarded an application
for Public Safety Personnel Retirement System ("PSPRS") retirement to the AGO
PSPRS Local Board ("Local Board") Chairperson, Special Agent Lauren Burhow,
via email. Mr. Parker included in his email that he was sending the original
PSPRS application to Ms. Burhow via certified mail. As of February 27, 2015, at
1:45 PM, Mr. Parker has not received any acknowledgement that his application
was received by the Local Board.

Also on February 23, 2015, Mr. Parker called AGO Human Resources ("HR")
and spoke to Tammie Jo Hatcher regarding whether he had to notify HR of his
pending PSPRS retirement application or if the Local Board would notify HR for
him. Mr. Parker also inquired about why his ID badge and email account were
deactivated, because he was still currently employed but on Family Medical
Leave Act ("FMLA") status. Ms. Hatcher told him that the deactivations were a
policy recently adopted by HR. Mr. Parker told Ms. Hatcher that he received no
notice that his building and email access would be suspended during FMLA
status, and he informed Ms. Hatcher that he had important emails related to
pending human resources issues (e.g. retirement and workers compensation
claims) preserved in his email account. Ms. Hatcher told him that his supervisor
would be able to access those emails.

Approximately two weeks prior to this phone call, Mr. Parker received word that
his office had already been packed by another AGO employee. Mr. Parker
inquired about coming to the AGO to collect his belongings, and stated that he
would coordinate his visit with his immediate supervisor, Charles Loftus. Mr.
Parker called Mr. Loftus, told Mr. Loftus that he was applying for PSPRS
retirement, and inquired about a time to collect his belongings. Mr. Loftus
informed Mr. Parker that his office had been packed to make room for another
employee. They agreed that Mr. Parker would come to the AGO on February 27,
2015, and collect his belongings. Soon after their conversation, Mr. Parker
received a return call from Mr. Loftus with a request by Chief Special Agent

A PROFESSIONAL
CORPORATION
OF ATTORNEYS

6011 N. 15TH STREET
PHOENIX, AZ 85014
TEL 602.241.0474
FAX 602.241.9687

TUCSON
520.547.3502
MVP0002254

MVP0002255

Andy Rubalacava to submit a letter of intent. Mr. Parker informed Mr. Loftus that until his retirement application was accepted by the Local Board, he was not going to submit anything regarding his employment status.

On February 27, 2015, at 10:00 AM, Mr. Parker arrived at the AGO; he was escorted while in the building because his ID badge had been deactivated. Mr. Parker asked Mr. Loftus about accessing his email account for his human resources emails, as well as to pass along information related to several AGO projects. Mr. Loftus informed Mr. Parker that, according to HR, he was not allowed to access any computers while in the building.

Mr. Parker requested that Mr. Loftus escort him to HR. At HR, Mr. Parker asked to speak with Ms. Thatcher, but was told she was not available; instead, Mr. Parker spoke with HR Specialist Kay Gee. Mr. Parker inquired about why his email account was closed because there were important emails he needed to access. Ms. Gee told Mr. Parker that it "was because you verbally resigned." Mr. Parker informed Ms. Gee that he did not resign and that he merely informed HR of his intent to file a PSPRS application. Mr. Parker informed Ms. Gee that he was covered under FMLA until at least March 9, 2015, and that he intended to maximize the full extent of his FMLA leave. Ms. Gee told Mr. Parker that her information was given to her by Ms. Thatcher; that Ms. Thatcher would contact Mr. Parker on Monday, March 2, 2015; and that any files Mr. Parker needed would be available to his supervisor.

Notably, under the FMLA, an employee on approved FMLA leave has the right to return to a position that is similar in job function and pay. In this case, the AGO has effectively terminated Mr. Parker's rights as an employee while he is in protected FMLA status. By deactivating Mr. Parker's ID badge and email account, and by clearing out his office – all while he is in protected FMLA status – the AGO has denied Mr. Parker access to his workplace and his personal belongings, as well as to his work product and email communications.

Mr. Parker currently has two pending matters before the State of Arizona. The first is an application for PSPRS retirement. The second is a workers compensation claim appeal before the Industrial Commission of Arizona. Both of these matters are directly related to his employment as a Special Agent for the AGO. By suspending his email account while he is still an employee, the AGO has prevented Mr. Parker from being able to review and provide necessary records related to his pending claims before the State of Arizona. Therefore, in lieu of Mr. Parker requesting a subpoena duces tecum for those records, I am requesting that you reauthorize Mr. Parker's access to his email account effective immediately, as he is still an employee of the AGO, or preserve the data as required by law pursuant to the following demand for preservation:

MVP0002255

MVP0002256

## DEMAND FOR PRESERVATION

Notice is hereby given to the Arizona Attorney General's Office that they are not to destroy, conceal, or alter in any manner whatsoever any and all evidence, documents, information, paper, or electronic data, and/or other tangible items pertaining or relevant to, or property discoverable in relation to, the employment of Special Agent Matthew V. Parker, including but not limited to all computers and cellular telephones owned by them or in their possession.  This notice includes but is not limited to all data generated and/or stored on any and all computers and cellular telephones owned or used by the Arizona Attorney General's Office that were assigned to Special Agent Matthew V. Parker; all data stored on any and all electronic storage media of any type, such as hard disks, floppy disks, CD-ROMs, DVDs, flash drives, backup tapes, online backup services, or any other storage media or service; all emails; all instant messages; all SMS text messages; all audio data, such as voicemail and tape recordings; and all photographs, videos, writing, or other documentary material of any nature found or stored on his computers, cellular telephones, or Internet accounts.  This notice also applies specifically but without limitation to any and all emails, instant messages, SMS text messages, email accounts, Internet addresses, and/or Internet accounts utilized or established by the Arizona Attorney General's Office related to Special Agent Matthew V. Parker, whether or not the data is stored locally on a computer used by him or stored by a third party on an Internet server, such as Outlook.com, Gmail.com, Yahoo.com, Hotmail.com, or any other third-party Internet service.  With regard to electronic data created subsequent to the date of delivery of this letter, relevant evidence is not to be destroyed, and the Arizona Attorney General's Office is to take whatever steps are appropriate to avoid destruction of evidence.  It is anticipated that these items will be used in evidence in forthcoming litigation.  In order to assure that the Arizona Attorney General's Office's obligation to preserve documents and things will be met, please forward

MVP0002257

a copy of this letter to any and all persons and entities with custodial responsibilities for the items referred to herein.

If you have any questions, please contact me.

Sincerely,

Neil Landeen

NL:sg

MVP0002257

| From: | Rubalcava, Andy |
|---|---|
| To: | Abretske, John |
| Cc: | Rodriguez, Lisa; Conrad, Donald |
| Subject: | FW: Matt Parker |
| Date: | Friday, March 06, 2015 11:09:31 AM |
| Attachments: | image001.png |
|  | image003.png |
|  | image004.png |

John, I support this request due to the time sensitive cases and projects which were assigned to SA Parker which now have to be quickly reviewed and reassigned.  Andy

# Andrew Rubalcava
## Chief Special Agent

Office of the Attorney General – SIS
1275 W. Washington, Phoenix, AZ 85007
Desk: 602.542.7944 I Cell: 602 ███████ I Fax: 602.542.4882
andy.rubalcava@azag.gov
http://www.azag.gov

LAW ENFORCEMENT SENSITIVE
NOTICE:  This message is intended exclusively for the individual or entity to which it is addressed.  This communication contains information that is law enforcement sensitive, for official use only, sensitive but unclassified, proprietary, privileged, and may be legally protected or otherwise exempt from disclosure.  If you are not the intended recipient, you are hereby notified that any disclosure, dissemination, copying or distribution of this transmission is strictly prohibited.  If you have received this message in error, please notify the sender immediately by email and immediately delete this message and all of its attachments.

---

**From:** Loftus, Charles
**Sent:** Friday, March 06, 2015 8:52 AM
**To:** Human Resources; Maya, Autumn
**Cc:** Rubalcava, Andy
**Subject:** Matt Parker

Agent Parker told me he has planned on employment separation on March 9th, 2015.  As a result I need access to several of his investigations contained in his email and K-drive.

Can you arrange that I have access to his email and K drive please?

Thank you,

Charlie

# Charles Loftus  Ph.D.
## Assistant Chief Special Agent

Office of the Attorney General – Special Investigations Section
1275 W. Washington, Phoenix, AZ 85007

| | |
|---|---|
| **From:** | Rubalcava, Andy |
| **To:** | Loftus, Charles; Human Resources; Maya, Autumn |
| **Subject:** | RE: Matt Parker |
| **Date:** | Friday, March 06, 2015 11:10:20 AM |
| **Attachments:** | image001.png |
| | image003.png |

I forwarded your request with my support to John Abretske and I copied Don Conrad.

**From:** Loftus, Charles
**Sent:** Friday, March 06, 2015 8:52 AM
**To:** Human Resources; Maya, Autumn
**Cc:** Rubalcava, Andy
**Subject:** Matt Parker

Agent Parker told me he has planned on employment separation on March 9th, 2015.  As a result I need access to several of his investigations contained in his email and K-drive.

Can you arrange that I have access to his email and K drive please?

Thank you,

Charlie

# Charles Loftus  Ph.D.
Assistant Chief Special Agent

Office of the Attorney General – Special Investigations Section
1275 W. Washington, Phoenix, AZ 85007
Desk: 602.542.7946 I Cell: 602 ███████ I Fax: 602.542.4882
Charles.Loftus@azag.gov
http://www.azag.gov



**MARK BRNOVICH**
ATTORNEY GENERAL

**OFFICE OF THE ARIZONA ATTORNEY GENERAL**

**OPERATIONS DIVISION**

**LESLIE WELCH**
DIRECTOR OF OPERATIONS

Special Agent Matthew Parker
6457 E Snowdon Street
Mesa, Arizona  85215

March 23, 2015

Dear Special Agent Parker:

The Attorney General's Office is providing to you PDF's of all of your emails contained in your Microsoft Outlook folders. We our providing these emails to you because you have indicated to us that within these folders are emails that could be relevant to a pending appeal you have with the Arizona Industrial Commission as well as an application for medical retirement with the Public Safety Personnel Retirement System (PSPRS).

Please understand that these emails are being provided to you for these limited purposes. The emails remain the property of the Arizona Attorney General's Office and some may contain confidential and/or sensitive information. While we understand that a limited number of these emails may be provided to either the Arizona Industrial Commission or to PSPRS in support of your appeal/retirement application, it is expected that these emails will not be further disseminated by you to any other third parties. By signing the acknowledgment below, you are indicating that you understand and agree to these conditions.

Sincerely,

Leslie Welch
Director of Operations

ACKNOWLEDGMENT: I, Matthew Parker, understand and agree that the emails provided to me are the property of the Arizona Attorney General's Office and will not be further disseminated by me to third parties beyond the limited requirements to support my appeals to the Arizona Industrial Commission and/or my application to the Public Safety Personnel Retirement System.

_____         3/26/15
Special Agent Matthew Parker              Date



**Matt Parker <matthew.v.parker@gmail.com>**

---

## Public Records Request

1 message

---

**Matt Parker** <matthew.v.parker@gmail.com>      Wed, Apr 22, 2015 at 8:45 AM
To: Human Resources <HumanResources@azag.gov>

Please see the attached public records request.


Respectfully,


Matthew V. Parker

---

📄 **Letter to AGO Regarding metadatea for Matthew V Parker - Copy.docx**
    17K

6457 E. Snowdon St., Mesa, AZ 85215
Phone: (570) 604-5686 * Email: Matthew.V.Parker@gmail.com

# M AT T H E W   V.   P A R K E R

April 17th, 2015

Human Resources
Arizona Office of the Attorney General
1275 West Washington Street
Phoenix, AZ 85007-2926
(602) 542-5025

To Whom It May Concern,

This request is made pursuant to A.R.S. § 39-101 *et seq*.  I request the following public records:

1.   Metadata related to the Arizona Attorney General's Office email account of Matthew Vernon Parker between the dates of January 21st, 2014 through April 8, 2015.

I request that these records be provided expeditiously.  Be aware that should you fail to provide these records in a reasonable time, it will constitute a denial which I will appeal through a special action in the superior court pursuant to A.R.S. § 39-121.02, wherein the court may award attorneys' fees and other legal costs that are reasonably incurred in pursuing such an action, including but not limited to damages resulting from the denial, attorneys' fees, and double damages.  If you have any questions please do not hesitate to contact me.

Respectfully,

*Matthew V. Parker*

Matthew V. Parker

MVP00011517

| | |
|---|---|
| **From:** | Rubalcava, Andy |
| **To:** | Canez, Stacey; Loftus, Charles |
| **Subject:** | RE: Records request by Parker |
| **Date:** | Friday, June 05, 2015 10:31:41 AM |

I am available

**From:** Canez, Stacey
**Sent:** Friday, June 05, 2015 10:25 AM
**To:** Rubalcava, Andy; Loftus, Charles
**Subject:** RE: Records request by Parker

Are you both available on Monday, 6/8 at 1:00 PM?

Thanks,
Stacey

**From:** Rubalcava, Andy
**Sent:** Friday, June 05, 2015 9:23 AM
**To:** Campagnolo, Ted; Loftus, Charles
**Cc:** Canez, Stacey
**Subject:** RE: Records request by Parker

Thanks Ted, Stacey, Charlie and I will be flexible as this has become a priority..

**From:** Campagnolo, Ted
**Sent:** Friday, June 05, 2015 9:09 AM
**To:** Rubalcava, Andy; Loftus, Charles
**Cc:** Canez, Stacey
**Subject:** RE: Records request by Parker
**Importance:** High

I think we should meet. I will ask Stacey to set up a time. I get too confused on scheduling if more than one person is meeting with me.

**From:** Rubalcava, Andy
**Sent:** Friday, June 05, 2015 8:51 AM
**To:** Loftus, Charles; Campagnolo, Ted
**Cc:** Abretske, John
**Subject:** RE: Records request by Parker

Thanks Charlie. While I concur with your redactions ( initial production of emails to Parker was when he was a Special Agent on FMLA) due to Parker now being a former employee, I am sending this string of message to Ted Campagnolo seeking his guidance prior to finalizing the production. Ted let me know if you would like to meet with Charlie and I on this to obtain the scope of our PRR response. Andy

**From:** Loftus, Charles
**Sent:** Friday, June 05, 2015 8:43 AM
**To:** Rubalcava, Andy
**Cc:** Abretske, John

**Subject:** Records request by Parker

Andy,

I completed the redaction.

I used the following criteria for redaction:

- Any victim information such as names DOB.
- Any attorney agent communication regarding cases.
- Any case reports, notes, documents or communications still under investigation or not yet indicted.
- Any MOU or interagency contracts under consideration.
- Any ACJIC, TOC, or Coplink credentials, applications, materials, or employee information who has requested such credentials.
- Any material covered by the Bank Secrecy Act (FinCEN)

These deleted documents are presently in a deleted folder, not yet permanently deleted.  According to John Abretske I need to delete these before we send the file to Parker.  I want to confirm my analysis of redacted materials before I permanently delete these items.

Thanks,

Charlie

## Charles Loftus  Ph.D.
Assistant Chief Special Agent

Office of the Attorney General – Special Investigations Section
1275 W. Washington, Phoenix, AZ 85007
Desk: 602.542.7946 I Cell: 602 ████ 8 I Fax: 602.542.4882
Charles.Loftus@azag.gov
http://www.azag.gov

 **Matt Parker <matthew.v.parker@gmail.com>**

---

## Demand for Preservation
1 message

---

**Matt Parker** <matthew.v.parker@gmail.com>                    Tue, Sep 6, 2016 at 4:54 PM
To: "Diaz, Bethany" <Bethany.Diaz@azag.gov>

Bethany,

Please confirm receipt of my demand for preservation related to my litigation.  In particular, the AGO is not to destroy
any records related to my polygraph examination as they are relevant to my pending litigation involving ASU.

--
Respectfully,


Matthew V. Parker
(570) 604-5686

---

📄 **Matt Parker - Demand for Preservation (9.6.2016).pdf**
74K

530 E. McDowell Rd., #107-217 Phoenix, AZ 85004
*Phone*: (570) 604-5686 * *Fax*: (800) 897-3707
*Email*: Matthew.V.Parker@gmail.com

# MATTHEW V. PARKER

September 6, 2016

Bethany Diaz
Arizona Attorney General's Office
1275 W. Washington St.
Phoenix, Arizona 85007
Phone #

**VIA EMAIL**

RE:  Demand for Preservation - All records related to Matthew Vernon Parker

Ms. Diaz,

 My name is Matthew Vernon Parker.  As you are aware, I am a former Special Agent with the Arizona Attorney General's Office.

On February 17th, 2016 a lawsuit was filed in Maricopa County, Arizona Superior Court against defendants of the Arizona State University Police Department under CV2016-004435.  The case was removed pursuant to the Fed. R. Civ. P. to the Federal District Court of Arizona under 16: CV 924 PHX ROS.  It is the belief that employees of the Arizona Attorney General's Office currently possess documents, information, and knowledge related to this litigation.  In particular, all records related to polygraph examinations including but not limited to audio and video recordings, raw data sets, statistical data, testing questions, and / or scoring data.

## <u>DEMAND FOR PRESERVATION</u>

This letter is to give notice to the Arizona Attorney General's Office that they are not to destroy, conceal or alter in any manner whatsoever any or all evidence, documents, information, paper or electronic data and/or other tangible items pertaining or relevant to or property discoverable in relation to the employment of Special Agent Matthew V. Parker, including but not limited to all computers and cell phones owned by them or in their possession.

MVP00011489

This notice includes, but is not limited to, all data generated and/or stored on any and all computers and cellular telephones owned or used by Arizona Attorney General's Office that were assigned to Special Agent Matthew V. Parker; all data stored on any and all other electronic storage media of any type such as hard disks, floppy disks, CD-ROMs, DVDs, flash drives, backup tapes, online backup services or any other storage media or service; all emails; all instant messages; all SMS text messages; all audio data such as voicemail, tape recordings; and all photographs, videos, writing or other documentary material of any nature found or stored on his computers, cellular telephones, or Internet accounts.  This notice also applies specifically, but without limitation, to any and all emails, instant messages, SMS text messages, email accounts, Internet addresses and/or Internet accounts utilized or established by Arizona Attorney General's Office related to Special Agent Matthew V. Parker, whether or not the data is stored locally on a computer used by him or stored by a third party on an Internet server such as Outlook.com, Gmail.com, Yahoo.com, Hotmail.com, or any other third party Internet service.

With regard to electronic data created subsequent to the date of delivery of this letter, relevant evidence is not to be destroyed and the Arizona Attorney General's Office is to take whatever steps are appropriate to avoid destruction of evidence.  It is anticipated that these items will be used in evidence in the forthcoming litigation.

In order to assure that the Arizona Attorney General's Office obligation to preserve documents and things will be met, please forward a copy of this letter to any and all persons and entities with custodial responsibilities for the items referred to herein

If you have any questions, please contact me.

Respectfully,

"/s/ Matthew V. Parker"



**Matt Parker <matthew.v.parker@gmail.com>**

## RE: Demand for Preservation
1 message

**Diaz, Bethany** <Bethany.Diaz@azag.gov>                    Tue, Sep 6, 2016 at 4:55 PM
To: Matt Parker <matthew.v.parker@gmail.com>

Mr. Parker,


I am in receipt of your demand for preservation.


Thank you,




Bethany Diaz

Deputy Public Information Officer

Office of the Arizona Attorney General

1275 W. Washington Street

Phoenix, AZ  85007




**From:** Matt Parker [mailto:matthew.v.parker@gmail.com]
**Sent:** Tuesday, September 06, 2016 4:54 PM
**To:** Diaz, Bethany
**Subject:** Demand for Preservation


Bethany,

Please confirm receipt of my demand for preservation.  In particular, the AGO is not to destroy
any records related to my polygraph examination as they are relevant to my pending litigation involving ASU.


--

Respectfully,

MVP00011491

Matthew V. Parker
(570) 604-5686

MVP00011492



**Matt Parker <matthew.v.parker@gmail.com>**

---

# RE: Records Request / Polygraph Follow Up
1 message

---

**Diaz, Bethany** <Bethany.Diaz@azag.gov>                            Fri, Sep 23, 2016 at 2:52 PM
To: Matt Parker <matthew.v.parker@gmail.com>

Mr. Parker,

I believe you received a response with regard to item 1 already, so I'm writing to address the items you've listed under the public information request items.  Your email is fine and I don't need a formal letter.

Item 2)  Document PHX-4297754 is an Excel spreadsheet of your 2015 MAP. It is literally the same document as the attachment titled "Parker MAP Review.pdf".  So, the PHX-4297754 is not a signature, it is just a document number.  The reason it was sent to you as a PDF rather than the excel is because I am unable to redact the EIN number from a spreadsheet; therefore, it was converted to PDF.  Nothing was changed prior to the conversion and the only difference is that I redacted the EIN numbers and the title of the document was changed in the PDF I released to you.  So, the PHX-4297754 is the same record that you are in possession of.

Item 3) ISS ran an email search of your email account on March 20, 2015. I am told that initially, it was provided as a PDF file.  It is my understanding that the entire PDF was provided to you as you were still an employee at that time.  Subsequently, those same search results were provided in a PST file to accommodate your request for the email metadata; however, prior to the AGO releasing the email metadata to you, Charlie Loftus reviewed the emails in the PST file for confidential material because you were no longer an employee at the time of the subsequent release.  If, in the course of reviewing your email account Mr. Loftus considered material confidential or sensitive that would normally not be released to a third party, it was not provided in the subsequent release regardless of your status as a former employee.  This does not mean that information was not preserved pursuant to any Demands for Preservation but rather that the information was not released to you again because of your change in employment status and the lack of credentials within the AGO to be able to access otherwise confidential information.

Mr. Loftus was granted access to your email account based upon the written request of Andrew Rubalcava on March 6, 2015. The request from Mr. Rubalcava is attached.  ISS is not able to determine how many times Mr. Loftus may have accessed the email account.  ISS has no mechanism to track how many times users access the email account of another user or what they may have done with that access.  It appears that Mr. Loftus was using two different AGO computers during the March 2015 to June 2015 timeframe.  The IP address of those two computers were 10.246.22.95 and 10.246.9.4, both of which are private AGO IP addresses.  The AGO has the 10.246.#.# IP range registered with AzNet.

I hope this is helpful, please let me know if you need me to clarify anything further.

MVP00011462

Sincerely,

Bethany Diaz

Deputy Public Information Officer

Office of the Arizona Attorney General

1275 W. Washington Street

Phoenix, AZ  85007

**From:** Matt Parker [mailto:matthew.v.parker@gmail.com]
**Sent:** Wednesday, September 07, 2016 8:15 AM
**To:** Diaz, Bethany
**Subject:** Records Request / Polygraph Follow Up

Bethany,

A few items:

(1) Regarding the polygraph issue, attached is a designation showing I was classified as an uncovered employee, in state service in regards to the statement by the State designating ARS 38-1101 as it has no applicability.  See the attached word document, inside of the PDF File.

**Public Information Request Items**:

Please let me know if you would like this request in a formal letter or not.

(2) In the response to public records I received, there was a MAP review conducted on me sometime after January 27, 2015 by Charles Loftus.  I was on FMLA during that time period, was never contacted by Loftus, and never signed the form.  Despite this, the form is signed with a signature referring to a Legal Files Document # of:  **PHX-4297754**.  Pursuant to A.R.S. 39-121 et. seq. I am requesting a copy of MAP form which references that Legal File number.  I have attached a copy of the MAP sheet for you to refer to.

(3) I had previously requested the metadata related to my email account.  I alerted the AGO in 2015 that Charles Loftus had gained access to my email account and files while on leave and altered them.  Located in the public records released to me are Loftus' requests for access to my emails, despite me still being employed and on FMLA date March 6, 2015. When I later received a download of my underacted email account on March 23, 2015 it was clear there were emails that were deleted, altered, or missing.  If you were to review a copy of the email records you would see that there were multiple emails that were sent from the account approximately two months after I no longer had access to my email account.  Pursuant to a Demand for Preservation from early 2015, the metadata was to be

MVP00011463

preserved regarding this issue for future litigation.  Pursuant to A.R.S. 39-121 et. seq., I am requesting a copy of any and all information related to any and all documents, related to Loftus accessing my email accounts, who granted him authority, when he was granted access, when he accessed the files, and how many times he did, what IP address he accessed the records from and whether that IP address is an AGO / State registered IP address, and  what changes he made.  This is all information which ISS has access to and should be preserved based on the Demand for Preservation from 2015 and the ongoing litigation I have had with the State.


--

Respectfully,


Matthew V. Parker
(570) 604-5686

_____

 **FW_ Matt Parker.pdf**
84K

MVP00011464

| From: | Rubalcava, Andy |
|---|---|
| To: | Abretske, John |
| Cc: | Rodriguez, Lisa; Conrad, Donald |
| Subject: | FW: Matt Parker |
| Date: | Friday, March 06, 2015 11:09:31 AM |
| Attachments: | image001.png |
| | image003.png |
| | image004.png |

John, I support this request due to the time sensitive cases and projects which were assigned to SA Parker which now have to be quickly reviewed and reassigned.  Andy

# Andrew Rubalcava
## Chief Special Agent

Office of the Attorney General – SIS
1275 W. Washington, Phoenix, AZ 85007
Desk: 602.542.7944 I Cell: 602.763-6665 I Fax: 602.542.4882
andy.rubalcava@azag.gov
http://www.azag.gov

LAW ENFORCEMENT SENSITIVE
NOTICE:  This message is intended exclusively for the individual or entity to which it is addressed.  This communication contains information that is law enforcement sensitive, for official use only, sensitive but unclassified, proprietary, privileged, and may be legally protected or otherwise exempt from disclosure.  If you are not the intended recipient, you are hereby notified that any disclosure, dissemination, copying or distribution of this transmission is strictly prohibited.  If you have received this message in error, please notify the sender immediately by email and immediately delete this message and all of its attachments.

**From:** Loftus, Charles
**Sent:** Friday, March 06, 2015 8:52 AM
**To:** Human Resources; Maya, Autumn
**Cc:** Rubalcava, Andy
**Subject:** Matt Parker

Agent Parker told me he has planned on employment separation on March 9th, 2015.  As a result I need access to several of his investigations contained in his email and K-drive.

Can you arrange that I have access to his email and K drive please?

Thank you,

Charlie

# Charles Loftus  Ph.D.
## Assistant Chief Special Agent

Office of the Attorney General – Special Investigations Section
1275 W. Washington, Phoenix, AZ 85007

Desk: 602.542.7946 I Cell: 602.763.0768 I Fax: 602.542.4882
Charles.Loftus@azag.gov
http://www.azag.gov

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #128</u>

## Declaration of Sergeant Patrick Murphy

## MVP00018168-70

## <u>Declaration of Plaintiff Patrick J. Murphy</u>

1.  I am Patrick J. Murphy. I am listed as a witness in Parker v. State of Arizona et. al., United States District Court for Arizona case #2:17 887 PHX DLR, and am not a party to the litigation.

2.  My statements herein are based upon my own personal knowledge and I am competent to testify as to these matters.

3.  I was employed as a sworn police officer with Arizona State University Police Department beginning my employment on April 15, 2002 and retired as a Police Sergeant on March 31, 2013.

4.  During my employment I was the direct supervisor of Officer Matthew V. Parker (Badge #583).

5.  I supervised and completed his employee evaluations between the dates of December 30, 2008 and March 31, 2009 and completed his evaluations between July 12, 2010 through June 30, 2011.  Between these dates Ofc. Parker was assigned to Sergeant Mark Aston.

6.  As Ofc. Parker's immediate supervisor, I was directly responsible for issuing any and all discipline he would have received during his employment.

7.  As Ofc. Parker's immediate supervisor, I was required to maintain his personnel file, known as a workstation file.  A workstation file contained all discipline, complaints, and other information related to ASU PD employees.   At the completion of the period of supervision, all disciplinary files, including letters of instruction, and internal affairs were turned over to ASU PD Human Resources by the supervisors for inclusion in the employees permanent ASU PD personnel file.  I did this for each period of supervision I supervised Ofc. Parker.

8.    At the completion of a period of supervision, a copy of the disciplinary files, including letters of instruction, and internal affairs investigations would remain in the workstation file passed from supervisor to supervisor.

9.    For a period of time, ASU PD Command Staff were conducting "administrative reviews" of minor events such as a vehicle being scratched.  These administrative reviews were NOT internal affairs investigations.   Often administrative reviews would mistakenly be labeled as internal affairs investigations resulting in an internal affairs number being generated for an incident which was not in-fact, an IA. This practice was eventually stopped.

10.   ASU PD's Policy regarding discipline of officers is PSM 261-01.  This policy provided instruction and that "counseling" was not a form of discipline.  Additionally, an employee could not have been "exonerated" and still received counseling.  Additionally, a single IA number would be pulled for all events related to a call for service.  In other words, if an officer was accused of more than one policy violation, only one IA number would be generated.

11.   During the period of Ofc. Parker's employment ASU PD did NOT maintain a secure third-party software to track internal affairs.  Instead, ASU PD relied on paper files which were maintained by the individual supervisors as explained above.

12.   Employees were not allowed to make copies of their ASU PD HR personnel file and I have witnessed several emails where ASU PD HR personnel deny officer's requests to photocopy their files.

13.   While Ofc. Parker was a witness to several other officers being the focus of an internal affairs investigation, Ofc. Parker was only involved in one internal affairs investigations during his employment that was documented in his personnel file.  That incident, involved Ofc. Parker failing to follow instruction to turn a memo in before the end of his shit as a result he received a letter of instruction.  I am aware of this information because I maintained a copy of Ofc. Parker's workstation

files upon retirement should future issues arise. I reviewed Ofc. Parker's workstation files prior to completing this declaration.

14. Between the end of my employment on March 31, 2013 and April 29, 2018, I was never contacted by any member from Arizona State University Police Department or the Arizona Attorney General's Office regarding Ofc. Parker or my knowledge of his personnel files, workstation, or involvement in internal affairs investigations.

15. Ofc. Parker's performance at ASU PD increased overtime and he matured as an officer. He was considered by his peers, a trustworthy, honest, and dependable individual who routinely out performed his peers in terms of number of arrests, traffic citations, and other department performance standards.

16. In the Fall of 2013, when I learned of Ofc. Parker's application to the Arizona Attorney General's Office and that he would be working with former ASU PD Sergeant Charles Loftus, I called him on the telephone and cautioned him about taking the job based on my negative experiences working for Loftus which included unprofessional, deceitful, and, inappropriate conduct.

Pursuant to 28 U.S.C. 1746, I hereby declare and state under penalty of perjury that the foregoing is true and correct. Executed this 29th day of April, 2018.

PATRICK MURPHY

Patrick J. Murphy
10610 S. 48th St., #2106
Phoenix, AZ 85044

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #129</u>

## Declaration of Chief Kevin Williams

## MVP00018420-26



# UNIVERSITY OF MICHIGAN-DEARBORN

## Police and Public Safety Department

May 21, 2018

My name is Kevin H. Williams. I was employed at the Arizona State University Police Department as a Police Commander from August 2010 to June 2014.

I currently am employed as the Chief of Police of the University of Michigan-Dearborn.  My law enforcement career includes working as a Police Lieutenant for the Los Angeles Police Department for 20 years. I have over 29 years' experience in police supervision including knowledge of proper administration of internal affairs investigations involving police officers.

I am aware that this information will be used in a lawsuit in the Arizona Federal District Court for the District of Arizona in the matter of Parker v. State of Arizona and Attorney General Mark Brnovich, in his official capacity, (case #: 2:CV-17-887-PHX-DLR). I was asked by the Plaintiff, Matthew Parker to provide a written and truthful statement regarding my knowledge of both the official and unofficial ASU PD "Internal Affairs" (IA) policy and the use of "Blue Team" IA software, during my employment at ASU PD. In particular, I was asked to provide any information I recalled specific to Mr. Parker's employment. I agreed to voluntarily complete this statement as I am certain the policies at ASU PD were not equitably applied to all employees.  (I can provide specific examples, if needed.)

I have never and do not have a personal relationship with Mr. Parker.  I only know him in a professional capacity from my law enforcement service at ASU PD.

During my employment as a Police Commander, I was assigned to complete a comprehensive audit of the ASU PD internal affairs files. Part of the audit required the review of all employees' internal affairs files and documenting the findings. This audit took significant time to complete and was forwarded to Assistant Chiefs Jim Hardina and Michael Thompson on October 16, 2013. See Attachment #1 to this letter titled: "Complaint Audit covering January 1, 2011 through October 16, 2013."

Also attached to this email was an excel spreadsheet which included all of my findings titled: "ASU PD IA AUDIT - THREE YEARS.xlsx" which is attached to this letter as Attachment #2.

This audit included me reviewing all of the internal affairs records at ASU PD, which were housed within Police Headquarters at 325 E. Apache Blvd. Tempe, AZ (Tempe Campus). These files were in a locked filing cabinet with restricted access controlled by the Chief of Police.

All of the internal affairs records were maintained in a paper format.

Note: I have no recollection of any electronic records available in any computer format.

Additionally, I do not recall that any internal affairs software existed for my use at the time of this audit. I had to create a master spreadsheet in Microsoft Excel from scratch. If the electronic records had previously existed, I would not have had to complete this audit.

---

CSS Building, 4901 Evergreen Road
Dearborn, Michigan 48128-2406

313 593-9953        F: 313 436-9161



 **UNIVERSITY OF MICHIGAN-DEARBORN**

**Police and Public Safety Department**

In reviewing the investigative (personnel complaint) files, I noted only one internal affairs investigation under IA Tracking Number 11-05-18 for insubordination of which the records indicated he was exonerated. I do not recall seeing any other internal affairs records in his file which would have been present as Mr. Parker was hired in 2008 and ASU PD had a five-year records retention policy. If any other internal affairs were present they would have been reviewed. As Mr. Parker also served as a police association representative I would have been particularly concerned with his veracity in that role and would have mentally noted any improper conduct he would have engaged in. This is also relevant because of the intense interest Assistant Chief Clark had in ensuring Parker would be terminated. However, as my records indicate, there was only one internal affairs investigation noted.

In dealing with Mr. Parker in both his role as a detective and a police association representative, I found him to be to be respectful, hardworking, and honest. It should be noted Parker routinely advocated for other employees and for the improvement of working conditions of ASU PD.   That did not endear him to leadership and made him the target of several supervisors including Assistant Police Chief Allen Clark specifically and I have vague recollection of disdain from Commander Louis Scichilone.  I can confirm and I specifically state that I possess firsthand knowledge of disparaging remarks being made about Parker, on numerous occasions.   Allen Clark was overtly seeking justification to terminate Parker, in large part due to Parker's police union activities.  Further, I personally discussed my concerns with Clark and I warned him about violations of myriad labor relations rules specific to Parker and persons Parker represented.

I swear and affirm this statement is true and correct to the best of my knowledge under the penalty of perjury dated this 21st day of May 2018.

Kevin H. Williams, Chief of Police
Director of Public Safety
University of Michigan-Dearborn
1300 CSS Building
4901 Evergreen Road
Dearborn, MI 48128-2406
(313) 593-1908 Desk
(313) 269-3110 Cell
E-mail: kevinwms@umich.edu

**Parker v. State of Arizona et al.**

**U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL**

# <u>Exhibit #130</u>

**AGO Background Investigation Report of**

**Matthew Parker**

**Case 2:16-cv-00924-ROS dkt. #62-1**

# EXHIBIT #2

# CONFIDENTIAL



## BACKGROUND INVESTIGATION

ARIZONA ATTORNEY GENERAL'S OFFICE
CRIMINAL DIVISION
SPECIAL INVESTIGATIONS SECTION

### REPORT COMPLETED ON:

December 12, 2013

APPLICANT:    PARKER, MATTHEW VERNON

SSN:

DOB:

BACKGROUND INVESTIGATOR:   D. WATOLA

## CONFIDENTIAL
### BACKGROUND INVESTIGATION

**I.    OTHER NAMES USED**

None

**II.   BIRTH RECORD**



REDACTED

**III.  SOCIAL SECURITY**

REDACTED          Verified through DES and MVD.

**IV.   EDUCATION**

REDACTED

**V.    MILITARY**

Not Applicable

**VI.   EMPLOYMENT HISTORY (AT LEAST 3 YEARS)**

A.    Arizona State University, DPS
      Position:  Detective/Criminal Investigator
      Date Hired:  2008 – Present

B.    University of Scranton Police Department
      Position: Public Safety Officer
      2007  -2008
      B.    Freeland Police Department, Freeland, PA

Document Number: 2029167
Document Name: FORM- BACKGROUND REPORT FOR APPLICANT

Position: Police Officer
2007 - 2008

## VII.  CERTIFICATION HISTORY

AZPOST CLEARS reports Parker certified through ASU PD on 08/25/2008.  Full
Peace Officer Certification is current, no reports of misconduct.  (CLEARS Report
Attached)

## VIII.  IMPROPER CONDUCT

Parker was subjected to a Polygraph Examination at the Maricopa County
Sheriff's Department on 12/11/2013.  On 12/12/2013 I was advised that Parker's
Polygraph examination indicated no evidence of deception.

A review of Parker's personnel file at ASU PD was conducted on 12/17/2013.
Kerry Schambach, ASU PD Human Resources, provided access to Parker's
personnel files at ASU PD, Tempe Campus.  Parker maintained acceptable
performance standards in his reviews from 2008 – 2010.  After that time his
performance review were rated at an 'exceeds expectations' rating.  Parker had
two complaints on file, both of which he was exonerated.

Parker was promoted to Detective on 05/02/2011 and to Corporal on 12/112012.
Notations in his personnel file indicate that he performance while employed at
the University of Scranton and Freeland, PA PD met standards and he was eligble
for rehire.

## IX.  RESIDENCE VERIFICATION

REDACTED                        where Parker has
lived the last three years.  No record found.  Coplink did reflect several reports
by Tempe PD where Parker had assisted in their activities as an ASU PD Officer.

REDACTED

## X.  DRIVING RECORD

REDACTED

## XI.   CRIMINAL HISTORY

On 12/02/2013, the Attorney General's Office submitted Parker's fingerprint cards to the Arizona Department of Public Safety and the Federal Bureau of Investigation for review.  No returns have been received as of this date.

NCIC/ACIC indicate no record for Parker based on name/dob/ssn search.

## XII.   CIVIL ACTIONS

Parker has no indices in Maricopa County Civil Court records.

## XIII.  PERSONAL REFERENCES

A.    Christopher Speranza. Former supervisor and associate at ASU PD. Rates Parker very highly, see attached.

B.    Eric Johnson.  University of Scranton PD Officer.  Rates Parker highly, see attached.

C.    Mark Griffin. Rates Parker very highly, see attached.

## XIV.  RECOMMENDATION

Matthew Vernon Parker meets or exceeds agency and AZPOST standards and criteria for hire.

_____
Donald E. Watola #113
Background Investigator
Special Investigations Section

## XV.   REVIEWED BY

_____  #376
Dan Woods
Assistant Chief Special Agent
Special Investigations Section

## XVI.  APPROVED BY

_____ #296

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #131</u>

## AZPOST Administrative Rules

## MVP00015012, 42-43, 53

## DECLARATION OF CUSTODIAN OF RECORDS

Re:    Matthew V. Parker V. State of Arizona, and Mark Brnovich, et., al.
       Case No. CV-17-00887-PHX-DLR

The undersigned declares as follows:

*1.*   I, *Sandra L. Sierra*_____, an employee or agent of:
                     *(name)*
       **Arizona Police Officer Standards and Training (AZPOST) Board**_____ and as such I have the
                              *(entity name)*
       authority to certify these records.

2.    I received a subpoena requiring the production of certain records.  The enclosed copies of
      records are true copies of the documents in the care, custody or control of
      **Arizona Police Officer Standards and Training (AZPOST) Board**_____, which could be located
                              *(entity name)*
      based on the description of documents set forth in the subpoena.  Every possible effort has
      been undertaken to locate the documents as requested.

3.    I am informed and believe on that basis and thereon allege that the records were prepared
      by personnel of **Arizona Police Officer Standards and Training (AZPOST) Board**_____.
                              *(entity name)*

4.    [✓]   I hereby affirm that these are complete and accurate records regarding the subjects
      requested:

            OR

5.    [ ]   **Arizona Police Officer Standards and Training (AZPOST) Board**_____ has no responsive
                              *(entity name)*
      records to this subpoena.

I declare under the penalty of perjury under the laws of the State of Arizona that the foregoing is
true and correct.

Executed this *13*th day of *April*_____, 2018, in the State of Arizona


_____          _____
Signature of Custodian of Records          (Printed Name)

MVP00015042
Case 2:17-cv-00887-DWL   Document 138   Filed 12/24/18   Page 297 of 324

STATE OF ARIZONA PEACE OFFICER
STANDARDS AND TRAINING BOARD

JANUARY 1, 2007
RULES AND PROCEDURES MANUAL

# ARIZONA ADMINISTRATIVE CODE

## TITLE 13. PUBLIC SAFETY

### Supp. 06-1

### CHAPTER 4.   ARIZONA PEACE OFFICER STANDARDS AND TRAINING BOARD

(Authority: A.R.S. § 41-1822(1) et seq.)

*The Arizona Law Enforcement Officer Advisory Council's name was changed by Laws 1994, Ch. 324, § 1, effective July 17, 1994. All references to the Council were changed to reflect the new Board. (Supp. 94-3).*

### ARTICLE 1. GENERAL PROVISIONS

New Article 1 consisting of Sections R13-4-101 through R13-4-118 adopted effective March 23, 1989.
Former Article 1 consisting of Sections R13-4-01 through R13-4-08 repealed effective March 23, 1989.

**Section**

| R13-4-101. | Definitions |
| R13-4-102. | Internal Organization and Control of the Board |
| R13-4-103. | Certification of Peace Officers |
| R13-4-104. | Peace Officer Category Restrictions |
| R13-4-105. | Minimum Qualifications for Appointment |
| R13-4-106. | Background Investigation Requirements |
| R13-4-107. | Medical Requirements |
| R13-4-108. | Agency Records and Reports |
| R13-4-109. | Denial, Revocation, Suspension, or Cancellation of Peace Officer Certified Status |
| R13-4-109.01. | Restriction of Certified Peace Officer Status: Training or Qualification Deficiencies |
| R13-4-110. | Basic Training Requirements |
| R13-4-111. | Certification Retention Requirements |
| R13-4-112. | Time-frames |
| R13-4-113. | Repealed |
| R13-4-114. | Minimum Course Requirements |
| R13-4-115. | Repealed |
| R13-4-116. | Academy Requirements |
| R13-4-117. | Training Expense Reimbursements |
| R13-4-118. | Hearings; Re-hearings |



In effect 1-1-07 to 4-7-16 (20)

MVP00015042

STATE OF ARIZONA PEACE OFFICER
STANDARDS AND TRAINING BOARD

JANUARY 1, 2007
RULES AND PROCEDURES MANUAL

### ARTICLE 2. CORRECTIONAL OFFICERS

*Article 2, consisting of Sections R13-4-201 through R13-4-208, adopted effective December 16, 1992, filed June 16, 1992 (Supp. 92-2).*

**Section**

R13-4-201.      Definitions
R13-4-202.      Uniform Minimum Standards
R13-4-203.      Background Investigation
R13-4-204.      Records and Reports
R13-4-205.      Basic Training Requirements
R13-4-206.      Continuing Training Including Firearms Qualification
R13-4-207.      Repealed
R13-4-208.      Re-employment of State Correctional Officers

MVP00015043

STATE OF ARIZONA PEACE OFFICER                                    JANUARY 1, 2007
STANDARDS AND TRAINING BOARD                        RULES AND PROCEDURES MANUAL

E.   Medical history. A person who seeks to be appointed shall supply to the examining physician a statement of the person's medical history that includes past and present diseases, injuries, operations, immunization status, and medications taken.

F.   Medical examination. The examining physician shall review the person's medical history and examine the person.

G.   Examination report. The examining physician shall record the findings of the medical examination on a form prescribed by the Board. The physician shall indicate whether a medical, physical, or mental circumstance in Category II or III exists, describe how the circumstance affects the person's ability to perform the duties of a peace officer, and specify the type and duration of any treatment required. In all Category II or III cases, the physician shall advise the appointing agency in writing of any limitation on the person's ability to function as a peace officer.

H.   Category II and Category III reviews. The diagnosis of a person with a circumstance classified in Category II or Category III by an examining physician who is not Board trained shall be reviewed by a Board-trained physician if the agency intends to appoint the person. The Board-trained physician may review prior medical examination reports concerning the person and contact examining physicians to review their findings. If required by the Board-trained physician, an independent medical examination shall be conducted, if the agency wishes to appoint the person, and the person shall be referred to a specialist in the appropriate medical field.

I.   Additional findings. The appointing agency may submit to the Board results of additional examinations or tests, or obtain additional opinions from other licensed physicians.

J.   This Section is effective six months after filing with the Secretary of State as required by A.R.S. § 41-1823(A).

**Historical Note**

*Adopted effective March 23, 1989 (Supp. 89-1). References to "Council" changed to "Board" (Supp. 94-3). Amended by final rulemaking at 8 A.A.R. 3201, effective January 11, 2003 (Supp. 02-3).*

**R13-4-108. Agency Records and Reports**

A.   Agency reports. On forms prescribed by the Board, an agency shall submit:

    1.   A report by the agency head attesting that the requirements of R13-4-105 are met for each person appointed. The report shall be submitted to the Board before a person attends an academy or performs the duties of a peace officer.

    2.   A report of the termination of a peace officer. The report shall be submitted to the Board within 15 days of the termination and include:

        a.   The nature of the termination and effective date;

        b.   A detailed description of any termination for cause; and

        c.   A detailed description of and supporting documentation for, any cause existing for suspension or revocation of certified status.

B.   Agency records. An agency shall make its records available upon the request of the Board or staff. The agency shall maintain the following for each person for whom certification is sought:

    1.   An application file that contains all of the information required in R13-4-103(E) and R13-4-106(C) for each person appointed for certification as a peace officer;

    2.   A copy of reports submitted under subsection (A);

    3.   A signed copy of the affirmation to the Code of Ethics required under R13-4-105;



MVP00015053

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# Exhibit #132

**Summary of AZPOST Dismissal**

**MVP00014912-14913**

*Law Office of Dale Norris, LLC*
*517 W Monte Vista Rd*
*Phoenix, Arizona 85003*
*(602) 307-5627*
*facsimile (602) 325-0486*

Dale F Norris
norrislaw@cox.net

April 5, 2017

**COPY VIA EMAIL; ORIGINAL MAILED:**

Buddy Loomis, Board Secretary
Attorney General's Office Local PSPRS Pension Board
1275 West Washington Street
Phoenix, Arizona 85007

**RE: MATT PARKER:**

Dear Ms. Loomis:

As part of its campaign to discredit Agent Parker, the AG's Office fabricated false allegations against him. These untrue assertions were made after he filed a claim for worker compensation benefits for PTSD.  The accusations were later forwarded to the Arizona Peace Officers Standards and Training Board (AzPOST), and last Summer it brought charges of dishonesty against Agent Parker. These charges were discussed with Dr. Drake during Agent Parker's IME (Dr. Drake report, May 20, 2016, p.5).

Since filing these charges, AzPOST, without any defense from Agent Parker, admitted that there was no basis for the allegations, and on February 9, 2017, AzPOST's attorney requested the Board dismiss the charges (Mo. Reconsideration, February 9, 2017) (attached). In presenting the motion to the AzPOST Board, Michael Saltz, the Board's attorney, stated:

"You initiated this case and our POST staff was preparing for a hearing.  When we were gathering up the evidence, the documents required to pursue this case and they were analyzed by Mr., umm., Mr. Seth, Sorry, by R. Graves, Mr. Seth (laughs).  It was determined that it would be impossible for POST to meet their burden of proof to pursue the case with the evidence as it was provided.  *The basic issue was that the documents provided by his agency* [AG'sOffice] *were not consistent with the allegations that they had made*." (emphasis added).
(031517-002.mp3.mpeg, @ 26:35-28:28 (mm:ss); and March 15, 2017 AzPOST Board Minutes, p.6, item #15) (attached).

Based on the motion and statements from Mr. Saltz, the AzPOST Board dismissed the charges against Agent Parker and voted to take no action against his peace officer certification. (March 15, 2017 AzPOST Board Minutes, p.6, item #15; and Perkovich letter, March 16, 2017) (attached).

Buddy Loomis
April 4, 2017                                                                                          Page 2

   The AG's memorandum asserting these slanderous allegations was made part of the worker's compensation file and was provided to Dr. Drake and Dr. Don. These scurrilous charges came from his employer as a result of his duty to report his workplace injury/illness. Further, Dr. Don noted Agent Parker's feelings toward the AG's office in her first IME, and the Board seemed fixated on this part of her report. This development demonstrates the reasonableness of Agent Parker's point of view. Agent Parker requests this letter and the attachments be forwarded to Dr. Don for consideration during her examination.

   Please contact me if you need further information.

                                        Very truly yours,


                                        Dale F. Norris, Attorney for Matt Parker


Encl:


Cc:     David Niederdeppe and Cindy Kelley, Board Attorneys (email only)

**Parker v. State of Arizona et al.**

**U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL**

# **Exhibit #133**

**Parker's BRC Interview Report with
Sam Kazemi re: Human Body Dissection Video**

**Ex. 133 - MVP0008859-8864**

F18 A.

**STATE OF ARIZONA**
**OFFICE OF THE ATTORNEY GENERAL**
**SPECIAL INVESTIGATIONS SECTION**
**REPORT**

**DATE WRITTEN BY AGENT:** August 9th, 2014          **LF NUMBER:** P-2013-2429

**CASE NAME:**   Biological Resource Center

**REPORT TYPE:** Supplement – Interview with Sam Kazemi

**AGENT:** M. Parker, #401      **SUPERVISOR:** C. Loftus, #366      **PAGE 1 OF 6 PAGE(S)**

After the search warrant was served on the Biological Resource Center (BRC), a video was located in the seized evidence that showed the dismembering of a human body, specifically the removal of a cervical spine, with a Dewalt brand reciprocating saw, commonly referred to as a "sawzall." Based on information gained during this investigation a sawzall is not a medically approved device for tissue recovery. The high speed of the reciprocating blade causes tissue to become lodged into the blade-locking mechanism. Even when utilizing cleaning practices involving the submersion of a sawzall in a cleaning solution tissue, germs, bacteria, and other biological material can remain in the device and cross contaminate other biological samples (supporting evidence) used by the saw regardless of   The instructional video contained credits that showed a subject by the name of Samuel Kazemi as being the instructor in the video removing the spine.

Based on this video, Kazemi was contacted via phone during approximately the first week of April 2014 by me (Special Agent Parker)  I explained to Kazemi that I would like to interview him regarding his involvement with the Biological Resource Center. Kazemi agreed to meet for an interview. Based on Kazemi's schedule and being employed as a teaching assistant at Arizona State University in Tempe, AZ, I coordinated a scheduled interview with Samuel Kazemi at the Arizona State University Police Department on 4/8/2014.

On 4/8/2014, at approximately 1400 hours, Special Agent Paul Cuellar #404 and I, met with Samuel Kazemi at the Arizona State University Police Department (325 E. Apache Blvd., Tempe, AZ 85281). Kazemi was signed in as a visitor and escorted to an interview on the second floor located in the Criminal Investigation's Bureau.

The following is a summary of the interview with Samuel Kazemi.   SEE VIDEO FOR SPECIFIC DETAILS:

I told Kazemi that he was free to leave at any point and that he was not the focus of our investigation. Kazemi was identified by his Arizona driver's license. I told Kazemi we were conducting an investigation into the Biological Resource Center.

I asked Kazemi about the background of how he met Steve Gore, Ben Winters, and Tim Gore. Kazemi stated his ex-girlfriend was a tennis player and that Steve's daughter also played tennis.

Kazemi met Steve's wife, Sally through tennis. Sally told Kazemi about the work that she was doing (at BRC) and Kazemi's interest was peaked as he was a college student studying anatomy and physiology. Eventually the Gores were looking for a person to work in their lab. Sally contacted Kazemi through his ex-girlfriend and Kazemi interviewed for a job and was hired in approximately May or June of 2012.

Kazemi stated that other than being a student at Arizona State University (ASU) he did not have prior experience in the tissue recovery field. Kazemi stated he did have some exposure to cadavers through a program at ASU.

Kazemi interviewed for the position with Ben Winters and was told by Ben that his (Kazemi's) responsibilities would include dealing with donor intakes, dissections in the lab, and preparing tissue. Kazemi stated that Ben informed him that the tissue being used went to different universities for research. Kazemi stated he took the position because it was a great educational opportunity.

I asked Kazemi about expectations that were conveyed to him by Steve Gore. Kazemi told me that Steve had stopped in (during the interview) and they spoke some. Steve gave Kazemi a tour of the facility and told him that it would be a great learning experience for him and offered him the job.

Kazemi state that he learned "quite a bit" from working at BRC. I asked Kazemi about the training he received at BRC and he told me that he did not receive much in the way of class room training but more hands on. Kazemi stated that Tim (Gore) "knew more about the specific preparation of the tissues", meaning that each end user gave instructions on how they wanted tissue prepared, recovered, and packaged. (Any institutions that would say to use a sawzall?)

I asked Kazemi to walk me through the tissue recovery process from the time a body arrived at BRC until the body was dissected and the tissue was shipped out. Kazemi stated the he did not have experience with the donor intakes and it was handled by staff in the front office. Kazemi said he would describe the lab portion of the process.

Prior to a donor arriving in the lab they had a sheet that had an assigned number on it (which was completed by the front office). When a body would arrive they would double check the donor number on the sheet against the donor number on a tag attached to the body by the hospital, hospice, or nursing home. He stated they also had the name of the donor as well and would cross-reference both. Kazemi stated usually they had two lab employees working side-by-side to double check each other.

The next step included a physical assessment of the body where they would notate any physical issues with the body such as surgical scars or their physical features. Any property that was located was notated and would later be returned to the family of the deceased.

Report to Biological Resource Center File
AGI P-2013-2429
Supplement
8/9/2014
Page 3 of 6
_____

Blood would be drawn for serology (study of plasma serum for antibodies of specific diseases), centrifuged, and then kept in the refrigerator and was sent for testing daily through VRL Laboratory.

Kazemi went into more detail regarding the form (pre-retrieval selection form?).  He stated that he would try to fill out the form as accurately as possible and would give the form to "Tim (Gore)" or "Haley (Woods)" to enter into the system.   Kazemi said that "they" would identify the "tissue needs" and then return with a form of what body parts were to be dissected.

Kazemi started to describe the tissue recovery process and stated that they would only work with one donor at a time from start to finish.  Kazemi stated that each piece of tissue was cleaned and wrapped and then tagged with a donor number.   Kazemi stated that a computer generated barcode would also be attached to each piece of tissue.  Kazemi stated the tissue would either be frozen for later use or packaged with dry ice for immediate shipping to a researcher.

I asked Kazemi about the serology process and if the lab picked up the samples.  Kazemi told me that the samples were prepared based on the VRL Lab instructions which include a Styrofoam box and an icepack for the sample.  A biohazard label was placed on the package and the entire package would later be shipped via FedEx to VRL Labs for testing.

I asked Kazemi about the submission process for VRL Labs and he explained that there was a form that was hand filled out notating when a sample was taken.  I asked about the return time and Kazemi said the blood results would usually come back within a day but he was not completely sure because he did not do it.  He said that the lab would typically email Tim Gore or Haley Woods the results of the serology.

I asked about Haley's responsibilities and Kazemi said that she was in charge of tissue allocation such as shipping and dealing with researchers.  Kazemi stated that he received information on what to recover from Haley.

I asked if any whole bodies came in that were not dissected.  Kazemi said, "rarely" that would happen.  Kazemi stated if a body was diseased with something such as hepatitis or an unknown rash that they would cremate the body.  Kazemi stated that if the labs came back positive that the body would be cremated as well.  Kazemi stated there was a place on the tissue retrieval form to notate that no tissue was recovered due to a specific reason.

I asked Kazemi if bodies were ever dissected prior to serology results coming back from the lab. Kazemi said, "sometimes".  I asked Kazemi some follow up questions regarding this subject and he told me the following:

*"Sometimes researchers needed something within hours of death.  So if that were the case.  Then obviously, you know, we'll let them know it was pending serology."*

Report to Biological Resource Center File
AGI P-2013-2429
Supplement
8/9/2014
Page 4 of 6

I asked Kazemi to tell me about the precautions (i.e. – universal precautions) that were used in the lab each day. Kazemi told me that you had to have on full "PPE" (personal protective equipment) on in the lab and that you could not leave the lab with your PPE on.

It's important to note that the following questioning was directly related to an attempt to identify individuals with potential exposure to harmful pathogens as information presented itself during the course of the investigation that proper State and Federal Occupational Safety & Health Administration (OSHA) guidelines were not utilized by the Biological Resource Center. SEE SPECIAL AGENT JACKSON'S REPORT FOR FURTHER.

I told Kazemi that during the search warrant some food items such as drinks were observed in the lab. I asked him if he ever observed anyone eating or drinking in the lab and he stated he did not.

I asked Kazemi if the lab (at BRC) had any type of air filtration system, such as an air scrubber (or other system to remove particles from the air) and Kazemi stated that there was a fan in the room. He said that when it got hot or "smelly" in the lab they would utilize the fan.

I asked Kazemi about the use of recovery or surgical tools such as a micro saw, surgical bone saw, pneumatic drills, or hood and vacuum system. Kazemi stated they had a "rotary saw" and "just a regular drill if they needed to drill the bone or something."

I asked Kazemi what the tools they would use if they were going to do a cranial (removal). Kazemi responded, "Just a sawzall or just a regular clean blade." I asked Kazemi where he learned about using a sawzall versus using a rotary bone saw. Kazemi responded, "We use that saw for all the bone recoveries." Kazemi stated that they had another new sawzall on stand-by in case the saw they were using broke.

I asked Kazemi based on his training and experience if using a sawzall was an industry standard for tissue recovery. Kazemi stated that he wasn't sure. However, he indicated that he learned to use a sawzall for recoveries at BRC. Kazemi stated he had seen other tools such as a rotary saw used at school but when asked if he has ever seen anyone else use a sawzall for dissection other than BRC he stated he had not.

I asked Kazemi to tell me about the blades (used for the saw) or if they used an "autoclave" (often referred to as a sterilizer used to clean and disinfect medical equipment). Kazemi stated that the blades were soaked in an antibacterial solution called "cavicide." After a dissection each blade would be put into the solution for a period of time. The blade would then be rinsed and allowed to air dry. A disinfected or clean blade would be put onto the sawzall.

I asked Kazemi if the sawzall itself was cleaned. Kazemi said that the black tip of the sawzall was dipped into the solution and soaked. I asked Kazemi if there ever was a time when he was busy that the blade was just changed and the sawzall was not dipped into the solution. Kazemi stated that the sawzall was always dipped into the solution.

Report to Biological Resource Center File
AGI P-2013-2429
Supplement
8/9/2014
Page 5 of 6
_____

I asked Kazemi if he had any knowledge of any tissue dissections occurring and then a positive serology report coming back. Kazemi explained that if a body was dissected on one day, the following day the body would be sent to the crematorium. He explained that normally the serology would already be back from the lab (We have records indicating otherwise – explain this more) and that the recovered tissue would then just be included with the rest of the body to go for cremation. Kazemi said if the serology did return positive that the recovered parts would be sent to the crematorium as "medical waste."

I asked Kazemi about who reviewed serology results. Kazemi said that Tim (Gore) checked the serology reports every morning to make sure they were clear. Kazemi did not review the records, but was merely told that the serology was negative for disease.

Kazemi described instances of when he would have to dissect known diseased bodies and in those instances he requested "cutting gloves". Kazemi spoke to Steve and Tim (Gore) and they ordered the gloves as Kazemi expressed that he was "uncomfortable" cutting into diseased bodies without the proper safety precautions.

Kazemi described scenarios where he was requested to dissect the body because a researcher needed something in either (3) three to (6) six hours, or within (12) twelve hours post mortem and was told that the body was known not to have a serology results.

I spoke to Kazemi about the dissection videos that were recovered (during the search warrant). SEE BRC VIDEOS FOR FURTHER (REFERENCE BRC# 13071790 SNYDER AND BRC#13091938 OLSON). I asked Kazemi to explain how the videos came about. Kazemi described speaking with Steve (Gore) about making training videos to ensure that the tissue recoveries occurred the same way. Kazemi stated that the training videos that were at BRC were actually internal videos only for BRC staff. Kazemi spoke more about a proposal he had made to Steve Gore about producing commercial videos as a part of training others on how to properly recover tissue.

I asked Kazemi if he had a list of students who may have participated in any type of externship at BRC. Kazemi said that there was a folder at BRC that contained a list of all of the students who came to BRC. Kazemi said that the folder was blue and was in the lab and that every student had to sign a waiver prior to going into the lab. I asked Kazemi to provide a list of any students who may have come to the lab for health notification reasons. This information was later obtained from and forwarded to Special Agent Jackson for dissemination to the appropriate health agencies.

We inquired about the volume of bodies that Kazemi had exposure to. I asked Kazemi about how many bodies would come through on a busy day. He responded "a few...five, six, seven?"

Kazemi was asked about the storage of the bodies, specifically if a whole body was not dissected if it would be stored. Kazemi stated that the bodies were typically just dissected once they arrived at BRC. Kazemi said there was a long list of [end users] who needed tissue.

MVP0008864

Report to Biological Resource Center File
AGI P-2013-2429
Supplement
8/9/2014
Page 6 of 6
_____

I asked if they kept samples and gave the example of if 20 hearts were recovered would they be put into a freezer and Kazemi said, "Yeah".

I showed Kazemi a copy of a video that was seized during the search warrant of the lab at BRC. An SD card was located in (evidence item #?)  In the video Kazemi described that he was performing a "stripped surgical spine" removal.  I asked Kazemi if the PPE he was wearing in the video was the standard dress in the lab.  Kazemi said it was.  Kazemi indicated that Tim (Gore) was the lab manager and taught him (Kazemi) some of the procedures.

I asked if Ben Winters or Steve Gore ever assisted him in the lab and Kazemi said "no". Kazemi said that indicated that "he" (either Steve Gore or Ben Winters) mostly worked doing office work.

Special Agent Cuellar commented on the training video and Kazemi stated that he wasn't even sure if the technique he was utilizing was a proper recovery method.  I asked Kazemi if he was aware of any industry standards regarding the recovery of tissue.  Kazemi indicated that he mostly got the information from researchers (end users) who gave general instructions on how to remove a specific body part.

I asked Kazemi about the sawzall shown in the video and if he could point to where on the sawzall it would get soaked in the cleaning solution to.  Kazemi indicated that it was up to the front hand guard, a couple inches above the blade locking mechanism.  I asked Kazemi about how long the sawzall would sit in the solution.

I asked Kazemi if he was willing to aid in prosecution if the investigation determined that the fact that bodies were diseased was willfully concealed from him.  Kazemi indicated that he did desire prosecution if that were the case.

I requested Kazemi provided me with a list of ASU Students who had traveled to BRC and he said he would provide it to me.

That concluded the interview with Sam Kazemi.  Kazemi was escorted back to the lobby. Special Agent Cuellar and I obtained a copy of the video interview and then left ASU PD.

-End


ARS 23-410 and 414

# Parker v. State of Arizona et al.

## U.S. District Court for Arizona case # 2:17 CV 887 PHX DWL

# <u>Exhibit #134</u>

**Reuters Investigates - The Body Trade:
The Chop Shop**

**MVP0009782-9695**

🎞 HOW TO BUTCHER A CORPSE: In 2013, lab technician Sam Kazemi starred in an instructional video for his employer, Biological Resource Center. In it, Kazemi and an assistant use a construction saw to carve up a corpse. Reuters obtained the 24-minute video, titled "Stripped Cervical Spine!" Here's how it begins. BRC photo via REUTERS

*Warning: This story contains graphic content.*

PHOENIX — Sam Kazemi stood over the old man's corpse. Nearby lay pliers, a scalpel and a motorized saw designed to cut drywall and pipe.

MVP00009782

REUTERS/Jeong Suh

## REUTERS INVESTIGATES    **The Body Trade**    The Chop Shop ☐

Cashing in on the donated dead

# The Body Trade

# A business where human bodies were butchered, packaged and sold

A REUTERS SERIES

Part 7: For a decade, Arizona-based Biological Resource Center persuaded dying Americans to donate their bodies to science. More than 5,000 did. Here's what happened to thousands of them.

By JOHN SHIFFMAN, READE LEVINSON and BRIAN GROW | Filed Dec. 27, 2017, 1 p.m. GMT

HOW TO BUTCHER A CORPSE  In 2013, lab technician Sam Kazemi starred in an instructional video for his employer, Biological Resource Center. In it, Kazemi and an assistant use a construction saw to carve up a corpse. Reuters obtained the 24-minute video, titled "Stripped Cervical Spine!" Here's how it begins. BRC photo via REUTERS

*Warning: This story contains graphic content.*

PHOENIX – Sam Kazemi stood over the old man's corpse. Nearby lay pliers, a scalpel and a motorized saw designed to cut drywall and pipe.

On a busy day, Kazemi might harvest body parts from five or six people who had donated their bodies to science. On this day in November 2013, the corpse before Kazemi typified the donors who gave their remains to his employer, Biological Resource Center.

The man was a retired factory worker with a ninth-grade education. He had lived with his wife in a mobile home in Mohave Valley, Arizona, and had died six days earlier, aged 75. His name was Conrad Patrick.

But after he died and his body was donated, Patrick became a commodity, known by the company's initials and a number: BRC13112103.

Reuters reviewed thousands of internal BRC records and confidential law enforcement documents containing profiles of Patrick and 2,280 other donors. The documents include invoices and inventories for thousands of body parts harvested from those people. They show how their bodies were dissected, which body parts were sent where, and why buyers obtained them.

RELATED CONTENT



**The Body Trade**

Cashing in on the
donated dead

Kazemi helped cut up and package Patrick into seven pieces. BRC shipped Patrick's left foot to a Chicago-area orthopedic lab. His left shoulder was sent to a Las Vegas company that holds surgical seminars. His head and his spine went to a project run by the U.S. Army. And Patrick's "external reproductive organs" were sent to a local university. His right foot and left knee were placed in the company's freezers, where they became part of BRC's million-dollar inventory of flesh and bone.

For more than a year, Reuters has examined America's body trade, a little-known and virtually unregulated industry. These businesses, which call themselves non-transplant tissue banks, are also known as body brokers.



Donating bodies, selling the parts
Frequently asked questions

The operations can resemble meat-packing plants. At BRC, body parts from heads to fingernails were harvested and sold. On Saturday mornings, Kazemi taught college students how to dismember cadavers in the company lab. He also starred in a grisly training video, demonstrating how to carve out a man's spine using a motorized saw.

The documents obtained by Reuters – along with dozens of interviews with investigators, former BRC workers and families of donors – offer an unparalleled look at how one of America's major body brokers operated.

The records, never before made public, also reveal how little the government or the donors themselves understood what was happening at the company, and show in graphic detail how a cadaver becomes a commodity.

Sales invoices detail many of those transactions.

For $607, BRC sold the liver of a public school janitor to a medical-device company. The torso of a retired bank manager, bought by a Swiss research institute, fetched $3,191. A large Midwestern healthcare system paid $65 for two femoral arteries, one from a church minister. And the lower legs of a union activist were purchased by a Minnesota product-development company for $350 each.

For raw material, the industry relies in large part on people too poor to afford a funeral, offering to cremate a portion of each donated body for free.

A Reuters analysis of BRC donor files from May 3, 2011 through January 20, 2014 confirmed how important the disadvantaged were to business. The vast majority of BRC donors came from neighborhoods where the median household income fell below the state average. Four out of five donors didn't graduate from college, about twice the ratio of the country as a whole.

Before brokers accept a body, they typically present the donor or next of kin with a consent form. These agreements are often written in technical language that many donors and relatives say they find hard to understand. The documents give brokers the right to dismember the dead, then sell or rent body parts to medical researchers and educators, often for hundreds or thousands of dollars. At BRC, a

Inside a business where human bodies were butchered, packaged and sold

## Precious commodities

Conrad Patrick died at age 75 and donated his body to science. Documents show that Biological Resource Center cut and packaged Patrick's body into seven pieces. Here is what happened to those parts:



HEAD WITH  SPINE
Sent to a
U.S. Army project
Nov. 20, 2013

SHOULDER
Sent to a Las
Vegas surgical
seminar
company
Nov. 21, 2013

SPINE
Sent to a
U.S. Army
project
Nov. 20, 2013

REPRODUCTIVE
ORGANS
Sent to Arizona
State University
November 2013

RIGHT FOOT
AND SHIN
Placed in freezer as
part of BRC inventory

LEFT KNEE
Placed in freezer as
part of BRC inventory

LEFT FOOT
Shipped to a Chicago-
area orthopedic lab
Dec. 17, 2013

Sources: BRC and law enforcement records

whole body sold for $5,893, records show.

Since 2004, when a federal health panel unsuccessfully called on the U.S. government to regulate the industry, Reuters found that more than 2,357 body parts obtained by brokers from at least 1,638 people have ended up misused, abused or desecrated.

Documents reviewed for this article indicate that those figures are vastly understated. The extent of BRC's operation surprised even investigators who raided the Phoenix-based company in 2014.

There, agents discovered 10 tons of frozen human remains – 1,755 total body parts that included 281 heads, 241 shoulders, 337 legs and 97 spines.

Applying a state forfeiture law, authorities hauled away the contents of BRC's freezers, filling 142 body bags. One bag held parts from at least 36 different people.

The seizure was so large that officials struggled to properly handle the body parts. When plans to cremate the remains stalled, officials brought three walk-in freezers to a military base and stacked the body bags inside, one atop another. Parts from 851 different people remained in those freezers for almost three years before they were cremated.

The raid on BRC was part of a broader federal probe into the suspected practices of one of its clients, Arthur Rathburn. A Detroit body broker, Rathburn has pleaded not guilty to charges of defrauding customers. During a 2013 search of Rathburn's warehouse, federal agents found rotting body parts along with four preserved fetuses, confidential photographs reviewed by Reuters show. It is not clear how Rathburn acquired the fetuses or what he planned to do with them. He was indicted for allegedly selling diseased body parts without warning buyers. His trial is set for January.

After the BRC raid, the company went out of business. Its founder and former owner, Stephen Gore, later pleaded guilty to fraud – not for selling body parts but for misleading customers by shipping them contaminated specimens. His punishment: probation. He is expected to testify at the Rathburn trial.

Gore's attorney, Clark Derrick, said Gore always tried to act in the best interests of his donors. "At some point the business grew exponentially, we became shorthanded, we cut some corners, and for that I apologize and make amends," Derrick said on Gore's behalf.

PROFITING OFF THE POOR

Gore housed his business in a 9,000-square-foot building once occupied by an insurance agency – a one-story facility near two interstate highways and the Phoenix airport. From 2005 until early 2014, court records show, BRC received about 5,000 human bodies and distributed more than 20,000 body parts.

As Reuters reported last year, BRC also sold body parts to U.S. Army contractors for military experiments. A Pentagon spokeswoman said BRC provided the body parts "under false pretenses," misleading the Army that consent had been secured for donors  to be used in destructive tests.

Among the parts BRC sold for the Army experiments were the heads and spines of Conrad Patrick and Leon Small, a 71-year-old retiree who had once managed a furniture factory.

On the consent forms Patrick and Small signed, each man checked a box stating that he did not wish to be used in military or destructive tests, records show.

But just days after Patrick and Small died, a BRC employee called their widows and persuaded them to amend the forms so their husbands could be used by the military, according to recordings of the calls reviewed by Reuters. The widows said the calls came during a traumatic time.

"I didn't understand what they were talking about," Dona Patrick said. "But I said 'OK.'"

Bodies or parts from at least 20 BRC donors were used without their consent in Army experiments, Reuters found. Parts from Small and Patrick, however, were not. The military halted testing when it learned of the raid at BRC.

The shoulders of both men were sent to a for-profit surgical training company in Nevada.

The widows, Karen Small and Dona Patrick, are among two dozen next of kin who said they were surprised to learn that BRC profited from a relative's donated body.

"They prey on people that have no money, that are poor, that have no insurance – like us," Patrick said.

# 78

The percentage of BRC body donors who did not graduate from college

(Audio) In this BRC recording, a company representative gets widow Dona Patrick to amend her husband s donor agreement so his body can be used in military blast tests.

Family members of some donors said BRC employees told them before a body donation was regulated by federal and state authorities, and that selling body parts is illegal. Based on those pitches, the relatives said they believed the remains wouldn't be sold. In truth, there are virtually no regulations on the body trade.

## "They prey on people that have no money, that are poor, that have no insurance – like us."

Dona Patrick, whose husband donated his body to BRC

"It's a horrible thing," Small said. "Sick."

In a statement to Reuters last year, Gore said his employees took "great care to ensure that donors and their families were well-informed about the processes." Gore acknowledged at his sentencing that he relied on books and the Internet for instruction on how to handle the bodies he sold.

"HOMEMADE HORROR MOVIE"

In 2012, BRC hired lab technician Kazemi. He earned $21 an hour. Before joining the company, his resume shows, he spent the previous decade working as a real estate agent, a waiter at a Morton's steakhouse and a manager for an Olive Garden restaurant.

When he arrived at BRC, he was 35 and had just graduated from Arizona State University with a degree in kinesiology, the study of body movement. At ASU, he was a teaching assistant in an anatomy lab.

In 2013, Kazemi starred in a BRC instructional video. It opens with a jarring title, punctuated for emphasis: "Stripped Cervical Spine!"

The video begins with a close-up of Kazemi wearing a mask, gloves, goggles and a surgical gown. Then it pulls back to reveal a body face down on a table. The man's shoulders and arms have already been sheared off. The head lolls from side to side until Kazemi holds it still.

With a scalpel, he makes incisions along the neck and back, then peels away the man's skin and scalp. About seven minutes into the video, Kazemi picks up a construction saw.

"On this one," he says of the cadaver, "we are using a sturdy, thicker 9-inch blade. You want to make sure that the blade is long enough to reach from ear to ear across the back."

In his interview with Reuters, Kazemi described the video as clinical and "not disrespectful to donors" in any way. It was meant for internal use only, he said. Kazemi also said he did not know how BRC acquired donors or where body



CARVING TOOL  As part of an instructional video he did for employer BRC, lab technician Sam Kazemi and an assistant used this construction saw to help cut up a corpse. BRC photo via REUTERS

parts were shipped.

In hindsight, Kazemi said using a motorized saw was wrong because it cannot be cleaned well enough to avoid spreading diseases.

"Would I do something like that now that I know better? No," Kazemi said. "But at the time, that's what was provided to me."

Two retired investigators for the Arizona attorney general said even veteran prosecutors recoiled when they viewed the 24-minute video.

"It was like a homemade horror movie," said Charles Loftus, the former assistant chief agent.



CHOP SHOP  Matthew Parker, a former agent for the Arizona Attorney General s Office, stands in front of the former headquarters of BRC. "It looked like a junkyard chop shop where they are just ripping things apart," he said of a company-made video that shows a body being dismembered. REUTERS/John Shiffman

---

**"It's not how you treat human beings ... You don't throw them in a bunch of body bags and then throw them into a freezer like a pile of garbage."**

Matthew Parker, former investigator with the Arizona Attorney General s Office

---

"I couldn't sleep at night after seeing that," said Matthew Parker, another former

Inside a business where human bodies were butchered, packaged and sold

agents says he reacted with a disability — perhaps a mood disorder — related to his work on the case. "It looked like a junkyard chop shop where they are just ripping things apart."

INTERNING AT BRC

Kazemi also spent Saturdays in BRC's lab teaching college students about dissection.

On one Saturday in late 2013, ASU junior Emily Glynn said she showed up for her first day at the lab. She was majoring in nutrition.

"I was really surprised when I got the internship because I didn't have any experience," said Glynn, then 20. "Just went in the first day and learned things on the job."

That first day, under Kazemi's direction, interns used pliers to remove fingernails from donors, Glynn recalled.

"I don't want to say it was barbaric, but it was weird," she said. "One day, I found myself holding the hand of a 70-year-old woman and felt like I needed to apologize to her, to say, 'I'm sorry.'"



| Anatomical Tissue Requested: | | |
|---|---|---|
| Quantity & Description of Tissue Requested (include medical history exclusions, specific criteria & other relevant information.) | 32 fingernails (no thumbnails). Need entire fingernail, no skin. Four (4) male donors and Four (4) female donors = Eight (8) total donors. Need four (4) nails from each donor = 8 donors * 4 nails/donor = 32 nails. Age: Greater than or equal to 17 years, however, older the better. Serology: No HIV, HBV, HCV or infectious disease. Preference: Prefer healthy donors without cancer or radiation treatment; if possible. | |
| Description of procedures, uses &/or studies being performed. | in vitro systems biology testing.  Pharmaceutical and toxilogical drug development. | |
| Proposed start date for tissue use | July 31, 2013. | Proposed end date for tissue use | Aug. 30, 2013 |

FINGERNAIL ORDER  A BRC document shows a company's request for four fingernails from eight different donors.

Neither Glynn nor Kazemi knew how the fingernails were used, they said, and Reuters could not locate invoices for that order. But the news agency did identify fingernails from 22 other donors that were sold by BRC. They went to a North Carolina bioengineering research company, SciKon Innovation.

SciKon CEO Randy McClelland said he was unaware that BRC was raided by the FBI. He said his business helps companies study how products enter the bloodstream through fingernails. "Like new cosmetics that go on your skin," he said.

On another Saturday, Glynn said, Kazemi gathered the interns around the body of another elderly woman.

"He says, 'Emily, you've never cut off a head before, and everyone else has, so do you want to try?'" Glynn recalled. "And I'm, like, 'OK.'"

As she held the reciprocating saw, Glynn said, Kazemi steadied her grip.

"It wasn't a full-on chainsaw like you would see in a horror movie, but it was a

smaller incision," Glynn said and then "just pulled on it. It was pretty high so we drew blood but there wasn't much to it. It came right off," she said of the woman's head.

Kazemi said he doesn't remember helping an intern cut off a head or any other body parts. The Saturday sessions, he said, were more akin to lectures during which he showed interns various organs and other body parts.

In her senior thesis, Glynn described her time at BRC differently.



INTERN S STORY  During an internship at Biological Resource Center, college student Emily Glynn wrote in her thesis that she "sutured dismembered legs using an oversized needle and twine, and decapitated an elderly woman with what looked and sounded like a chainsaw from Home Depot." REUTERS/Caitlin O'Hara

**"One day, I found myself holding the hand of a 70-year-old woman and felt like I needed to apologize to her, to say, 'I'm sorry.'"**

Inside a business where human bodies were butchered, packaged and sold

Emily [illegible]

"Over the course of the internship, I stripped subcutaneous fat from the vertebrae of a cervical spine, practiced performing cricothyrotomies (incisions to the throat), sutured dismembered legs using an oversized needle and twine, and decapitated an elderly woman with what looked and sounded like a chainsaw from Home Depot," Glynn wrote in her thesis. "Not once did I receive formal training or instruction."

BODY PARTS TO MIDDLEMEN

BRC's customers were not always directly acquiring body parts from the broker for their own medical education, research or training programs. According to invoices, some customers were middlemen – brokers who resold or leased body parts originally donated to BRC. The consent forms gave BRC the discretion to choose its customers, but the forms did not state that body parts could be resold by third parties.

In 2012 and 2013, BRC sold at least 961 body parts, including at least 224 human heads, to three such middlemen.

One was Innoved Institute LLC, a Chicago-area medical lab provider that also supplies human body parts. Innoved was among BRC's best customers. It received at least 32 shipments with 277 body parts. Innoved executives did not respond to requests for comment.

Another was Rathburn, the Detroit-area broker facing trial next month. He received at least 26 heads from BRC. Rathburn's lawyers did not respond to a request for comment.

A third middleman was Biological Resource Center of Illinois, another Chicago-area broker. Better known as BRC-IL, it received at least 658 body parts from BRC. BRC-IL operated independently from BRC. But it was also raided by FBI agents as part of the federal probe into suspected fraud against donors and customers. No one has been charged with a crime in the BRC-IL matter, and executives there did not respond to requests for comment.

One of the shoulders shipped to BRC-IL came from the body of Robert Louis DeRosier, a casino security employee. He died at age 64 after a long battle with diabetes.

His widow, Tama DeRosier, lives in a mobile home park in Mohave Valley, Arizona. She said her husband donated his body hoping it might contribute to diabetes research. She did not expect anyone to make money selling his remains.

## 31

The percentage of BRC body donors who served in the military



FIGHTING DIABETES  Tama DeRosier holds a photo of her husband Robert. He donated his body to BRC in hopes that it might contribute to diabetes research. Instead, his remains were sold. REUTERS/Reade Levinson

"That's morbid," the widow said. "Greed is a terrible thing."

Russell Parker Jr, who helped care for his dying brother Todd, said he was surprised to learn from a reporter that BRC sold Todd's right knee and offered to sell Todd's head. Friends had recommended BRC, he said. And when the company returned his brother's ashes, everything seemed "all on the up and up, very professional."

"Shame on BRC for showing such disrespect," Parker said. "That's so wrong. It's like trafficking."

CONFUSED CONSENT

The companion of one donor cited another area of confusion: BRC's use of the term "tissue."

In sales pitches and on consent forms, body brokers commonly talk about retrieving tissue from donors. To the medical community, "tissue" means any part of the body – from an organ to a torso.

---

## "Shame on BRC for showing such disrespect. It's like trafficking."

But in interviews with Reuters, family members of some donors said they believed "tissue" meant only skin samples. Though BRC did sell skin, those sales represented just 2 percent of its business, invoices show.

Maureen Krueger said her partner of 42 years, Fidel Silva, told a female hospice worker in his final days that he wished to be cremated.

"And that's when she brought it up: 'Would you be interested in donating tissues?'" Krueger recalled.

The way she understood it, Krueger said, a few skin samples would be removed for research purposes. In return, BRC would cremate Silva for free. Silva, a 69-year-old construction worker with a high school degree, peppered the hospice worker with questions.

"He asked, 'Well, are you sure? What are they going to do?'" Krueger said. "He wanted to know. And that's when she assured him it was only body tissues, they only took samples, they didn't remove any organs or parts or anything. It was just tissues. And that's when Fidel agreed."

The conversation took place at the Hospice of Havasu in Arizona. Its executive director, Dan Mathews, said he could not discuss the matter due to patient-privacy laws. But he said the hospice, which offers its clients options to donate their bodies to science, "removed that company BRC from our list of providers" upon hearing it was under investigation.



Internal BRC records show the body broker removed Silva's head, and his right and left arms from shoulder to hand. Each was tagged with a tracking number and prepped for sale.

"Wow," Krueger said. "I didn't really realize they could do all that. I mean, I didn't understand that's what would happen with Fidel at all."

BODY PARTS IN LIMBO

After the raid of BRC by federal and state agents, the body parts seized by authorities remained in limbo for almost three years. Their fate, detailed in confidential state logs, sworn statements and photographs, has never been made public.

Logistical problems began the day of the raid, said former agents Parker and Loftus.

Inside a business where human bodies were butchered, packaged and sold

Authorities were stunned to find so much human remains at BRC, they said.

"We expected two freezers and a few hundred pounds of body parts," said Loftus, who's now running for state representative. "Instead, we found 40 freezers with 10 tons of bodies and parts."

Agents entered in hazmat gear and took biopsies from each body part to preserve as evidence. Records show the agents then placed the 1,755 parts into 142 body bags.

The bags were sent to 10 local funeral homes so the remains could be cremated. But records and interviews show that BRC and others for whom it was storing body parts objected to their destruction. They argued that the parts had a value of more than $1 million.

The cremation plans were put on hold, but authorities soon faced a pressing problem, according to former agents Loftus and Parker. Funeral homes could refrigerate but not freeze the body parts, and the mortuaries began to complain that some of the parts were starting to thaw.

As a solution, authorities obtained three walk-in industrial freezers and installed them at a military base used by the Arizona National Guard. Then, body bag by body bag, the mortuaries delivered the parts, and Loftus and Parker helped carry them into the freezers.

In an interview, Parker recalled feeling body parts sloshing around inside the bags as he moved them. Some bags leaked blood that stained his pants and shoes. The experience led to his PTSD diagnosis, he said.

"It's not how you treat human beings, human remains," Parker testified in a deposition as part of his PTSD claim. "You don't throw them in a bunch of body bags and then throw them into a freezer like a pile of garbage."

The spokeswoman for the Arizona Attorney General's Office said the body parts were kept for federal authorities "as evidence in ongoing criminal investigations and prosecutions across the country." An FBI spokesman declined to comment. In February, after almost three years in the containers, the remains were cremated and returned to families that requested them, the state spokeswoman said.

In response to the Gore case, the Arizona governor signed into law a bill that requires body brokers like BRC to be licensed and regularly inspected. The new law calls for brokers to follow a set of standards and to hire a medical doctor to supervise company practices.

Although the law was adopted a year and a half ago, it has yet to be enforced: The state health department still must create specific rules for brokers. It isn't clear when it will. Health department officials, said a spokeswoman, "do not have an anticipated date of completion at this time."

REUTERS INVESTIGATES




More Reuters investigations and long-form narratives

Got a confidential news tip? Reuters Investigates offers several ways to securely contact our reporters

Inside a business where human bodies were butchered, packaged and sold

**The Body Trade**

By John Shiffman, Reade Levinson and Brian Grow
Data analysis  Reade Levinson
Graphics  Maryanne Murray
Photo editing  Steve McKinley
Design  Troy Dunkley
Edited by Blake Morrison

☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐

Follow Reuters Investigates  ☐ ☐

---

OTHER REUTERS INVESTIGATIONS



### Massacre in Myanmar

Reuters uncovers how Myanmar forces burned, looted and killed in a remote village.



### Made in America

**The Body Trade** | Part 9  Since 2008, body parts from American donors have been exported to at least 45 nations. Demand is highest where customs limit selling or dissecting the dead.



### The Vulnerable

**Shock Tactics** | Part 7  Taser's maker warns that some – the pregnant, elderly, those with heart conditions – face greater risks from stun guns. Yet police still shock the vulnerable.



### A Pious Generation

Turkey's president wants to create a "pious generation" to change the nation. So the government is pouring money into schools that teach Islamic values.

---



THOMSONREUTERS.COM   PRIVACY POLICY   TERMS OF USE   COPYRIGHT   TRUST PRINCIPLES