**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Matthew V. Parker,

          Plaintiff,

v.

State of Arizona, et al.,

          Defendants.

No. CV-17-00887-PHX-DWL

**AMENDED ORDER**

      Pending before the Court are Defendants State of Arizona and Arizona Attorney General Mark Brnovich's ("Defendants") motion for summary judgment (Doc. 117), Plaintiff Matthew V. Parker's ("Parker") motion for partial summary judgment (Doc. 119), and Parker's motion for attorney's fees (Doc. 121).[1]  For the following reasons, the Court will grant Defendants' motion for summary judgment in part, deny Parker's motion for partial summary judgment, and grant Parker's motion for attorney's fees in part.

## BACKGROUND

I.   <u>Factual History</u>

      On January 21, 2014, Parker began working at the Arizona Attorney General's Office (the "AGO") as a Special Agent in the Special Investigations Section.  (Doc. 118 ¶ 1.)  On Parker's first day of employment, the AGO executed a search warrant at the Biological Resource Center of Arizona ("BRC"), a human biological remains donation

---

[1]    Although the parties initially requested oral argument on their motions, they later filed notices asking the Court to vacate the hearing that had been set for May 8, 2019. (Docs. 159, 161.)

center being investigated for fraudulent activity. (*Id.* ¶ 2.) Parker was assigned to perform administrative searching functions necessary to execute the warrant, such as going through file cabinets and removing hard drives from electronic devices. (*Id.* ¶ 3.) Defendants contend that Parker "performed [his] work 'exclusively' on the office side of the BRC, and did not work in the 'lab side' in which biological remains were stored." (*Id.* ¶ 4.) Parker disputes this claim, asserting he observed "multiple frozen, severed human remains, arms, legs, heads, and torsos." (Doc. 137 at 3).

In August 2014, Parker sought counseling services from Lorraine Kern ("Kern") of Brilliant Sky Counseling. (Doc. 118 ¶ 11.) Kern's initial diagnostic impression was that Parker presented with "problems related to intimate relationships & vocational stress." (*Id.* ¶ 12.) Parker continued to visit Kern each week, and on October 28, 2014, she referred Parker to a psychiatrist to be evaluated for post-traumatic stress disorder ("PTSD"). (*Id.* ¶ 13.)

It is undisputed that, on October 28, 2014, Parker met with Kay Gee ("Gee"), a member of the AGO's Human Resources office, and submitted a claim for workers' compensation benefits. (*Id.* ¶ 14.)

One of the key issues in this case is whether Parker also made a request to be removed from the BRC case, as an accommodation for his PTSD, around the same time he submitted his workers' compensation claim. Parker contends he made such a request to three different AGO employees. Defendants deny this. As discussed *infra*, the evidence produced by Parker potentially implicates the "sham affidavit" doctrine.

In the immediate aftermath of Parker's alleged request to be removed from the BRC case, Parker claims (and Defendants deny) that his immediate supervisor, Charles Loftus ("Loftus"), "hyper-scrutinized Parker's work and became unreasonably critical of him." (Doc. 137 at 59-60.) Parker also claims Loftus made false statements in response to Parker's workers' compensation application. (Doc. 1-1 ¶ 17(F).) Parker further asserts that, approximately one month after filing his workers' compensation claim, the AGO's Human Resources office informed him the claim "had been lost." (Doc. 137 at 60.) In the

interim, Parker continued to work on the BRC case.

On December 12, 2014, Parker completed a Family Medical Leave Act ("FMLA") form and requested a 12-week leave of absence. (Doc. 118 ¶ 34.) The AGO granted this request and Parker began his 12-week term of FMLA leave on December 15, 2014. (*Id.* ¶ 36.)

Parker asserts Loftus "was hostile" to his request to take FMLA leave. (Doc. 137 at 60.) Loftus then directed Parker to write a memo detailing his encounters with corpses and body parts, collected the keys to the AGO vehicle that had been assigned for Parker's use, and collected Parker's AGO service pistol. (*Id.*) The AGO also suspended Parker's building and email access. (Doc. 118 ¶ 38.) The AGO notified Parker that, while on leave, he was not to perform work for the AGO pursuant to its policy against working while on medical leave. (*Id.* ¶ 37.)

At some point after his FMLA leave had commenced, Parker claims he sought access to the AGO building to gather to his personal property but his second-level supervisor, Andy Rubalcava ("Rubalcava"), wouldn't help him and said Parker was "someone else's problem." (Doc. 137 at 60-61.)

On March 3, 2015, one week before Parker's FMLA leave was set to expire, the AGO sent Parker paperwork he would need to complete to either return to work or request additional non-FMLA leave without pay. (Doc. 118 ¶ 44.)

On March 4, 2015, attorney Neil Landeen, on Parker's behalf, sent the AGO a letter lodging a complaint about its deactivation of Parker's badge and email access and alleging that an AGO employee told Parker he no longer worked there. (*Id.* ¶ 45.)

On March 9, 2015, the AGO responded to Landeen's letter by assuring him that "Parker is currently an employee of the [AGO]" and that "pursuant to the FMLA, his position awaits his return." (*Id.* ¶ 46.) The AGO also stated that Parker's FMLA leave would expire on March 9, 2015, and to remain employed, Parker would need to request non-FMLA leave without pay within 10 days, unless there was a legitimate reason preventing him from doing so. (*Id.* ¶ 48.)

1  Parker never submitted forms requesting non-FMLA leave without pay.  (*Id.* ¶ 49.)

2  Accordingly, the AGO terminated him on April 8, 2015.  (*Id.* ¶ 51.)

3  Sometime after Parker's last day of work, Rubalcava was informed that Parker may

4  have failed to disclose relevant information on his employment application to the AGO.

5  This information concerned the number of times Parker had been the subject of an internal

6  affairs investigation during his previous employment with the Arizona State University

7  police department.  (*Id.* ¶ 52.)  Rubalcava requested that Assistant Chief Daniel Woods

8  ("Woods") investigate.  (*Id.* ¶ 53.)   Woods eventually determined Parker had failed to

9  disclose the correct number of internal investigations on his application.[2]  (*Id.* ¶ 54.)

10  The AGO then reported this finding to the Arizona Peace Officer Standards and

11  Training Board ("AZ POST").  (*Id.* ¶ 55.)  AZ POST concluded, however, that the

12  information provided by the AGO didn't warrant revocation of Parker's peace officer

13  certification.  (*Id.* ¶ 57.)

14  II.  <u>Procedural History</u>

15  On October 27, 2016, Parker filed a complaint in Maricopa County Superior Court

16  against Defendants.[3]  (Doc. 1-1.)   The complaint alleges two counts, both arising under

17  the Rehabilitation Act: (1) failure to accommodate and (2) retaliation.  (*Id.*)

18  On March 24, 2017, Defendants removed the action to this Court.  (Doc. 1.)

19  On September 7, 2018, Defendants moved for summary judgment.  (Doc. 117.)

20  On September 7, 2018, Parker moved for partial summary judgment.  (Doc. 119.)

21  On September 26, 2018, Parker filed a motion for attorney's fees.  (Doc. 121.)

22  **SUMMARY JUDGMENT STANDARD**

23  A party moving for summary judgment "bears the initial responsibility of informing

24  the district court of the basis for its motion, and identifying those portions of 'the pleadings,

25  depositions, answers to interrogatories, and admissions on file, together with the affidavits,

26

27  [2]    Parker disputes that he failed to disclose any internal investigations, although he doesn't dispute that Woods made such a determination.  (Doc. 137 at 50.)

28  [3]    Defendant Mark Brnovich, who is named in his official capacity, is sued only for prospective injunctive relief.  (Doc. 1-1 at 9.)

if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists if 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *United States v. JP Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao V. Samaniego, VL: $446,377.36*, 835 F.3d 1159, 1162 (9th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird*, 908 F.3d at 459. Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## DISCUSSION

I.   <u>Preliminary Matters</u>

In his response to Defendants' separate statement of facts ("SSOF"), Parker moved to strike several pieces of evidence pursuant to LRCiv 7.2(m)(2). (Doc. 137). Defendants didn't respond to these requests. Because none of the evidence Parker seeks to strike has any bearing on the outcome of the matters presently before the Court, the Court will deny his requests as moot.

Next, Parker asks the Court to take judicial notice of Exhibit 110, a document "from the ICA file on Parker's unresolved and still-pending Workers' Compensation claim." (Doc. 137 at 6.) The Court will deny this request. Exhibit 110 is an internal report "prepared in anticipation of litigation" by the Attorney General's Litigation Management Section that includes a summary of facts regarding the BRC case. (Doc. 137-1 at 71-75.) These facts are "subject to reasonable dispute" and are not the type that are "generally known" or "can be accurately and readily determined from sources whose accuracy cannot

reasonably be questioned." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). Thus, they aren't subject to judicial notice.

Last, Parker argues Defendants made various admissions in a joint proposed discovery plan. (Doc. 139 at 12-13.) Although "statements of fact contained in a brief *may* be considered admissions of the party in the discretion of the district court," *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988), the Court will exercise its discretion and decline to characterize the particular statements at issue here as judicial admissions. They were contained in the parties' joint Rule 26(f) report, filed during the early stages of the case (Doc. 22), and simply represented Defendants' attempt to provide an overview of the anticipated facts.

## II. Defendants' Motion For Summary Judgment

### A. **Count One**

#### 1. Did Parker Make An Accommodation Request?

"A failure to provide reasonable accommodation can constitute discrimination under section 504 of the Rehabilitation Act." *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002). However, "an employer cannot be held liable for failing to accommodate in the absence of an employee request for accommodation." *Maes v. Henderson*, 33 F. Supp. 2d 1281, 1290 (D. Nev. 1999). Defendants argue they're entitled to summary judgment on Count One because Parker "simply did not request any disability accommodations that were not granted." (Doc. 117 at 11.)

At first blush, this argument appears weak. During his deposition in this case (and in a declaration submitted following his deposition), Parker testified that he made an accommodation request to three different AGO employees. Specifically, Parker contends he met with his second-level supervisor (Rubalcava) on October 27, 2014 to report his PTSD diagnosis and ask to be removed from the BRC case and that he repeated this case-removal request to his direct supervisor (Loftus) and to the AGO's Human Resources representative (Gee) during separate meetings on October 28, 2014.[4]   In contrast,

---

[4]   *See* Doc. 118 ¶ 20 (Defendants' SSOF, acknowledging Parker's deposition testimony on these points); Doc. 118-1 at 25-30 (Parker's deposition testimony concerning

Rubalvaca, Loftus, and Gee each stated under oath, as part of the discovery process in this case, that Parker never asked to be removed from the BRC case.[5] Summary judgment is usually unavailable in this circumstance—it's the role of the jury to sort out who's telling the truth in the face of such conflicting evidence.

The added complication here, however, is that Parker also provided sworn testimony on this topic during a different proceeding. In April 2015, Parker was deposed as part of his application for workers' compensation benefits. During that deposition, Parker suggested that, during his October 2014 meeting with Rubalcava, he didn't ask to be removed from the BRC case—"I told him . . . I'm going to keep working and I'm going to see how it goes"—and separately admitted that it was "around December 15th [2014]" when "I was telling Charlie [Loftus] . . . 'You know, I can't work on this case anymore.'" (Doc. 118 ¶ 23, citing Doc. 118-1 at 38-48.) Defendants argue that Parker's 2015 deposition testimony triggers the "sham affidavit" doctrine and requires the Court to disregard his conflicting deposition testimony and declaration from this case. (Doc. 144 at 5-6.)

The Court will decline to grant summary judgment on this basis. To be sure, "[t]he general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony. Every circuit has some form of 'sham affidavit' rule similar to our own." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998-99 (9th Cir. 2009) (citations omitted). *See generally Rabodenko v. Automated Equip. Corp.*, 520 F.2d 540, 543-44 (9th Cir. 1975) (holding that "contradictory testimony of a plaintiff

October 2014 meetings with Rubalcava, Loftus, and Gee); Doc. 137 at 15-17, 21-23, 26 (Parker's response to Defendants' SSOF and Parker's affidavit).

[5]    *See* Doc. 118 ¶ 26 ("Rubalcava testified unequivocally that Plaintiff never told him he allegedly had PTSD and never spoke to him about being removed from the BRC Case."); *id.* ¶ 27 ("Loftus . . . denies that Plaintiff asked to be removed from the BRC case."); *id.* ¶ 28 ("Plaintiff also made no mention in his conversation with Kay Gee on October 28, 2014, of needing to be removed from the BRC Case, of needing any workplace accommodation, or of having any difficulty performing his essential job functions whatsoever."). Defendants have also proffered evidence showing that the documentation Parker submitted to the AGO during this timeframe didn't contain any mention of a request to be removed from the BRC case (*see* Doc. 118 ¶¶ 18-19) and that Parker admitted, during an interview with an EEOC investigator, that he "never asked for an accommodation" (*see* Doc. 118 ¶ 25).

alone [cannot] be used by him to defeat a defendant's summary judgment motion where the only issue of fact results from the necessity of choosing between the plaintiff's two conflicting versions . . . ."). However, the Ninth Circuit has also cautioned that "the sham affidavit rule should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment. In order to trigger the sham affidavit rule, the district court must make a factual determination that the contradiction is a sham, and the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (citations and internal quotation marks omitted). "[N]ewly-remembered facts, or new facts, accompanied by a reasonable explanation, should not ordinarily lead to the striking of a declaration as a sham. [T]he non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition and minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Id.* at 1081.

As an initial matter, the sham affidavit doctrine is potentially applicable here even though Defendants seek to invoke it based on the deposition testimony that Parker provided in an *earlier* case (as opposed to the typical scenario where a party makes admissions during a deposition in the *pending* case and then seeks to sidestep those admissions by submitting a contradictory post-deposition declaration). Although the law on this point is somewhat unsettled,[6] the general consensus seems to be that sworn statements made in prior proceedings may trigger the doctrine while unsworn statements may not.[7] Here,

---

[6]     *See generally Scott v. City of Pasadena*, 2009 WL 10699094, *7 (C.D. Cal. 2009) ("It is uncertain . . . whether [the sham affidavit] rule applies to a declaration that contradicts trial testimony given in an earlier, related case, as opposed to deposition testimony offered during discovery in the same case.").

[7]     The Ninth Circuit has held that unsworn pre-litigation statements can't trigger the doctrine. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999) ("Leslie's letters to ICA appear to contradict his assertion of a contract entitling him to a percentage fee. This is different, however, from our 'sham affidavit' cases, because Leslie's deposition testimony and sworn declaration in this case are consistent and are contradicted only by Leslie's unsworn letters."); *see also SEC v. Retail Pro, Inc.*, 673 F. Supp. 2d 1108, 1136-37 (S.D. Cal. 2009) ("The Court may not disregard Furman's sworn testimony and/or

- 8 -

Parker's deposition testimony in the workers' compensation proceeding was provided under oath, so the doctrine is potentially applicable. *Cf. Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 806-07 (1999) (holding that, when considering a motion for summary judgment in a discrimination case, the court may ignore the plaintiff's contention that he could have performed the job with a reasonable accommodation if that contention is contradicted by the "plaintiff's previous sworn statement [in an application for Social Security benefits] asserting 'total disability' or the like"); *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 604 (9th Cir. 1996) (applying doctrine of judicial estoppel to preclude plaintiff in age discrimination lawsuit from making factual claims that were contrary to representations she'd made in earlier workers' compensation proceeding).

On the merits, the sham affidavit doctrine applies to Parker's testimony concerning his meetings with Loftus and Rubalcava. This is not a case where the inconsistency between Parker's 2015 deposition testimony and the testimony he provided in this case can be chalked up to an honest mistake, ambiguity, or newly discovered evidence. Parker stated during the 2015 deposition that told Rubalcava, in October 2014, that he wished to

---

sworn affidavit even if they are directly contradicted by unsworn, pre-litigation emails."). Other courts have held that pre-litigation statements may trigger the doctrine if made under oath. *See, e.g., Mistler v. Worthington Armstrong Venture*, 2017 WL 491635, *2 (D. Md. 2017) ("[I]n his charge filed with the EEOC, plaintiff alleged under oath that he was told by Bloxham that he only had to 'verbally inform [his] supervisor' that he was unable to work. Plaintiff [now] contradicts the record in an attempt to create a factual issue by . . . stating that Bloxham 'never informed how the notice ought to be given.' A party cannot create a genuine issue of material fact for summary judgment purposes by submitting an affidavit contradicting his own prior testimony."); *Williams v. Nish*, 2015 WL 106387, *7 (M.D. Pa. 2015) ("[T]he doctrine is applicable in circumstances involving conflicting sworn statements, which includes, but is not limited to, deposition testimony. Other courts have used the doctrine in similar circumstances."). Finally, some courts outside the Ninth Circuit have suggested even unsworn pre-litigation statements may suffice. *See, e.g., Cano v. Oxley*, 2019 WL 1597308, *2 (E.D.N.Y. 2019) ("[A] plaintiff cannot take a position in opposing a dispositive motion that is contradicted by his own statements. That rule seems equally or more applicable to a recorded and transcribed pre-litigation statement given by plaintiff to investigators that flatly contradicts the allegations in his complaint.") (citations omitted); *Wilson v. Gaston County, N.C.*, 685 Fed. App'x 193, 198-99 (4th Cir. 2017) (affirming grant of summary judgment to employer in sexual harassment case, where plaintiff submitted an affidavit claiming she'd reported the harassment to her supervisors, because the affidavit was contradicted by a "signed, handwritten" letter she had sent to her employer before the litigation commenced and "[t]here is a limit to how much law can allow a party to switch or distinguish earlier statements that prove problematic later in litigation").

keep working on the BRC case and didn't ask Loftus to be removed from the case until December 2014. Now, having apparently recognized that such admissions will hurt his position, Parker claims he actually made separate case-removal requests to Rubalcava and Loftus in October 2014. The inconsistency between these accounts is clear and unambiguous.

Although Parker attempts to reconcile his two sets of testimony, these efforts are unpersuasive. For example:

▪ Parker first objects to Defendants' discussion of his 2015 deposition testimony by arguing that "Parker did in fact request an accommodation . . . from both Rubalcava and Loftus, to-wit: transfer from the BRC[] investigation." (Doc. 137 at 21.) But the only evidence Parker cites in support of this claim is his new declaration. This is circular logic and begs the question of whether the two sets of testimony can be fairly reconciled.

▪ Parker's second argument is that the workers' compensation deposition took place six months (not four months) after the October 2014 meetings. (Doc. 137 at 21-22.) This is true but irrelevant—it was still recent enough to expect that Parker's testimony would be accurate and not the product of a foggy memory.

▪ Parker's third argument is that the 2015 deposition was focused on his "workers compensation claim . . . [and] was not related to an[y] statements or questions related to an accommodation request." (Doc. 137 at 22.) Again, this is true but irrelevant—although Parker may not have been obliged to provide any testimony during his 2015 deposition about whether he made an accommodation request, he proceeded to address that topic. Parker's argument, at bottom, is that he didn't realize telling the truth about that topic during his workers' compensation deposition would be bad for his future litigation position. That's not a legitimate objection.

▪ Parker's final argument is that Defendants selectively quoted from the 2015 deposition transcript and that he actually "unambiguously stated" during the deposition that he made a transfer request. (Doc. 137 at 22-23.) The Court has reviewed the language excerpted by Parker and disagrees—there's no escaping the conclusion that, during the

2015 deposition, Parker stated he told Rubalcava in October 2014 that he wished to stay on the BRC case and didn't ask Loftus to be removed from the case until December 2014.

For these reasons, if Count One were premised only on the accommodation requests that Parker supposedly made to Rubalcava and Loftus on October 27-28, 2014, the Court would be inclined to grant summary judgment to Defendants. There is simply no cognizable evidence in the record that Parker made an accommodation request during those two meetings. *Van Asdale*, 577 F.3d at 998-99 (for the sham affidavit doctrine to apply, "the district court must make a factual determination that the contradiction was actually a 'sham'" and must provide the non-moving party with an opportunity to "elaborat[e] upon, explain[] or clarify[] prior testimony elicited by opposing counsel on deposition").

However, Count One is not so limited. Parker also asserted, during his deposition in this case, that he made an accommodation request to a third AGO employee, Gee, on October 28, 2014. This assertion is not contradicted by any of Parker's 2015 deposition testimony—that testimony simply doesn't touch upon any interactions with Gee—so it isn't subject to exclusion under the sham affidavit doctrine.[8] Moreover, Parker's testimony concerning his meeting with Gee is not, as Defendants contend (Doc. 144 at 4), improper "self-serving" testimony that can be ignored for summary judgment purposes. *Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001) ("[S]elf-serving affidavits are cognizable to establish a genuine issue of material fact so long as they state facts based on personal knowledge and are not too conclusory."); *Cadle Co. v Hayes*, 116 F.3d 957, 961 n.5 (1st Cir. 1997) ("[T]he appellee's attempt to discount Hayes' affidavits as 'self-serving' misses the mark. A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment.").

---

[8]     Although Defendants have proffered evidence that Parker told an EEOC investigator he never made an accommodation request to anybody (Doc. 118 ¶ 25)—a statement that tends to contradict Parker's position in this case—this evidence doesn't trigger the sham affidavit doctrine because Parker wasn't under oath at the time he made the alleged statements. *Leslie*, 198 F.3d at 1158 (declining to apply sham affidavit doctrine based upon "unsworn letters"); *Retail Pro,* 673 F. Supp. 2d at 1136-37 (same).

1    Accordingly, Defendants are not entitled to summary judgment on Count One based
2    on their contention that Parker "simply did not request any disability determinations that
3    were not granted" (Doc. 117 at 11)—there is a material dispute of fact on this issue that
4    precludes summary judgment.

5                    2.    PTSD Documentation

6    Alternatively, Defendants seek summary judgment on Count One because Parker
7    didn't provide the AGO with "reasonable documentation" of his PTSD.  (Doc. 117 at 12-
8    13.)  In support of this argument, Defendants cite an EEOC guidance document that states,
9    in relevant part: "When the disability and/or the need for accommodation is not obvious,
10   the employer may ask the individual for reasonable documentation about his/her disability
11   and functional limitations."      EEOC Enforcement Guidance on Reasonable
12   Accommodation and Undue Hardship Under the Americans with Disabilities Act, EEOC
13   Notice No. 915.002 (October 17, 2002), at ¶ 6.  The guidance document further provides:
14   "If an individual's . . . need for reasonable accommodation is not obvious, and s/he refuses
15   to provide the reasonable documentation requested by the employer, then s/he is not
16   entitled to reasonable accommodation." *Id.*

17   Although the EEOC guidance document provides some legal support for
18   Defendants' position,[9] their argument fails as a factual matter because there's no evidence
19   the AGO ever requested documentation of Parker's PTSD at the time Parker requested to
20   be removed from the BRC case.  Indeed, Defendants' position is that Parker never made a
21   case-removal request.  The EEOC guidance is clear—an individual's obligation to provide
22   reasonable documentation to his employer is only triggered by the employer's request for
23   that documentation.  Because Defendants don't proffer any evidence that the AGO made
24   such a request, Defendants aren't entitled to summary judgment on this basis.

25   …

26   …

27
28
_____
[9]      "Although EEOC Guidelines are not binding on the courts, they 'constitute a body
of experience and informed judgment to which courts and litigants may properly resort for
guidance.'"  *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000) (citation omitted).

B.     **Count Two**

A *prima facie* case of retaliation under the Rehabilitation Act requires a plaintiff to show: "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004) (citation omitted).  A plaintiff must proffer "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." *Id.*  In other words, here, Parker "must establish a link between his request for a reasonable accommodation and [the allegedly adverse employment action]." *Id.*

If a plaintiff establishes a *prima facie* case of retaliation, "the burden of production [then] shifts to the employer to present legitimate reasons for the adverse employment action." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).  "Once the employer carries this burden, [the] plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext. . . .  Only then does the case proceed beyond the summary judgment stage." *Id.* (citation omitted).

1.     Prima facie test

Parker satisfies the first prong of a *prima facie* case for retaliation—involvement in a protected activity.  As explained in the previous section, Parker has produced evidence that he requested to be removed from the BRC case as a reasonable accommodation for his PTSD.  A reasonable-accommodation request qualifies as protected activity under the Rehabilitation Act.  *Coons*, 383 F.3d at 887 ("Coons was engaged in a protected activity when he requested that the IRS make reasonable accommodations for his alleged disability.").

As for the second prong, Parker purports to identify nine different "adverse employment actions" the AGO took against him: (1) Parker's direct supervisor—Loftus—"hyper-scrutinized Parker's work and became unreasonably critical of him"; (2) the AGO's Human Resources office "lost" Parker's workers' compensation application, requiring him to file a new one; (3) when Parker requested FMLA leave, Loftus "was hostile" and directed Parker to "write a memo detailing his direct encounters with corpses and body

parts, took from him the keys to the AGO car that had been assigned for his use, and took his AGO service pistol"; (4) the AGO revoked Parker's access to his office and Parker's second-level supervisor—Rubalcava—refused to help Parker obtain access to his personal property and said that Parker was "someone else's problem"; (5) the AGO blocked Parker's email usage; (6) Loftus made false statements in response to Parker's workers' compensation application; (7) the AGO fired Parker while he was on approved FMLA leave; (8) the AGO filed a complaint with AZ POST against Parker that included false allegations; and (9) when Parker applied for medical/disability retirement, the AGO caused "delay in processing [his] application" (Doc. 137 at 59-62; Doc. 1-1 ¶ 18).

Defendants argue, as an initial matter, that several of these items are too insignificant to constitute "adverse employment actions" because, under *Ray v. Henderson*, 217 F.3d 1234 (9th Cir. 2000), an action can only qualify as adverse if it "materially affect[s] compensation, terms, conditions, or privileges." (Doc. 144 at 7.) This argument lacks merit. Although the Ninth Circuit noted in *Ray* that the Second and Third Circuits employ the "materially affects" test, the *Ray* court proceeded to rejected that test in favor of the "EEOC test," which provides that an "adverse employment action" means "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Id.* at 1242-43. Thus, contrary to Defendants' suggestion that the Ninth Circuit construes adverse employment actions narrowly, "[t]he Ninth Circuit takes an expansive view of the types of action that qualify as an adverse employment action." *Brooks v. Capistrano Unified Sch. Dist.*, 1 F. Supp. 3d 1029, 1036 (C.D. Cal. 2014) (citation omitted).[10]

As for the first alleged adverse employment action—that Loftus "hyper-scrutinized Parker's work and became unreasonably critical of him"—Parker hasn't proffered

---

[10]     In Defendants' defense, the Ninth Circuit's 2008 decision in *Davis v. Team Elec. Co.*, 520 F.3d 1080 (9th Cir. 2008), contains a passage suggesting that "materially affects compensation, terms, conditions, or privileges of employment" is the applicable standard. *Id.* at 1089. However, this passage can be viewed as dicta—the *Davis* court wasn't presented with a dispute about the applicable standard—and *Davis* didn't purport to overrule *Ray*, which contains a lengthy discussion of which standard should apply. Accordingly, the Court views *Ray* as continuing to supply the relevant standard.

sufficient evidence to satisfy his burden. The only "evidence" proffered by Parker on this issue is paragraph 18(a) of his declaration, which states: "Mr. Loftus hyper-scrutinized my work and became unreasonably critical of me, which was 180 degrees from his supervision of me prior to learning of my PTSD and request for a transfer from the BRC[]." (Doc. 137 at 59-60.) This is far too conclusory to suffice—there is no detail as to what the "hyper-scrutiny" and "unreasonable criticisms" entailed, how often they occurred, whether they were repeated to others, and what impact they had on Parker. Thus, although the Court is mindful of *Ray*'s admonition that the concept of "adverse employment actions" should be construed broadly, Parker's claim here fails because he simply hasn't met his burden of production. *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003) ("Conclusory allegations unsupported by factual data cannot defeat summary judgment."). *See also Brooks,* 229 F.3d at 929 ("[B]admouthing an employee outside the job reference context do[es] not constitute adverse employment action[].").

Parker's second allegation—that the AGO "lost" his workers' compensation application, and then allowed him to refile it approximately one month later—isn't sufficient to constitute an adverse employment action. Notably, Parker doesn't suggest the AGO intentionally misplaced his application. Instead, Parker merely claims "[n]o explanation was ever provided to him as to how or why his claim had gotten 'lost' after he submitted it." (Doc. 137 at 60.) An accidental misplacement of a workers' compensation report wouldn't deter a reasonable employee from exercising his rights. *Brooks*, 229 F.3d at 928-29 ("[O]nly non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation.").

As for Parker's third, fourth, and fifth allegations, the Court concludes that none of the challenged conduct constitutes an adverse employment action. To be sure, in certain circumstances, collecting an employee's equipment and suspending his email and building access might constitute adverse actions. *Thompson v. City of Waco, Texas*, 764 F.3d 500, 504 (5th Cir. 2014) ("In certain instances, a change in or loss of job responsibilities— similar to the transfer and reassignment contexts—may be so significant and material that

it rises to the level of an adverse employment action.") (citation omitted). But here, these actions were taken immediately preceding and during Parker's FMLA leave. When determining whether particular conduct constitutes an adverse employment action, "[c]ontext matters." *Frey v. Berkley Specialty Underwriting Managers, LLC*, 2013 WL 12291870, *3 (N.D. Ga. 2013). Because the AGO took the challenged actions attendant to Parker's FMLA leave—which Parker was taking because his PTSD prevented him from working—this isn't the type of conduct that is reasonably likely to deter an employee from engaging in protected activity. *See, e.g., Anderson v. Hibu, Inc.*, 26 F. Supp. 3d 1019, 1027 (D. Or. 2014) ("[T]his Court finds that plaintiff's allegation of email lock out during her leave of absence likely does not meet her prima facie burden."); *Frey*, 2013 WL 12291870 at *3 (concluding that "disabling the plaintiff's voicemail, email, building and parking deck access while she was on medical leave were not materially adverse actions under the ADA because such actions would not 'dissuade[ ] a reasonable worker from making or supporting a charge of discrimination'"); *Bender v. City of Clearwater*, 2006 WL 1046944, *13 (M.D. Fla. 2006) (finding that defendant's "confiscation" of plaintiff's work-issued laptop when she was on FMLA leave didn't "materially affect[] her position").

Similarly, Loftus's "hostile" reaction and Rubalcava's statement that Parker was "somebody else's problem" don't qualify because "'mere offensive utterances' or 'social slights' are generally trivial and cannot be viewed as serious enough to give rise to an adverse employment action." *Lelaind v. City and Cty. of San Francisco*, 576 F. Supp. 2d 1079, 1098 (N.D. Cal. 2008) (citation omitted). Finally, Loftus's decision to require Parker to write a memorandum detailing his exposure to corpses isn't an adverse employment action—Parker doesn't produce any evidence that memo-writing was a departure from his typical job duties.

The sixth alleged adverse employment action is that Loftus made false statements in response to Parker's workers' compensation application. This allegation is unsupported by any evidence in the record—Parker makes this allegation in his complaint but doesn't mention it, let alone attempt to identify any evidence supporting it, in the portion of his

declaration describing the adverse employment actions he endured. (Doc. 137 at 59-62.)

As for seventh alleged adverse employment action—termination—Defendants concede the AGO fired Parker. "[T]ermination plainly qualifies as an adverse employment action." *Lakeside-Scott v. Multnomah Cty.*, 556 F.3d 797, 803 (9th Cir. 2009). Thus, the Court will proceed to analyze whether Defendants have identified legitimate, non-pretextual reasons for engaging in this conduct.

The eighth alleged adverse employment action is that the AGO filed a retaliatory complaint with AZ POST against Parker. The Court assumes without deciding that this may constitute an adverse employment action. *Cf. Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996) ("[R]etaliatory prosecution can have an adverse impact on future employment opportunities and therefore can be an adverse employment action."); *Equal Employment Opportunity Comm'n v. Virginia Carolina Veneer Corp.*, 495 F. Supp. 775, 778 (W.D. Va. 1980) (holding that employer filing a defamation action against former employee constituted an adverse employment action). Thus, the Court will proceed to analyze whether Defendants have identified legitimate, non-pretextual reasons for engaging in this conduct.

Finally, Parker argues the AGO took an adverse employment action by causing "delay in processing [his] application" for medical/disability retirement in front of the Attorney General's Public Safety Personnel Retirement System Local Board ("AGO Local Board"). (Doc. 137 at 62.) Parker claims in his declaration that the AGO Local Board "took [] 27 months to adjudicate [his] claim" and he wasn't referred for an independent medical examination "until 10 months after [his] application was submitted." (*Id.*) This occurred, in part, because the AGO "falsely claimed Maricopa County Superior Court case records in the BRC[] felony case had been sealed which caused an unnecessary delay in obtaining records." (*Id.*) This claim is unavailing because Parker's proffered evidence is too conclusory. Parker identifies no evidence to demonstrate that the AGO made any statements to the AGO Local Board or to show these alleged statements were false.

The last element of a *prima facie* case of retaliation is a causal link between the

protected activity and the adverse employment action.  As discussed above, Parker has produced sufficient evidence to establish that (1) the AGO terminated him and (2) the AGO filed a complaint against him with AZ POST, both of which may qualify as adverse employment actions.  Thus, Parker must demonstrate a causal link between these two actions and his request for a reasonable accommodation.

Parker argues both actions occurred within six months of his request to be removed from the BRC case, which is enough to establish a causal link.  (Doc. 139 at 16.)  A causal link between the protected activity and the adverse employment action "can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and adverse action."  *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011) (citation omitted).  Although "[c]ourts have not identified a bright-line rule" regarding how much time is too much to infer a causal link, *Pratt v. Hawai'i, Dep't of Pub. Safety*, 308 F. Supp. 3d 1131, 1147 (D. Haw. 2018) (citation omitted), the Ninth Circuit has held that "[d]epending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation."  *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003).  The Court will thus assume, without deciding, that Parker has satisfied this component of the *prima facie* test.

## 2. Employer's Burden

After a plaintiff establishes a *prima facie* case of retaliation, "the burden of production shifts to the employer to present legitimate reasons for the adverse employment action."  *Brooks*, 229 F.3d at 928.

Regarding the first cognizable adverse employment action—termination— Defendants argue the AGO terminated Parker "a full month after exhaustion of his twelve-week FMLA leave entitlement" because he "abandoned" his position by failing to respond to requests to fill out leave-without-pay paperwork and by failing to return to work.  (Doc. 117 at 15.)  An employee who fails to return to work at the conclusion of his term of FMLA leave isn't entitled to reinstatement.  *Rogers v. Maricopa Cmty. Coll. Dist.*, 2019 WL 467602, *3 (D. Ariz. 2019) (citations omitted).  *See also Johnson v. Morehouse Coll., Inc.*,

199 F. Supp. 2d 1345, 1360 (N.D. Ga. 2002) ("[A]s long as the employee has been given the requisite leave period under the FMLA, the FMLA does not forbid an employer from firing an employee who simply refuses to come back to work. . . ."). Thus, Defendants have provided a legitimate, non-retaliatory reason for taking the adverse employment action of terminating Parker.[11]

The other cognizable adverse employment action is that the AGO reported to AZ POST that Parker lied on his employment application by "omitt[ing] his six internal affairs investigations." (Doc. 117 at 9.) Defendants argue this wasn't retaliatory because the AGO was required by Arizona law (A.R.S. § 41-1828.01) to report such matters to AZ POST. (*Id.* at 9-10.) In his response, Parker acknowledges that Defendants' discussion of their reporting duties under Arizona law "is a correct statement of law" and simply argues the report was factually inaccurate. (Doc. 137 at 51.) Thus, Defendants' explanation for the submission of the report to AZ POST is legitimate.

### 3.   Whether Defendants' Reasons Are Pretextual

After an employer presents legitimate reasons for the adverse employment action, the "plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext. . . . Only then does the case proceed beyond the summary judgment stage." *Brooks*, 229 F.3d at 928. "[T]he plaintiff must show that the articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002) (citation omitted).

Here, Parker hasn't offered any direct evidence that shows Defendants' proffered reasons for the adverse employment actions were pretextual. Parker does proffer some circumstantial evidence, but it only relates to the AGO's submission of the report to AZ

---

[11]   Parker argues he was fired on April 8, 2015, while "he was still out on approved leave." (Doc. 137 at 61.) But Parker commenced FMLA leave on December 15, 2014. (Doc. 139 at 7.) Thus, if Parker took all of the FMLA leave to which he was entitled, his 12-week leave term would have expired on March 9, 2015.

POST.  Specifically, Parker presents declarations from two of his former supervisors at the ASU Police Department (where the six internal affairs investigations are alleged to have occurred), both of whom state that Parker was only involved in one internal affairs investigation. (Doc. 137 at 48-49.) Also, Parker presents evidence that the complaint filed with AZ POST was dismissed.  (*Id.* at 51-52.)

This evidence is insufficient to create a triable issue of material fact on the issue of pretext.  At most, it shows that the AGO's belief that Parker failed to report all of his internal affairs investigations turned out to be inaccurate.  It doesn't, however, "show[] that the employer's proffered explanation is unworthy of credence." *Villiarimo*, 281 F.3d at 1062.  Parker hasn't provided any evidence undercutting Defendants' explanation that the AGO filed the complaint with AZ POST out of obligation, not in retaliation.  *See id.* (when a plaintiff relies on circumstantial evidence to show pretext, "such evidence must be both specific and substantial" to survive summary judgment).  Parker also doesn't provide any evidence showing that Defendants' reason for terminating him was pretextual.  Thus, Parker hasn't raised a genuine issue of material fact and Defendants are entitled to summary judgment on Count Two.[12]

C. **Workers' Compensation Statute**

Arizona law provides that the state's workers' compensation system shall act (except in cases of "wilful misconduct") as "the exclusive remedy" for "[t]he right to recover compensation . . . for injuries sustained by an employee . . . acting in the scope of his employment."  A.R.S. § 23-1022(A).  Defendants argue that, because there's no

---

[12] Recently, Parker filed a supplemental response to Defendants' motion for summary judgment, arguing that the Court must view the adverse employment actions in aggregate, not individually, and citing *Aydelotte v. Town of Skykomish*, 757 F. App'x 582 (9th Cir. 2018). (Doc. 150.) But in *Aydelotte*, the plaintiff produced evidence showing that he'd been subjected to "a litany of actions . . . [that] would chill a person of ordinary firmness from" engaging in protected activity, including evidence that the defendant "had his fence destroyed, ticketed and threatened to ticket his vehicle, threatened to tow his vehicle, excluded him from the start of a public meeting, instructed him to remove his signs protesting the Skykomish government, and threatened Aydelotte with eviction from his property." *Id.* at 584.  Here, in contrast, Parker has only produced evidence of two categories of conduct that might qualify as adverse employment actions and Defendants have identified legitimate, non-discriminatory reasons for engaging in that conduct.

evidence the AGO engaged in "wilful misconduct" when causing Parker to develop PTSD, he "cannot recover damages in this action" and his "only recourse, including damages constituting alleged lost earnings, is through Arizona's workers' compensation laws." (Doc. 117 at 10-11.)

In his response, Parker offers two counter-arguments. (Doc. 139 at 13-14.) First, Parker argues that "state laws cannot abrogate or limit federal statutory rights unless expressly provided by the latter" and cites two cases, *Adams Fruit Co., Inc. v. Barrett*, 494 U.S. 638 (1990), and *Wood v. County of Alameda*, 875 F. Supp. 659 (N.D. Cal. 1995), in support of this position. Second, Parker argues there's no risk of double recovery here because he hasn't recovered on his workers' compensation claim yet and will dismiss that claim if he prevails in this lawsuit.

In their reply, Defendants do not attempt to address Parker's preemption argument. (Doc. 144 at 6-7.) Defendants also withdraw their earlier claim that *all* of Parker's damage claims are foreclosed by the workers' compensation statute—they now argue the statute simply precludes him from seeking one particular category of damages (*i.e.,* damages arising from his PTSD) at trial. (*Id.* ["For clarity, Defendants do not argue Plaintiff's claims must be dismissed on this basis alone, but that Plaintiff cannot seek damages for his workplace injury (PTSD) outside of his workers' compensation claim."].)

The Court will decline to grant summary judgment to Defendants in light of their failure to address the preemption argument raised by Parker. Indeed, one of the cases cited by Parker seems to provide strong support for his position. In *Wood*, "[t]he sole question before the Court . . . [was] whether a provision in a state statute establishing workers' compensation payments as the exclusive remedy for certain injuries sustained on the job bars the plaintiff from bringing a simultaneous or subsequent claim under the ADA." 875 F. Supp. at 661. The court concluded the state statute was preempted because "giving effect to the [state exclusivity provision] in a manner which limits the availability of federal remedies would clearly stand as an obstacle to the accomplishment of Congress' stated purpose in enacting the ADA." *Id.* at 665. Although *Wood* is not binding on the Court,

Defendants' silence in response to Parker's brief suggests they don't dispute its reasoning. *Cf. Kuser v. Hoffman Koos, Inc.*, 2000 WL 1781920, *1 (E.D. Pa. 2000) ("Defendant's failure to respond to Plaintiff's argument regarding the third claim . . . indicates acquiescence of the relief Plaintiff requests."). This is hardly an appropriate record on which to decide a complicated legal issue like preemption.

Moreover, it's unclear whether the statute under which Parker brings this suit—the Rehabilitation Act of 1973—would even permit him to seek damages from Defendants for causing his underlying injury. Parker's claim in Count One, after all, is that *after* he developed PTSD, Defendants failed to provide a reasonable accommodation for his condition. This would seem to preclude any suggestion that the alleged accommodation violation somehow caused the PTSD. Because the parties haven't briefed this issue in their moving papers, the Court declines to resolve it here and simply notes that it provides an additional reason to decline to resolve the applicability of the Arizona workers' compensation statute at this juncture.

D.    **After-Acquired Evidence**

Defendants argue the Court should "Limit[] Plaintiff's Damages" under the doctrine of after-acquired evidence because Parker lied on his job application (about the number of times he'd been investigated by the ASU police department's internal affairs division) and the AGO would have fired him once it discovered the lie. (Doc. 117 at 17.) In his response, Parker contends this argument is factually unsupported because he didn't lie in his job application and AZ POST "dismissed" the AGO's complaint concerning the supposed lie. (Doc. 139 at 17-18.) In their reply, Defendants reprise the arguments they made in their motion. (Doc. 144 at 11.)

Defendants are not entitled to summary judgment on this record. An employer seeking to invoke the after-acquired evidence doctrine must, among other things, "present after-acquired evidence of Plaintiff's misconduct." *April v. U.S. Airways, Inc.*, 2010 WL 1196015, *2 (D. Ariz. 2010). Here, although Defendants argue that Parker engaged in misconduct by failing to disclose the existence of six internal affairs investigations when

preparing his job application, Parker has submitted conflicting evidence suggesting there was only one such investigation. This factual conflict precludes the entry of summary judgment.[13]

III. <u>Parker's Motion For Partial Summary Judgment</u>

Parker moves for partial summary judgment on several "issues" that he argues Defendants are collaterally estopped from disputing. (Doc. 119.) Specifically, Parker argues the AGO Local Board already made certain findings regarding his disability, so Defendants should be barred in this case from relitigating whether (1) "Parker had a disability (PTSD) as defined under the Rehabilitation Act"; (2) "Parker's disability was the result of on the job occurrences while employed by the AGO"; (3) "Parker is now unable to work because of his disability and has been unable to work since at least June, 2017 when his disability retirement application was approved by the Board"; and (4) "Parker was not terminated by the [Attorney General's Office] for a disciplinary reason." (Doc. 119 at 11.)[14]

In their response, Defendants argue the AGO Local Board's decision does not give rise to collateral estoppel because (1) there is no commonality between the parties; (2) the AGO Local Board's findings weren't actually litigated and there wasn't a full and fair opportunity to litigate the fact issues; and (3) the AGO Local Board's decision wasn't a final decision on the merits. (Doc. 130.)

A. **Collateral Estoppel**

"Federal courts must accord a state court judgment the same preclusive effect that the judgment would receive in state court." *Misischia v. Pirie*, 60 F.3d 626, 629 (9th Cir.

---

[13] This outcome is not inconsistent with the grant of summary judgment to Defendants on Parker's retaliation claim. The AGO had a legitimate, non-pretextual reason for forwarding its suspicions concerning Parker's application fraud, which arose after an unrelated party conducted an investigation, to AZ POST. Indeed, the AGO was required by Arizona law to make that report, even if its suspicions turned out to be unfounded. Here, the issue is different—it's whether Defendants have established that Parker actually engaged in "misconduct" when filling out his job application.

[14] In Parker's motion, he argued the AGO Local Board's decision entitled him to summary judgment on three additional issues. However, in his reply, he abandoned those three. (Doc. 136 at 7-8.)

1995) (citation omitted).  Ordinarily, "[t]his rule extends to fact-finding by administrative agencies acting in quasi-judicial capacities." *Id.* (citation omitted).  In Arizona, collateral estoppel, or issue preclusion, applies when "an issue was actually litigated in a previous proceeding, there was a full and fair opportunity to litigate the issue, resolution of the issue was essential to the decision, a valid and final decision on the merits was entered, and there is common identity of parties." *Hullett v. Cousin*, 63 P.3d 1029, 1034-35 (Ariz. 2003).

### B.    Public Safety Personnel Retirement System And AGO Local Board

It is helpful to begin by summarizing how the AGO Local Board operates.  A.R.S. § 38-841, *et seq.*, established the Public Safety Personnel Retirement System ("PSPRS") for the benefit of employees of the State of Arizona who are regularly assigned to hazardous duty. *Fund Manager, Public Safety Personnel Retirement System v. Department of Public Safety Local Retirement Bd.*, 757 P.2d 128, 129 (Ariz. Ct. App. 1988).  As a peace officer, Parker was a member of the PSPRS.

Each state agency employing public safety personnel has a local board that makes initial determinations of eligibility for retirement.  *Id.*  Thus, because Parker worked for the AGO, the initial determination as to whether he was eligible for retirement was made by the AGO Local Board.

Parker applied to the AGO Local Board for disability retirement related to his PTSD.  After a claimant applies for disability retirement, the respective local board schedules a medical examination for the claimant with the Medical Board.  Ariz. Admin. Code R13-8-105(B).  If the claimant is applying for an accident disability pension—as Parker did here—the Medical Board is required to address to address the following questions: "1. Whether the claimant has a physical or mental condition which totally and temporarily prevents the claimant from performing a reasonable range of duties within the member's department, 2. Whether the disabling condition was incurred in the performance of the member's job duties, and 3. Whether the claimant's disability is the result of a physical or mental condition or injury that existed or occurred prior to the claimant's date of membership in the system."  *Id.* at (E).  After the local board receives the Medical

Board's evaluation, the applicant's disability retirement application is placed on the local board's agenda for consideration. *Id.* at (G). Here, the AGO Local Board voted to pass a motion granting Parker an accidental disability pension. (Doc. 137-1 at Ex. 106 at 20-21.)

After a local board makes an initial determination, the Board of Trustees of the PSPRS "reviews the action[] of the [] local board[]." *Fund Manager*, 757 P.2d at 129. "When [the Board of Trustees] agrees with a [local] board's award, it disburses pension benefits accordingly; when it disagrees, the [Board of Trustees] may request reconsideration by the [local] board and, if dissatisfied, appeal to the superior court." *Id.* In Parker's case, the Board of Trustees didn't request reconsideration of the AGO Local Board's decision to award benefits.

### C. **Analysis**

The AGO Local Board's decision to award Parker pension benefits doesn't trigger any collateral estoppel effects in this litigation. Again, for an issue to be given collateral estoppel effect under Arizona law, the issue must have been "actually litigated" with "a full and fair opportunity to litigate the issue." *Hullett*, 63 P.3d at 1034-35. Here, no issues were actually litigated in front of the AGO Local Board. The AGO Local Board made its determination that Parker was disabled by reviewing his application and an independent medical evaluation and then passing a motion. Parker was the only party. There was no "litigation" at all.

Arizona's collateral estoppel rules also require "common identity of the parties," which isn't present here. Although the AGO Local Board's decision can be appealed (via a request for reconsideration), such a request can only be made by the claimant or the PSPRS Board of Trustees. A.R.S. § 38-847(H) ("A claimant or the board of trustees may apply for a rehearing before the local board."). The PSPRS Board of Trustees isn't a litigant in this case.

### IV. Parker's Motion For Attorney's Fees

On April 10, 2018, during the deposition of Lauren Buhrow, a former AGO employee, Buhrow refused to answer certain questions because Defendants' counsel

instructed her not to respond. On April 30, 2018, the parties filed a joint memorandum of discovery dispute with the Court regarding this issue. (Doc. 78.) The Court held a telephonic discovery hearing on May 3, 2018, and then ruled as follows: "With regard to the deposition of Lauren Buhrow, the Court finds the instruction to the witness not to answer was without a factual or legal basis and the deposition must be re-taken. Counsel for plaintiff will be granted attorney's fees that were incurred for taking the first Buhrow deposition and shall submit to the Court an application for attorney's fees for time involved in Ms. Buhrow's deposition." (Doc. 85.)

Parker has now filed a motion seeking $8,843.40 in attorney's fees pursuant to the Court's minute entry. (Doc. 121.) Defendants oppose Parker's request. (Doc. 126.) First, Defendants argue Parker's fee application doesn't meet the requirements of Local Rule of Civil Procedure 54.2. Second, Defendants take issue with the amount of fees requested because (1) the time billed wasn't necessary to achieve the results obtained, (2) the disputed line of questioning lasted no more than one hour, (3) Parker's attorney has included time not incurred in taking Buhrow's initial deposition, and (4) work completed by the paralegal was unnecessary. Defendants argue the Court should award Parker $350.00, or, at most, $1,400.00. (*Id.*) In his reply, Parker concedes his request for fees for the second deposition is beyond the scope of the Court's minute entry. (Doc. 158 at 2-3.) Thus, he reduces his request to $5,185.90. (*Id.* at 5.)

As an initial matter, LRCiv 54.2 does not govern Parker's fee request. The rule expressly states: "This Local Rule does not apply to claims for attorney's fees and related non-taxable expenses . . . for violations of the Federal Rules of Civil Procedure . . . ." Because Parker is seeking fees pursuant to Fed. R. Civ. P. 37(a)(5) and the Court's May 3, 2018 minute entry, it wouldn't make sense to require Parker to "specify the judgment and cite the applicable statutory or contractual authority upon which [he] seeks an award of attorney's fees and related non-taxable expenses," as Local Rule 54.2 requires.

On the merits, the Court agrees with the parties that the May 3, 2018 minute entry doesn't allow Parker to recover fees for the second deposition. The Court also concludes

that Parker's request for fees arising from the first deposition is excessive. Parker seeks fees for, among other things, participation in the telephonic discovery dispute regarding this issue and preparing his fee application. (Doc. 158-1.) But the May 3, 2018 minute entry only allowed Parker to apply for attorney's fees "incurred for taking the first Buhrow deposition." (Doc. 85.)

There are two entries reflecting time incurred for taking the first Buhrow deposition: (1) 4/10/2018: Lauren Buhrow Deposition at Griffin and Associates (Phoenix, AZ) - 1:00 p.m. to 5:00 p.m.: $1,400; and (2) 4/10/2018: Paralegal Tasks: Attend Deposition of Lauren Buhrow - 1:00 p.m. to 5:00 p.m.: $700. (Doc. 121-1.) Defendants argue "the disputed line of questioning lasted no more than one hour," so Parker shouldn't be permitted to recover for the entire deposition. This argument lacks merit. The May 3, 2018 order stated that Parker was entitled to recover all of his fees arising from the first deposition, not the subset of fees tied to the particular line of questioning. Parker is therefore entitled to recover $2,100 in attorney's fees.

Accordingly, **IT IS ORDERED** that:

(1)     Defendants' motion for summary judgment (Doc. 117) is **granted in part and denied part**;

(2)      Parker's motion for partial summary judgment (Doc. 119) is **denied**;

(3)     Parker's motion for attorney's fees (Doc. 121) is **granted in part and denied in part**; and

(4)     Parker is awarded $2,100 in attorney's fees**.**

Dated this 13th day of May, 2019.

_____

Dominic W. Lanza
United States District Judge
